*11*

0323/28629 RJR/sc 8/23/0
Rule 11

United States District Court
Southern District of Texas
FILED

OCT 0 2 2000

Michael N. Milby
Clerk of Court

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ROBERTO L. LOZANO | § | |
| | § | |
| V. | § | |
| | § | |
| WAYNE BENEKE, INDIVIDUALLY AND | § | CIVIL ACTION NO. |
| AS A PARTNER OF LONG, CHILTON, | § | B-00-068 |
| PAYTE AND HARDIN, L.L.P.; AND | § | |
| LONG, CHILTON, PAYTE AND | § | |
| HARDIN, L.L.P. | § | |

## DEFENDANTS' MOTION FOR RULE 11 SANCTIONS and MEMORANDUM OF

## AUTHORITIES IN SUPPORT THEREOF

**Now Come**, WAYNE BENEKE, INDIVIDUALLY and AS A PARTNER OF LONG,

CHILTON, PAYTE and HARDIN, L.L.P., and LONG, CHILTON, PAYTE

and HARDIN, L.L.P., Defendants in the above styled and numbered cause and file this their

Motion for Rule 11 Sanctions and Memorandum Of Authorities In Support Thereof. Defendants

respectfully request the court to impose sanctions against Plaintiff, Roberto Lozano, for filing a

frivolous pleading in violation of FEDERAL RULE OF CIVIL PROCEDURE 11(b).

### A. Introduction

1.      The present cause of action arises out of a relationship between Defendant, LONG,

CHILTON, PAYTE & HARDIN, L.L.P., an accounting firm, and its client, Treasure Hills

Investments, N.V., an Antilles corporation, engaged in the business of developing residential real

estate, hereinafter referred to as "Treasure Hills."

2.      In the mid to late 1980s Treasure Hills went through the first of three bankruptcy

proceedings. Following the second bankruptcy, which occurred in the early 1990s, an individual

holding a first lien priority note on property owned by Treasure Hills, sold his note and transferred his lien to Plaintiff, Roberto Lozano. In addition to purchasing the note and obtaining this security interest on the property, Mr. Lozano also maintained an equity position in the company.

3.      In 1995, Treasure Hills became the subject of an IRS examination. This examination raised significant issues regarding the capitalization of the corporation. In connection with the development of its residential real estate projects and golf courses, millions of dollars had been invested in Treasure Hills. These investments were characterized by the corporation as shareholder loans which accrued annual "if not paid" interest. Corporate records only evidenced approximately $3,000 of shareholder equity. The IRS denied the deductions for the interest on these shareholder loans, and criticized the corporation's extremely thin capitalization.

4.      After receiving the IRS report, Defendant, Wayne Beneke, on behalf of Defendant Long, Chilton, Payte & Hardin, L.L.P. met with Treasure Hill's two principal equity holders, Plaintiff Roberto Lozano and Hector D. Zarmacona. Mr. Beneke recommended some of these shareholder loans be reclassified as common stock or shareholder equity. Because of the huge net operating losses being incurred by the company, Mr. Beneke believed the net tax effect of doing so would be zero. Subsequently, Defendants received instructions from Carlos Cuellar, Treasure Hills' General Manager, directing them to reclassify the shareholder loans as common stock or equity. Defendants did as instructed. As such, Defendants reclassified a loan in the amount of $2,500,00, held by Defendant Lozano, as equity.

5.      In October 1996, Treasure Hills again sought Chapter 11 bankruptcy protection, filing Case Number 96-24360-B-11, in the Southern District of Texas, Brownsville Division. Various adversarial actions were filed. One such dispute was designated as Adversary Number 99-2085-

B.  This proceeding pertained to the very issue made the basis of Plaintiff's suit, and concerned

the issue of whether Defendant Lozano would be classified as a secured creditor, or simply as

stockholder with a $2,500,000 equity stake in the company.  Both Plaintiff Lozano, and

Defendant, Long Chilton, Payte and Hardin, L.L.P., were creditors and parties to the bankruptcy

proceedings.  During the course of these proceedings, Defendant, Wayne Beneke was compelled

to testify before the court.

6.      In an effort to resolve the adversarial proceedings filed against it, and pursuant to 11

U.S.C § 1128, Treasure Hills submitted a Liquidation Plan to the court.  The Plan set forth the

manner and means by which Treasure Hills would sell its assets and pay its creditors.   On or

about October 29, 1999, Treasure Hills submitted its liquidating plan, which included an

"Agreement Incident to Distributing Sales Proceeds" (hereinafter "Agreement"), to the court.

The Agreement had been signed and approved by all parties and creditors on October 20, 1999.

A copy of the plan is attached hereto as Exhibit 1, and is incorporated by reference as if fully set

forth herein.  That plan, and in particular, the Agreement, as is apparent on its face, was approved

and signed off on by Plaintiff herein, Lozano, by and through his attorney of record, Demitrio

Duarte, Jr.  The Agreement was also approved and signed off on by Defendant Long, Chilton,

Payte and Hardin, L.L.P., acting through its attorney.  The Agreement, in the body thereof, and

particularly paragraph 2,  clearly stated:

> The parties further agree that their agreement is a "universal settlement" which shall end
> all disputes between the parties and all litigation between the parties with prejudice.

7.      Additionally, there were also handwritten miscellaneous provisions added to the

agreement **before** it was approved by the parties.  In particular, the court's attention is called to

paragraph 7, subpart E which provided:

This plan includes the execution of mutual releases by and against all parties & creditors from further litigation by all parties to this Agreement.

8.    On December 1, 1999, the Bankruptcy Court conducted a hearing to consider confirmation of Treasure Hills' Liquidating Plan of Reorganization.  Upon conclusion of this hearing, the Court issued an Order declaring Treasure Hills' Liquidation Plan confirmed.   A copy of the Order Confirming Debtor's Liquidating Plan of Reorganization is attached hereto as Exhibit 2, and is incorporated by reference as if fully set forth herein.

9.    On or about May 17, 2000, Plaintiff filed its Original Complaint suing Defendants for alleged negligence, alleged gross negligence, alleged accounting malpractice, alleged breach of contract, alleged breach of warranty, alleged breach of fiduciary duties and alleged violations of the TEXAS DECEPTIVE TRADE PRACTICES ACT.   Said  Original Complaint constitutes a frivolous pleading.

10.    On July 26, in accordance with their obligations under Rule 26(f) of the Federal Rules of Civil Procedure, counsel for Defendants and Plaintiff met to plan for discovery and discuss a proposed discovery control plan.  At that meeting, Plaintiff's attorney was informed that Defendants considered Plaintiff's Original Complaint to be frivolous.  Specifically, Defendants' counsel informed Plaintiff's counsel that the very same issues and claims raised in Plaintiff's Original Complaint were finally and formally disposed of by the United States Bankruptcy Court for the Southern District of Texas Brownsville Division.  As indicated by Exhibit 3 attached hereto and incorporated by reference as if fully set forth herein, immediately after this meeting, Plaintiff's counsel was presented with a draft version of a Motion for Summary Judgment.  This motion informed Plaintiff's counsel that Plaintiff's claims and causes of action were barred as a matter of law by the doctrines of release and settlement, res judicata and / or collateral estoppel.

Plaintiff was asked to voluntarily dismiss this cause of action.  To date, Plaintiff has not done so.

11.     As per **FED. R. CIV. P.** 11(C)(1)(A), Defendants served this motion on Plaintiff on August

23, 2000, 21 days before filing this motion with the court.

## B.  Arguments and Authorities

12.     The court may impose sanctions on an attorney if he presents a pleading such as to harass

or cause unnecessary delay or expense.  FED.R. CIV.P. 11(b)(1) (West 2000).  Additionally, the

court may impose sanctions on an attorney if he presents a pleading that includes any of the

following: (1) claims unsupported by existing law or by a good faith argument for a change in

existing law; (2) allegations that do not have, or are unlikely to have after a reasonable

investigation, evidentiary support.  *Id.* at 11(b)(2)-(4). (West 2000).

13.     Plaintiff's Original Complaint violated Rule 11.  Plaintiff filed a pleading which contains

claims that are not warranted: Specifically, Defendant shows the court as follows:

**Plaintiff Executed Release Barring Claims With Defendants**

14.     As previously mentioned, the United States Bankruptcy Court issued an Order

Confirming Treasure Hills' Liquidating Plan.  Paragraph one of page six of the Order states as

follows:

> The Debtor's Plan is CONFIRMED, and **this Order shall constitute a final judgment,
> order and decree**.  The Debtor's modifications, including the Modifications are
> APPROVED.  A copy of the Plan inclusive of all approved Modifications is attached
> hereto as Exhibit "A." (Emphasis added).

Exhibit A attached to the Court's Order was a document entitled "Agreement Incident to

Distribution of Sales Proceeds."  This agreement was executed October 20, 1999.

15.     By way of this "Agreement Incident to Distribution of Sales Proceeds," Plaintiff and

Defendant explicitly settled and released each other from any further liability.  In particular,

Defendants refer the court to Paragraph 2 of the "Agreement Incident to Distribution of Sales Proceeds" which states as follows:

> The Parties further agree that their agreement is a 'universal settlement' which shall end **all** disputes between the parties and all litigation between the parties **with prejudice.** (Emphasis added).

The explicit intent of the parties is further evidenced in Paragraph 7, subsection E, which states as follows:

> This plan includes the execution of mutual releases by and against all parties & creditors from further litigation by all parties to this Agreement.

Importantly, as indicated on page four (4) of this agreement, attorneys for both Plaintiff and Defendant signed this document on behalf of their respective clients.

16.     Questions concerning interpretation of the parties' release are questions of law for the court. *In re: Stratford of Texas, Inc.*, 635 F.2d 365, 368 (5th Cir.1981).   Under Texas law, unambiguous releases must be enforced as written, with the intent of the parties being derived from the agreement itself. *Southwestern Bell Telephone Co. v. Public Utility Comm. Of Texas*, 208 F.3d 475, 486 (5th Cir. 2000).   When interpreting the meaning of a contract, the objective, and not the subjective intent of the parties controls. *Swaminathan v. Swiss Air Trans. Co., Ltd.*, 962 F.2d 387, 389 (5th Cir. 1992).   When a contract is unambiguous, the instrument alone is taken to express the intent of the parties. *Fuller v. Phillips Petroleum Co.*, 872 F.2d 655 (5th Cir.1989); *Shelton v. Exxon Corp.*, 921 F.2d 595 (5th Cir.1991).

17.     The release made part of the "Agreement Incident to Distribution of Sale Proceeds" is clear and unambiguous.  Its plain language unequivocally states Plaintiff and Defendants intended to settle any and all claims and disputes between them.  The Court is able to ascertain the objective intent of the parties as a matter of law, without the need for extrinsic aids.  As such,

Defendants have been released from any further liability.  As such, Plaintiff's present cause of action is frivolous.

## Prior Court's Order is Res Judicata

18.     If further argument be needed, it is well established that a settlement agreement approved and embodied in an order by a bankruptcy court is "entitled to full res judicata effect." *See In re West Texas Marketing Corp.*, 12 F.3d 497, 501 (5th Cir.1994); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1051 (5th Cir. 1987) (noting that federal res judicata principles bar re-litigation of claims previously settled in Bankruptcy Court).

19.     Res judicata is appropriate if:

      (1)     the parties to both actions are identical (or at least in privity);

      (2)     the judgment in the first action is rendered by a court of competent jurisdiction;

      (3)     the first action concluded with a final judgment; and

      (4)     the same claims or causes of action are involved in both suits.

*See United States v. Shanbaum*, 10 F.3d 305, 310 (5th Cir.1994).   Analyzing these elements in light of the factual background of this suit supports Defendants' contention that Plaintiff's claims and causes of action are barred by res judicata.

### Identical Parties

20.     As indicated by their signatures on the "Agreement Incident To Distribution of Sales Proceeds, " the interests of both Plaintiff and Defendants were before the Bankruptcy Court. Their  mere participation in the proceedings made them parties even if they were never formally named as such. *See Shoaf*, 815 F.2d at 1051  (holding that bankruptcy court's order had res judicata effects on those who were not formally named as parties to the bankruptcy but whose interests are before the court).   Support for the proposition that Plaintiff and Defendants were

parties to this bankruptcy is further evidenced by the signatures of their attorneys affixed to the "Agreement Incident to Distribution of Sales Proceeds," attached as Exhibit 2.  As indicated these persons signed as agents for Plaintiff and Defendants.

21.     Moreover, Defendant Wayne Beneke, although not individually named in release, is also entitled to maintain a defense on the grounds of res judicata. *See id.*   The Fifth Circuit has held that the defense of res judicata is available to an individual who is in privity with a party who actually participated in the bankruptcy proceedings. *See Southmark Properties v. Charles House, Corp.* 742 F.2d 862, 869-70 (5th Cir. 1984).  If such privity exists, the federal res judicata requirement of identical parties is sufficiently satisfied. *Id*; *see also Geary v. Texas Commerce Bank*, 967 S.W.2d 836, 838-39 (Tex. 1998)(discussing federal res judicata requirement of identical parties).

22.     In the present case,  Defendant Wayne Beneke was a partner in the firm, Long, Chilton, Payte & Hardin, L.L.P.  *See* Deposition Testimony of Wayne Beneke, page 13, lines 19-20 attached hereto as Exhibit 4.  Clearly, as a partner, he is in privity with Defendant Long, Chilton, Payte & Hardin, L.L.P.  As such, the res judicata effects of the bankruptcy court's final order are available to him as well.

### Jurisdiction Was Proper

23.     As indicated on the face the bankruptcy court's "Order Confirming Debtor's Liquidating Plan, attached as Exhibit 2, jurisdiction over the bankruptcy proceeding was proper.

### Bankruptcy Concluded With Final Judgment

24.     As previously discussed, the bankruptcy court explicitly stated its order was to constitute "a final judgment."   This recitation is consistent with Fifth Circuit precedent which holds that a bankruptcy court's order bringing to an end litigation between parties is a "final" order for the

purposes of res judicata.  *See In re Cajun Electric Power Coop., Inc.*, 119 F.3d 349, 354 (5th Cir.1997).

### Plaintiff has Presented Same Claims and Same Issues Disposed of in Bankruptcy Court

25.     As part of the bankruptcy proceeding, the oral deposition of Wayne Beneke, was taken on August 17, 1999.  This deposition is attached hereto as Exhibit 4, and is incorporated by reference as if fully set forth herein.  Plaintiff, by and through his attorney of record, was present at said deposition.[1]  A reading of pages 41 through 125 of the transcript clearly indicates that the claims and issues first raised in the bankruptcy proceeding are the very same claims and issues raised in Plaintiff's Original Complaint.  Specifically, paragraph 18 of Plaintiff's Original Complaint, alleges Defendants are guilty of negligence, gross negligence  and accounting malpractice for:

(1)     acting without authority from Plaintiff;

(2)     reclassifying loans which did not need to be reclassified;

(3)     providing Plaintiff with faulty and defective accounting advice;

(4)     improperly and without reason or authority reclassifying real estate lien notes which were never the subject of the Defendants accounting duties or responsibilities.

(5)     making misleading representations, assurances, warranties and guarantees to Plaintiff that he (Beneke) could and would reverse his previous wrongful and unauthorized reclassification of Plaintiff's three real estate notes as capital contributions back to the original and proper status as secured real estate notes which was the secured property of Plaintiff, and that Plaintiff would suffer no harm or adverse consequences from Defendants' negligent actions;

---

[1]  Plaintiff was represented by counsel other than his present counsel in the bankruptcy proceeding.  Counsel for Plaintiff herein represented another party in the bankruptcy and was present at such proceeding on behalf of that client.

(6)     Breaching client confidences, and assisting a creditor's counsel to take way property properly belonging to Plaintiff, thus violating their fiduciary duties; and

(7)     improperly defending and not adequately defending Plaintiff's interest before the Internal Revenue Service and the U.S. Bankruptcy Court all to Plaintiff's great damage.

26.     Plaintiff's Complaint alleges Defendants reclassified debt owned by Plaintiff without his authority. A review of pages 85 -126 of Wayne Beneke's deposition indicates that these matters were addressed in the bankruptcy proceeding. Specifically, on page 105, Mr. Beneke testifies that he and his firm were merely following instructions when the reclassification occurred. Additionally, on pages 113-16, and 124-25, Plaintiff, by and through his attorney, Demitrio Duarte, Jr., explicitly questioned Mr. Beneke about whether or not he the authority to act on behalf of Plaintiff. Clearly, this issue was raised in the bankruptcy court. The bankruptcy court issued its final judgment in this matter releasing all parties from further liability. Plaintiff's claim is barred by res judicata.

27.     Moreover, Plaintiff alleges that Defendant improperly reclassified the debt made the basis of this suit. This issue was also raised and addressed by the bankruptcy court. Pages 61-65 of Wayne Beneke's deposition contains testimony pertaining to the propriety of reclassifying the debt owned by Plaintiff, including the tax effects of doing so. Again, as evidenced by pages 116-118 of Defendants' Exhibit 4, Plaintiff, by and through his attorney, personally addressed these issues. Finally, on page 126, Mr. Beneke is asked whether, according to accounting standards, it is acceptable to reclassify the debt. As such, this issue was raised and addressed by the bankruptcy court. The bankruptcy court issued its final judgment in this matter releasing all parties from further liability. Plaintiff's claim is barred by res judicata.

28.     In regard to Plaintiff's allegations that Defendants breached their fiduciary duties and

rendered faulty accounting advice, page 120 through 130 of Wayne Beneke's deposition indicates that these matters were raised during the bankruptcy proceedings. The bankruptcy court issued its final judgment in this matter releasing all parties from further liability. Plaintiff's claim is barred by res judicata.

29.     Finally, the issue of whether or not Defendants improperly defended Plaintiff before the Internal Revenue Service and the U.S. Bankruptcy Court, was also addressed in the bankruptcy court. Pages 65, 68-76, 116, and 126 of Mr. Beneke's deposition all evidence that Defendants' contacts with the Internal Revenue Service were at issue in the bankruptcy court. The bankruptcy court has issued a final order releasing all parties from any further liability. Plaintiff's claim is barred by res judicata.

30.     In conclusion, all four elements necessary to establish the affirmative defense of res judicata have been met. The parties to this suit and bankruptcy are identical. The court had proper jurisdiction over the bankruptcy matter. The court entered a final judgment which contained a release absolving the parties of any further liability, and the issues and claims raised in this suit are the same issues and claims raised in the bankruptcy proceedings.

**Collateral Estoppel**

31.     In the alternative, Defendants maintain that Plaintiff's claims are barred by the doctrine of collateral estoppel or issue preclusion.  The United States Supreme Court has explicitly stated that collateral estoppel, or issue preclusion, principles apply to matters decided in bankruptcy proceedings. *See Grogan v. Garner*, 498 U.S. 279, 285 (1991).  Issue preclusion, or collateral estoppel, applies when the following elements are met:

    (1)     the issues at stake must be identical to the one involved in the prior action;

    (2)     the issues must have been actually litigated in the prior action;  and

(3)    the determination of the issues in the prior action must have been a part of the judgment in that earlier action.

*RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1290 (5th Cir.1995).   Under federal law, it is not

necessary for the party asserting the estoppel to have been a party to the prior adjudication if, as

in this case, the estoppel is used defensively. *See   Blonder-Tongue Labs v. University of Illinois*

*Foundation*, 402 U.S. 313, 349-50 (1971).

### Identical Issues

32.    As discussed above, the issues and claims asserted in Plaintiff's Original complaint are

identical.  For the sake of judicial economy, Defendants hereby incorporate by reference

paragraphs 25-30 of its Motion for Rule 11 Sanctions.

### Actually Litigated

33.    Three factors are especially important in analyzing the question of whether a claim was

actually litigated in a prior proceeding:

(1)    whether the parties were fully heard;

(2)    whether the court supported its decision with a reasoned opinion; and

(3)    whether the decision was subject to appeal or was in fact reviewed on appeal.

*State Farm Fire and Cas. Co. v. Fullerton*, 118 F.3d 374, 382 (5th Cr. 1997).  As evidenced by

Defendants' Motion of Rule 11 Sanctions Exhibits 1, 2 & 4, all three of these criteria are

satisfied.  Exhibit 4 clearly indicates that this matter was contested and that all parties had an

opportunity to be heard.  Likewise, Exhibit 2 indicates that the bankruptcy court's decision was

supported with a reasoned opinion.  And finally, the Order of the court is final and as such,

subject to appeal. *See Shoaf*, 815 F.2d at 1050.  Consequently, in the alternative Plaintiff's suit is

barred by collateral estoppel and Defendants are entitled to judgment as a matter of law.

34.     The Court should impose sanctions against Plaintiff because he did not make a reasonable inquiry into the facts or law before filing his Original Complaint.   As sanction, the court should strike Plaintiff's Original Complaint and award Defendants $3,500.00 as attorney fees and costs associated with preparing this motion.

**WHEREFORE, PREMISES CONSIDERED,** Defendants pray that upon a final hearing hereof the Court grant its Motion for Rule 11 Sanctions, and strike Plaintiff's Original Complaint and award Defendants $3,500 as attorney fees and costs and such other and further relief, both at law and in equity, to which these Defendants may show themselves to be justly entitled.

Respectfully submitted,

THORNTON, SUMMERS, BIECHLIN,
     DUNHAM & BROWN, L.C.
Airport Center - Suite 300
10100 Reunion Place
San Antonio, Texas 78216-4186
Telephone: (210) 342-5555
Facsimile: (210) 525-0666

BY _____
     Richard J. Reynolds, III
     State Bar No. 16803800
     Attorneys for Defendants
     **WAYNE BENEKE AND LONG,
     CHILTON, PAYTE & HARDIN, L.L.P.**

## <u>CERTIFICATE OF SERVICE</u>

A true and correct copy of the above and foregoing instrument has been properly delivered pursuant to the Federal Rules of Civil Procedure, on the _23rd_ day of _August_, 2000, to the following counsel of record:

>Mr. Heriberto "Eddie" Medrano
>HERIBERTO "EDDIE" MEDRANO LAW OFFICES
>1101 West Tyler
>Harlingen, Texas 78550

Richard J. Reynolds, III

STATE OF TEXAS      §
                       §

COUNTY OF BEXAR     §

       Before me the under signed notary public, on this day, personally appeared RICHARD J. REYNOLDS, III, a person whose identify is known to me, After I administered an oath to him, upon his oath, he said:

"My name is RICHARD J. REYNOLDS, III, I am capable of making this affidavit, the facts stated in the affidavit are within my personal knowledge and are true and correct.

       1.      All copies of the documents attached to Defendants' Motion for Rule 11 Sanctions as Exhibits are true and exact copies of the originals.

                                    RICHARD J. REYNOLDS, III

       SWORN TO and SUBSCRIBED before me by Richard J. Reynolds, III on _August 23_, 2000.

                                    Notary Public in and for the State of Texas

**LESLEY OATMAN**
Notary Public, State of Texas
My Commission Expires 06-06-2004

# DEFENDANTS' MOTION FOR SANCTIONS
# EXHIBIT 1

ClikPDF – www.fastio.com

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 96-24360-B11 |
| | § | |
| TREASURE HILLS INVESTMENTS, N.V., | § | |
| Debtor | § | Chapter 11 |
| | § | |

## DEBTOR'S LIQUIDATING PLAN

TO THE HONORABLE JUDGE OF SAID COURT:

    TREASURE HILLS INVESTMENTS, N.V., Debtor-In-Possession in this cause, and pursuant to 11 U.S.C. 1127 files this Debtor's Liquidating Plan and would show unto the court the following:

I.

## DEFINITIONS

For the purpose of this Liquidating Plan of Reorganization, the following definitions shall apply:

    1.1    <u>Administrative Expense</u>: All costs and expenses of the Chapter 11 Case allowed under 11 U.S.C. Section 503(b)(2), (4), and (6), including all costs of making distributions and providing notices and ballots regarding the Plan.

    1.2    <u>Agent, or Liquidating Agent, or Disbursing Agent</u>: This term shall refer to an authorized person, or other entity to be selected by the Debtor and approved by the Court, to act as custodian and disbursing agent of the Sales Proceeds and of the funds to be paid to Creditors pursuant to the Plan.

    1.3    <u>Allowed Claim</u>: Any claim:

        (a.)    Which is scheduled by the Debtor pursuant to Section 521 (l) other than a Claim scheduled as disputed, contingent, or unliquidated;

        (b.)    For which a proof of Claim was filed with the Bankruptcy Court on or before the Bar Date:

TRUE COPY I CERTIFY
ATTEST: 7-13-2000
MICHAEL N. MILBY, Clerk of Court
By _____
Deputy Clerk

(c.)    In the case of Administrative Expenses subject to Bankruptcy Court approval, requests for payment which are approved by the Court after having been timely filed; or

(d.)    As to which no objection to the allowance thereof has been or may be interposed within the applicable period of limitation fixed by the Court, the Code or the Federal Rules of Bankruptcy Procedure (the "Rules), or as to which an objection has been determined by an order or judgment that is no longer subject to appeal.

1.4    Allowed Secured Claim: An Allowed claim which is secured by a perfected, non-preferential lien on property of the Debtor's estate, to the extent of the value of the interest of the holders of such allowed claim in such property of the Debtor, as determined by the Bankruptcy Court pursuant to 11 U.S.C. Section 506 (a).

1.5.    Bankruptcy Code:    The Bankruptcy Code of 1978 as contained in Title 11, U.S.C., §101 et seq. and the amendments thereto.  All references to any statute in this plan are references to the Bankruptcy Code as defined therein.

1.6    Bar Date: March 17, 1997 (or as may have been extended  specifically by Order of the Court with respect to any specific Creditor or party in interest), which is the date set by the Court after which any claims which are filed will be void and disallowed for purposes of voting and distribution. With respect to any claims which arose after (date here) the bar date for filing such claims shall be 30 days after entry of the Order of Confirmation and not thereafter.

1.7    Cash Collateral:   All revenues, costs, profits, and other monetary proceeds from any of the Debtor's assets the subject of a valid Secured Claim, and all cash collateral as defined under Section 363 of the Code, all of which are subject to the respective Secured Creditor's perfected first lien and security interest.

1.8    Claim: Any right to payment from the Debtor as of the Confirmation Date: (a) which is evidenced by a proof of claim properly filed in this Chapter 11 Case prior to the Bar Date and/or scheduled by the Debtor as a debt, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or

unsecured; or (b) which is a claim for payment or of liability, whether direct or indirect, against Debtor, whether based upon theories of "alter ego" or piercing the corporate veil", .whether any such claim is based upon joint or several liability therefore, or whether such claim is based upon any guaranty, whether or not such claim has been listed in Debtors' Statements or Schedules,; and whether or not evidenced by a proof of claim properly filed in this Case prior to the Bar date.

1.9     Collateral Security: All of Debtor's property and assets, including all property brought into the estate under Section 541 of the Code, which includes the Debtor's assets, together with all contracts, rentals, leases, intangibles and all money and other proceeds of each of the foregoing (including all Cash Collateral) and all other real and personal property wherever located, and which was the subject of a valid, perfected lien or other security interest on the Petition Date.

1.10    Confirmation Date:    The date of entry upon the docket for this case by the Bankruptcy Court of an Order of Confirmation of this liquidating plan in accordance with 11 U.S.C. §1129.

1.11    Confirmation Order: The Order of the court confirming this Liquidating Plan, together with any supplemental or amended Order with respect thereto.

1.12    Court:    The United States Bankruptcy Court for the Southern District of Texas, Brownsville Division, acting in this case.

1.13    Contested/Disputed Claim: Any claim as to which the Debtor or any other party in interest has interposed or may interpose an objection in accordance with the Code and the rules, which objection has not been determined by an order or judgment that is no longer subject to appeal.

1.14    Creditor:  Any entity that has a claim against the Debtor that arose at the time of or before the filing of the petition in this case as defined in §101(4) of the Bankruptcy Code.

1.15.   Debtor:  TREASURE HILLS INVESTMENTS, N.V.
        Case No. 96-24360-B-11

1.16    Disclosure Statement: The Disclosure Statement approved by order of the court with respect to this plan, together with any amendments, supplements or Exhibits thereto, including the Supplement to the Disclosure Statement which is being filed contemporaneously hereto.

1.17   <u>Effective Date</u>:   Effective date shall mean the Confirmation date.

1.18   <u>Equity Holder</u>:   Any interest of any person or entity who or which has or claims to have an ownership interest of any kind, including any interest represented by a partnership interest, stock, or any other type of ownership interest of any kind or nature whatsoever in any of the Debtors.

1.19   <u>Final Order</u>:        An Order that becomes final ten (10) days after it is entered if no notice of appeal is filed during that period pursuant to Bankruptcy Rule 8002.

1.20   <u>Interest Holder</u>:        Any equity security holder and each owner and holder of common stock of the Debtor, including existing shareholders.

1.21   <u>Petition Date</u>:        October 21, 1996, the date when this Chapter 11 case was filed by the Debtor with the filing of a voluntary petition under Chapter 11 of the Code.

1.22   <u>Plan</u>:  This Liquidating Plan of even date herewith.  It represents a complete modification of the first plan confirmed on November 1997.

1.23   <u>Plan Documents</u>: This Liquidating Plan, the Disclosure Statement for this Plan, together with its Exhibits and any amendments or supplements thereto, as approved by the Bankruptcy Court.

1.24   <u>Plan Proponent</u>:   Treasure Hills Investments, N.V.

1.25   <u>Priority Claim</u>: Any claim having priority under 11 U.S.C. Section 507, except for the Administrative Claims.

1.26   <u>Professional or Professional Person</u>: Any person, firm or other entity employed by the Debtor or by the Committee pursuant to Order of the Court, under 11 U.S.C. Section 327.

1.27   <u>Sales Proceeds</u>: The sum of $2.6 Million (TWO MILLION SIX HUNDRED THOUSAND DOLLARS) to be paid by Tres Deseos, Inc. to the Debtor as the purchase price for the Debtor's assets previously ordered sold by the Court, such sum to be set aside in the registry of the Court and dedicated for payment of all allowed Claims in this case.

1.28   <u>Secured Claim</u>:        The Claim of any creditor of the Debtor to the extent

that such claim is secured by a lien, security interest, or other encumbrance which has been properly perfected as required by law with respect to property owned by the Debtor. A claim is secured only to the extent of the value of the Debtor's property which the Court finds is the valid security for such claim as evidenced by a perfected security interest enforceable against property of the estate of the Debtor.

1.29    Secured Creditor:    Those creditors who hold a lien, security interest, or other encumbrance which has been properly perfected as required by law with respect to property owned by the Debtor at or prior to confirmation of the plan.

1.30    Substantial Consummation: Substantial consummation of the plan, as that is used in the Bankruptcy Code, shall be effected only upon the full and final payment of all payments under the Note from Tres Deseos Inc. to the Debtor.

1.31    Unsecured Claim:    Any claim or portion of a claim against the Debtor not secured by a perfected security interest in property of the Debtor's estate.

A Term used in this Plan, not otherwise defined herein or in the Disclosure Statement but used in the Code, shall have the definition assigned to such term in the Code.

## II.

## Classification of Claims

2.1    Unless otherwise expressly stated in the Plan, distributions to holders of Allowed Claims and interests are in full satisfaction of those Allowed Claims and Interests,. All claims against the Debtor arising before Confirmation of the Plan shall be deemed satisfied by the obligations provided for in the Plan, pursuant to U.S.C. Section 1141 (d), and no holder of any Claim shall have any further or future rights with respect thereto. For the purposes of distribution under this Plan, Claims are divided into the following classes:

2.2    Classification of Classes under the Plan

Class 1 - Trustee Fees as per 11 U.S.C. Section 503.

Class 2 - Administrative Claims: All allowed administrative Claims, as that term is defined herein, including fees for services rendered and expenses incurred by Court-- appointed counsel for the Debtor, Committee Attorneys, or other Professionals employed by the Committee or the Debtor, and any expenses provided for under 28 U.S.C. Section 1930. There are six (6) claims in this class: the

CMPDF - www.fenlo.com

Law Office of John Ventura, P.C., attorneys for Debtor; the Law Office of Brendan Hall, special counsel for Debtor; the §503 claim of Treasure Hills Properties, Inc , a claim previously allowed by this Court; John Harris, attorney for the Class 12; Lawrence Walsh, (allowed as a partial administrative claim by agreement); and Jack Brown, a claim for post-petition services (survey).

Class 3 - All allowed administrative claims which are claims for post-petition wages. There are two claims in this class:  Carlos Cuellar and  Joe Shirley.  Both claims are disputed.

Class 4  - The Allowed Claim of each priority creditor, person or entity, whether or not the holder of a secured claim that is secured by a tax lien and/or security interest in the Sale Proceeds  which arises from a priority claim as allowed by 11 U.S.C. Section 507(a)(7) of the Code.   There  is one claim in this class: the Internal Revenue Service.

Class 5 - The Allowed Claim of each secured creditor, person or entity, which is the holder of a secured claim that is secured by a statutory tax lien and/or security interest in the Sales Proceeds and which arises under state law.  There are two claims in this class: the State of Texas Comptroller and the Texas Workforce Commission.

Class 6 -   The Allowed Claim of each secured creditor, person or entity, which is the holder of a secured claim that is secured by a lien and/or security interest in the Sales Proceeds
 There is one claim in this class: Roberto Lozano.

Class 7 - The Allowed Claim of each secured creditor, person or entity, which is the holder of a secured claim that is secured by a lien and/or security interest in the real property of the Debtor  as that property is known as four lots, including any claim with respect to or arising out of any and all mortgages, leases, and liens.  There is one claim in this class: International Bank of Commerce.

Class 8 -  The Allowed Claim of each secured creditor, person or entity, which is the holder of a secured claim that is secured by a lien and/or security interest in the personal  property of the Debtor as that property is known as a 1991 Mitsubishi Expo and as more fully described on the attached Exhibit A describing the Sale Assets, including any claim with respect to or arising out of any and all mortgages, leases, and liens.  There is one claim in this class: Chrysler Credit.

Class 9 - The Allowed Claim of each secured creditor, person or entity, which is the holder of a secured claim that is secured by a lien and/or security interest in the personal property of the Debtor as that property is known as sixty golf carts, including any claim with respect to or arising out of any and all mortgages, leases, and liens.  There is one claim in this class: First Valley Bank.

Class 10- The Allowed Claim of each secured creditor, person or entity, which is the holder of a secured claim that is secured by a lien and/or security interest in the personal property of the Debtor as that property is known as a fairway mower, including any claim with respect to or arising out of any and all mortgages, leases, and liens.  There is one claim in this class: John Deere Credit.

Class 11 - The Allowed Claim of each creditor, person or entity, which is a party to that certain litigation entitled Vicki Tolifson v. Treasure Hills, N.V. et. al, in the 138th District Court of Cameron County, Texas.

Class 12 - The allowed claim of each secured creditor, person, or entity which is the holder of a secured claim by an alleged lien and/or security interest in the real property of the Debtor, as that property is known as Lots 1 through 14, inclusive, Block 7; Lots 15 thru 44 inclusive, Block 8; Lots 15 through 30, inclusive, Block 9, Treasure Hills Country Club Subdivision, Cameron County, Texas. There is one claim in this class: Claudio Rangel.

Class 13 - The Allowed Claim against the Debtor whether pre-petition or post-petition, whether secured or unsecured, whether liquidated or unliquidated, by or on behalf of Lawrence Walsh, Trustee, or on behalf of any other party, including but not necessarily limited to American Express International or any other party which is a plaintiff in that certain litigation entitled Lawrence A. Walsh, Trustee vs. Treasure Hills Investments, N.V. et al pending in the United States District Court for the Southern District of Texas Brownsville Division, Civil Action No. B-96-83.

Class 14- The Allowed Claim of each creditor, person or entity, which is the holder of a deficiency claim that was previously secured by a lien and/or security interest in the real property of the Debtor as that property is known as the golf course, the pro shop, and the club house and as is more fully described on the attached Exhibit A describing the Sale Assets, including any claim with respect to or arising out of any and all mortgages, leases, and liens. There is one claim in this Class: Banamex

Class 15 - The allowed unsecured claim for services provided post-petition in connection with the prosecution of the subordination claim against Roberto Lozano: There is one claim in this class: that of Long, Chilton, Payte, and Hardin.

Class 16 - The allowed unsecured claim of each creditor, person, or entity in an amount higher than $100,000.00. There is one claim in this class: Fernando de la Garza. The claim is disputed.

Class 17 - As heretofore provided, all other claims against the Debtor, however arising, not otherwise included in any other class described herein, including the undersecured portion of any allowed secured claim that is allowed by this Plan, allowed unsecured claims, claims based upon the rejection or modification of executory contracts or unexpired leases insofar as the same are allowed under the terms and provisions of this Plan, and any other Claim of any other creditor not otherwise defined or provided specifically by the other Classes of Claims, and/or by the other provisions of this Plan. This class includes any claim of any purchaser of lots which were sold by the Debtor pre-petition but which were never transferred to the purchaser. These lots are described as follows:

1.      Lot 20, Block 4, Treasure Hills Country Club Subdivision, Cameron County, Texas, conveyed to Rolando Derbez, Oaxaca 3365, Colonia Jardin, Nuevo Laredo, Mexico

88260;

2. Lot 15, Block 1, Treasure Hills Country Club Blocks 1, 2, 6 and 7, Sec. I, Subdivision, Cameron County, Texas, conveyed to Guillermo Siller, whose address is unknown.

3. Lot 6, Block 2, Blocks 1, 2, 6 and 7, Sec. I, Treasure Hills Country Club Subdivision, Cameron County, Texas, conveyed to Gerardo Almaguer, whose address is unknown.

4. Lot 1, Block 2, Blocks 1, 2, 6 & 7, Sec. I, Treasure Hills Country Club Subdivision, Cameron County, Texas, conveyed to Jaime Woldenberg, Ave. whose address is Los Angeles, 1700 OTE Col. Garza Cantu, San Nicolas, N.L. Mexico 66480.

5. Lot 6, Block 7, Blocks 7, 8 & 9, (Partial) Treasure Hills Country Club Subdivision, Cameron County, Texas, conveyed to Roberto Lozano and Hector Zamacona, principals of the Debtor, whose address is the same as the Debtor's.

6. Lot 14, Block 4, Treasure Hills Country Club Subdivision, Cameron County, Texas, conveyed to Andres Cantizani, Florenciak, whose address is 117 Col San Patricio, San Pedro Garza Garcia, N.L. Mexico 66270.

Class 18 - Any claim of any equity holder as an owner of the Debtor. There are nine (9) claims in this class. The equity shareholders of the Debtor are:

FRANCISCO DE ANDA
JOSE MAIZ
FERNANDO DE LA GARZA
FELIX CANTU
FERNANDO MEDRANO
MARTIN JUAREZ
ROBERTO LOZANO
HECTOR ZAMACONA
CARLOS GARCIA
DRA. GUADALUPE TIJERINA
JOSE GUAJARDO
RGC GROUP
ALBERTO DIAZ RIVERA

### III. Treatment Of Non-Impaired Classes

Liquidating Plan of Reorganization
TREASURE HILLS INVESTMENTS, N.V.

The following is the treatment of the Non-Impaired Classes:

3.1     These claims consist of all claims in Class 1. These claims shall be paid in cash on Confirmation, or as soon thereafter as each becomes an Allowed claim and upon application to the Court to release the funds in the registry of the Court for payment. The following classes of claims shall be unimpaired.   Class 1.

## IV.  Cramdown and Treatment of Impaired Classes

4.1     Cramdown: The Plan Proponent reserves the right, pursuant to Section 1129 (b) of the Code, to request, and Plan Proponent hereby requests, that the Court confirm the Plan if all of the applicable requirements of Section 1129 are met.   Classes 2 through 16 are impaired.

4.2     The holders of allowed Class 2 claims shall be paid out of the Sales Proceeds upon the closing of the sale of the Debtor's assets to Tres Deseos, Inc.  These claims and their amounts are as follows:

|   |   |   |
|---|---|---|
| A. | Law Office of John Ventura | $85,000.00 |
| B. | Brendan Hall | 65,000.00 |
| C. | Treasure Hills Properties, Inc. | 11,200.00 |
| D. | John Harris | 50,000.00 |
| E. | Lawrence Walsh | 200,000.00 |
| F. | Jack Brown | 3,500.00 |

4.3   The disputed claims in Class 3 of Carlos Cuellar was filed for $80,000.00. It shall be paid the amount of $60,000.00 and allowed as an administrative claim upon confirmation and shall be paid from first available proceeds from the sale of the six lots described in Section 5.1 herein.

The claim of Joe Shirley was not filed with the Court. It was delivered to Debtor's counsel via a letter requesting payment on October 5, 1999. The Debtor will dispute this claim as being a late filed claim and as being a claim for wages pre-petition instead of post-petition. It shall be paid as a claim in Class 4.17, if allowed.

Any other holder of any allowed administrative claim not listed in this plan is forever barred from asserting an administrative claim in this case and against the sales proceeds in this case and shall not receive any distribution under this Plan unless the claim is filed in accordance with the requirements of Section 503 of the Bankruptcy Code on or before the expiration of thirty (30) days from the confirmation date and is held to be an allowed administrative claim.

4.4     The holders of allowed Class 4 claims shall be paid out of the Sales Proceeds upon the closing of the sale of the Debtor's assets to Tres Deseos, Inc.  There is one claim in this class:

the Internal Revenue Service in the approximate amount of $311,000.00.

4 5    The holders of allowed Class 5 claims shall be paid out of the Sales Proceeds upon the closing of the sale of the Debtor's assets to Tres Deseos, Inc.  There are two claims in this class: the secured claim of State of Texas Comptroller in the approximate amount of $25,218.00;  and the secured claim of the Texas Workforce Commission in the amount of $9,500.00.  To the extent that these claimants are owed more because of post-petition interest or other charges, the claims shall be paid from the liquidation of the lots as described in Section V herein.  These claimants have liens on such lots

4.6    The holders of allowed Class 6 claims, including any post-petition portions thereof, shall be paid out of the Sale Proceeds upon the closing of the sale of the Debtor's assets to Tres Deseos, Inc.  There is one claim in this class: the secured claim of Roberto Lozano in the amount of $3,907,520.00.  The claim shall be paid Four Hundred Sixty-Five Thousand and No/100 Dollars ($465,000.00).  By agreement previously approved by the Court, Roberto Lozano has assigned $65,000 00 to Demetrio Duarte and $400,000.00 to Banco Nacional de Mexico; said amounts to be paid at the closing of the sale of assets to Tres Deseos, Inc.

4.7    The holders of allowed Class 7 claims, including any post-petition portions thereof, shall not be paid out of the proceeds of the Sale Assets.  There is one claim in this class: the International Bank of Commerce.  The Debtor has surrendered its interest in the collateral in full and final satisfaction of the debt.  IBC shall have no other claims in this case.

4.8    The holders of allowed Class 8 claims, including any post-petition portions thereof, shall not be paid out of the proceeds of the Sale Assets. There is one claim in this class: The secured claim of Chrysler Credit in the amount of $4,513.48 secured by a 1991 Mitsubishi Expo. The Debtor has surrendered its interest in the vehicle and Chrysler Credit shall have no other claim in this case.

4.9    The holders of allowed Class 9 claims, including any post-petition portions thereof, shall not be paid out of the proceeds of the Sale Assets. There is one claim in this class: The secured claim of First Valley Bank in the amount of $99,285.14 secured by 60 golf carts.  The Debtor has surrendered its interest in the golf carts and First Valley Bank shall have no other claim in this case.

4.10    The holders of allowed Class 10 claims, including any post petition portions thereof, shall not be paid out of the proceeds of the Sale Assets. There is one claim in this class: The secured claim of John Deere Credit in the amount of $16,499.54 secured by a fairway mower. The Debtor has surrendered its interest in the fairway mower and John Deere shall have no other claim in this case.

4.11    The holders of allowed Class 11 claims, including any post-petition portions thereof, shall not be paid in this case. There is one claim in this class: Vicki Tolifson. Previously, the Debtor had entered into a settlement agreement with the claimant pre-petition on December 8, 1995. The

settlement agreement gave the claimant six lots in lieu of the claim; however, these lots were encumbered by federal tax liens and other first and second lien encumbrances as more specifically described in the Debtor's Disclosure Statement and as described on the agreement.  Additionally, the first lienholder, International Bank, has foreclosed on the lots pursuant to an Agreed Order Modifying Stay entered by this Court..  Tolifson shall receive the remaining two lots described in the settlement agreement and shall receive no other claim in this case.   These lots are as follows: Blocks 1, 2, 6 & 7, Sec. I, Lot 2, Block 7, Treasure Hills County Club, Cameron County, Texas and Blocks 1, 2, 6 & 7, Sec. I, Lot 1, Block 7,  Treasure Hills County Club, Cameron County, Texas.

     4.12   The holders of allowed Class 12 claims, shall be paid  out of the Sale Proceeds held by the Court.   There is one claim in this class: the secured claim of Claudio Rangel in the amount of $305,000.00.  The claim shall be paid One  Hundred Fifty Thousand and No/100 Dollars cash ($150,000.00) upon the payment in full of the Tres Deseos Note into the registry of the Court.

     4.13   The holders of allowed Class 13 claims shall be paid out of the Sales Proceeds held by the court.  There is one claim in this class: the claim of Lawrence Walsh, Trustee, in the amount of $1.5 Million.    The claim shall be paid the sum of Seven Hundred Twenty Thousand Dollars ($720,000.00) Dollars cash upon the payment in full of the Tres Deseos Note into the registry of the Court.  Walsh shall also receive two lots of those described in Section 5.1 in satisfaction of the claim and shall receive no other claim in this case.

     4.14   The holders of allowed Class 14 claims shall be paid out of the proceeds held by the Court.   There is one claim in this Class:  the unsecured deficiency claim of Banamex in the approximate amount of $2.5 Million.  This claim shall be paid the sum of Three Hundred Fifty Thousand and No/100 Dollars ($350,000.00) cash upon the payment in full of the Tres Deseos Note into the registry of the Court. Banamex shall fully and finally release all claims against the principals of the Debtor (Roberto Lozano and Hector de Zamacona) upon receipt of payment hereunder and upon receipt of payment under Section 4.6 herein and shall immediately release any and all liens and or encumbrances currently held against any and all property owned by them wherever located.

     4.15   The holders of allowed Class 15 claims shall be paid pro rata from the proceeds held by the Court. There is one claim in this class: that of Long, Chilton, Payte, and Hardin in the amount of $12,000.00.  Long, Chilton, Payte, and Hardin shall have no other claim in this case or under this plan.

     4.16   The holders of allowed Class 16 claims shall be paid out of the proceeds held by the Court.  There is one claim in this Class:  the disputed claim of Fernando De La Garza in the amount of $205,000.00.  This claim shall  be paid the sum of Eighty Thousand and No/100 Dollars ($80,000.00) cash upon the payment in full of the Tres Deseos Note into the registry of the Court. De La Garza shall have no other claim in this case or under this plan.

     4.17   The holders of allowed Class 17 claims shall be paid pro rata from the sale proceeds

to be generated by the sale of the four lots remaining after distribution of two lots to Walsh as per Section 4.13 herein. They shall share pro-rata from the sales proceeds only after payment in full to Carlos Cuellar as per Section 4.3 herein, after payment to the tax claims of Section 4.5, and after payment of costs, expenses, and fees of the Liquidating Agent as per Section 5.1 herein. The claims are as follows:

| Claimant | Amount |
|---|---|
| Chem-Mark of Texas | 621.63 |
| David Geoffrey & Associates | 1,873.00 |
| Dick Office Supply | 215.74 |
| Duckster | 4,104.43 |
| Felco | 530.19 |
| Foot-Joy/Titleist | 8,204.05 |
| Imperial Headwear | 898.10 |
| IZOD | 1,864.68 |
| La Mode | 1,285.15 |
| Morado's Pest Control | 872.05 |
| Portoco | 793.88 |
| Scoggins, McElvey | 3,800.00 |
| South Point Car Care | 300.00 |
| Unifirst Linen | 1,129.62 |
| Unifirst Uniforms | 700.00 |
| Watson Distributing | 2,750.00 |
| Royston, Rayzor | 15,765.04 |
| Slazenger Golf | 1,873.00 |
| B. D. Holt | 17,762.50 |
| Jaime Saldivar | 8,625.11 |
| Rolando Derbez | Amt. Unknown |
| Guillermo Siller | Amt. Unknown |
| Jaime Woldenberg | Amt. Unknown |
| Romulo Elizondo | Amt. Unknown |
| Roberto Lozano | Amt. Unknown |
| Hector de Zamacona | Amt. Unknown |
| Andres Cantizani | Amt. Unknown |

4.18   The holders of allowed Class 16 claims shall be divested of their stock in the Debtor.

4.19   In the event that any class and/or the Debtor vote against the plan, but that the court nonetheless approves the plan under Section 1129 (b) of the Code, the treatment afforded each Creditor in each class will be the same as provided herein.

### V. Means for Execution of the Plan

5.1   Sale of Assets. The Bankruptcy Court has previously ordered the sale of the Debtor's

assets to Tres Deseos, Inc. for cash and under a Promissory Note. Certain creditors will be paid at the closing of such transfer. These creditors are reflected on the Order authorizing such sale. Approximately six (6) developed lots were not part of that sale. The Confirmation Order shall authorize and direct the Liquidating Agent to sell these six lots free and clear of liens. The Confirmation Order shall also authorize the Liquidating Agent to act as custodian and disbursing agent of the Sales Proceeds received from both the Tres Deseos, Inc, proceeds in addition to the proceeds of the six lots, whether at any closing or whether in the registry of the Court. The Liquidating Agent shall also be authorized to distribute the proceeds as herein stated and as may be further described in the Agreement Incident to Distribution of Sales Proceeds. Additionally, the Liquidating Agent shall have the right to apply to this court for approval of fees and expenses from the sales proceeds.

## VI.  Agreement Incident to Distribution of Sales Proceeds

6.1   The Agreement Incident to Distribution of Sales Proceeds is attached hereto as Exhibit A and is hereby made a part of this plan and are incorporated herein for all purposes. If any provision of this Plan is in conflict with the terms of the Agreement, the terms of the Plan shall prevail.

## VII.  Provisions For Rejection of Executory Contracts

7.1   Debtor hereby reserves the right to accept or reject any and all executory contracts not previously assumed or rejected under §365 of the Code prior to the Confirmation Date.

## VIII Other Provisions

8.1   All United States Trustee Quarterly fees due and owing on the date of confirmation shall be paid in full on the effective date of the plan or as the Court may otherwise order..

## IX.  Jurisdiction of the Court

9.1 The Court will retain jurisdiction until this plan is fully consummated including, but not limited to, the following purposes:

9.2   The classification of the claim of any creditor and the reexamination of claims which have been allowed for purposes of voting, and the determination of such objections as may be filed to creditor's claims for the purposes of voting, shall not be deemed to be a waiver of the Debtors' right to objection to, or re-examine the claim in whole or in part, unless the creditor accepts the plan in which case the claim shall not be subject to further challenge.

9.3   Determination of parties' claims as secured or unsecured, including valuation hearings under §506 of the Bankruptcy Code.

9.4    Determination of all questions and disputes regarding title to the assets of the estate, and determination of all causes of action, controversies, disputes or conflicts, whether or not subject to action pending as of the date of confirmation, between the debtors and any other party, including, but not limited to, any right of the Debtors to recover assets pursuant to the provision of Title 11 of the United States Code or the determination of tax liabilities under §505 of the Bankruptcy Code.

9.5    The correction of any defect, the curing of any omission, or the reconciliation of any inconsistency in this plan or the order of confirmation as may be necessary to carry out the purpose and intent of this plan.

9.6    The modification of this plan after confirmation pursuant to the Bankruptcy Rules and Title 11 of the United States Code.

9.7    To enforce and interpret the terms and conditions of this plan, and prior orders of the Court and the Agreement Incident to Distribution of Sales Proceeds.

9.8    Entry of any order, including injunctions, necessary to enforce the title, rights, and powers of the Debtor and to impose such limitations, restrictions, terms and conditions of such title, rights, and powers as the court may deem proper.

## X.  Notices

10.1    Any notice required to be given hereunder shall be given by Certified Mail, Return Receipt Requested, as follows:

To Debtor:
> TREASURE HILLS INVESTMENTS, N.V.
> c/o Brendan Hall
> P.O. Box 2725
> Harlingen, Texas 78550

> With a Copy to:
> Abelardo Limon
> Law Offices of John Ventura, P.C.
> 7 North Park Plaza
> Brownsville, Texas 78521

## XI.

## Execution and Signatures

Liquidating Plan of Reorganization
TREASURE HILLS INVESTMENTS, N.V.
14

This Liquidating Plan is proposed by the Debtor in good faith, in compliance with the Bankruptcy Code, and executed this 29th day of October, 1999.

Respectfully submitted,

TREASURE HILLS INVESTMENTS, N.V.

By: _____

Hector De Zamacona
Its: Managing Director

Of Counsel:

Law Offices of John Ventura, P.C.
7 North Park Plaza
Brownsville, Texas 78521
956-546-9398 Voice
956-542-1478 Fax
Attorneys for Debtor

By: _____

Abelardo Limon
Federal I.D. No. 10045
Texas Bar No. 12357750

### CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of November, 1999, a true and correct copy of the foregoing was sent VIA REGULAR UNITED STATES MAIL,

TRUSTEES:
UNITED STATES TRUSTEE
515 Rusk, Suite 3516
Houston, Texas 77002

Barbara C. Kurtz, Attorney
Wilson Plaza, Ste. 1107
606 N. Carancahua
Corpus Christi, Texas 78476

OTHER PARTIES:

Attorney General, State of Texas

c/o Flora A. Fearon
Assistant Attorney General
P.O. Box 12548
Austin, Texas 78711-2548

Banamex
c/o Charles Kelley
Mayer, Brown & Platt
700 Louisiana Str., Ste. 3600
Houston, TX 77002-2730

International Bank of Commerce
c/o Mary Lou Ryan Ray
RANSOME & RAY, P.C.
550 E. Levee Street
Brownsville, Texas 78520-5343

Internal Revenue Service
Special Procedures Staff
c/o Keri Templeton
300 East 8th Street
STOP 5022 AUS
Austin, TX 78701

Roberto Lozano
c/o Demetrio Duarte
2200 Warner
San Antonio, Texas 78201

Claudio Arellano Rangel
c/o Kurt Stephen
100 S. Bicentennial
McAllen, Texas 78541

Vicki Tolifson
c/o Preston Henrichson
222 West Cano
Edinburg, Texas 78540-1229

Larry Walsh
950 E. Van Buren
Brownsville, Texas 78520-7199

Liquidating Plan of Reorganization
TREASURE HILLS INVESTMENTS, N.V.
16

Larry Walsh
c/o John W. Harris
GRESHAM, DAVIS, ET AL
112 E. Pecan Street, Suite 900
San Antonio, Texas 78205

Brendan Hall
1221 E. Polk St.
P.O. Box 2725
Harlingen, Texas 78550

United States Attorney
P.O. Box 61129
Houston, Texas 77208

Attorney General of the
United States of America
10th & Constitution, Ave. N.W.
Washington, DC 20220

Jennifer Graff
c/oLouise Hytken
Department of Justice
Tax Division
Maxus Energy Tower
717 N. Harwood, Suite 400
Dallas, Texas 75201

Nancy Masso
Assistant U.S. Attorney
P.O. Box 1671
Brownsville, Texas 78522

and to all parties shown on attached matrix.

_____
Abelardo Limon

Liquidating Plan of Reorganization
TREASURE HILLS INVESTMENTS, N.V.
17

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

IN RE:

TREASURE HILLS INVESTMENTS, N.V.            CASE NO. 96-24360-B-11

        DEBTOR                              CHAPTER 11

## *AGREEMENT INCIDENT TO DISTRIBUTION OF SALE PROCEEDS*

On this date, after notice of the hearing had been given to all parties in open court, came to be heard the arguments and objections concerning the distribution of proceeds from the sale of real estate to Tres Deseos, Inc. pursuant to the order of the Court signed and entered October 19, 1999.

$SALE = \$2,601,000.00$ ( *LESS ADVALOREM* $\$65,000$ ) = $\$2,536,000$ *TO DISTRIBUTE*

The parties present announced to the Court that they had reached an agreement concerning the distribution of the sale proceeds. The undersigned parties announced their agreement in open court to the following:

1. The following parties would be paid the following amounts:

   a. Internal Revenue Service     $ 311,000.00
   b. Texas Workforce     $ 9,500.00
   c. Comptroller of Public Accounts     $ 25,218.09
   d. ~~Ad Valorem Taxes~~     $ _____
   e. ~~Carlos Cuellar~~     $ _____
   f. Abelardo Limon     $ 85,000.00
   g. Brendan Hall     $ 65,000.00
   h. ~~Demetrio Duarte~~     $ _____
   i. ~~Scott Rowland~~     $ _____
   j. Banco Nacional de Mexico     $ 350,000.00
   k. Claudio Rangel     $ 150,000.00
   l. DeLaGarza     $ 80,000.00
   m. Treasure Hills Properties     $ 12,000.00
   ~~Subtotal~~     $
   n. Lozano - Lien     $ 465,000.00
   o. Lawrence Walsh, Trustee     $ 970,000.00
   p. Long Chilton (CPA)     $ 12,500.00
   ~~Total~~     ~~$2,600,000.00~~

3.     From Proceeds of Sale of 6 Remaining Lots:
   (Est. Value @ $30,000/ea.)
   q. Trade Creditors     $ 37,500.00
   r. Potential Post-Op. Exp.     $ 97,000.00
   s. Carlos Cuellar     $ 60,000.00

CutePDF — www.cutepdf.com

2) The parties further agree that their agreement is a "universal settlement" which shall end all disputes between the parties and all litigation between the parties with prejudice.

3. This agreement shall not be binding upon the parties until approved by the bankruptcy court in this cause.

4. All parties shall be paid in full within ~~thirty~~ TEN days of the court approving the ~~settlement~~ PLAN OF ~~agreement~~. CONFIRMATION, AS THE TRES DESEOS NOTE FOR $1.3 MILLION BECOMES PAYABLE IN FULL WIN 10 DAYS OF ENTRY OF CONFIRMATION ORDER, REGARDLESS OF ANY APPEAL.

5. Banco Nacional De Mexico agrees to release Hector de Zamacona, Roberto Lozano Lozano and their respective spouses from the personal guarantees and all other liabilities for payment upon the receipt of $750,000.00, total from both the estate and conveyance of proceeds from Lozano's lien.

6. Each signator hereto represents and warrants his or her authority to execute this instrument in the individual and/or representative capacity stated.

7. Miscellaneous Provisions.

A. ROBERTO LOZANO AGREES (THAT THE ESTATE SHALL) CONVEY $400,000 of the DESIGNATED $465,000 ~~RECEIVED~~ TO BE RECEIVED BY LOZANO DIRECTLY TO BANAMEX. UPON BANAMEX'S RECEIPT OF $400,000 from the ESTATE FOR MR. LOZANO'S LIEN AND $350,000 FROM THE ESTATE FOR BANAMEX'S UNSECURED CLAIM, BANAMEX WILL EXECUTE A RELEASE OF THE CONTINUING GUARANTEES TO MR. ZAMACONA, MR. LOZANO & THEIR RESPECTIVE SPOUSES.

B. MR. ROBERTO LOZANO & HIS SPOUSE AGREES TO CONVEY BY SPECIAL WARRANTY DEED THE (2) TWO PROPERTIES MR. LOZANO PERSONALLY OWNS IN "TREASURE HILLS ESTATE" TO MR. LARRY WALSH, TRUSTEE IN RETURN FOR A FULL RELEASE FROM ANY AND ALL CLAIMS AGAINST MR. LOZANO, MR. ZAMACONA & THEIR SPOUSES.

C. TREASURE HILLS, THE DEBTOR, AGREES TO CONVEY BY ORDER OF THE COURT TWO (2) OF THE REMAINING EIGHT (8) PROPERTIES HELD BY THE DEBTOR IN "TREASURE HILLS ESTATE" TO MR. LARRY WALSH, TRUSTEE, OF MR. WALSH'S CHOICE, IN RETURN FOR A FULL RELEASE FROM ANY AND ALL CLAIMS AGAINST THE ESTATE. MR. WALSH, TRUSTEE RECOGNIZES THAT THERE MAY BE CLAIMS AGAINST THE LOTS AND ACCEPTS FULL RESPONSIBILITY FOR RESOLVING THOSE CLAIMS.

↑ DISCREPANCIES IN VALUE FOR NOT-PRESENT CLAIMS OR CREDITORS.

D. TREASURE HILLS, the DEBTOR, SHALL SELL THE REMAINING SIX (6) OF THE EIGHT (8) PROPERTIES HELD BY THE DEBTOR AND FROM THE PROCEEDS OF THIS SALE SHALL PAY $37,500 TO TRADE CREDITORS ON A PRO RATA BASIS, $60,000 TO CARLOS CHERCLE, AND THE REMAINING PROCEEDS SHALL BE USED TO PAY THE EXPENSES OF THIS SALE, FURTHER ESTATE EXPENSES, AND HELD IN RESERVE FOR PAYMENT OF ~~AD POST COST~~ PETITION TRADE CREDITORS WHO SUBMITTED ~~CLAIMS FOR~~ ADMINISTRATIVE CLAIMS FOR APPROVAL W/IN THIRTY (30) DAYS OF NOTICE.

E. THIS PLAN INCLUDES THE EXECUTION OF MUTUAL RELEASES BY AND AGAINST ALL PARTIES FROM ANY FURTHER LITIGATION (& CREDITORS)

BY ALL PARTIES TO THIS ~~AGREEMENT~~. The court shall issue, as part of the confirmed plan, an order(s) selling the 6 lots set forth in ~~the~~ paragraph (D) free and clear of all liens and claims.

F. THE AMOUNTS TO BE PAID IN SETTLEMENT SHALL BE BROKEN OUT AS $200,000 TO WALSH AS AN ADMINISTRATIVE CLAIM, $50,000 TO JOHN HARRIS AS AN ADMINISTRATIVE CLAIM, THE BALANCE OF $720,000 PLUS THE TWO LOTS FROM THE ESTATE AND TWO LOTS FROM MR. LOZANO SHALL BE CONVEYED TO LARRY WALSH, TRUSTEE. THIS BREAKDOWN AND ALLOCATION OF ADMINISTRATIVE CLAIM SHALL BE THE SOLE RESPONSIBILITY OF MR. WALSH AND MR. HARRIS, AND NOT THAT OF THE CREDITORS TO THE ESTATE.

APPROVED THIS 20TH DAY OF OCTOBER, 1999.

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

36. Any amounts paid at closing are subject to disgorgement if the plan is not confirmed as contemplated by this agreement. At the closing of the property, all items listed in Exhibit A shall be paid

3H. The approval of this instrument by the IRS representative is subject to approval by appropriate IRS authorities. Any release by the IRS shall relate or pertain only to claims that the IRS possesses by, through, or under Treasure Hills, the debtor.

F. _____

APPROVED THIS 20TH DAY OF OCTOBER, 1999.

_Lawrence A. Walsh_
Individually and as trustee.

_Demetrie Dearth_
as agent for Hector deZamacona & Roberto Lozano

_____
ATTORNEY FOR TREASURE HILLS, N.V.

_Kurt Stephen_, ATTORNEY FOR CLAUDIO RANGEL

_Eduardo V Roch_
Atty for _____
a _____

_Jennifer Graff_
JENNIFER GRAFF, subject to approval

_Charles S. Kelley_; subject to final ratification and approval by Bruce Nae de Mee.

_Heriberto Medrano by Demetrie Dearth_
For Gaston Derley

_____

_D A Livingood_
Atty. For Tres Dercos, Inc.

Exhibit A

List of agreed expenses to be paid at closing:

A. Internal Revenue Service            $311,000.00

B. Texas Workforce                    $ 9,500.00

C. Comptroller of Public Accounts     $ 25,218.00

D. Ad Valorem Taxes                 $65,000.00

E. Abelardo Limon                  $ 85,000.00

F. Brendan Hall                    $ 65,000.00

G. Demetrio Duarte (from Lozano Lien)   $ 5,000.00

H. Banco Nacional de Mexico (from Lozano Lien)   $400,000.00

I. John W. Harris, Esquire          $ 50,000.00

J. Lawrence A. Walsh           $ 200,000.00

               SUBTOTAL:   1,275,218.00

ED STATES BANKRUPTCY COURT ase No 96-24360-B-11  Chapter 11
HERN DISTRICT OF TEXAS Debtor(s) TREASURE HILLS INVESTMENTS N V MATRIX
NSVILLE DIVISION  Page 1

| | | |
|---|---|---|
| OFFICES OF JOHN VENTURA, P<br>ORTH PARK PLAZA<br>WNSVILLE, TEXAS 78521 | *ED PHILLIPS, JR.<br>One Forum, Suite 1000<br>8000 I.H. 10 West<br>San Antonio, Texas 78230 | *KURT STEPHENS, ATTORNEY<br>100 S. BICENTENNIAL<br>McALLEN, TEXAS 78541 |
| EASURE HILLS INVESTMENTS N.V<br>09 N. Augusta National Drive<br>rlingen, Texas 78550 | *EDWARD C. SNYDER, ATTORNEY<br>Acct. FERNANDO DE LA GARZA<br>MARTIN, DROUGHT & TORRES<br>200 S. 10TH STREET, SUITE 1111<br>McALLEN, TEXAS 78501 | *LORI GRUVER<br>1949 SOUTH IH 35 (78741)<br>P.O. BOX 17428<br>AUSTIN, TX 78760-7777 |
| LLEN C. LEE<br>46 MAIN ST.<br>O. DRAWER GG<br>IESLIDE, TX 78362 | *FLORA A. FEARON<br>ASSISTANT ATTORNEY GENENRAL<br>P.O. BOX 12548<br>AUSTIN, TX 78711-2548 | *LOUISE HYTKEN, DEPT OF JUSTIC<br>TAX DIVISION, MAXUS ENERGY TOW<br>717 N. HARWOOD, SUITE 400<br>DALLAS, TEXAS 78522 |
| NDREW K. ROZELL<br>3 EAST JACKSON<br>RLINGEN, TX 78550 | *FLORA FEARON, ASST ATTY GEN<br>OFFICE OF TX ATTORNEY GENERAL<br>P.O. BOX 12548<br>AUSTIN, TX 78711-2548 | *LOUISE HYTKEN, DEPT. OF JUST.<br>TAX DIV. MAXUS ENERGY TOWER<br>717 N. HARWOOD, SUITE 400<br>DALLAS, TX 75201 |
| TTORNEY GENERAL OF USA<br>TH & CONSTITUTION AVE. NW<br>SHINGTON, DC 20220 | *HENRY L. HARDWICK<br>PORTER, ROGERS, DAHLMAN & GORDON<br>800 N. SHORELINE, SUITE 800<br>CORPUS CHRISTI, TX 78401 | *MARY LOU RYAN RAY<br>RANSOME AND RAY, P.C.<br>550 E. Levee Street<br>Brownsville, TX 78520-5343 |
| RENDON HALL<br>21 E. POLK STREET<br>O. BOX 2725<br>ARLINGEN, TX 78550 | *INTERNAL REVENUE SERVICE<br>CHIEF, SPECIAL PROCEDURES<br>P.O. BOX 250, STOP 501-A<br>AUSTIN, TX 78767 | *MICHAEL G. COLVARD<br>2500 NATIONAL BANK PLAZA<br>300 CONVENT STREET<br>SAN ANTONIO, TX 78205 |
| HARLES S. KELLEY<br>AYER, BROWN & PLATT<br>00 LOUISIANA STREET, STE 3600<br>OUSTON, TX 77002-2730 | *J. ROLANDO OLVERA, JR.<br>FLEMING & OLVERA, P.C.<br>1650 PAREDES LINE RD., STE.102<br>BROWNSVILLE, TX 78521 | *MR. MIKE NIEBRUGGE<br>MAYER, BROWN & PLATT<br>700 LOUISIANA STR., STE. 3600<br>HOUSTON, TEXAS 77002 |
| DALE WEYAND<br>URNS, O'GORMAN, BLACK ET AL<br>50 RITTMAN ROAD<br>AN ANTONIO, TX 78209 | *JOHN W. HARRIS ESQ.<br>Gresham, Davis, et al<br>112 E. Pecan Street, Suite 900<br>San Antonio, Texas 78205 | *NANCY MASSO<br>ASSISTANT U.S. ATTORNEY<br>P.O. BOX 1671<br>BROWNSVILLE, TX 78522 |
| DEMETRIO DUARTE, JR.<br>EMETRIO DUARTE, JR., & ASSOC<br>200 WARNER STREET<br>AN ANTONIO, TEXAS 78201 | *KENRIC D. KATTNER, ESQ.<br>4700 THE TEXACO HERITAGE BLDG.<br>1111 BAGBY<br>HOUSTON, TX 77002 | *NANCY MASSO, ASST. U.S. ATTY<br>P.O. BOX 1671<br>BROWNSVILLE, TEXAS 78521 |

JL LEE WILEY
E. TYLER
. DRAWER 2764
LINGEN, TX  78551-2764

CAMERON CO. TAX C/O LORI GRUVE
P.O. BOX 17428/1949 S. IH 35
AUSTIN, TX  78760-7777

FERNANDO DE LA GARZA
C/O CAMILLE R. MCLEOD
4500 TRAMMELL CROW CENTER
DALLAS, TX  75201

ESTON HENRICHSON, ATTORNEY
WEST CANO
BURG, TEXAS  78540-1229

CHEM-MARK OF TEXAS
P.O. Box 1358
Aransas Pass, TX  78336

FERNANDO MEDRANO
C/O 3402 OAKMONT DR.
HARLINGEN, TEXAS  78550

BERT B. McLEAISH
EAST HIBISCUS
LLEN, TEXAS  78501

CHRYSLER-CREDIT CORP
P.O. BOX 63002
DALLAS, TEXAS 75263-0002

FIRST VALLEY BANK
400 Hidalgo
Raymondville, Texas  78580

EPHEN F. MCLAUGHLIN
TE 1, BOX 104-A
HONDO ROAD @ BURNS ROAD
LINGEN, TX  78552-9801

DAVID GEOFFREY & ASSOC.
P.O. BOX 601035
CHARLOTTE, NC  28260-1035

FOOT-JOY/TITLEIST
144 Field Street
Brockton, MA  02402

ITED STATES ATTORNEY
. BOX 61129
STON, TX  77208

DICK OFFICE SUPPLY
1807 NORTH 10TH STREET
MCALLEN, TEXAS 78501

FRANCISCO DE ANDA
C/O LOMAS DEL VALLE
COL. LOMAS DEL VALLE
GARZA-GARCIA, NL MEXICO

RES CANTICANI FLORENCIAK
' COL SAN PATRICIO
I PEDRO GARZA GARCIA
.MEXICO  66270

DRA. GUADALUPE TIJERINA
C/O LOMAS DEL VALLE
COL. LOMAS DEL VALLE
GARZA-GARCIA, NL MEXICO

GERARDO ALMAGUER
ADDRESS UNKNOWN

D.HOLT
). BOX 1979
RPUS CHRISTI, TX  78403

DUCKSTER
P.O. Box 190
GRINNELL, IA  50112-0190

GUILERMO SILLER
UNKNOWN ADDRESS

NAMEX
L. DEL VALLE OTE #409
BO #3
RZA-GARCIA, NL, MEX CP66220

FELCO
2635 S. 77 SUNSHINE STRIP
HARLINGEN, TX  78550

HARLINGEN I.S.D. TAX OFFICE
P.O. BOX 2643
HARLINGEN, TX 78551

NAMEX c/o Oscar R Bergara
lzada Del Valle 350 Ote.
l. Del Valle
rza Garcia, N.L. MEX 66220

FELIX CANTU A.
PRIBADA FUNDIDORES #1331
COLONIA GARZA CANTU SAN
NICOLAS DE LOS GARZA NL 66480

HECTOR ZAMACONA
LOMAS DEL VALLE
COL. LOMAS DEL VALLE
GARZA-GARCIA, NL MEXICO

PERIAL HEADWEAR
T. 233
VER, COLORADO  80291

JOSE GUAJARDO
ARISTA 3797 NTE
MONTERREY, N.L. MEXICO

ROBERTO L. LOZANO
3402 OAKMON DR.
HARLINGEN, TX  78550


ERNAL REVENUE SERVICE
CIAL PROCEDURES BRANCH
 E. 8TH STR., STOP 5022 AUS
TIN, TEXAS  78701

JOSE MAIZ IG. CARVAJAL Y DE
LA CUEVA
#425 NORTE
MONTERREY, N.L. MEXICO

ROBERTO LOZANO
3402 OAKMONT DR.
HARLINGEN, TX  78550


ERNATIONAL BANK OF COMMERCE
). BOX 1831
WNSVILLE, TEXAS 78521

LA MODE
P.O. BOX 92904
LOS ANGELES, CA   90009

ROLANDO DERBEZ
OAXACA 3365
COLONIA JARDIN
NUEVO LAREDO, TAMPS MEX   88260


D
) ADDRESS

LAWRENCE A. WALSH, Attorney
WALSH & ASSOCIATES
950 E. Van Buren Street
Brownsville, Texas  78520-7199

ROMULO ELIZONDO
MANOLO MARTINEZ
323 COL DEL PRADO
MONTERREY, N.L. MEX  64410


ME SALDIVAR
0 Pinehurst
lingen, Texas  78550

LONG, CHILTON
402 E. TYLER
HARLINGEN, TEXAS 78550

ROYSTON, RAYZOR, ET AL
55 COVE CIRCLE
BROWNSVILLE, TEXAS  78523-3509


ME WOLDENBERG
:. LOS ANGELES
0 OTE COL. GARZA CANTU
 NICOLAS, N.L. MEX  66480

MARTIN JUAREZ
C/O 3402 OAKMONT DR.
HARLINGEN, TEXAS  78550

SAN BENITO ISD
152 E. ROWSON ST
SAN BENITO, TEXAS 78586


O. SHIRLEY
. KERRY LANE
LLEN, TEXAS  78501

MORADOS PEST CONTROL
P.O. BOX 1805
SAN BENITO, TX  78586

SCOGGINS, MCELVEY, MALONE
720 E HARRISON
Harlingen, Texas  78550


N DEERE CREDIT
). Box 5307
iison, Wisconsin 53791-9044

PORTOCO
1403W. FERGUSON
PHARR, TX  78577

SLAZENGER GOLF
C/O NATIONAL COLLECTIONS, INC.
P.O. BOX 551324
DALLAS, TX  75355-1324


SE ANDRES CANTIZANI
RENCIA 117
 SAN PATRICIO; SAN PEDRO
ZA GARCIA NL MEX 66270

RGC GROUP

SOUTH POINT CAR CARE
913 N. ED CAREY DRIVE
HARLINGEN, TEXAS  78550

# DEFENDANTS' MOTION FOR SUMMARY JUDGMENT EXHIBIT 2

CVisPDF – www.faxisa.com

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States Bankruptcy Court
Southern District of Texas
ENTERED

DEC - 6 1999

*Candy Neal*

Michael N. Milby, Clerk of Court

IN RE:                                            §                    CASE   NO. 96-24360-B-11
                                                  §
TREASURE HILLS INVESTMENTS, N.V.                  §
                                                  §
                                                  §
        Debtor                                    §                    CHAPTER 11

## ORDER CONFIRMING DEBTOR'S
## LIQUIDATING PLAN OF REORGANIZATION AND APPROVING CERTAIN
## MODIFICATIONS THERETO

On December 1, 1999, this Court conducted a hearing to consider the confirmation of

the "Debtor's Liquidating Plan As Modified" ("Plan"), as filed in this case by TREASURE

HILLS INVESTMENTS, N.V. ("Debtor") on November 10, 1999 and as modified by agreement

of the parties, which represents a modification before substantial consummation of a Plan

confirmed on November 17, 1997. The Debtor appeared through its counsel, the Law Offices

of John Ventura, P.C.. It appears all interested parties received notice of the hearing as

required by the Code, the Federal Rules of  Bankruptcy Procedure and the Local Rules.

Pursuant to this Court's "Order Setting Hearing On Disclosure Statement And Setting Hearing

For Confirmation Of The Liquidating Plan For December 1, 1999 And Order Shortening Notice

Periods Under Rule 2002 And Setting Deadline For Objections To Disclosure Statement And

To Liquidating Plan And Reducing Time For Changing Previous Acceptances Or Rejections

Under 11 U.S.C. §1127(d), Rules 2002(a)(d), (f), (i) and 3019" entered on November 17,

1999, the hearing on the Debtor's Supplemental Disclosure Statement was set for December

1, 1999, and established that ballots either accepting or rejecting the Plan, or withdrawing

previous acceptances or rejections, were to be received by counsel for the Debtor no later

than November 24, 1999, and that objections to confirmation of the Plan were to be filed by

TRUE COPY I CERTIFY
ATTEST: 7-13-2000
MICHAEL N. MILBY, Clerk of Court

November 24, 1999, and would be considered at the hearing on confirmation of the Plan on December 1, 1999. The following persons presented objections to the confirmation of the Plan ("Objecting Creditors").

1. Carlos Cuellar; and

2. Texas Taxing Authorities (Texas Comptroller of Public Accounts And Texas Workforce Commission

At the hearing, counsel for the Debtor and counsel for affected creditors and interested parties who appeared at the hearing advised the Court of certain additional amendments and modifications to the Plan, set forth herein, and represented that all of such amendments or modifications (the "Modifications") do not materially or adversely affect any Creditor or interested party and/or that the affected Creditor or Class or interested party has consented to the Modifications. As represented by the Objecting Creditors' statements in open Court, the Objecting Creditors have withdrawn their objections in consideration of the Modifications.

The Court has considered all pleadings on file in this case, particularly the Plan, Disclosure Statement and the Modifications, in addition to, the written and verbal comments and stipulations of counsel present, the Ballot Summary of the voting by Classes in the Plan filed by the Debtor in support of confirmation, and the entire court record in this case including adversary proceedings, and based on all of the above, the Court has determined that the Plan should be confirmed as meeting the requirements for confirmation under §1129(a) of Title 11, United States Code ("Code"). The Court therefore makes the following mixed findings of fact and conclusions of law in accordance with FED. R. BANKR. P. 7052 and 9014:[1]

---

[1] Capitalized terms used herein and not otherwise defined shall have the same meaning as in the Plan.

1.      The Disclosure Statement, as modified and amended and including the Modifications, contains adequate information, as defined by §1125(a) of the Code, as would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant classes in the Plan to make an informed judgment about the Plan.

2.      The Plan complies with the applicable provisions of Chapter 11 of Title 11, United States Code pursuant to 11 U.S.C. §1129(a)(1).

3.      The Debtor, as proponent of the Plan, has complied with the applicable provisions of Chapter 11 of Title 11, United States Code pursuant to 11 U.S.C. §1129(a)(2).

4.      The Plan has been proposed by the Debtor in good faith and not by any means forbidden by law pursuant to 11 U S.C. §1129(a)(2).

5.      Any payment made or to be made by the Debtor, as proponent or otherwise, for services or for costs and expenses in or in connection with the case, or in connection with the Plan and incident to the case, has been approved by the Court incident to or pursuant to its confirmation of the Plan or, if to be fixed after confirmation of the Plan, will be subject to the approval of the Court as reasonable pursuant to 11 U.S.C. §1129(a)(4).

6.      The Debtor, as proponent of the Plan, has disclosed the identity and affiliation of every individual proposed to serve after confirmation of the Plan as a director, officer, disbursing agent or liquidating trustee of the Debtor pursuant to 11 U.S.C. §1129(a)(5)(A).

7.      The Debtor, as proponent of the Plan, has disclosed all insiders that the Debtor will continue to employ or retain after Plan confirmation, and the nature of any compensation for such insiders pursuant to 11 U.S.C. §1129(a)(5)(B).

8.      The requirements of §1129(a)(6) of the Bankruptcy Code are not applicable to the Debtor or the Plan and the Plan does not propose or provide for any change of rates.

9       With respect to each impaired class of claims or interests under the Plan, each holder of a claim or interest in such class has accepted the Plan, or such holder will receive or retain under the Plan on account of such claim or interest, property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated under Chapter 7 of Title 11, United States Code, on such date pursuant to 11 U.S.C §1129(a)(7).

10.     With respect to each class of claims or interests under the Plan, such class has accepted the Plan, such class is impaired but has not voted and is, therefore, deemed to have accepted the Plan, or such class is not impaired under the Plan pursuant to 11 U.S.C. §1129(a)(8). Notwithstanding the requirements of §1129(a)(8) of the Code, the Court finds that the Debtor has requested non-consensual confirmation and pursuant to §1129(b) of the Code the Plan does not discriminate unfairly, and is fair and equitable with respect to any Class which has voted to reject the Plan or any Class which may receive nothing under the Plan and are deemed to have rejected the Plan.

11.     The Plan provides for the payment in full on the Effective Date of all Priority Claims, unless otherwise agreed by a Priority Claim claimant, and therefore complies with the requirements of §1129(a)(9) of the Bankruptcy Code.

12.     The Plan has been accepted in writing by at least one class of impaired creditors, determined without including any acceptance of the Plan by an insider of the Debtor and therefore the Plan complies with 11 U.S.C. §1129(a)(10).

13.     The Plan proposes the orderly liquidation of the Debtor's assets, and therefore, the Plan satisfies the requirements of §1129(a)(11) of the Bankruptcy Code.

14.    The Plan provides and the Debtor is authorized and directed to pay all fees due to the U S Trustee under §1930 of Title 28, United States Code, on or before the Effective Date of the Plan in compliance with 11 U S C. §1129(a)(12).

15.    The requirements of §1129(a)(13) of the Bankruptcy Code are not applicable in this case.

16.    The Court finds that the solicitation of acceptances or rejections of the Plan and /or Modifications of the Plan and the offer and sale of property of the Debtor's estate pursuant to the Plan were made in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including §1125(e)

17.    All amendments and modifications set forth in the Plan meet the requirements of §§ 1125 and 1127(a) of the Code, and, accordingly, the Plan, as modified and amended, becomes the Plan for this case. The Plan's additional amendments and modifications to the Plan set forth in the Modifications and/or announced on the record of the hearing on the confirmation, are set forth in the Debtor's Liquidating Plan, As Modified, attached hereto as Exhibit "A".

18.    The Court finds that notice to creditors and parties-in-interest of the hearings on the confirmation of the Plan and thus on the Modifications was appropriate, adequate and sufficient under the Federal Rules of Bankruptcy Procedure and relevant local rules.

19.    The Modifications to the Plan constitute non-material modifications of the Plan that do not materially affect the rights of any holder of a claim against the Debtor or any holder of an interest in the Debtor  and, therefore, no further notice of or disclosure of the Modifications is necessary beyond that provided by the Debtor pursuant to the service of the Disclosure Statement and Plan upon all creditors and parties requesting notice.

20.     The provisions of the Plan bind the Debtor, all creditors, interest holders, and parties-in-interest, whether or not their claims, interests or rights are impaired under the Plan and whether or not any of the foregoing have accepted or rejected the Plan

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED as follows.

1.     The Debtor's Plan is CONFIRMED, and this Order shall constitute a final judgment, order and decree.  The Debtor's modifications, including the Modifications, are APPROVED.  A copy of the Plan inclusive of all the approved Modifications is attached hereto as **Exhibit "A"**

2.     Except as otherwise expressly provided for in the Plan or as otherwise subject to pending motions or other pleadings of the Debtor otherwise dispositive of property, all property of the estate of the Debtor wherever situated, whether real or personal, tangible or intangible and whether held in fee, in trust, or by a nominee, or Insider of the Debtor including beneficial and equitable interests in such assets, shall vest in the Debtor, free and clear of all liens, claims and encumbrances of creditors and equity security interests of the Debtor on the Confirmation Date.  Subsequent to the Confirmation Date, the Debtor shall be fully empowered to manage and dispose of its property pursuant to the Plan, without further notice or involvement of the Bankruptcy Court, subject to the terms of the Plan and this Order.

3.     Except for claims expressly created, assumed, or preserved under the Plan, the Plan shall discharge the Debtor from any and all claims that arose before the date of entry of this order, as of the Effective Date.  As of the Effective Date, the holders of any discharged Claims shall be permanently barred and enjoined from any attempt to assess, demand or collect such discharged Claims.

4      All persons or entities which are required to perform acts, render services, execute documents, make payments, release liens, or discharge responsibilities pursuant or incidental to the Plan are hereby ordered and directed to comply timely therewith.

5.     Pursuant to 11 U.S.C 11142(b), the Debtor is hereby authorized and fully empowered to consummate the transactions called for by the Plan without further order of this Court.  Abelardo Limon is appointed as Liquidating Agent for the Debtor under the Plan and he is authorized and fully empowered, without the necessity of any board of directors or stockholder, partner or partnership approval, other notice of approval, or further order of this Court to enter into, execute and deliver all documents necessary, to implement the terms of the Plan including the authority to execute documents effecting the transfer of title to property of the Debtor, Treasure Hills Investments, N.V.

6.     Any judgment at any time obtained, to the extent that such judgment is a determination of the liability of the Debtor with respect to any debt discharged hereunder, shall be, and hereby is, rendered null and void.

7.     All entities that have held, currently hold or may hold a Claim that is discharged or an interest that is canceled pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions on account of any such discharged Claims or canceled interests:

>   (a)     commencing or continuing in any manner any action or other proceeding against the Debtor, or its property;
>
>   (b)     enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor or its property;

(c) creating, perfecting or enforcing any lien or encumbrance against the Debtor or its property; and

(d) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

Notwithstanding any of the other provisions of this Plan, confirmation of the Plan shall not preclude any Creditor from asserting a right of setoff, right of subrogation or right of recoupment with respect to any debt, liability, or obligation that may be asserted by the Debtor against such Creditor to the extent that such debt, liability, or obligation arose in favor of the Debtor, or its respective property prior to the commencement of the Debtor's Chapter 11 Case. To the extent that any Creditor asserts any right of setoff, right of subrogation, or right of recoupment that is based upon an Allowed Claim, such Allowed Claim shall be deemed automatically reduced to the extent of any right of setoff, right of subrogation, or right of recoupment asserted with respect thereto. If any Creditor asserting a right of setoff, right of subrogation, or right of recoupment has received any distribution with respect to an Allowed Claim that forms the basis for such setoff, subrogation, or recoupment, such Creditor shall return the portion of the distribution attributable to the portion of such Allowed Claim that would be reduced as a result of the setoff, subrogation, or recoupment prior to asserting any setoff, subrogation, or recoupment.

8.     Other than professionals retained by the Debtor, and other than those persons identified in §2.2, Class 2, and 4.2 of the Plan who are hereby deemed to have approved and allowed Administrative Claims in the amounts stated for purposes of distribution under the Plan on the Confirmation Date, any party or creditor asserting an Administrative Claim including professional fees and expenses arising prior to the entry of this order under Section 503(a) and 503(b) of the Bankruptcy Code, shall file

and serve applications seeking allowance thereof no later than the thirtieth (30th) day following the Confirmation Date. Any creditor failing to timely file an application in accordance herewith, shall be forever barred from asserting a claim in this case and shall not receive any distribution under the Plan

9.     In accordance with Section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of a security or the making or delivery of an instrument of transfer under the Plan shall not be taxed under any law imposing a stamp tax or similar tax.

10.     This Court retains that jurisdiction provided by Article IX, §9.1 et. seq. as amended, of the Plan.

11.     All objections to confirmation that are not otherwise dealt with herein, are overruled.

12.     The Debtor shall provide sales tax returns for the third and fourth quarter, 1998 to the local office of the Comptroller within ten (10) days after Confirmation of the Plan. Subject to the Comptroller's verification of the returns, the Comptroller's Administrative Expense Claim shall be reduced to $22,000.00, subject to confirmation by the Comptroller.

13.     The Clerk of the Court is hereby ORDERED and DIRECTED to pay to the Texas Comptroller of Public Accounts, $19,000.00 from the funds held in the registry of the Court.   Such $19,000.00 shall be issued in a check payable to Texas Comptroller of Public Accounts, and delivered to Flora Fearon, Office of the Attorney General, Bankruptcy & Collections Division, P. O. Box 12548, Austin, Texas 78711-2548. Such check shall be issued to the Texas Comptroller within ten (10) days of the date of this Order.

14.     The balance of the Texas Comptroller of Public Accounts Expense Claim shall be paid by January 10, 2000  The balance of the administrative claim of $3,000.00 shall be disbursed by the appointed Liquidating Agent  The remainder of the Texas Comptroller of Public Accounts Pre-Petition Sales Tax Claim of $7,805.60 shall be paid, in full, from the lots to be sold or auctioned within six (6) months from the Confirmation Date.

15.     The remainder of the Texas Workforce Commission's administrative expense claim of $2,053.44 shall be paid from the lots to be sold or auctioned within six (6) months from the Confirmation Date.

16.     The Clerk of the Court is ORDERED and DIRECTED to pay the amount of $11,387.90 to Treasure Hills Properties, Inc. from the funds in the registry of the Court. Said payment will be made by check payable to Treasure Hills Properties, Inc. and delivered to Treasure Hills Properties, Inc., c/o Andrew K. Rozell, Law Offices of Andrew K. Rozell, 323 E. Jackson, Harlingen, Texas 78550. The Clerk is directed to make this payment within ten (10) days of the date of this Order.

17.     The Class 12 secured claim of Claudio Rangel shall be timely paid the $50,000.00 Note payment due December 1, 1999 from Tres Deseos, Inc. to Debtor, which payment shall be to credit against the Class 12 claim and shall be paid by Tres Deseos, Inc., check payable to Cardenas, Whitis and Stephen, L.L.P. Trust Account. The remaining Class 12 claim shall be paid in full by the Liquidating Agent from the Tres Deseos Note Sales proceeds which is due January 10, 2000.

18.     In return for Debtor's agreement not to demand payment under the Tres Deseos, Inc. Note until the Administrative Claim Bar Date as set forth in the Plan and Debtor's further agreement not to negotiate or sell the Note, Tres Deseos, Inc.

represents and promises by and through its counsel of record, Dale Weyand (who has represented to the Court that he has authority to make this agreement on behalf of Tres Deseos, Inc ) that Tres Deseos, Inc , and Scott Rowland, have not and will not lien or encumber or otherwise burden the real property purchased from Debtor save and except the existing bridge loan and any permanent financing which will fund the full payment of the Tres Deseos, Inc., Note in accordance with the Plan.

19.    This Court shall retain jurisdiction over these matters as set forth in Paragraph 10 of this Order, including but not limited to until the Tres Deseos, Inc. Note to Debtor is paid in full.

20.    The Clerk of the Court is ORDERED and DIRECTED to pay all remaining sums which have been received or which may be received in this cause from the registry of the Court to the Law Offices of John Ventura, P.C., for the benefit of Treasure Hills Investments, N.V., said funds to be mailed to 7 North Park Plaza, Brownsville, Texas 78521

SIGNED this __1__ day of _____, 1999.

_____
UNITED STATES BANKRUPTCY JUDGE

**APPROVED AS TO FORM AND SUBSTANCE
AND ENTRY REQUESTED:**

FLORA FEARON
Assistant Attorney General
State Bar No. 06870400
P. O. Box 12548
Austin, Texas 78711-2548
(512) 463-2195
Attorneys for Texas Comptroller of Public Accounts
and Texas Workforce Commission

CARLOS CUELLAR, Pro Se

TREASURE HILLS INV NV                    Page 12:  ORDER CONFIRMING DEBTOR'S LIQUIDATING PLAN OF
                                   REORGANIZATION AND APPROVING CERTAIN MODIFICATIONS THERETO

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

In re: § Case No. 96-24360-B-11
§
TREASURE HILLS INVESTMENTS, N.V., §
     Debtor § Chapter 11
§

## DEBTOR'S LIQUIDATING PLAN, AS MODIFIED

TO THE HONORABLE JUDGE OF SAID COURT:

     TREASURE HILLS INVESTMENTS, N.V., Debtor-In-Possession in this cause, and pursuant to 11 U.S.C. 1127 files this Debtor's Liquidating Plan, as modified, and would show unto the court the following:

I.

## DEFINITIONS

For the purpose of this Liquidating Plan of Reorganization, the following definitions shall apply:

    1.1    <u>Administrative Expense</u>: All costs and expenses of the Chapter 11 Case allowed under 11 U.S.C. Section 503(b)(2), (4), and (6), including all costs of making distributions and providing notices and ballots regarding the Plan.

    1.2    <u>Agent, or Liquidating Agent, or Disbursing Agent</u>: This term shall refer to an authorized person, or other entity to be selected by the Debtor and approved by the Court, to act as custodian and disbursing agent of the Sales Proceeds and of the funds to be paid to Creditors pursuant to the Plan.

    1.3    <u>Allowed Claim</u>: Any claim:

        (a.)    Which is scheduled by the Debtor pursuant to Section 521 (1) other than a Claim scheduled as disputed, contingent, or unliquidated;

        (b.)    For which a proof of Claim was filed with the Bankruptcy Court on or before the Bar Date:

Liquidating Plan of Reorganization
Treasure Hills Investments, N.V.

1

(c.)     In the case of Administrative Expenses subject to Bankruptcy Court approval, requests for payment which are approved by the Court after having been timely filed; or

(d.)     As to which no objection to the allowance thereof has been or may be interposed within the applicable period of limitation fixed by the Court, the Code or the Federal Rules of Bankruptcy Procedure (the "Rules), or as to which an objection has been determined by an order or judgment that is no longer subject to appeal.

1.4     <u>Allowed Secured Claim</u>: An Allowed claim which is secured by a perfected, non-preferential lien on property of the Debtor's estate, to the extent of the value of the interest of the holders of such allowed claim in such property of the Debtor, as determined by the Bankruptcy Court pursuant to 11 U.S.C. Section 506 (a).

1.5.     <u>Bankruptcy Code</u>:     The Bankruptcy Code of 1978 as contained in Title 11, U.S.C., §101 et seq. and the amendments thereto.  All references to any statute in this plan are references to the Bankruptcy Code as defined therein.

1.6     <u>Bar Date</u>: March 17, 1997 (or as may have been extended  specifically by Order of the Court with respect to any specific Creditor or party in interest), which is the date set by the Court after which any claims which are filed will be void and disallowed for purposes of voting and distribution.  With respect to any claims which arose after the Petition Date, the bar date for filing an application under §503 of the Code shall be on or before the expiration of 30 days after the Confirmation Date and not thereafter.

1.7     <u>Cash Collateral</u>:   All revenues, costs, profits, and other monetary proceeds from any of the Debtor's assets the subject of a valid Secured Claim, and all cash collateral as defined under Section 363 of the Code, all of which are subject to the respective Secured Creditor's perfected first lien and security interest.

1.8     <u>Claim</u>: Any right to payment from the Debtor as of the Confirmation Date: (a) which is evidenced by a proof of claim properly filed in this Chapter 11 Case prior to the Bar Date and/or scheduled by the Debtor as a debt, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment,

fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured; or (b) which is a claim for payment or of liability, whether direct or indirect, against Debtor, whether based upon theories of "alter ego" or piercing the corporate veil", .whether any such claim is based upon joint or several liability therefore, or whether such claim is based upon any guaranty, whether or not such claim has been listed in Debtors' Statements or Schedules,; and whether or not evidenced by a proof of claim properly filed in this Case prior to the Bar date.

1.9    Collateral Security: All of Debtor's property and assets, including all property brought into the estate under Section 541 of the Code, which includes the Debtor's assets, together with all contracts, rentals, leases, intangibles and all money and other proceeds of each of the foregoing (including all Cash Collateral) and all other real and personal property wherever located, and which was the subject of a valid, perfected lien or other security interest on the Petition Date.

1.10   Closing Date:"Closing Date" shall mean the date established for the payment of the balance due under the Tres Deseos, Inc. Promissory Note dated November 23, 1999 in the total amount of $1,300,000.00 made payable to the Debtor, which payment date is extended by agreement until Monday, January 10, 2000.

1.11   Confirmation Date:    The date of entry upon the docket for this case by the Bankruptcy Court of an Order of Confirmation of this liquidating plan in accordance with 11 U.S.C. §1129.

1.12   Confirmation Order: The Order of the court confirming this Liquidating Plan, together with any supplemental or amended Order with respect thereto.

1.13   Court:    The United States Bankruptcy Court for the Southern District of Texas, Brownsville Division, acting in this case. .

1.14   Contested/Disputed Claim: Any claim as to which the Debtor or any other party in interest has interposed or may interpose an objection in accordance with the Code and the rules, which objection has not been determined by an order or judgment that is no longer subject to appeal.

1.15   Creditor:  Any entity that has a claim against the Debtor that arose at the time of or before the filing of the petition in this case as defined in §101(4) of the Bankruptcy Code, or has a claim allowable under §503(b) and 507(a)(1) of the Code.

1.16   Debtor: TREASURE HILLS INVESTMENTS, N.V.
           Case No. 96-24360-B-11

1.17   Disclosure Statement: The Disclosure Statement approved by order of the
       court with respect to this plan, together with any amendments, supplements
       or Exhibits thereto, including the Supplement to the Disclosure Statement
       which is being filed contemporaneously hereto.

1.18   Effective Date:  Effective date shall mean the Confirmation date.

1.19   Equity Holder:   Any interest of any person or entity who or which has or
       claims to have an ownership interest of any kind, including any interest
       represented by a partnership interest, stock, or any other type of ownership
       interest of any kind or nature whatsoever in any of the Debtors.

1.20   Final Order:        An Order that becomes final ten (10) days after it is
       entered if no notice of appeal is filed during that period pursuant to
       Bankruptcy Rule 8002.

1.21   Interest Holder:       Any equity security holder and each owner and holder
       of common stock of the Debtor, including existing shareholders.

1.22   Petition Date:        October 21, 1996, the date when this Chapter 11 case
       was filed by the Debtor with the filing of a voluntary petition under Chapter
       11 of the Code.

1.23   Plan: This Liquidating Plan of even date herewith.  It represents a complete
       modification of the first plan confirmed on November 1997.

1.24   Plan Documents: This Liquidating Plan, the Disclosure Statement for this
       Plan, together with its Exhibits and any amendments or supplements thereto,
       as approved by the Bankruptcy Court.

1.25   Plan Proponent:  Treasure Hills Investments, N.V.

1.26   Priority Claim: Any claim having priority under 11 U.S.C. Section 507, except
       for the Administrative Claims.

1.27   Professional or Professional Person: Any person, firm or other entity
       employed by the Debtor or by the Committee pursuant to Order
       of the Court, under 11 U.S.C. Section 327.

1.28   Sales Proceeds: The sum of $2,601,000.00 (TWO MILLION SIX HUNDRED ONE THOUSAND DOLLARS), principal, to be paid by Tres Deseos, Inc. to the Debtor as the purchase price for the Debtor's assets previously ordered sold by the Court, a portion of said sum to be paid pursuant to the Disbursement Agreement and a portion of said sum to be set aside in the registry of the Court and dedicated for payment of all allowed Claims in this case pursuant to the provisions of this Plan as delivered to the Liquidating Agent.

1.29   Secured Claim:   The Claim of any creditor of the Debtor to the extent that such claim is secured by a lien, security interest, or other encumbrance which has been properly perfected as required by law with respect to property owned by the Debtor. A claim is secured only to the extent of the value of the Debtor's property which the Court finds is the valid security for such claim as evidenced by a perfected security interest enforceable against property of the estate of the Debtor.

1.30   Secured Creditor:   Those creditors who hold a lien, security interest, or other encumbrance which has been properly perfected as required by law with respect to property owned by the Debtor at or prior to confirmation of the plan.

1.31   Substantial Consummation: Substantial consummation of the plan, as that is used in the Bankruptcy Code, shall be effected only upon the full and final payment of all payments under the Note from Tres Deseos Inc. to the Debtor.

1.32   Unsecured Claim:   Any claim or portion of a claim against the Debtor not secured by a perfected security interest in property of the Debtor's estate.

A Term used in this Plan, not otherwise defined herein or in the Disclosure Statement but used in the Code, shall have the definition assigned to such term in the Code.

II.

## Classification of Claims

2.1   Unless otherwise expressly stated in the Plan, distributions to holders of Allowed Claims and interests are in full satisfaction of those Allowed Claims and Interests,. All claims against the Debtor arising before Confirmation of the Plan shall be deemed satisfied by the obligations provided for in the Plan, pursuant to U.S.C. Section 1141 (d), and no holder of any Claim shall have any further or future rights with respect thereto. For the purposes of distribution under this Plan, Claims are divided into the following classes:

Liquidating Plan of Reorganization
TREASURE HILLS INVESTMENTS, N.V
5

2 2    Classification of Classes under the Plan

Class 1 - Trustee Fees as per 11 U.S.C. Section 503

Class 2 - Administrative Claims:  All allowed administrative Claims, as that term is defined herein, including fees for services rendered and expenses incurred by Court-- appointed counsel for the Debtor, Committee Attorneys, or other Professionals employed by the Committee or the Debtor, and any expenses provided for under 28 U.S.C. Section 1930. There are six (6) claims in this class: the Law Office of John Ventura, P.C., attorneys for Debtor;  the Law Office of Brendan Hall, special counsel for Debtor; the §503 claim of Treasure Hills Properties, Inc., a claim previously allowed by this Court; John Harris, attorney for the Class B; Lawrence Walsh, (allowed as a partial administrative claim by agreement); and Jack Brown, a claim for post-petition services (survey).

Class 3 - All allowed administrative claims which are claims for post-petition wages. There are two claims in this class:  Carlos Cuellar and Joe Shirley. Both claims are disputed.

Class 4  - The Allowed Claim of each priority creditor, person or entity, whether or not the holder of a secured claim that is secured by a tax lien and/or security interest in the Sale Proceeds  which arises from a priority claim as allowed by 11 U.S.C. Section 507(a)(7) of the Code.  There is one claim in this class: the Internal Revenue Service.

Class 5 (a) - The Allowed Claim of each secured creditor, person or entity, which is the holder of a secured claim that is secured by a statutory tax lien and/or security interest in the Sales Proceeds and which arises under state law. There are two claims in this class: the State of Texas Comptroller and the Texas Workforce Commission.

Class 5(b) - The Allowed Claim of each secured creditor, person or entity, which is the holder of a secured claim that is secured by a statutory tax lien and/or security interest in the Sales Proceeds and which arises under state law. There are three claims in this class: the local taxing authorities liens against the real property sold to Tres Deseos, Inc in the amount of $59,616.58; the local taxing authorities liens against the 6 lots set forth under the Class 17 claims; and the local municipal liens against the 6 lots set forth under the Class 17 claims.

Class 6 -  The Allowed Claim of each secured creditor, person or entity, which is the holder of a secured claim that is secured by a lien and/or security interest in the Sales Proceeds. There is one claim in this class: Roberto Lozano.

Class 7 - The Allowed Claim of each secured creditor, person or entity, which is the holder of a secured claim that is secured by a lien and/or security interest in the real property of the Debtor as that property is known as four lots, including any claim with respect to or arising out of any and all mortgages, leases, and liens. There is one claim in this class: International Bank of Commerce.

Class 8 - The Allowed Claim of each secured creditor, person or entity, which is the holder of a secured claim that is secured by a lien and/or security interest in the personal property of the Debtor as that property is known as a 1991 Mitsubishi Expo and as more fully described on the attached Exhibit A describing the Sale Assets, including any claim with respect to or arising out of any and all mortgages, leases, and liens. There is one claim in this class: Chrysler Credit.

Class 9 - The Allowed Claim of each secured creditor, person or entity, which is the holder of a secured claim that is secured by a lien and/or security interest in the personal property of the Debtor as that property is known as sixty golf carts, including any claim with respect to or arising out of any and all mortgages, leases, and liens. There is one claim in this class: First Valley Bank.

Class 10- The Allowed Claim of each secured creditor, person or entity, which is the holder of a secured claim that is secured by a lien and/or security interest in the personal property of the Debtor as that property is known as a fairway mower, including any claim with respect to or arising out of any and all mortgages, leases, and liens. There is one claim in this class: John Deere Credit.

Class 11 - The Allowed Claim of each creditor, person or entity, which is a party to that certain litigation entitled Vicki Tolifson v. Treasure Hills, N.V. et. al, in the 138th District Court of Cameron County, Texas.

Class 12 - The allowed claim of each secured creditor, person, or entity which is the holder of a secured claim by an alleged lien and/or security interest in the real property of the Debtor, as that property is known as Lots 1 through 14, inclusive, Block 7; Lots 15 thru 44 inclusive, Block 8; Lots 15 through 30, inclusive, Block 9, Treasure Hills Country Club Subdivision, Cameron County, Texas. There is one claim in this class: Claudio Rangel.

Class 13 - The Allowed Claim against the Debtor whether pre-petition or post-petition, whether secured or unsecured, whether liquidated or unliquidated, by or on behalf of Lawrence Walsh, Trustee, or on behalf of any other party, including but not necessarily limited to American Express International or any other party which is a plaintiff in that certain litigation entitled Lawrence A. Walsh, Trustee vs. Treasure Hills Investments, N.V. et al pending in the United States District Court for the Southern District of Texas Brownsville Division, Civil Action No. B-96-83.

Class 14- The Allowed Claim of each creditor, person or entity, which is the holder of a deficiency claim that was previously secured by a lien and/or security interest in the real property of the Debtor as that property is known as the golf course, the pro shop, and the club house and as is more fully described on the attached Exhibit A describing the Sale Assets, including any claim with respect to or arising out of any and all mortgages, leases, and liens. There is one claim in this Class: Banamex

Class 15 - The allowed unsecured claim for services provided post-petition in connection with the prosecution of the subordination claim against Roberto Lozano: There is one claim in this class: that of Long, Chilton, Payte, and Hardin.

Class 16 - The allowed unsecured claim of each creditor, person, or entity in an amount higher than $100,000.00.   There is one claim in this class: Fernando de la Garza.  The claim is disputed.

Class 17 -  As heretofore provided, all other claims against the Debtor, however arising, not otherwise included in any other class described herein, including the undersecured portion of any allowed secured claim that is allowed by this Plan, allowed unsecured claims, claims based upon the rejection or modification of executory contracts or unexpired leases insofar as the same are allowed under the terms and provisions of this Plan, and any other Claim of any other creditor not otherwise defined or provided specifically by the other Classes of Claims, and/or by the other provisions of this Plan. This class includes any claim of any purchaser of lots which were sold by the Debtor pre-petition but which were never transferred to the purchaser.  These lots are described as follows:

1.      Lot 20, Block 4, Treasure Hills Country Club Subdivision, Cameron County, Texas, conveyed to Rolando Derbez, Oaxaca 3365, Colonia Jardin, Nuevo Laredo, Mexico 88260;

2.      Lot 15, Block 1, Treasure Hills Country Club Blocks 1, 2, 6 and 7, Sec. 1, Subdivision, Cameron County, Texas, conveyed to Guillermo Siller, whose address is unknown.

3.      Lot 6, Block 2, Blocks 1, 2, 6 and 7, Sec. 1, Treasure Hills Country Club Subdivision, Cameron County, Texas, conveyed to Gerardo Almaguer, whose address is unknown.

4.      Lot 1, Block 2, Blocks 1, 2, 6 & 7, Sec. 1, Treasure Hills Country Club Subdivision, Cameron County, Texas, conveyed to Jaime Woldenberg, Ave. whose address is Los Angeles, 1700 OTE Col. Garza Cantu, San Nicolas, N.L.Mexico 66480.

5.      Lot 6, Block 7, Blocks 7, 8 & 9, (Partial) Treasure Hills Country Club Subdivision, Cameron County, Texas, conveyed to Roberto Lozano and Hector Zamacona, principals of the Debtor, whose address is the same as the Debtor's.

6.      Lot 14, Block 4, Treasure Hills Country Club Subdivision, Cameron County, Texas, conveyed to Andres Cantizani, Florenciak, whose address is  117 Col San Patricio, San Pedro Garza Garcia, N.L. Mexico 66270.

Class 18 - Any claim of any equity holder as an owner of the Debtor.  There are nine (9) claims in this class.  The equity shareholders of the Debtor are:

FRANCISCO DE ANDA
JOSE MAIZ
FERNANDO DE LA GARZA
FELIX CANTU
FERNANDO MEDRANO
MARTIN JUAREZ
ROBERTO LOZANO

HECTOR ZAMACONA
CARLOS GARCIA
DRA GUADALUPE TIJERINA
JOSE GUAJARDO
RGC GROUP
ALBERTO DIAZ RIVERA


III.  Treatment Of Non-Impaired Classes

The following is the treatment of the Non-Impaired Classes:

3.1     These claims consist of all claims in Class 1.  These claims shall be paid in cash on Confirmation, or as soon thereafter as each becomes an Allowed claim and upon application to the Court to release the funds in the registry of the Court for payment.  The following classes of claims shall be unimpaired.  Class 1.

IV.  Cramdown and Treatment of Impaired Classes

4.1     Cramdown: The Plan Proponent reserves the right, pursuant to Section 1129 (b) of the Code, to request, and Plan Proponent hereby requests, that the Court confirm the Plan if all of the applicable requirements of Section 1129 are met.  Classes 2 through 16 are impaired.

4.2(a)     The holders of allowed Class 2 claims shall be paid out of the cash portion of the Sales Proceeds upon the closing of the sale of the Debtor's assets to Tres Deseos, Inc.  These claims and their amounts are as follows:

| | |
|---|---|
| A.  Law Office of John Ventura | $85,000.00 |
| B.  Brendan Hall | 65,000.00 |
| C.  Treasure Hills Properties, Inc. | 11,200.00 |
| D.  John Harris | 50,000.00 |
| E.  Lawrence Walsh | 200,000.00 |

4.2(b)   The holder of allowed Class 2 Claims shall be paid out of the Note portion of Sale Proceeds held by the Court.  This Claim and its amount is as follows: Jack Brown in the amount of $3,500.00.

4.3   The disputed claims in Class 3 of Carlos Cuellar was filed for $80,000.00.  It shall be paid the amount of $60,000.00 and allowed as an administrative claim upon confirmation and shall be paid only from available proceeds as explained in Section 4.17 herein, from the sale of the lots described in Section 5.1 herein.

The claim of Joe Shirley was not filed with the Court. It was delivered to Debtor's counsel via a letter requesting payment on October 5, 1999. The Debtor will dispute this claim as being a late filed claim and as being a claim for wages pre-petition instead of post-petition. It shall be paid as a claim in Class 4.17, if allowed

Any other holder of any claim not listed in this plan is forever barred from asserting an administrative claim in this case and against the sales proceeds in this case and shall not receive any distribution under this Plan unless an application for payment of administrative claim is filed in accordance with the requirements of Section 503 of the Bankruptcy Code on or before the expiration of thirty (30) days from the Confirmation Date and is held to be an allowed administrative claim.

4.4     The holders of allowed Class 4 claims shall be paid out of the Sales Proceeds upon the closing of the sale of the Debtor's assets to Tres Deseos, Inc. There is one claim in this class: the Internal Revenue Service in the approximate amount of $311,000.00.

4.5(a)   The holders of allowed Class 5(a) claims shall be paid a portion out of the cash Sales Proceeds upon the closing of the sale of the Debtor's assets to Tres Deseos, Inc. with the balance paid from the liquidation of the lots as described in Section V. herein. There are two claims in this class: the secured claim of the State of Texas Comptroller in the approximate amount of $73,067.83 ($33,023.69 Pre Petition and $40,044.14 Post Petition); and the secured claim of the Texas Workforce Commission in the amount of $11,553.44. The State of Texas Comptroller shall be paid $25,218.09 of its Pre-Petition claim out of the Sales Proceeds upon the closing of the sale of the Debtor's assets with the balance to be paid from the cash portion of the first available proceeds from the sale of the lots described in Section 5.1 herein. The Texas Workforce Commission shall be paid $9,500.00 out of the cash portion of the Sales Proceeds upon the closing of the sale of the Debtor's assets with the balance of the claim totaling $2,053.44 to be paid from the first available proceeds from the sale of the lots described in Section 5.1 herein.

The claims of the State of Texas Comptroller and the Texas Workforce Commission for post-confirmation sales and employment taxes will be treated as Administrative Expense Claims pursuant to 11 U.S.C. 503(b) and will be paid in full and will be paid pursuant to the Order Confirming Plan.

The State of Texas Comptroller's tax lien securing its pre-petition sales tax claim will be retained against the four lots described in Section 5.1 herein.

If after appointment, the court-appointed Liquidating Agent has failed to close sale on the lots described in Section 5.1 herein pursuant to the Plan within six months of the date of confirmation of the Plan, the Liquidating Agent shall conduct an auction of the four lots and shall distribute the proceeds pursuant to this Plan.

4.5(b)   The holders of allowed Class 5(b) claims shall be paid a portion out of the Sales Proceeds upon the closing of the sale of the Debtor's assets to Tres Deseos, Inc. and the municipal liens and ad valorem taxes due and owing on the lots described in

Section 5.1 shall be paid at closing or transfer of the sale of transfer of those lots.

4.6    The holders of allowed Class 6 claims, including any post-petition portions thereof, shall be paid out of the Sale Proceeds upon the closing of the sale of the Debtor's assets to Tres Deseos, Inc. There is one claim in this class: the secured claim of Roberto Lozano in the amount of $3,907,520.00. The claim shall be paid Four Hundred Sixty-Five Thousand and No/100 Dollars ($465,000.00). By agreement previously approved by the Court, Roberto Lozano has assigned $65,000.00 to Demetrio Duarte and $400,000.00 to Banco Nacional de Mexico; said amounts to be paid at the closing of the sale of assets to Tres Deseos, Inc.

4.7    The holders of allowed Class 7 claims, including any post-petition portions thereof, shall not be paid out of the proceeds of the Sale Assets. There is one claim in this class: the International Bank of Commerce. The Debtor has surrendered its interest in the collateral in full and final satisfaction of the debt. IBC shall have no other claims in this case.

4.8    The holders of allowed Class 8 claims, including any post-petition portions thereof, shall be paid out of the proceeds of the Sale Assets. There is one claim in this class: The secured claim of Chrysler Credit in the amount of $4,513.48 secured by a 1991 Mitsubishi Expo. The Debtor has surrendered its interest in the vehicle and Chrysler Credit shall have no other claim in this case.

4.9    The holders of allowed Class 9 claims, including any post-petition portions thereof, shall be paid out of the proceeds of the Sale Assets. There is one claim in this class: The secured claim of First Valley Bank in the amount of $99,285.14 secured by 60 golf carts. The Debtor has surrendered its interest in the golf carts and First Valley Bank shall have no other claim in this case.

4.10    The holders of allowed Class 10 claims, including any post petition portions thereof, shall not be paid out of the proceeds of the Sale Assets. There is one claim in this class: The secured claim of John Deere Credit in the amount of $16,499.54 secured by a fairway mower. The Debtor has surrendered its interest in the fairway mower and John Deere shall have no other claim in this case.

4.11    The holders of allowed Class 11 claims, including any post-petition portions thereof, shall not be paid in this case. There is one claim in this class: Vicki Tolifson. Previously, the Debtor had entered into a settlement agreement with the claimant pre-petition on December 8, 1995. The settlement agreement gave the claimant six lots in lieu of the claim; however, these lots were encumbered by federal tax liens and other first and second lien encumbrances as more specifically described in the Debtor's Disclosure Statement and as described on the agreement. Additionally, the first lienholder, International Bank, has foreclosed on the lots pursuant to an Agreed Order Modifying Stay entered by this Court.. Tolifson shall receive the remaining two lots described in the settlement agreement and shall receive no other claim in this case. These lots are as follows: Blocks 1, 2, 6 & 7, Sec. 1, Lot 2, Block 7, Treasure Hills County Club, Cameron County, Texas and Blocks 1, 2, 6 & 7, Sec. 1, Lot 1, Block 7, Treasure Hills County Club, Cameron County, Texas.

4.12   The holders of allowed Class 12 claims, shall be paid out of the Sale Proceeds held by the Liquidating Agent. There is one claim in this class: the secured claim of Claudio Rangel in the amount of $305,000.00. The claim shall be paid One Hundred Fifty Thousand and No/100 Dollars cash ($150,000.00) upon the payment in full of the Tres Deseos Note into the registry of the Court. Rangel shall additionally execute a mutual release in the form to be agreed upon by the parties and executed upon receipt of full payment as set forth in the Plan.

4.13   The holder of allowed Class 13 claim shall be paid out of the Note portion of the Sales Proceeds to be held by the Liquidating Agent. There is one claim in this class: the claim of Lawrence Walsh, Trustee, in the approximate principal amount of $1.5 Million. The claim shall be paid on the Closing Date by the Liquidating Agent in the sum of Seven Hundred Twenty Thousand Dollars ($720,000.00) Dollars cash upon the payment in full of the Tres Deseos Note. Walsh shall also receive two lots of those described in Section 5.1 on the Closing Date by the Liquidating Agent in satisfaction of the claim and shall receive no other claim in this case. The two lots to be conveyed to Walsh by the Liquidating Agent are more fully described as Lots 14 and 20, Block 4, Treasure Hills Country Club Subdivision, Cameron County, Texas. These lots shall be deemed conveyed to Walsh free and clear of all liens and encumbrances pursuant to entry of the Confirmation Order of the Bankruptcy Court. Walsh shall additionally execute a mutual release in the form to be agreed upon by the parties and executed upon receipt of full payment as set forth in the Plan.

4.14   The holders of allowed Class 14 claims shall be paid out of the Sales Proceeds held by the Court. There is one claim in this Class: the unsecured deficiency claim of Banamex in the approximate amount of $2.5 Million. This claim shall be paid the sum of Three Hundred Fifty Thousand and No/100 Dollars ($350,000.00) cash upon the payment in full of the Tres Deseos Note into the registry of the Court. Banamex, the Debtor, and the principals of the Debtor (Roberto Lozano and Hector de Zamacona), upon Banamex' receipt of full payment as set forth hereunder and upon receipt of payment under Section 4.6 herein, shall immediately execute mutual releases of any and all claims by and between them. As a condition of Banamex' approval of this Plan, all signatories to the Settlement Agreement, attached hereto, have agreed to execute mutual releases, which shall be executed, based on mutually agreeable language, following entry of Confirmation Order.

4.15   The holders of allowed Class 15 claims shall be paid pro rata from the proceeds held by the Liquidating Agent. There is one claim in this class: that of Long, Chilton, Payte, and Hardin in the amount of $12,500.00. Long, Chilton, Payte, and Hardin shall have no other claim in this case or under this plan.

4.16   The holders of allowed Class 16 claims shall be paid pro rata from the proceeds held by the Liquidating Agent. There is one claim in this Class: the disputed claim of Fernando De La Garza in the amount of $205,000.00. This claim shall be paid the sum of Eighty Thousand and

No/100 Dollars ($80,000.00) cash upon the payment in full of the Tres Deseos Note into the registry of the Court. De La Garza shall have no other claim in this case or under this plan. De La Garza shall additionally execute a mutual release to be agreed upon by the parties and executed upon receipt of full payment as set forth in the Plan.

4.17    The holders of allowed Class 17 claims shall be paid pro rata from the sale proceeds to be generated by the sale of the lots remaining in addition to any other remaining lots which Debtor is holding title to after distribution of two lots to Walsh as per Section 4.13 herein. They shall share pro-rata from the sales proceeds only after payment in full  first to payment of the tax claims of Section 4.5(a), second to payment of costs, expenses, and fees of the Liquidating Agent as per Section 5.1 herein and third to payment to Carlos Cuellar as per Section 4.3 herein.
. The claims are as follows:

| | |
|---|---|
| Chem-Mark of Texas | 621.63 |
| David Geoffrey & Associates | 1,873.00 |
| Dick Office Supply | 215.74 |
| Duckster | 4,104.43 |
| Felco | 530.19 |
| Foot-Joy/Titleist | 8,204.05 |
| Imperial Headwear | 898.10 |
| IZOD | 1,864.68 |
| La Mode | 1,285.15 |
| Morado's Pest Control | 872.05 |
| Portoco | 793.88 |
| Scoggins, McElvey | 3,800.00 |
| South Point Car Care | 300.00 |
| Unifirst Linen | 1,129.62 |
| Unifirst Uniforms | 700.00 |
| Watson Distributing | 2,750.00 |
| Royston, Rayzor | 15,765.04 |
| Slazenger Golf | 1,873.00 |
| B. D. Holt | 17,762.50 |
| Jaime Saldivar | 8,625.11 |
| Rolando Derbez | Amt. Unknown |
| Guillermo Siller | Amt. Unknown |
| Jaime Woldenberg | Amt. Unknown |
| Romulo Elizondo | Amt. Unknown |
| Roberto Lozano | Amt. Unknown |
| Hector de Zamacona | Amt. Unknown |
| Andres Cantizani | Amt. Unknown |

4.18    The holders of allowed Class 16 claims shall be divested of their stock in the Debtor.

4.19    In the event that any class and/or the Debtor vote against the plan, but that the court nonetheless approves the plan under Section 1129 (b) of the Code, the treatment afforded each Creditor in each class will be the same as provided herein.

## V.  Means for Execution of the Plan

5.1    Sale of Assets. The Bankruptcy Court has previously ordered the sale of the Debtor's assets to Tres Deseos, Inc. for cash and under a Promissory Note.  Certain creditors will be paid at the closing of such transfer.  These creditors are reflected on the Order authorizing such sale.  Approximately six (6) developed lots were not part of that sale.  Two of the six lots, as chosen by the Class 13 Creditor, shall be assigned to the Class 13 Creditor free and clear of all liens pursuant to the Plan and the Confirmation Order on the Confirmation Date.  The Confirmation Order shall authorize and direct the Liquidating Agent to sell the remaining four lots and any other property to which Debtor holds title free and clear of liens or as otherwise directed by the Confirmation Order.  The Confirmation Order shall also authorize the Liquidating Agent to act as custodian and disbursing agent of the Sales Proceeds received from both the Tres Deseos, Inc, Note proceeds on the closing date, in addition to the proceeds of the lots or property, whether at any closing or whether in the registry of the Court.  The Liquidating Agent shall also  be authorized to distribute the proceeds as herein stated and as may be further described in the Agreement Incident to Distribution of Sales Proceeds.  Additionally, the Liquidating Agent shall have the right to apply to this court for approval of fees and expenses from the sales proceeds.

## VI.  Agreement Incident to Distribution of Sales Proceeds

6.1    The Agreement Incident to Distribution of Sales Proceeds is attached hereto as Exhibit A and is hereby made a part of this plan and are incorporated herein for all purposes.  If any provision of this Plan is in conflict with the terms of the Agreement, the terms of the Plan shall prevail.

## VII.  Provisions For Rejection of Executory Contracts

7.1    Debtor hereby reserves the right to accept or reject any and all executory contracts not previously assumed or rejected under §365 of the Code prior to the Confirmation Date.

## VIII Other Provisions

8.1    All United States Trustee Quarterly fees due and owing on the date of confirmation shall be paid in full on the effective date of the plan or as the Court may otherwise order..

## IX.  Jurisdiction of the Court

9.1    The Court will retain jurisdiction until this plan is fully consummated including, but not limited to, the following purposes:

9.2    The classification of the claim of any creditor and the reexamination of claims which have been allowed for purposes of voting, and the determination of such objections as may be filed to creditor's claims for the purposes of voting, shall not be deemed to be a waiver of the Debtors' right to objection to, or re-examine the claim in whole or in part, unless the creditor accepts the plan in which case the claim shall not be subject to further challenge.

9.3    Determination of parties' claims as secured or unsecured, including valuation hearings under §506 of the Bankruptcy Code.

9.4    Determination of all questions and disputes regarding title to the assets of the estate, and determination of all causes of action, controversies, disputes or conflicts, whether or not subject to action pending as of the date of confirmation, between the debtors and any other party, including, but not limited to, any right of the Debtors to recover assets pursuant to the provision of Title II of the United States Code or the determination of tax liabilities under §505 of the Bankruptcy Code.

9.5    The correction of any defect, the curing of any omission, or the reconciliation of any inconsistency in this plan or the order of confirmation as may be necessary to carry out the purpose and intent of this plan.

9.6    The modification of this plan after confirmation pursuant to the Bankruptcy Rules and Title II of the United States Code.

9.7    To enforce and interpret the terms and conditions of this plan, and prior orders of the Court and the Agreement Incident to Distribution of Sales Proceeds.

9.8    Entry of any order, including injunctions, necessary to enforce the title, rights, and powers of the Debtor and to impose such limitations, restrictions, terms and conditions of such title, rights, and powers as the court may deem proper.

9.9    To enforce the Note executed by Tres Deseos, Inc. in favor of the Debtor, including but not limited to, proceedings by the Debtor to collect upon the Note.

9.10    Resolving any disputes among the parties regarding language to be set forth in the respective mutual releases to be executed hereunder and as required by the Settlement Agreement.

## X.   Notices

10.1    Any notice required to be given hereunder shall be given by Certified Mail, Return Receipt Requested, as follows:

To Debtor:
        TREASURE HILLS INVESTMENTS, N.V.

c/o Brendan Hall
P.O. Box 2725
Harlingen, Texas 78550

With a Copy to:
Abelardo Limon
Law Offices of John Ventura, P.C.
7 North Park Plaza
Brownsville, Texas 78521

## XI.

### Execution and Signatures

11.1    This Liquidating Plan is proposed by the Debtor in good faith, in compliance with the Bankruptcy Code, and executed this 1st day of December, 1999.

## XII.

### Discharge of Claims

12.1    Discharge of Claims. Except as otherwise particularly set forth in the Plan, all consideration provided pursuant to the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims of any nature whatsoever against the Debtor and/or the Estate (including liens); and upon the Effective Date, in accordance with §1141 of the Bankruptcy Code, all such Claims shall be satisfied, discharged and released in full; and all holders of Claims or an Equity Security (as defined in the Bankruptcy Code) shall be precluded from asserting against the Debtor or its assets any other or further Claim based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, other than Claims arising under the Plan, and all Creditors shall be precluded from asserting against the Debtor or its assets any causes of action or Claims or any nature whatsoever.

Respectfully submitted,

TREASURE HILLS INVESTMENTS, N.V.

By: _____
    Hector De Zamacona
    Its: Managing Director

Of Counsel:

Law Offices of John Ventura, P.C.
7 North Park Plaza
Brownsville, Texas 78521
956-546-9398 Voice
956-542-1478 Fax
Attorneys for Debtor

By: _____
    Abelardo Limon
    Federal I.D. No. 10045
    Texas Bar No. 12357750

## CERTIFICATE OF SERVICE

I hereby certify that on the _____ day of _____, 1999, a true and correct copy of
the foregoing was sent VIA REGULAR UNITED STATES MAIL,

TRUSTEES:
UNITED STATES TRUSTEE
515 Rusk, Suite 3516
Houston, Texas 77002

Barbara C. Kurtz, Attorney
Wilson Plaza, Ste. 1107
606 N. Carancahua
Corpus Christi, Texas 78476

OTHER PARTIES:

Attorney General, State of Texas
c/o Flora A. Fearon
Assistant Attorney General
P.O. Box 12548
Austin, Texas 78711-2548

Liquidating Plan of Reorganization
TREASURE HILLS INVESTMENTS, N.V.
17

Banamex
c/o Charles Kelley
Mayer, Brown & Platt
700 Louisiana Str., Ste. 3600
Houston, TX 77002-2730

International Bank of Commerce
c/o Mary Lou Ryan Ray
RANSOME & RAY, P.C.
550 E. Levee Street
Brownsville, Texas 78520-5343

Internal Revenue Service
Special Procedures Staff
c/o Keri Templeton
300 East 8th Street
STOP 5022 AUS
Austin, TX 78701

Roberto Lozano
c/o Demetrio Duarte
2200 Warner
San Antonio, Texas 78201

Claudio Arellano Rangel
c/o Kurt Stephen
100 S. Bicentennial
McAllen, Texas 78541

Vicki Tolifson
c/o Preston Henrichson
222 West Cano
Edinburg, Texas 78540-1229

Larry Walsh
950 E. Van Buren
Brownsville, Texas 78520-7199

Larry Walsh
c/o John W. Harris
GRESHAM, DAVIS, ET AL
112 E. Pecan Street, Suite 900
San Antonio, Texas 78205

Brendan Hall
1221 E. Polk St.
P.O. Box 2725
Harlingen, Texas 78550

United States Attorney
P.O. Box 61129
Houston, Texas 77208

Attorney General of the
United States of America
10th & Constitution, Ave. N.W.
Washington, DC 20220

Jennifer Graff
c/o Louise Hytken
Department of Justice
Tax Division
Maxus Energy Tower
717 N. Harwood, Suite 400
Dallas, Texas 75201

Nancy Masso
Assistant U.S. Attorney
P.O. Box 1671
Brownsville, Texas 78522

and to all parties shown on attached matrix.

_____
Abelardo Limon

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

IN RE

TREASURE HILLS INVESTMENTS, N.V.          CASE NO. 96-24360-B-11

            DEBTOR                        CHAPTER 11

## *AGREEMENT INCIDENT TO DISTRIBUTION OF SALE PROCEEDS*

On this date, after notice of the hearing had been given to all parties in open court, came to be heard the arguments and objections concerning the distribution of proceeds from the sale of real estate to Tres Deseos, Inc. pursuant to the order of the Court signed and entered October 19, 1999.

*SALE = $2,601,000.00 ( LESS AD VALOREM $65,000 ) = $2,536,000 TO DISTRIBUTE*

The parties present announced to the Court that they had reached an agreement concerning the distribution of the sale proceeds. The undersigned parties announced their agreement in open court to the following:

1. The following parties would be paid the following amounts:
   a. Internal Revenue Service                    $ 311,000.00
   b. Texas Workforce                             $ 9,500.00
   c. Comptroller of Public Accounts             $ 25,218.07
   d. ~~Ad Valorem Taxes~~                        $ _____
   e. ~~Carlos Cuellar~~                          $ _____
   f  Abelardo Limon                              $ 85,000.00
   g. Brendan Hall                                $ 65,000.00
   ~~h. Demetrio Duarte~~                         $ _____
   ~~i. Scott Rowland~~                           $ _____
   j. Banco Nacional de Mexico                    $ 350,000.00
   k. Claudio Rangel                              $ 150,000.00
   l. DeLaGarza                                   $ 80,000.00
   m. Treasure Hills Properties                   $ 12,000.00

~~Subtotal~~                                       $ _____

   n. *LOZANO - LIEN*                             $ 465,000.00
   o. *~~o.~~* Lawrence Walsh, *TRUSTEE*          $ 970,000.00
   p. *LONG CHILTON (CPA)*                        $ 12,500.00

~~Total~~                                          ~~$2,600,000.00~~

*FROM PROCEEDS OF SALE OF 6 REMAINING LOTS:
    (EST. VALUE @ $30,000/EA.)*

3
   Q. *TRADE CREDITORS*                           $ 37,500.00
   R. *POTENTIAL POST-OP. EXP.*                   $ 74,000.00
   S. *CARLOS CUELLAR*                            $ 60,000.00

2. The parties further agree that their agreement is a "universal settlement" which shall end all disputes between the parties and all litigation between the parties with prejudice.

3. This agreement shall not be binding upon the parties until approved by the bankruptcy court in this cause.

4. All parties shall be paid in full within ~~thirty~~ TEN days of the court approving the ~~settlement agreement~~ PLAN OF CONFIRMATION, AS THE TH&S DEEDS NOTE FOR $1.3 MILLION BECOMES PAYABLE IN FULL WITHIN 10 DAYS OF ENTRY OF CONFIRMATION ORDER, REGARDLESS OF ANY APPEAL.

5. Banco Nacional De Mexico agrees to release Hector de Zamacona, Roberto Lozano Lozano and their respective spouses from the personal guarantees and all other liabilities for payment upon the receipt of $750,000.00, total from both the estate and conveyance of proceeds from Lozano's to lien.

6. Each signator hereto represents and warrants his or her authority to execute this instrument in the individual and/or representative capacity stated.

7. Miscellaneous Provisions.

   THAT THE ESTATE SHALL

   A. ROBERTO LOZANO AGREES ~~TO~~ CONVEY $400,000 OF THE DESIGNATED $465,000 ~~RECEIVED~~ TO BE RECEIVED BY LOZANO DIRECTLY TO BANAMEX. UPON BANAMEX'S RECEIPT OF $400,000 FROM THE ESTATE FOR MR. LOZANO'S LIEN AND $350,000 FROM THE ESTATE FOR BANAMEX'S UNSECURED CLAIM, BANAMEX WILL EXECUTE A RELEASE OF THE CONTINUING GUARANTEES TO MR. ZAMACONA, MR. LOZANO & THEIR RESPECTIVE SPOUSES.

   B. MR. ROBERTO LOZANO & HIS SPOUSE AGREE TO CONVEY BY SPECIAL WARRANTY DEED THE (2) TWO PROPERTIES MR. LOZANO PERSONALLY OWNS IN "TREASURE HILLS ESTATE" TO MR. LARRY WALSH, TRUSTEE IN RETURN FOR A FULL RELEASE FROM ANY AND ALL CLAIMS AGAINST MR. LOZANO, MR. ZAMACONA & THEIR SPOUSES.

   C. TREASURE HILLS, THE DEBTOR, AGREES TO CONVEY BY ~~ETH~~ ORDER OF THE COURT TWO (2) OF THE REMAINING EIGHT (8) PROPERTIES/LOT HELD BY THE DEBTOR IN "TREASURE HILLS ESTATE" TO MR. LARRY WALSH, TRUSTEE IN RETURN FOR A FULL RELEASE FROM ANY AND ALL CLAIMS AGAINST THE ESTATE. MR. WALSH, TRUSTEE RECOGNIZES THAT THERE MAY BE CLAIMS AGAINST THE LOTS AND ACCEPTS FULL RESPONSIBILITY FOR RESOLVING THOSE CLAIMS.

   OF MR. WALSH'S CHOICE,

ANY DISCREPANCIES IN VALUE FOR NOT PRESENT CLAIM OF CREDITORS.

D. TREASURE HILLS, the DEBTOR, SHALL SELL THE REMAINING SIX (6) OF THE EIGHT (8) PROPERTIES HELD BY THE DEBTOR AND FROM THE PROCEEDS OF THIS SALE SHALL PAY $37,500 TO TRADE CREDITORS ON A PRO RATA BASIS, $60,000 TO CARLOS CHURLIE, AND THE REMAINING PROCEEDS SHALL BE USED TO PAY THE EXPENSES OF THIS SALE, FURTHER ESTATE EXPENSES, AND HELD IN RESERVE FOR PAYMENT OF ~~AS POST~~ ~~COSTS~~ PETITION TRADE CREDITORS WHO SUBMITTED ~~CLAIMS FOR~~ ADMINISTRATIVE CLAIMS FOR APPROVAL W/IN THIRTY (30) DAYS OF NOTICE.

E. THIS PLAN INCLUDES THE EXECUTION OF MUTUAL RELEASES BY AND AGAINST ALL PARTIES FROM ANY FURTHER LITIGATION (& CREDITORS) court BY ALL PARTIES TO THIS AGREEMENT. The shall issue, as part of the confirmed plan, an order(s) selling the 6 lots set forth in ~~the~~ paragraph (D) free and clear of all liens and claims.

F. THE AMOUNTS TO BE PAID IN SETTLEMENT SHALL BE BROKEN OUT to $200,000 TO WALSH AS AN ADMINISTRATIVE CLAIM, $50,000 TO JOHN HARRIS AS AN ADMINISTRATIVE CLAIM, THE BALANCE OF $720,000 PLUS THE TWO LOTS FROM THE ESTATE AND TWO LOTS FROM Mr. LOZANO SHALL BE CONVEYED TO LARRY WALSH, TRUSTEE. THIS BREAKDOWN AND ALLOCATION OF ADMINISTRATIVE CLAIM SHALL BE THE SOLE RESPONSIBILITY OF Mr WALSH AND Mr. HARRIS, AND NOT THAT OF THE CREDITORS TO THE ESTATE.

APPROVED THIS 20TH DAY OF OCTOBER, 1999.

_____          _____

_____          _____

_____          _____

_____          _____

B G. Any amounts paid at closing are subject to disgorgement if the plan is not confirmed as contemplated by this agreement. At the closing of the property, all items listed in Exhibit A shall be paid

B H. The approval of this instrument by the IRS representative is subject to approval by appropriate IRS authorities. ANY RELEASE IN THE IRS SHALL RELATE OR PERTAIN ONLY TO CLAIMS THAT THE IRS POSSESSES BY, THROUGH, OR UNDER TREASURE HILLS, INC. D/B/A/.

F.

APPROVED THIS 20TH DAY OF OCTOBER, 1999.

Lawrence A. Welsh
Individually and as trustee.

Demetrio Duarte
as agent for Hector de Zavarena + Roberto Legere

_____
ATTORNEY FOR TREASURE HILLS, N.V.

_____
KURT STEPHEN, ATTORNEY FOR CLAUDIO RANGEL

Eduardo V Rodriguez
Atty for _____
a _____

Jennifer Graff
JENNIFER GRAFF; subject to approval

Charles S. Kelley
CHARLES J. KELLEY; subject to final ratification and approval by Banco Nacional de Mexico.

Harrington Medrano by Demetrio Duarte Jr.
For Baxter Darby

_____

_____
Atty. For Tres Debcos. Inc.

Exhibit A

List of agreed expenses to be paid at closing:

A. Internal Revenue Service ................................ $311,000.00

B. Texas Workforce ........................................ $ 9,500.00

C. Comptroller of Public Accounts ........................ $ 25,218.00

D. Ad Valorem Taxes ...................................... $ 65,000.00

E. Abelardo Limon ........................................ $ 85,000.00

F. Brendan Hall .......................................... $ 65,000.00

G. Demetrio Duarte (from Lozano Lien) .................... $ 65,000.00

H. Banco Nacional de Mexico (from Lozano Lien) ........... $400,000.00

I. John W. Harris, Esquire ............................... $ 50,000.00

J. Lawrence A. Walsh ..................................... $200,000.00

SUBTOTAL: 1,275,218.00

Case: 96-24360    Form id: 122   Ntc Date: 12/06/1999   Off: 1    Page : 1
Total notices mailed: 9

Debtor    Treasure Hills Investments NV,   3009 North Augusta National Drive,   Harlingen, TX 78550
Aty       Hall, Brendan J, Jr   Attorney at Law,   P O Box 2725,   Harlingen, TX 78551
Aty       Rozell, Andrew K   Attorney at Law,   323 E Jackson,   Harlingen, TX 78550
Aty       Ventura, John   Attorney at Law,   7 North Park Plaza,   Brownsville, TX 78521
Aty       Harris, John Wallis   Gresham Davis Gregory Worthy & Moore,   112 E Pecan St,   9th Fl,   San Antonio, TX 78205
U.S. Trus United States Trustee,   515 Rusk,   Ste 3516,   Houston, TX 77002
Aty       Kurtz, Barbara C   Office of U S Trustee,   606 N Carancahua,   Ste 1107,   Corpus Christi, TX 78476
special c Walsh, Lawrence A   Walsh & Associates,   950 E Van Vuren St,   Brownsville, TX 78520-7199
Aty       Wiley, Paul Lee   Attorney at Law,   P O Box 2764,   Harlingen, TX 78551-2764

# DEFENDANTS' MOTION FOR SANCTIONS
# EXHIBIT 3

CVisPDF – www.fastio.com

# THORNTON, SUMMERS, BIECHLIN
## DUNHAM & BROWN, L.C.

# FILE COPY

### ATTORNEYS AT LAW

Richard J. Reynolds, III

Writer's direct e-mail address:
rreynolds@thorntonsummers.com

AIRPORT CENTER - SUITE 300
10100 REUNION PLACE
SAN ANTONIO, TEXAS 78216-4186
(210) 342-5555
FAX (210) 525-0666

AUSTIN

CORPUS CHRISTI

RIO GRANDE VALLEY

July 26, 2000

Mr. Heriberto "Eddie" Medrano
HERIBERTO "EDDIE" MEDRANO LAW OFFICES
1101 West Tyler
Harlingen, Texas 78550

RE:   Civil Action No. B-00-068
Roberto Lozano
v.
Wayne Beneke
Our File #3212/28629 RJR

Dear Mr. Medrano:

With reference to the above, I am enclosing herewith a draft of our proposed Motion for Summary Judgment together with copies of the summary judgment proof. As I told you during our conference, I have obtained certified copies of exhibits 1 and 2, the Debtor's Liquidating Plan and the Order confirming such plan.

As I also indicated during our conference, it is my firm belief that the document signed by Mr. Duarte on behalf of Mr. Lozano does constitute a release of all claims including any claims that Mr. Lozano might have against Mr. Beneke or the Long, Chilton firm. Additionally, the fact that the Court confirmed the plan, including the agreement incident to distribution of sale proceeds and the fact that the Court recited in such Order of confirmation that it was a final judgment, renders that res judicata as to the claims which you are seeking to assert on Mr. Lozano's behalf in this case.

I have urged you to consider this carefully and to confer with your client. Hopefully, after you have done so, you will agree that these claims are barred and will move for voluntary dismissal of this action. In the event that such a voluntary dismissal is not forthcoming within thirty (30) days of the

Mr. Heriberto "Eddie" Medrano
July 26, 2000
Page 2

date of this letter, I will assume that it will be necessary for us to proceed forward with the filing of the Motion for Summary Judgment. The Motion will be filed at that time and, as I also told you during our conference, I have been instructed by my client to also file a motion for sanctions pursuant to F.R.Civ.P. 11.

Very truly yours,

THORNTON, SUMMERS, BIECHLIN
DUNHAM & BROWN, L.C.

BY _____
Richard J. Reynolds, III

RJR/mcj
Enclosure

# DEFENDANTS' MOTION FOR SANCTIONS
# EXHIBIT 4

CutePDF – www.fesisi.com

AUGUST 17, 1999                                              WAYNE BENEKE, C.P.A.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

IN RE.                          )(   CASE NO. 95-24260-B-11
                                )(
TREASURE HILLS                  )(
INVESTMENTS N.V.                )(   CHAPTER 11 CASE
                                )(
Debtor                          )(
- - - - - - - - - - - - - - - - )(- - - - - - - - - - - - - - - -
LAWRENCE A. WALSH,              )(
TRUSTEE                         )(
         Plaintiff              )(
                                )(
vs                              )(   ADVERSARY NO. 95-2065-B
                                )(
ROBERTO LOZANO-LOZANO           )(
and TRES DESEOS, INC            )(
         Defendants             )(

ORAL DEPOSITION OF
WAYNE BENEKE, C.P.A.
AUGUST 17, 1999

ORAL DEPOSITION OF WAYNE BENEKE, C.P.A.,
produced as a witness duly sworn by me at the instance
of the PLAINTIFF, taken in the above styled and
numbered cause on AUGUST 17, 1999, from 1:43 p.m. to
5.40 p.m., before LOU ZUNIGA, Certified Shorthand
Reporter No. 2198 in and for the State of Texas, at the
offices of Bryant & Stingley, Inc., 2010 East Harrison,
Harlingen, Texas, pursuant to the Texas Rules of Civil
Procedure.

FOR THE UNITED STATES DEPARTMENT OF JUSTICE

JENNIFER M. GRAFF
UNITED STATES DEPARTMENT OF JUSTICE
TAX DIVISION
Maxus Energy Tower
717 North Harwood, Suite 400
Dallas, Texas 75201

FOR GASTON DEMEZ

HERIBERTO MEDRANO
LAW OFFICES OF HERIBERTO MEDRANO
1101 West Tyler
Harlingen, Texas 78550

MAR 9

05212 28629

APPEARANCES

FOR TREASURE HILLS INVESTMENTS N.V.:

BRENDAN HALL
LAW OFFICES OF BRENDAN HALL
1221 East Polk
Harlingen, Texas  78550

-and-

ABELARDO LIMON
LAW OFFICES OF JOHN VENTURA
7 North Park Plaza
Brownsville, Texas  78521

FOR THE PLAINTIFF:

LAWRENCE A. WALSH
WALSH & ASSOCIATES
950 East Van Buren Street
Brownsville, Texas  78520-7199

FOR THE DEFENDANTS ROBERTO LOZANO-LOZANO and HECTOR DE
ZAMACONA:

DEMETRIO DUARTE, JR.
DUARTE & PEDRAZA
2200 Warner
San Antonio, Texas  78201

FOR THE DEFENDANT TRES DESEOS, INC.:

DALE WEYAND
LAW OFFICES OF DALE WEYAND
750 Rittiman Road
San Antonio, Texas  78209

INDEX

|                                          | PAGE |
|------------------------------------------|------|
| Appearances                              | 2    |
| WAYNE BENEKE, C.P.A.                      |      |
| Examination by Mr. Walsh                 | 13   |
| Examination by Ms. Graff                 | 106  |
| Examination by Mr. Duarte                | 111  |
| Examination by Mr. Limon                 | 126  |
| Examination by Mr. Hall                  | 137  |
| Examination by Mr. Limon                 | 138  |
| Examination by Mr. Weyand                | 159  |
| Examination by Mr. Walsh                 | 150  |
| Examination by Mr. Duarte                | 162  |
| Examination by Mr. Weyand                | 166  |
| Examination by Ms. Graff                 | 167  |
| Examination by Mr. Limon                 | 168  |
| Witness Signature Page/Corrections       | 169  |
| Reporter's Certificate                   | 170  |

Attached to the end of the transcript  Stipulations

EXHIBITS
|          |                          | PAGE |       |
|----------|--------------------------|------|-------|
| NUMBER   | DESCRIPTION              |      | IDEN  |
| 1        | Box of documents         | 14   |       |
| 2        | Box of documents         | 14   |       |
| 3        | Box of documents         | 14   |       |
| 4        | Binder of documents      | 19   |       |
| 5        | Binder of documents      | 25   |       |
| 6        | File folder of documents | 90   |       |

(Exhibits retained by Mr. Walsh)

BRYANT & STINGLEY, INC.

**5**

1    MR. WALSH: Your concern just brought up
2  as to possible criminal referral of matters relating to
3  this case. I have been asked to express what I know
4  about it. What I know about it is that apparently Mr.
5  Rick Lara, the head of the U.S. Attorney's Office in
6  Brownsville has referred this matter for criminal
7  investigation. It has been assigned to the FBI for
8  investigation. The probable case agent is a Mr
9  Parsons. Whether or not the FBI is going to accept
10  this matter for investigation, I do not know. Whether
11  or not if they accept the case for investigation they
12  would proceed within the criminal charges, I do not
13  know. Whether or not the FBI recommends criminal
14  prosecution to the U.S. Attorney's Office and the U.S.
15  Attorney's Office accepts it, I do not know.
16        It is my further understanding that the
17  U.S. Attorney's Office is also aware that if a criminal
18  investigation is accepted and opened or criminal
19  prosecution is accepted by the U.S. Attorney's Office
20  that it has the potential of harming all creditors in
21  this case who are not in a secured position because any
22  delays that would result in the bankruptcy proceedings
23  would be detrimental to their interest because of all
24  the interest and penalties that will be accumulating on
25  the part of the IRS and other secured parties.

**6**

1        MR. HALL: It's my understanding that this
2  has been brought to the attention of the U.S. attorney
3  by you?
4        MR. WALSH: Correct.
5        MR. HALL: And it also was my
6  understanding that it's been brought to the attention
7  some other governmental agency besides the U.S.
8  attorney?
9        MR. WALSH: I discussed some of the
10  matters that I found with Nancy Masso who has
11  determined that it should be brought to the attention
12  of the proper authority.
13        MR. HALL: And Ms. Masso works for who?
14        MR. WALSH: U.S. Attorney's office in
15  Brownsville.
16        MR. HALL: Is this different than the
17  referral to Mr. Lara or --
18        MR. WALSH: Same thing.
19        MR. HALL: -- the same thing? It's also
20  my understanding that there had been a referral or some
21  sort of a communication with the IRS regarding the
22  matters that are involved in this case?
23        MR. WALSH: Civil IRS. Criminal IRS? No.
24        MR. HALL: Okay. I just understood IRS.
25  I wasn't sure. So IRS be Ms. Graff's --

**7**

1        MR. WALSH. Correct.
2        MR. HALL: -- agency?
3        MR. WALSH: Correct.
4        MR. HALL: And as part of that request
5  that it be looked into, that would involve all the
6  parties involved in this, all the principals who are
7  parties in the lawsuit?
8        MR. WALSH: I don't know what extent they
9  are going to investigate it if they investigate it.
10        MR. HALL: But it was the actions of the
11  parties to the lawsuit that you were concerned about
12  that led you to refer and asked that this be looked
13  into by the U.S. Attorney's Office.
14        MR. WALSH: Correct. I guess. I don't
15  know what you are talking about, Brendan. I sat down
16  with you for five hours and went over all of this stuff
17  several week ago.
18        MR. HALL: I guess what I'm trying to
19  figure out is who would be investigated by the U.S.
20  Attorney's Office. It would be the parties to this
21  lawsuit, correct, Treasure Hills Investments and the
22  individuals?
23        MR. WALSH: I'm not a charging authority.
24  Again. I told you then and I told you again now that,
25  you know, insofar as my concern, I did not want

1  criminal prosecution. I sat down and I discussed it
2  with you as to any way to avoid any possible criminal
3  prosecution. You know, I sat down with you and you
4  apparently agreed with me at the time as to the ethical
5  obligations to inform the authorities about what we had
6  gone over with. Now, if you currently disagree, I'd
7  like to get that on the record.
8        MR. HALL: My view of ethical obligations
9  is not the point of this. What I'm getting at is that
10  these matters have been referred to governmental
11  agencies regarding criminal investigations and those
12  investigations presumably would be of the parties to
13  this lawsuit, such as Treasure Hills Investments N.V.,
14  Roberto Lozano-Lozano, Hector de Zamacona and perhaps
15  even the accountants who were participating in doing
16  accounting work for the corporation.
17        MR. WALSH: Perhaps that, perhaps Mr.
18  Cuellar. I don't know. Now, as I went -- since we are
19  getting everything on the record, as I went over this
20  with you a couple of weeks ago, it's my understanding
21  that you have since relayed some of this information to
22  other parties. Can I understand just exactly what you
23  told, who and when?
24        MR. HALL: I'm not going to discuss what I
25  have done with information that was provided to me

9

1  because I think it would be very difficult for me to
2  separate what out of there was attorney/client
3  privilege and what wasn't. Initially when you talked
4  to me, you had indicated you wanted this to be between
5  us. As we got into the conversation, I explained to
6  you it would be, in my opinion, virtually impossible to
7  keep what you were telling me confidential because it
8  involved my client, the directors of my client and
9  co-counsel
10        MR. WALSH: I believe that what I told
11  you --
12        MR. HALL: Please let me finish. So when
13  we finished that discussion in your office, it was my
14  understanding that we had agreed once you had given me
15  what you had given me, as far as you were concerned, I
16  was released from any sort of confidentiality because I
17  told you I couldn't accept information and not discuss
18  it with my client, among others.
19        MR. WALSH: Was it that understanding or
20  was it the understanding that after you reviewed
21  everything in full, and we discussed the ethical
22  obligations that -- and whether or not you were under
23  the same ethical obligations at that point, whether or
24  not at that point the decision would be yours?
25        MR. HALL: It was my understanding that

10

1  once you had given me all the information you gave me
2  that day, both verbally and in documentary form, that
3  at that point, as far as you were concerned, I was free
4  to do with it whatever I saw fit.
5        MR. WALSH: I was just going by the basis
6  that you stated on the record versus the basis that,
7  you know, I just went over, whether or not you had a
8  complete understanding of everything and concerning the
9  ethical obligations.
10        MR. HALL: I'm quite sure I don't have a
11  complete understanding of everything. This thing goes
12  on and on and on, so --
13        MR. WALSH: Bottom line, are you stating
14  that the basis of you discussing the matter is because
15  what you just discussed right now insofar as that you
16  had to discuss it or, you know, are you saying that I
17  did not explain to you the situation concerning ethical
18  obligations and the fact that I wanted you to review
19  everything in detail?
20        MR. HALL: Your question is about my
21  ethical obligations. I thought it was only fair to put
22  this on the record so that Mr. Beneke would be aware of
23  the referrals to the criminal investigation agencies,
24  so if he felt it was appropriate to get legal advice on
25  his own, he would have an opportunity to do that. I

11

1  thought it was just fair to have that out there in the
2  record also.
3        MR. WALSH: I will also advise you that I
4  have discussed that matter with Mr. Beneke and I have
5  also informed the firm.
6        MR. HALL: Okay. That's all I have.
7        MR. WALSH: Anything else?
8        MR. DUARTE: Just for clarity on the
9  record, you are saying Mr. Beneke has been advised and
10  his firm has been advised that their office and/or any
11  individual in the firm may be investigated for any
12  criminal conduct that you may have brought to the
13  attention of authorities and he's here freely,
14  voluntarily and without counsel?
15        MR. WALSH: Yes. But I want clarification
16  on something, that I have not referred or requested any
17  criminal prosecution and I have not presented anything
18  for criminal prosecution, period.
19        MR. DUARTE: Well, to me. I'm not even
20  going to worry about it in that context. You spoke
21  with an assistant U.S. attorney, they made a referral
22  to the FBI, the FBI may or may not investigate, and
23  nobody in this room can define the parameters that the
24  justice department through the FBI or any other agency
25  will investigate this matter. And in fairness to this

12

1  individual who is about to be deposed, he's testified
2  once at deposition, he's testified once in court, and
3  if his testimony may be used against him in a criminal
4  prosecution, I think it's just fair to let him
5  know that. And if you say you have let him know that
6  and he's here to testify, I'm not his lawyer and he can
7  do whatever he --
8        MR. WALSH: I'm in complete agreement with
9  that.
10        MR. DUARTE: I'm just putting on the
11  record what I understand because --
12        MR. BENEKE: I'm not so sure I understood
13  that either.
14        MR. WALSH: We have got two, four, six --
15  seven attorneys in the room, so ask any question that
16  you want.
17        MR. DUARTE: But can he when he --
18        MR. WALSH: For the record, none of them
19  represent you. Furthermore, under the rules and
20  ethical considerations with government attorneys which
21  may apply to this case also, they are obligated to
22  represent their client and no one else.
23        MR. HALL: So the fact that there are
24  seven lawyers in the room, as far as Mr. Beneke's
25  concerns, are irrelevant. He can't look to us for

Case 1:00-cv-00068   Document 11   Filed in TXSD on 10/02/2000   Page 87 of 143

**13**

1  advice.  I want him to understand that.
2      MR. WEYAND: Mr Beneke, just for the sake
3  of -- so you are clear, I don't believe any of the
4  other attorneys in the room would mind if you asked the
5  court reporter to go off the record for a moment if you
6  want to ask some candid questions.
7      MR. BENEKE.  Yeah.  Let's do it.  Go off
8  the record.
9      (Discussion off record).
10
11          WAYNE BENEKE, C.P.A.,
12  having been duly sworn, testified as follows:
13          EXAMINATION
14  BY MR. WALSH:
15   Q  For the record, would you please state your
16  full name.
17   ?. Wayne Beneke.
18   Q. And, Mr. Beneke, how are you employed?
19   A. I'm a partner with the accounting firm of Long,
20  Chilton, Payte & Hardin.
21   Q. You have previously testified via deposition
22  and at one of the bankruptcy hearings in this cause; is
23  that correct?
24   A. That's correct.
25   Q. And so all of that identifying that and

**14**

1  contained in those proceedings would also apply to you
2  today?
3   A. That's correct.
4   Q. Okay.  Mr. Beneke, I have brought with me three
5  boxes that are sitting against the wall that have been
6  marked as Plaintiff's Exhibits 1, 2 and 3.  Would you
7  mind going over there, looking through them and see if
8  you can identify these records?
9   A. Yes, those are all records from our accounting
10  office which were initially subpoenaed sometime ago.
11  I'm not exactly sure how long ago.  But those are all
12  of our records dealing with this client.
13   Q. Okay.  Those would be the records you produced
14  for the May deposition pursuant to the Subpoena Duces
15  Tecum?
16   A. That's correct.
17   Q. Okay.  And do you have personal knowledge of
18  Long & Chilton's filing system?
19   A. Yes, I do.
20   Q. Okay.  And did you remove Treasure Hills'
21  records from those files when you gathered up the
22  records for the notice?
23   A. Yes.
24   Q. And these are the correct files that were
25  removed from the Long & Chilton archives or whatever

**15**

1  you want to call it, in other words, all of the
2  Treasure Hills files?
3   A. That's correct.
4   Q. And, again, these exhibits -- those boxes,
5  Plaintiff's Exhibits 1, 2 and 3 are all of the files
6  that were removed from your office?
7   A. That's correct.
8   Q. And how do you recognize all of those files?
9   A. We have certain jackets, file folders -- what
10  do you call these things?
11   Q  Folders?
12   A  -- folders that number -- that have an
13  identifying number and a client name identification on
14  each of those respective files.
15   Q. Okay.  Now, you have also been the personal
16  accountant for Long -- excuse me, for Treasure Hills
17  for a couple of years.  I would assume that you have
18  reviewed all these files at one time or another?
19   A. No, although I have served as the partner in
20  charge of this client subsequent to December of 1996,
21  at which point in time the partner in our office who
22  was responsible for this engagement retired from the
23  firm.  I then assumed those responsibilities subsequent
24  to his retirement.
25   Q. Would that be '96 or '95?

**16**

1   A. No, 1990 -- December of 1995.  That would be
2  correct, yes, December of 1995.
3   Q. Now, some of the records contain Long &
4  Chilton's computer printouts.  Does Long & Chilton use
5  a computer?
6   A. Yes, we use a multitude of computers.
7   Q. Are the computers reliable?
8   A. To my knowledge.
9   Q. Does Long & Chilton have procedures for
10  inserting data into the computer?
11   A. We have procedures which control the input of
12  information into the computer, that's correct.
13   Q. And you actually have data entry personnel
14  also?
15   A. Exactly.
16   Q. Do you have a procedure at Long & Chilton that
17  has built-in safeguards to ensure the accuracy and ID
18  errors that may be --
19   A. Yes.  The software that we use requires that --
20  you know, for example, in the case of accounting data
21  input, that that data is balanced, you know, prior to
22  the program accepting that data into the actual books
23  and records of the company.  There are a number of
24  safeguards of that nature which controls the input of
25  data onto any client's records.

17

1  Q.Okay. And additionally I would assume the
2  accountants and the other workers reviewed the
3  printouts to look for additional errors?
4  A. That's correct.
5  Q.Okay. Does the business of Long & Chilton keep
6  their computers in good shape repair -- state of
7  repair?
8  A. Yes
9  Q.Now, when you have these readouts or produce
10  the readouts on certain dates, how do you identify when
11  that particular computer record was produced?
12  A. The system automatically produces what is
13  referred to as a run date. That run date is identified
14  at the top of each page that is produced, and those run
15  dates are internally generated by the machine -- by the
16  computer itself and are not alterable.
17  Q.When Long & Chilton prints out one of these
18  computer readouts, do you-all use the proper
19  proceedings in obtaining it, in other words, follow the
20  instructions of the particular program to obtain a
21  readout?
22  A. Yes, that's correct. I mean, you need to
23  understand the procedure is to essentially instruct the
24  computer to print, and the internal operations of the
25  machine itself produce this information that I was

18

1  referring to earlier in terms of the run date, et
2  cetera. That's not anything that is operational by the
3  operator.
4  Q.Basically hit "print"?
5  A. Exactly.
6  Q.And when you-all obtain the readouts, do you
7  use the proper procedures in obtaining the -- in other
8  words, I guess brush print?
9  A. Yes.
10  Q.Okay. Were the computers in working order at
11  the time that Long & Chilton obtained the readouts that
12  were in the files?
13  A. To my knowledge they were.
14  Q.Do you recognize the printouts that are
15  contained in the files marked Plaintiff's Exhibits 1
16  through 3 as readouts of Long & Chilton?
17  A. I do.
18  Q.And how do you recognize them being readouts of
19  Long & Chilton's records?
20  A. It's information I'm very familiar at looking
21  at. The particular software that we use has a
22  particular print format that's very recognizable. It's
23  our printouts.
24  Q.Okay. Now, lastly, there's no strange symbols
25  or terms in the printouts that need any specific

19

1  explaining, do they? They are pretty --
2  A. Not to my knowledge.
3  Q.I'm going to hand you what has been previously
4  marked as Plaintiff's -- or Deposition -- excuse me,
5  Deposition Exhibits 2 and 3. Actually, I removed
6  Exhibit 3, so it's only --
7  MR. HALL: What are these exhibit numbers,
8  these boxes?
9  MR. WALSH: Plaintiff's 1 through 3.
10  MR HALL. Okay. So that's going to be 4?
11  MR. WALSH: This is going to be Deposition
12  Exhibit -- it was previously marked as Deposition
13  Exhibit No. 3  I will change it. I hand you what's
14  been re-marked as Plaintiff's Exhibit No. 4 and ask you
15  to go through and identify the document excerpts in
16  that exhibit.
17  A. Okay.
18  Q.Okay. What are those excerpts?
19  A. These are -- looks to be under Tab 1 a spread
20  sheet which identifies certain financial information
21  off -- which appears to be off of the books and records
22  of Treasure Hills Investments. It identifies certain
23  names of individuals which at least to me seems to
24  indicate note balances with certain individuals or
25  shareholders of the company. That spread sheet or

20

1  series of spread sheets start with 1989 and follows
2  certain of this financial information all the way
3  through 1996.
4  Q.Do you care to characterize it as basically a
5  summary of the excerpts that are subsequently --
6  A. It could very well be, yes.
7  Q.Then subsequent to that information we have
8  certain pages copied out of the federal income tax
9  returns of the company along with certain -- again,
10  certain spread sheets identifying transaction detail of
11  activities dealing with the shareholders and the notes
12  with the shareholders of the company for years 1989
13  through 1996. In addition, there appears to be some
14  general ledger and other financial statement matters
15  copied in these respective years.
16  A. Okay.
17  Q.And the full document would be contained in
18  your regular files marked Plaintiff's Exhibits 1
19  through 3 -- in other words, have, for example,
20  Schedule L of the tax return for a certain year? The
21  entire tax returns have been made exhibits?
22  A. That's correct. These look to be reproductions
23  of that original information save and except for this
24  recap, if I can use that word. At the front of this
25  file --

Case 1:00-cv-00068    Document 11    Filed in TXSD on 10/02/2000    Page 89 of 143

21

1    Q. Okay.
2    A. -- which probably is not our information.
3    Q. Let's go to the year ending 12-31-91. For that
4    year let's start off with Schedule L of the tax return.
5    I believe that all of this had been testified to
6    previously at either the deposition or the hearing in
7    front of the bankruptcy court, but let's go to another
8    portion, the Due to Stockholder summary. Do you know
9    what I'm talking about?
10   A. Yes.
11   Q. Okay. What is that?
12   A. That is a spread sheet which identifies the
13   loans that Treasure Hills had on its books with certain
14   of its shareholders
15   Q. Okay. And for the year ending 12-31-91 Mr.
16   Lozano was shown as an ending balance of $1,864,505.63
17   which was subsequently rounded to $506?
18   A. That's correct.
19   Q. Now, for 1991 I'm going to talk about three
20   notes. One I'm going to identify as the McBride note.
21   That was the -- that would be the note that Mr. Derbez
22   obtained an assignment from William McBride, Trustee,
23   on. I believe it was the original principal amount of
24   $2.5-some-odd million?
25   A. That's correct.

22

1    Q. The second note, which I will identify as what
2    I will call the NCNB note, I believe that that one was
3    originated, I think, with InterFirst Bank and it was
4    originally in the amount of 1.3 prior to the assignment
5    to Mr. Derbez. And by the time that Mr. Derbez took it
6    over, it had a principal and interest balance due of
7    $815,313?
8        MR. DUARTE: I'm going to object on the
9    form.
10   A. That's correct.
11   Q. The last one that I would identify would be
12   what I'll call Rio Grande Savings & Loan note. I think
13   the original amount was $58,000, but by the time of the
14   assignment, the principal and interest due was
15   $52,200?
16       MR. DUARTE: Objection; form.
17   A. That's correct.
18   Q. Okay. Let's start off with the McBride note.
19   According to the financial records of Treasure Hills
20   for the year ending 1991, is it correct to state that
21   the secured portion of that note was set out at
22   $1,795,000?
23   A. That's correct.
24   Q. And there was also separated and set out an
25   unsecured portion of the note which showed an amount of

23

1    $996,687?
2    A. That's correct.
3    Q. Okay. And according to the financial records,
4    apparently Treasure Hills carried the loans on their
5    internal records and financial statements in the same
6    manner that they were treated under the first
7    bankruptcy plan, is that correct, in other words, for
8    the amounts due and owing under the payment terms and
9    everything?
10   A. Exactly, that's correct.
11   Q. Okay And insofar as the McBride note, that
12   was again $1,795,000, and according to the financial
13   records of Treasure Hills, its payout was ten annual
14   payments of $179,500 principal plus interest commencing
15   on April 1st, 1991 with a balloon on the eighth year?
16   A. That's correct.
17   Q. In fact, all of the debts and notes related to
18   Treasure Hills, their payments began on the same date,
19   being April 1st, 1991?
20   A. That's correct.
21   Q. Okay. Insofar as the unsecured portion
22   concerned, that was set out as $996,687 due in 1998,
23   the terms of which were 84 monthly payments of
24   $6,115.57 principal only. No interest was accumulating
25   on that?

24

1    A. That's correct.
2    Q. And insofar as the NCNB is concerned, that
3    original amount was set forth as $815,313?
4    A. I'm sorry. I -- yes, you are correct.
5    Q. Okay. And that set out as to be due in 1994
6    with the terms being 12 quarterly payments of
7    $64,583.33 principal only plus interest again beginning
8    April '91?
9    A. That's correct.
10   Q. Okay. And insofar as the Rio Grande Savings &
11   Loan one, that was $52,200 amount owing at the time,
12   and it was set forth as being due in 2001 with the
13   terms of 40 quarter payments of $1,305 principal plus
14   interest beginning April 1, '91?
15   A. That's correct.
16   Q. Okay. And the -- what I will call the American
17   Express note, which is really American Express Bank
18   International, is shown on internal records of Treasure
19   Hills as a note of 500,000?
20   A. 1,500,000, that's correct.
21   Q. They have it down there as a balloon note due
22   in 1992?
23   A. That's correct.
24   Q. Okay. And then you have Banco de Mexico, also
25   a million five, also balloon, unsecured note ballooning

25

1  in '92?
2     A. That's correct.
3     Q. And then they also show other creditors and so
4  forth, for example, Fernando De la Garza, Mr. Rangel
5  and Banco de Mexico; is that correct?
6     A. That's correct. There are several.
7     Q. Now I'm going to switch gears on you for a
8  minute. Okay. I'm going to hand you what was
9  originally marked as 8-17-88 -- excuse me, 8-17 through
10  18-99, Deposition Exhibit No. 1, which I have now
11  re-marked as Plaintiff's Exhibit No. 5.
12        MR. DUARTE: Just for clarity, when you
13  are saying it was previously listed as Deposition
14  Exhibit No. 1, et cetera, you are talking about
15  previously listed in his deposition?
16        MR. WALSH: No. Those were my internal.
17  Before I came to the depositions, I just marked them on
18  the back. Those are my internal. Those are not
19  exhibits that have been gone over in any other
20  proceeding. Now, some of the exhibits and documents
21  have been.
22        MR. DUARTE: So for my purposes, I'm not
23  looking at the previous Deposition Exhibit No. 1 from
24  his previous depo and I'm not looking at the previous
25  Exhibit No. 1 from the trial? It's brand-new?

26

1        MR. WALSH: Correct.
2        MR. DUARTE: Okay. Thank you.
3     Q. Now, let's explain some of these notes at the
4  beginning. In Plaintiff's Exhibit No. 5, the first
5  document is a copy of a purchase agreement between Mr.
6  Derbez and Mr. McBride. Now, the purchase price -- and
7  I believe that we have gone through this in the
8  previous deposition, but basically the purchase price
9  is a million five, right?
10     A. That's correct.
11     Q. Okay. And that would constitute what they call
12  his basis in the note?
13     A. That's correct.
14        MR. WEYAND: Excuse me. When you say "his
15  basis," who are you referring to?
16        MR. WALSH: Mr. Derbez'.
17     Q. Could you explain what a basis is?
18     A. Basis is -- basis is a term that is used in the
19  accounting world as well as in the tax world to
20  represent the amount of money paid for an asset.
21     Q. Okay. So, for example, the internal records of
22  Treasure Hills in the bankruptcy plan carried this
23  McBride note down as $1,795,000 principal plus
24  996-some-odd-thousand dollars unsecured. So that's a
25  total of what, 2.4-some-odd million dollars?

27

1     A. That's correct.
2     Q. 2.5, whatever it is. His basis would be a
3  million five. What would be the difference?
4     A. Well, the difference is again a -- an
5  accounting entry on the books of the company, in this
6  case Treasure Hills, but for which the individual --
7  and in this case we are talking about Mr. Derbez --
8  that in the case of the individual had not -- had not
9  paid anything, had not retained any element of basis in
10  that obligation.
11     Q. I know there's no such thing, especially when
12  dealing with the IRS, but would it be fair to say that
13  if Mr. Derbez ever sold the note for over a million
14  five and made a gain on the difference, that that would
15  be subject to taxation and reported?
16     A. Yes, for -- yes, that would be exactly right.
17  He would be subject to an element of U.S. income tax
18  for any excess over the 1.5 million dollars of value
19  paid --
20     Q. Okay.
21     A. -- initially.
22     Q. Now, as noted on the McBride note, even though
23  it's carried on the books at the combined amount of
24  2.4, $2.5 million, whose basis is only a million five,
25  I was not able to locate in your documents any such

28

1  things specifying what the basis of the NCNB note or
2  the Rio Grande Savings note was. But according to
3  documents that have been previously introduced,
4  including transfer of the liens, the $815,000 plus the
5  $52,200 are the same amounts that are carried on the
6  books was the principal and interest then due and owing
7  at the time of transfer. Is there any way through the
8  internal records of Treasure Hills to determine what
9  the actual basis was to Mr. Derbez on these two notes?
10     A. Oh, yeah, I'm sure there would be. You know, I
11  think the problem we're faced with in this particular
12  situation is that at least from our standpoint, Long &
13  Chilton's involvement with Treasure Hills, you know,
14  began at -- and I'm not exactly sure, but at some point
15  in time subsequent to the 1991 bankruptcy, and so the
16  issue would be whether or not that information is
17  available from anyplace.
18     Q. Okay.
19     A. But we don't -- in our information, I don't
20  believe we would be able to corroborate that.
21     Q. I also noticed on the various transfers to Mr.
22  Derbez, he took the three notes that we're talking
23  about in a capacity as trustee. Do you know who Mr.
24  Derbez was a trustee for?
25     A. I have no idea. I have never met Mr. Derbez,

29

1  wouldn't know Mr. Derbez if I saw him.
2  Q. Okay. Now, I'd like you to go on Exhibit 5 to
3  Pages -- well, let's go to Page 12 first.
4  A. In Exhibit --
5  Q. 5.
6  A. -- 5?
7       MR. WEYAND: This is Plaintiff's Exhibit
8  5?
9       MR. WALSH: Yes.
10      MR. WEYAND: I'm sorry. Do you have a
11  page --
12      MR. WALSH: The Bates number.
13      THE WITNESS: Bates No. 12.
14      MR. WEYAND: Okay.
15  Q. Now, that's a list of shareholders and
16  percentage of shares as of March 6, 1991?
17  A. That's correct.
18  Q. And what would that document be utilized by
19  Long & Chilton for?
20  A. It could have been used for a number of
21  different reasons. In the case of the federal income
22  tax return, this would identify the more than 25
23  percent shareholders for which the form 5472, if I'm
24  not mistaken -- yeah, the 5472 -- it would identify for
25  that purpose those shareholders who would be reportable

30

1  on 5472. That's one purpose. But -- I mean, it's just
2  -- it's appropriate information to know in a
3  closely-held organization just who the shareholders
4  are.
5  Q. Can you remember whether or not during the IRS
6  audits for the years ending 1991 through 1993 the IRS
7  requested information as to -- you know, who were the
8  stockholders and what interest they had?
9  A. I don't specifically have any recollection of
10  that, although it would certainly be a very routine
11  matter on the part of the service to request that
12  information.
13  Q. Okay. And that document that's on Treasure
14  Hills stationery identifies, if I'm correct, Mr.
15  Diaz-Rivera, Alberto Diaz-Rivera, as a 25 percent
16  stockholder, Mr. Derbez, Gaston Derbez, as a 25 percent
17  stockholder, Mr. Lozano as 11.83 percent stockholder
18  and Mr. Zamacona as an 8.83 percent stockholder,
19  correct?
20  A. That's correct.
21  Q. Okay. Take a glance at Pages 13 through 17.
22  A. Okay.
23  Q. On Page 13 it's corporate minutes of Treasure
24  Hills which is entitled "Blocking Certificate and Power
25  of Attorney." Why would Long & Chilton have those

31

1  records?
2  A. I have no idea.
3  Q. Okay. And that document, which is under "O."
4  it states that Mr. Zamacona, Lozano, Garcia,
5  Villarreal, Derbez and Diaz-Rivera have in their
6  possession five outstanding bearer of stock
7  certificates representing the entire issue and
8  outstanding share capital of Treasure Hills; is that
9  correct?
10  A. That's correct.
11  Q. Okay. Now, compare that document with the
12  previous document on Page 12 where it lists all the
13  shareholders. Is there a conflict? I mean, you have
14  got five people that have all of the shares and then on
15  Page 12 you have a whole bunch of shareholders. It's
16  more than five listed on Page 12, right?
17  A. Yes, that's correct.
18  Q. And, again, on the list of shareholders that's
19  dated March 6, 1991. Page 12?
20  A. Yes.
21  Q. And the blocking certificate is notarized on
22  March 28th, 1991?
23  A. That's correct.
24  Q. That's within the same month?
25  A. That's correct.

32

1  Q. Now, on Page 17, which is the corporate minutes
2  whereby I believe they added Mr. Derbez, Diaz-Rivera to
3  managing directors --
4  A. That's correct.
5  Q. And that document also states that those five
6  individuals contain all 6,000 issued shares of stock of
7  Treasure Hills?
8  A. That's correct.
9  Q. Okay. Again, that document is also in conflict
10  with the list of shareholders that we have gone over on
11  Page 12?
12  A. Yeah, assuming that, you know, between March
13  6th and March 29th those remaining shares hadn't been
14  acquired by one of those four parties.
15  Q. Correct. Now, let's go to Page 18. Can you
16  identify that document?
17  A. This looks -- it's a handwritten document which
18  is titled "Lots sold - payment made to Gaston Derbez."
19  Q. Okay. That basically reflects that he was
20  getting 40 percent of the sales proceeds of lots that
21  he would release?
22      MR. DUARTE: I'm going to object to the
23  form of that question. It calls for speculation on the
24  part of this witness.
25  A. Well, what it appears to represent is some

33

1  information identifying certain lots  The sales price
2  of those lots and a 60 percent computation of the full
3  sales price and then an identification of a check
4  written.
5     Q.Okay.  But it does contain a 60 percent figure
6  in one column and then lists the amount?
7     A. It does, in fact.
8     Q Okay  And according to this document --
9  handwritten document between December 4th, 1989 and
10 April I believe, the 16th, 19 -- or March 30th, 1990,
11 Mr. Derbez was paid $164,410 by Treasure Hills?
12       MR. DUARTE: I'm going to object.  That
13 calls for speculation on the part of this witness  The
14 document speaks for itself.
15    A. It would -- it could seem to indicate that, but
16 we don't know.
17    Q.Okay.  Well, we've actually traced that amount
18 into one of the notes, specifically the NCNB note.
19 Now, that note was originally in the amount of
20 $815.313, correct?
21    A. That's correct.
22       MR. DUARTE: I'm going to object to the
23 form of that question.
24    Q.And according to the financial records of
25 Treasure Hills, was that note reduced by any amount in

34

1  the tax year 1991?  That would be the financial -- you
2  can go back to Exhibit No. 4.
3        MR. DUARTE: I'm going to object to the
4  form of that question.  It assumes facts not in
5  evidence.
6     A. Yes, there is a reduction in that year from the
7  original note balance of $815,000.
8     Q.Okay.  And it's brought down to --
9     A. $640,913.
10    Q.That difference was $174,410.  Have you been
11 able to identify in your records where the $10.000
12 difference came from?
13    A. No.
14    Q.But in your opinion --
15    A. But you have to understand we didn't have
16 records for Treasure Hills at this time.
17    Q.Okay.  The other two notes remain the same for
18 that year, correct, McBride -- well, both the McBrides,
19 the unsecured and the secured, and the Rio Grande
20 Savings & Loan?
21    A. That's correct.
22    Q.Okay.  Let me ask you this: If Mr. Derbez did
23 not obtain these monies and someone else obtained them,
24 I mean, would the financial records need to reflect
25 that?

35

1        MR. DUARTE: I'm going to object and just
2  ask for clarification  When you say Mr. Derbez did not
3  receive these monies, what are you talking about?
4        MR. WALSH: The $164,410.
5     A. This -- you know, this reduction that occurs in
6  the note balance is a reduction in a note that the
7  corporation carried in the name of Gaston Derbez
8     Q Okay.  But what I'm saying is that if the money
9  was not paid to Mr. Derbez as the note holder but
10 actually to a third party, should the corporate records
11 of Treasure Hills reflect who the money was paid for --
12 paid to, excuse me?
13    A. Yeah, it certainly should.
14    Q For example, if the money was actually paid to
15 a shareholder, let's say Mr. Zamacona or Mr. Lozano,
16 especially with them being foreign nationals, should
17 the internal records reflect that payment to them?
18    A. It certainly should.
19    Q.And if Mr. Lozano and Zamacona were receiving
20 monies from Treasure Hills, would that implicate the
21 filing of and reports to the IRS or obligate them to
22 pay taxes should it be income to them?
23    A. It would.
24    Q.Okay.  Now, let's stick with the financial
25 records for '91 -- never mind.  Okay.  Let's go back to

36

1  Exhibit No. 5, Plaintiff's Exhibit No. 5, Page 19.  And
2  apparently this is a document that was prepared by
3  Treasure Hills concerning Mr. Derbez.
4     A. This is a document on Treasure Hills Country
5  Club stationery, which is to the board of directors
6  regarding a payment.  It's dated April 22nd, 1992 and
7  it reads, "On March 22nd, Treasure Hills Investment
8  directors celebrated the monthly meeting to which we
9  agreed to pay in accordance to the bankruptcy plan a
10 total of $205,000 to Mr. Gaston Derbez.
11    Q.Okay.  And that's signed by Mr. Zamacona and
12 Mr. Derbez?
13    A. Exactly.
14    Q.And there's some initials at the upper
15 right-hand corner next to the name of Carlos E.
16 Cuellar.  Do you recognize that signature as being Mr.
17 Cuellar's?
18    A. Oh, I don't know that I would be able to
19 testify to Mr. Cuellar's signature.
20    Q.Okay.
21    A. But it is clearly initialed.  It apparently was
22 sent to our office because there is further
23 identification entitled "For Ron Shimotsu,"
24 who was a staff accountant with us at this time --
25 during this time.

Case 1:00-cv-00068   Document 11   Filed in TXSD on 10/02/2000   Page 93 of 143

## 37

1    Q. Okay. Again, the same questions I asked you
2  about the $164,000, if that money was not actually
3  given to Mr. Derbez but paid to another party, for
4  example, Mr. Zamacona and Lozano, that should have been
5  reflected within the corporate records of Treasure
6  Hills, correct?
7    A. It certainly should have been.
8    Q. The same question, and I assume the same answer
9  pertaining to the income that Mr. Lozano or Mr.
10  Zamacona may have --
11    A. Certainly.
12    Q. Let's go to Page 20. Now, apparently this
13  document is a one-sheet breakdown of how the monies
14  obtained from the $1.5 million American Express loan
15  were utilized. Do you remember this being prepared to
16  present to the IRS during that audit period?
17    A. I don't -- I don't have any specific
18  recollection of this document. You know, I'm not
19  certain that it was something that we had prepared for
20  the Internal Revenue Service or whether it was a
21  document generated by the client.
22    Q. Okay. Now, according to this document, on
23  April 23rd, 1992, it reflects that Mr. Gaston Derbez
24  got the 205,000. There's an extra $15,000, which I'd
25  assume is a wire transfer fee. But it mentions that it

## 38

1  was payment for lien releases on the lots; is that
2  correct?
3    A. On which date?
4    Q. April 23rd, 1992. I believe it's highlighted.
5    A. Yes.
6    Q. Okay. It also indicates -- the same document
7  also indicates that on March 23rd, 1992 Mr. Derbez got
8  some portion -- we don't know what portion -- of the
9  sum of $84,000. And, again, I'm assuming that the
10  15,000 -- excuse me, $15 was a wire transfer fee?
11    A. That's correct.
12    Q. Okay.
13    A. This describes that transaction as being IRS
14  for Gaston payroll, Enrique cart pass and Banamex
15  interest.
16    Q. Let me ask you this: If these documents were
17  prepared to turn over to the Internal Revenue Service
18  as part of the audit, do you instruct your client that
19  they should provide the Internal Revenue Service with
20  truthful information?
21    A. Oh, yes.
22    Q. And are you aware of some criminal statutes,
23  including false statement?
24    A. To the Internal Revenue Service, absolutely.
25    Q. Okay. Let's go back to Exhibit No. 5 in the

## 39

1  financial matters for the year ending 1992.
2    MR. HALL: Page number?
3    MR. WALSH: You don't have it. Do you
4  want a copy?
5    Q. Okay. I want to first start talking about the
6  notes. The McBride note apparently, according to the
7  financial records of Treasure Hills, was reduced from
8  $1,795,000 to $1,590,000; is that correct -- the
9  secured portion of that note, rather?
10    A. That's correct.
11    Q. Which -- let me talk about -- interrupt and go
12  somewhere else and stop here. Apparently during all of
13  the years on all three of these notes. McBride, the
14  secured, unsecured, the Rio Grande Savings & Loan and
15  the NCNB note, no interest was ever accumulated on the
16  financial statements or other internal records of
17  Treasure Hills on these notes, they always carried the
18  principal amount and any reductions were made to the
19  principal amount; is that correct?
20    A. Well -- okay. I mean, that certainly appears
21  to be true, but I think to really -- to really answer
22  that question would really take some fairly extensive
23  analysis to be sure. But it certainly, if you will,
24  kind of at first glance appears that any disbursement
25  of funds to any of the shareholders was, first of all,

## 40

1  applied to the outstanding principal. There was no, if
2  you will, consideration given to any accrued but yet
3  unpaid interest.
4    Q. And there would be other records, perhaps in
5  the general journals or other places, where you did
6  keep track of any accumulated interest?
7    A. Correct. That's right.
8    Q. But so far as the financial statements, general
9  ledgers are concerned, they're always carried on the
10  principal amount?
11    A. Exactly.
12    Q. Okay. So that reduction on the McBride from
13  1,795,000 to 1,590,000, that's exactly $205,000?
14    A. That's correct.
15    Q. Apparently was how this $205,000 was applied?
16    A. That's correct.
17    Q. Now, the unsecured portion of the McBride note
18  for the year ending 12-31-92 remained the same at
19  996,687, correct?
20    A. That's correct.
21    Q. The NCNB remained the same at 640,913?
22    A. That's correct.
23    Q. And the Rio Grande Savings & Loan remained the
24  same at $52,200?
25    A. That's correct.

## 41

1  Q Okay. Now, in there you have some excerpts of
2  some financial statement. I'm going to refer you to
3  Note L -- excuse me, Note N.
4  A. Okay.
5  Q And in that they are talking about Mr. Lozano's
6  alleged purchase of the three notes from Mr Derbez,
7  correct?
8  A. Well, it doesn't -- this footnote disclosure in
9  the financial statement, it doesn't necessarily
10  identify Mr. Zamacona individually
11  Q Mr. Lozano.
12  A. I'm sorry, Mr. Lozano. It speaks generically
13  of an individual.
14  Q. But through the facts that they are talking
15  about, for example, the $736,000 consideration of
16  undeveloped lots and so forth, you can't identify Mr.
17  Lozano?
18  A. That's correct.
19  Q. Okay. And it does contain the statement in
20  there that Mr. Lozano is currently deliberating on the
21  merits of potentially reclassifying a part of that
22  purchase as equity?
23  A. That is correct, it does say that.
24  Q. So apparently Mr. Lozano, whenever this
25  financial statement was compiled, had been talking to

## 42

1  somebody at Long & Chilton concerning possibly
2  reclassifying some portion or all of whatever of the
3  three notes he was obtaining from Mr. Derbez?
4  A. Yes.
5      MR. DUARTE: Objection: form. Objection:
6  hearsay. Objection; speculation.
7  A. The footnote would certainly seem to indicate
8  that. I didn't have any personal knowledge of that.
9  Q. Okay. Now, let's go to the Due to Stockholder
10  loans. And now for this year we have a 5472 -- .5472.
11  Now, again, in '91 the Due to Shareholder for Mr. Lozano
12  was $1,864,506. Did it increase to $2,041,496?
13  A. The form 47 -- 5472 for 1992 does, in fact,
14  reflect an increase to $2,041,496.
15  Q. From the 1,864,000?
16  A. From the 1,864,000.
17  Q. Okay. And those Due to Stockholders summaries
18  that we previously discussed in '91, you also had
19  copies of those in there. Do those match with the form
20  5472?
21  A. They do, in fact.
22  Q. Okay. So basically the 5472 are tracing the
23  Due to Stockholder loans to the individuals, including
24  Mr. Lozano, during the years?
25  A. That's correct.

## 43

1  Q. Okay. So the -- excuse me, the forms 5472s
2  will not be referring to other debts that Mr. Lozano
3  may or may not have with Treasure Hills, just the Due
4  to Stockholders?
5  A. That's correct.
6  Q Now, the Due to Stockholder loans are kept
7  within the internal records, and that's specifically
8  the general journals of Treasure Hills under a specific
9  journal entry number; is that correct?
10  A. Under specific account numbers. Is that what
11  you are speaking of?
12  Q. Yes, sir
13  A. Yes
14  Q. Okay Let's go to within Exhibit No. 4, Page
15  22.
16  A. Okay.
17  Q. Okay. According to this memo, and I'm not
18  going to go over it much because it's already been gone
19  through in other depositions, but Mr. Derbez in
20  exchange for the transfer of the three notes to Mr.
21  Lozano was going to get 24 lots valued at $736,205
22  which we have previously discussed and the forgiveness
23  of a $50,000 note for a total of 941.000.
24  A. Well, okay. Now, first of all, this is
25  prepared in Spanish and I'm not -- but I would -- my

## 44

1  limited understanding of Spanish would certainly leave
2  me to believe that that's what it's communicating,
3  correct.
4  Q. Okay. Let's go to the next page, 23. Now,
5  that is another one of these board of director memos
6  signed by Mr. Zamacona and Mr. Derbez and initialed by
7  someone, perhaps Mr. Cuellar, that's dated June 25th,
8  '93 that talks about $736,000 going to Mr. Derbez in
9  exchange for the 24 lots?
10  A. That's correct.
11  Q. Okay. And that language and this is often
12  similar -- you know, basically matches the memo from a
13  year beforehand concerning the $205,000?
14  A. That's correct.
15  Q. Okay. And attached to that memo is not a list
16  of the 24 lots, including block and lot number, section
17  numbers and the value assigned to each lot?
18  A. That's correct.
19  Q. Page 45. That is apparently an agreement
20  between Mr. Derbez and Mr. Lozano concerning the
21  purchase?
22  A. That's correct.
23  Q. Okay. First of all, that agreement basically
24  sets it out, the purpose as only being one note, in
25  other words, he was purchasing the McBride note which

## 45

1 was attached to that agreement as an exhibit, and also
2 reflects that the sole consideration are the 24 lots
3 which have previously been valued at $736,000?
4     A. That's correct.
5     Q.Okay. I want you to assume the following
6 facts, that Mr. Lozano has previously testified under
7 oath that the true agreement was that he was purchasing
8 all three notes and that the true consideration was the
9 900-some-odd thousand dollars that we have broken down
10 to the $50,000, the 205,000 and the 736,000 plus
11 forgiveness of debt in the amount of 1 7 million
12 dollars. In other words, he forgave -- Mr Derbez
13 allegedly owed him $1.7 million in Mexico and he
14 forgave that debt. That formed part of the
15 consideration of that transfer.
16       First of all, should the true
17 consideration be reflected on the books? In other
18 words, if these notes were -- if three notes were being
19 assigned to Mr. Lozano by Mr. Derbez, should the
20 correct consideration be reflected on the books,
21 especially insofar as any consideration could affect
22 the balances of it?
23     A. Yes.
24     Q.Okay.
25     A. Yes.

## 46

1     Q.If such a transaction resulted in a gain to Mr.
2 Derbez over and beyond the basis that he may have had
3 in the notes, would that gain be subject to taxation?
4       MR. HALL: I'm going to object on the
5 grounds of relevance.
6       MR. WALSH: Object.
7       MR. HALL: Thank you.
8     A. It certainly could.
9     Q.If Treasure Hills and/or the shareholders were
10 trying to disguise the nature of a sale to abate -- I'm
11 not going to use the word "avoid" -- but abate
12 reporting any potential income or paying taxes on any
13 gains, is that proper?
14       MR. DUARTE: Object; form.
15       MR. HALL: Object; speculation.
16       MR. DUARTE: Same objection.
17     Q.Go ahead and answer.
18     A. Ask the question again.
19     Q.Is it proper for, for example, Treasure Hills
20 to cook the books to reflect that the consideration
21 paid for a certain transaction was much less than the
22 actual consideration?
23       MR. WEYAND: I'm going to object to the
24 form of the question. It's calling for speculation on
25 the part of this witness. Furthermore, it assumes

## 47

1 facts not in evidence. Furthermore, it misconstrues
2 the characterization of the records of the corporation
3 on the financial ends of the things, transactions, in
4 that the amount paid by a third party does not have to
5 reflect it on the books of the corporation in the
6 amount actually being paid. It does not change the
7 character of the obligation of the corporation on that
8 debt. And to the extent your question mischaracterizes
9 or miscommunicates those records. I object to the form
10 of the question.
11     Q He's basically correct. Go ahead.
12     A. I mean, what he just said was basically a true
13 statement. But, you know, it would certainly be
14 improper to use the corporation -- if your question is,
15 you know, would it be proper for the individuals to use
16 the corporation as a mechanism to disguise a real
17 transaction, then the answer to that question would be
18 that that would be improper.
19     Q.Okay.
20       MR. HALL: Object on grounds of
21 responsiveness.
22     Q.But it would be improper for the corporation to
23 assist the individuals in not reporting any gain; would
24 that be correct?
25     A. That would be correct.

## 48

1       MR. HALL: Objection; form.
2     Q.Okay. Now, additionally I want you to assume
3 that Mr. Lozano has testified under oath that the
4 consideration deriving from Treasure Hills, the
5 $736,000 in the lots plus the $205,000 cash payment
6 plus the 50,000 forgiveness of note was not actually
7 paid to Mr. Derbez but was actually paid to Mr. Lozano
8 who, in turn, transferred it to Mr. Derbez. Okay.
9 First of all, is there any indication within any of the
10 financial records of Treasure Hills that Treasure
11 Hills' alleged debt to Mr. Lozano was ever reduced by
12 one penny? In other words, had Treasure Hills ever
13 paid any Mr. Lozano any sums of money?
14       MR. HALL: Objection; form.
15       MR. DUARTE: I'm going to object to form.
16 It assumes facts not in evidence.
17     A. Based on the information that I have reviewed,
18 there doesn't appear to be any evidence of a -- of
19 payment on the part of the company to Mr. Lozano in
20 reducing those indebtednesses.
21     Q.Okay. So if Treasure Hills transferred 24 lots
22 to Mr. Lozano in extinguishment of part of the debt
23 that it allegedly owed Mr. Lozano, should that be
24 reflected on the books as a payment to Mr. Lozano?
25     A. That's -- well, yeah, but these weren't lots

49

1 that Treasure Hills owned. These were lots that Mr.
2 Derbez owned.
3 Q. These were lots that Treasure Hills owned.
4 A. Okay. I'm sorry. Yes, you are right. You are
5 right. That should -- if those lots -- if those
6 corporation-owned lots were transferred to Mr. Lozano,
7 in consideration there should have been some reduction
8 for the indebtedness that was owed him.
9 Q. Okay. Would that also trigger any reporting
10 requirements on behalf of Treasure Hills to the
11 Internal Revenue Service?
12 A. Okay. Well, now, that's a fine point. I'm not
13 sure whether or not responsibilities are with the
14 corporation or whether those responsibilities are with
15 the title company or attorneys who close the
16 transactions who actually file the legal documents.
17 Q. Someone is required to?
18 A. Somebody is required to, you are right. There
19 are reporting requirements.
20 Q. Now, additionally, if $205,000 is actually paid
21 to Mr. Lozano including just by reducing his debt and
22 the $50,000 note was also attributed to Mr. Lozano's
23 debt, would that be reflected on the books? In other
24 words, if I'm Treasure Hills and I owe Mr. Lozano a
25 million bucks and I'm going to offset 200,000 over

51

1 A. That's correct.
2 Q. And that was supposed to be, presuming to that
3 memo or fax, how much they would get the title policy
4 for also?
5 A. Correct.
6 Q. Okay. Let's go to Page 33. Now, we are going
7 into when Mr. Derbez actually got the lots -- 24 lots
8 and what he did with them. I'm not going into 24 lots,
9 but I have enclosed -- on Page 33, and then on 38
10 copies of two deeds. Apparently Mr. Derbez transferred
11 one of the lots to Maria Juanita Lozano who was an
12 employee of Treasure Hills. Do you know what title she
13 held at Treasure Hills?
14 A. I have no idea.
15 Q. And the other one was to a Carlos Cuellar and
16 his wife, Claudia Cuellar. Now, Mr. Cuellar is the
17 general manager of Treasure Hills, correct?
18 A. That's correct.
19 Q. Do you know what -- whether or not these two
20 people bought these two lots or what was the
21 circumstances surrounding this transaction?
22 A. I have no idea.
23 Q. Now, let's go to Page 42.
24 A. Okay.
25 Q. Now, apparently this is a release of lien

50

1 here, that should be reflected that Treasure Hills no
2 longer owes me $1,000,000, it owes me 800,000?
3 A. That's correct.
4 Q. Okay. Go to Page 10 of Exhibit 5.
5 A. Okay.
6 Q. Now, can you identify this document?
7 A. This is a copy of our facsimile cover sheet.
8 It's dated January 21st, 1994. It's faxed to Lee
9 Wiley's law office -- an individual in Lee Wiley's
10 from, again, Ron Shimotsu, who at the time worked for
11 us.
12 Q. Okay. Now, apparently it's talking about the
13 sale again of one note, the McBride note, and how they
14 are going to apply the payments that Mr. Derbez and Mr.
15 Lozano originally received?
16 A. That's correct.
17 Q. Okay. And correct me if I'm wrong, but did
18 they apply it beginning with the principal balance of
19 1,795,000?
20 A. That's correct.
21 Q. Minus the 736,000 being the lots?
22 A. That's correct.
23 Q. Minus the 205,000?
24 A. Correct.
25 Q. Minus the $50,000 a balance then of $904,000?

52

1 whereby Mr. Derbez released 74 lots in Treasure Hills.
2 The instrument date is September 10th, 1990; however,
3 it's acknowledged on September 14th, 1990, which just
4 so happens to be the same day that the first bankruptcy
5 was closed, and then it was filed a couple -- six days
6 later on the 20th. Do you know anything about this
7 transaction?
8 MR. HALL: Objection; forms. Objection;
9 assumes facts not in evidence.
10 A. I'm not familiar with --
11 Q. Okay. Now, on Page 46 there was a release of
12 collateral transfer of note with a UCC form included.
13 Now, this is the $500,000 note that Mr. Derbez,
14 Trustee, gave to Mr. McBride, Trustee. Apparently it
15 was released on this date. Do you know or do your
16 records reflect where Mr. Derbez got this $500,000 for
17 payments to McBride?
18 A. I don't have any specific recollection. Maybe
19 I should.
20 Q. How about this? Why don't you think about it
21 and review your records if necessary, and if you can
22 think of anything --
23 A. Well, help me.
24 Q. Just when you get your deposition, just add it
25 to it. Would that be fair?

53

1    A. There were -- during 1996 there were new monies
2    received from Mr. Zamacona and Mr. Lozano during that
3    period -- during that year, and it could be such that
4    those shareholder loans were used to retire this note.
5         MR. HALL: I'm going to object to it as
6    nonresponsive and speculative.
7    A. I don't know.
8    Q Again, Mr. Beneke, would you be so kind as to
9    think about it and when you receive your deposition, if
10   you have other information you can derive from your
11   memory or from your records, just -- just insert it
12   into the deposition.
13   A. Okay.
14   Q Okay. Now, I want to go to July 20th of 1994,
15   a document set forth on Page 76?
16        MR. WEYAND: Of Exhibit 5?
17        MR. WALSH: Of Exhibit 5.
18   A. Page 76?
19   Q. Yes.
20   A. Okay.
21   Q.Now, I want you to assume something. I would
22   like you to assume that according to the Cameron County
23   deed records, the transaction and transfer of the 24
24   lots to Mr. Derbez took place and was consequently
25   filed within the deed records in May of 1994. So July

54

1    20th, '94 would be approximately two months subsequent
2    to there. Apparently Long & Chilton issued a tax
3    memorandum of Treasure Hills? Page 76.
4    A. Yes.
5    Q.And the -- there were several issues that were
6    set forth in this tax memorandum.
7    A. That's correct. It identifies some issues
8    which were apparently questions given to us on the part
9    of the client.
10   Q.Okay. Now, that was going to be my next part
11   of the question. Long & Chilton issue tax
12   memorandums on their own, they wait until their client
13   instructs them or requests memorandums; is that
14   correct?
15   A. Correct.
16   Q.Now, on the second issue, whether Treasure
17   Hills must withhold a 30 percent tax on any fixed or
18   determinable annual or periodical income (FDAP) paid to
19   nonresident aliens or foreign corporations. Your
20   general conclusion was Treasure Hills must withhold 30
21   percent of all U.S. source, FDAP, including the
22   interest, dividends and the original issue discount,
23   OID, et cetera, that it pays to nonresident aliens and
24   foreign corporations and Treasure Hills must remit the
25   withheld tax to the IRS with forms 1042 and 1042S.

55

1    What's that about?
2    A. Well, that merely identifies the Internal
3    Revenue Service forms which report these withholding
4    amounts.
5    Q.Okay. If Treasure Hills had paid Mr. Lozano
6    $941,000 as a result of the thing that was consummated
7    in May, two months previously, would that have -- this
8    memo indicate that Treasure Hills was required to
9    withhold any amounts?
10   A. Yes, it would certainly indicate that they were
11   responsible for withholding.
12        MR. HALL  I'm going to object to this
13   line of questioning on the grounds of relevance
14   Q The next issue is whether transferees and real
15   property transactions with Treasure Hills would
16   withhold ten percent tax. The general conclusion is
17   that transferees should withhold ten percent of the
18   amount realized on real property disposed of by
19   Treasure Hills because it is a foreign corporation.
20   However, Treasure Hills pays a tax upon the disposition
21   of the real property and the transferee will not be
22   liable for withholding tax and would probably not be
23   liable for any applicable penalties or interest.
24   According to this issue, if Mr. Lozano had transferred
25   any real property to Mr. Derbez, would Mr. Lozano be

56

1    required to withhold?
2         MR. HALL: Objection; relevance.
3    A. That's correct.
4    Q.Now, just from the standpoint of clarifying,
5    your initial question addressed what are called fixed
6    and determinable payments, okay? And by that we're
7    talking about the payment of interest, you know, to a
8    foreign individual, the payment of a dividend to a
9    foreign individual, payment of rents to a foreign
10   individual, those kinds of fixed or determinable
11   payments. Your most -- your last question talks
12   about --
13   A. The individual's obligations?
14   Q.Well, and real property.
15   A. Yes.
16   Q.Okay. Now --
17   A. Real property transactions.
18   Q.Now, as you answer some of these questions in
19   part -- not in total but in part -- part of the basis
20   of the challenge that we have in the adversary hearing
21   is that the three notes, if they were owned by Mr.
22   Lozano, should be equitably subordinated to the other
23   creditors. I would ask you to consider and assume that
24   part of the parameters, equitable subordination
25   including the one broad legality, breach of fiduciary

57

1   duty. No. 2. undercapitalization. and. No. 3, the
2   claimant's use of a debtor corporation as a mere
3   instrumentality or alter ego. That's just a statement
4   for your consideration.
5       MR. HALL: Objection. form.
6   A. Say that again.
7   Q Basically it goes to the relevancy of all of
8   this stuff It's not a question. It's basically when
9   you make a determination as to whether or not the stuff
10   is relevant that insofar as equitable subordination is
11   concerned. fraud, illegality, criminal conduct, use of
12   the corporation or alter ego. all of that stuff is
13   relevant in the determination?
14       MR. DUARTE: Objection; sidebar.
15       MS GRAFF: Can we take ten minutes?
16       MR. WALSH: Sure
17       (Brief recess).
18   Q.Going back to the Derbez/Lozano transfer, do
19   the internal records of Treasure Hills reflect any
20   consideration paid whatsoever to Mr. Derbez, Mr.
21   Lozano. anybody on this transaction?
22       MR. WEYAND: By who? Any consideration
23   paid by whom?
24       MR. WALSH: By Treasure Hills.
25       MR. WEYAND: So the question is, if I

58

1   understand it correctly. do the records -- the
2   corporate accounting records of Treasure Hills reflect
3   any consideration paid either Mr. Derbez or Mr. Lozano
4   in connection with Mr. Derbez' transfer of the notes to
5   Mr. Lozano?
6       MR. WALSH: Correct, from Treasure Hills.
7   A. The accounting records for Treasure Hills
8   merely reflect, if you will, a name change on Mr.
9   Derbez' notes to a Mr. Lozano's notes. In other words,
10   Treasure Hills had certain obligations that it
11   reflected on its books as loans to Mr. Derbez which
12   were merely changed to reflect Mr. Lozano's name.
13   Q.Okay. But insofar as any payments concerned,
14   again we previously discussed it, about Mr. Lozano's
15   debt to Treasure Hills being reduced or anything like
16   that?
17   A. There's none of that.
18   Q.Okay. Page 79.
19   A. Okay.
20       MR. WEYAND: Of Exhibit --
21       MR. WALSH: 5.
22       MR. HALL: Or 4?
23       MR. DUARTE: 5.
24       MR. WEYAND: 5.
25   Q.Okay. This is an information document request

59

1   to Treasure Hills from Jane Maxwell, revenue agent.
2   Was this -- do you recognize that document?
3   A. I recognize that document.
4   Q Okay. And was this request made in
5   relationship to the audit of Treasure Hills for the
6   year ending '91 through '93?
7   A. Jane Maxwell was a revenue agent with the
8   Internal Revenue Service, and this request was made by
9   her to Treasure Hills.
10   Q Okay. Now. in that document she requested
11   complete and a detailed analysis of all of the
12   outstanding notes and information with aspects to --
13   you know, all aspects. payments. transfers. everything.
14   That would include not only Derbez, but Banamex She
15   had some questions about that one. And she also wanted
16   documents that substantiated the purpose in utilization
17   of the note proceeds on all the notes?
18   A. That's correct.
19   Q.She even wanted to know who Mr. Derbez
20   represented?
21   A. That's correct.
22   Q.Okay. So obviously the IRS was looking very
23   closely at all of the loans that Treasure Hills had
24   which were owned in whole or in part by any of the
25   shareholders?

60

1   A. That's correct.
2       MR. DUARTE: Objection to the form of the
3   question, the characterization of the IRS conduct.
4   Q.Now, let's go back to Exhibit 4 and into the
5   financial records for the year ending '94.
6   A. Okay.
7   Q.Now, does this one show the transfers to Mr.
8   Lozano -- from Mr. Derbez to Mr. Lozano? Can the notes
9   be traced according to financial statements and so
10   forth, records where the three notes were transferred
11   from Mr. Derbez to Mr. Lozano?
12   A. They can be.
13   Q.Okay. Now, the NCNB, although now on the books
14   as being Mr. Lozano's, remain the same at 640,913 --
15   excuse me, $913?
16   A. That's correct.
17   Q.And the Rio Grande Savings remain the same at
18   52,200?
19   A. That's correct.
20   Q.Okay. Now, McBride is down at 1,863,687?
21   A. That's right.
22   Q.Okay. Now, if you -- again, the last time
23   reduction on the McBride or the previous year was down
24   at the secured portion being $1,590,000?
25   A. That's correct.

61

1    Q.And then you had the unsecured portion of
2 $996,687?
3    A. That's correct.
4    Q.Okay.  And if you add those two amounts
5 together, it comes to $2,586,687?
6    A. That's correct.
7        MR. DUARTE: Objection; asked and
8 answered.  This line of questioning was covered twice.
9    Q And if you deduct $736,000 for the 24 lots, do
10 you get that amount on the books, 1,863,687?
11    A You do, in fact.
12    Q.Okay.  So that's apparently how the McBride
13 loan was treated?
14    A. That's correct.
15    Q.They combined the principal and the -- or
16 secured and unsecured portion and then deducted the
17 736,000?
18    A. That appears to be exactly how that was done.
19    Q.Okay.  Now, the 205 is built in because that
20 had been previously deducted from the million five?
21        MR. HALL: Object; form of the question.
22    A. That's correct.
23    Q.Now, there's a change that happened to the
24 American Express note that was taken off the note
25 section and put into paid in capital.  In fact, I

62

1 believe that within the documentation you will find
2 some handwritten notes identifying that as being
3 converted and paid in capital?
4    A. That's correct.
5    Q.Okay.  Now, how is that accomplished?  How do
6 you pay the debt and convert it into paid in capital?
7    A. Well, if you are talking about the accounting
8 for that, that's -- it can be accomplished merely by
9 recording a journal entry which would essentially zero
10 the note balance and increase, if you will, an equity
11 component referred to paid in capital, increase that by
12 the amount of the note reduction.
13    Q.Okay.  In fact, the million five is also
14 reflected on the Schedule L as --
15    A. Exactly.
16    Q.Let me ask you this:  Is it proper to convert a
17 debt into paid in capital absent the owner of the
18 debt's permission?
19        MR. WEYAND: I'm going to object to the
20 form of the question.
21    Q.According to accounting standards?
22    A. Well, from an accounting standpoint, you would
23 generally require evidence to substantiate the fact
24 that this no longer was a debt and instead an equity.
25    Q.If Treasure Hills owed me, Larry Walsh,

63

1 $1,500,000, and they converted my debt to paid in
2 capital they should obtain my permission for it,
3 correct?
4    A. Now, I'm not an attorney.
5    Q.And let's limit your answers to the general
6 accepted accounting principles and standards.
7    A. Yeah, if we were -- I mean, we would generally
8 ask for evidence to support that transaction.
9    Q Okay.  What were you -- were you told anything
10 personally about the conversion of this matter by any
11 of the shareholders or officers or directors?
12    A. Well, I mean, we obviously reflected that on
13 the books of the company based on information that was
14 -- based on the instruction of the client  In this
15 case probably -- and, I don't know, I didn't take these
16 instructions --
17        MR. DUARTE: Objection: speculation.
18        MR. HALL: Objection.
19    A. -- but probably the general manager or some
20 person like that.
21        MR. HALL: I object as being nonresponsive
22 and speculative.
23    Q.Do you remember during the audit that the IRS
24 informed Treasure Hills, yourself or any of the
25 shareholders, officers or directors that if they

64

1 challenged the American Express debt and if they won
2 that, they would be obligated to pay taxes on that
3 amount?
4    A. No.
5    Q.Okay.
6    A. I don't recall that ever being any -- there
7 being any discussion of that type with the Internal
8 Revenue Service.
9    Q.Okay.  I'd like to you to assume for a minute
10 that -- now, of course, you are aware that I'm seeking
11 to enforce this note?  I've sued Treasure Hills for it.
12    A. Yes.
13    Q.Okay.  Now, let's assume that Treasure Hills
14 wins and is not obligated to pay me this note and
15 assume it's still --
16        MR. DUARTE: Objection; relevance.  We are
17 talking about what's going to happen after these cases
18 are over with and the tax consequences?
19        MR. WALSH: Any more?
20        MR. DUARTE: That's the objection.  I
21 don't see where the relevance is in discussion what
22 happens when this case is all over with and how
23 everybody is going to treat it.
24    Q.If Treasure Hills was not obligated as a debt,
25 would that be taxable to Treasure Hills?

## 65

```
 1        MR. HALL: Objection; relevance
 2        MR. DUARTE: I'm going to object because
 3   it doesn't give the CPA the proper parameters.  You
 4   can't tell him what it is that the court's decided.
 5   You can't tell him what it is that the bankruptcy court
 6   decided  You can't tell whether -- it's going to call
 7   for speculation on his part.  I'm going to object that
 8   he's not qualified to answer the question based on the
 9   foundation given.
10        Q.Can you continue with the hypothetical and
11   assumptions?
12        A. Yes.  It would be -- if the indebtedness is
13   forgiven, it represents a form of income to be reported
14   by the company.  Would there be any tax effect
15   associated with the forgiveness of that debt?  In
16   Treasure Hills' case, the answer is no.
17        Q.Why?
18        A. Because the magnitude of operating losses was
19   sufficient to offset that income.
20        Q.Okay.
21        A. So would Treasure Hills essentially write a
22   check to IRS for income taxes?  No, because the
23   magnitude of prior losses would offset that effect.
24        Q.You previously testified that Treasure Hills
25   basically from '89 to present has never been able to
```

## 66

```
 1   make even operating expenses, they have always had
 2   losses in all the years.
 3        A. They reflected operating losses probably -- I'd
 4   have to look exactly, but probably all of those years
 5   reflected operating losses.
 6        Q.Okay.  Treasure Hills was trying during these
 7   time periods to clean up its financial picture, have a
 8   better financial statement and so forth in their
 9   attempts to obtain financing at various banks?
10        A. That's correct.
11        Q.Okay.  And are you aware that between the time
12   periods of, let's say, '94 and '96 that Treasure Hills
13   was attempting to obtain financing from local banks?
14        A. Yeah, I think -- I think it would be fair to
15   say that during that period of time, they were
16   soliciting capital to carry on their project.
17        Q.Including loans through local banks?
18        A. Certainly.
19        Q.And they were not able to obtain any financing
20   from any of the local banks?
21        MR. DUARTE: I'm going to object.  That
22   calls for speculation.
23        MR. HALL: Relevance.
24        Q.To your knowledge?
25        A. To my knowledge, they didn't secure any
```

## 67

```
 1   independent third party financing during that period
 2   except for maybe -- there might be some exceptions in
 3   there for certain equipment acquisitions, like
 4   lawnmowers and golf carts and things of that nature
 5        Q.Okay.  Back in '94 on the 5472 for Mr. Lozano
 6   and the Due to Shareholders sheets, Mr Lozano went
 7   from $2,264,099 up to $2,506,599?
 8        A. That's correct.
 9        Q.And, again, that's -- both the 5472 and the Due
10   to Shareholders for some reason talk about the same
11   thing, these contributions or loans that Mr Lozano
12   made?
13        A. That's correct.
14        Q.Okay.  Now I'd like you go to Page 83
15        MR. WEYAND.  Of what exhibit?
16        MR. WALSH: Exhibit No. 5.  For the
17   record, I will be referring to Exhibit No. 5 unless
18   specifically stated otherwise.
19        A. Okay.
20        Q.Okay.  Can you identify that document?
21        A. Yes.  This is -- this is a letter, in fact,
22   that I wrote or personally signed in December 1995 to
23   -- it's addressed to the shareholders of Treasure
24   Hills.  And this is exactly the time that I initially
25   became involved with this client because as I spoke
```

## 68

```
 1   earlier of the retirement of one of our other partners.
 2        But at this stage I was beginning --
 3   assuming client responsibility, and it was also at this
 4   time that the initial Internal Revenue Service report
 5   came down from the agent, and the essence of this
 6   letter is to identify the matters -- or some of the
 7   matters that the IRS report raised, primarily the
 8   issues regarding the shareholder loans and the IRS's
 9   desires to, if you will, recharacterize those as
10   shareholder or paid in capital.
11        Q.Okay.  In fact, beginning on Page 85, that's
12   the IRS explanation of items that was attached to that
13   letter, correct?
14        A. That's correct.
15        Q.Okay.  Explain in general terms what the IRS
16   was challenging in relationship to certain debt of
17   Treasure Hills.
18        A. Well, it's basically a concept referred to as a
19   corporation being thinly capitalized.  And what that
20   term refers to is the relationship that exists within a
21   company's financial structure between its component of
22   shareholder loans as a relative percentage of
23   shareholder equity or stockholders' equity.  And the
24   difference there is an issue of loans being able to be
25   repaid without really any real tax consequences as
```

## 69

1　opposed to this equity component being. if you will.
2　more a permanent sort of investment into the company
3　for its lifetime.
4　　Q.Okay. And what triggered this was that
5　Treasure Hills attempted to deduct interest from these
6　loans?
7　　A. Yeah. that -- from the standpoint of the IRS
8　reviewing the company's financial situation. you know,
9　we had -- or the company at that time was in a
10　situation of deducting interest accrued or accruable or
11　paid on the shareholder loans and obviously taking tax
12　deductions for that, whereas if those same amounts had
13　been classified as a permanent investment in the
14　company. that interest component or that interest
15　deduction would not be there.
16　　Q Okay. Let me see if this is a correct
17　summarization of that: Basically the IRS presumed that
18　these loans that the shareholders owned or had an
19　interest in should be classified as contributions -- I
20　believe they used equity -- and not carried on as a
21　debt?
22　　A. That's correct.
23　　Q.Okay. And then in this letter you were -- I
24　believe that you -- the way that you put it is "The
25　purpose, however, of our letter to you is to perhaps

## 70

1　'encourage' the shareholders who also have 'loans' with
2　the company to consider accepting this position." being
3　the IRS position, "that being to 'reclassify' such
4　loans as equity contributions?
5　　A. That's correct. I was basically encouraging
6　them in the course of my professional judgment that
7　this would be the proper thing to do.
8　　Q.Okay. And, again, the attachment to that
9　letter, the IRS information of items, Section D sets
10　forth, you know, basically all the reasons the IRS took
11　their position?
12　　A. Exactly.
13　　Q.Okay. Now, we've already gone through the tax
14　returns at your last deposition. I remind you the '94
15　tax return was signed by yourself on January 9th, 1996
16　and they were signed by Mr. Cuellar on January 11th,
17　1996.
18　　A. Okay.
19　　Q.Now, going into January 25th, 1996, Page 100 of
20　Exhibit 5, there's a letter to Mr. Cuellar from you?
21　　A. That's correct.
22　　Q.Okay. And this, again, you are basically
23　encouraging to go ahead and accept IRS position?
24　　A. Correct.
25　　Q.And in there --

## 71

1　　MR. DUARTE: I'm sorry, Mr. Walsh. You
2　said No. 100 was a letter from Mr. Cuellar to Long &
3　Chilton. What we have as 100 is a letter from Long &
4　Chilton to Mr. Cuellar.
5　　MR. WALSH: That's what I said, letter to
6　Mr. Cuellar from Long & Chilton.
7　　MR. DUARTE: Okay. I got it backwards.
8　I'm sorry.
9　　Q.Now, in there you are talking about the IRS
10　agent's position You said. "Further. we believe her
11　position is correct under the IRS Code and consequently
12　we don't believe we have any position to argue." What
13　did you mean by that statement?
14　　A. Well, basically -- I mean, the tax code gives
15　the service somewhat -- if you will, somewhat wide
16　latitude in viewing these cases of thinly capitalized
17　corporations. And in our particular case, we certainly
18　did have a thinly capitalized corporation. We had an
19　equity component in the corporation of some 6,000 or
20　$3,000, some fairly insignificant sum. and several
21　million dollars of shareholder loans. I think clearly,
22　you know, we were in a situation where we were going to
23　be very hard-pressed to justify that being an
24　appropriate classification.
25　　Q.Okay. Let me see if I can summarize it.

## 72

1　During this time period you are also talking about
2　switching some of the -- go ahead and reclassify it.
3　Get some extra stock out of the company, that way if
4　you wanted to sell anything, there ain't going to be
5　any tax consequences and what's the big deal?
6　　A. That's right. Adverse tax consequences at the
7　time, you know, to doing that. It was just the right
8　thing to do.
9　　Q.Okay. Then in that same letter you go through
10　the stuff there's no taxes due and so forth, and then
11　you recommended accepting his position, contact the IRS
12　agent, finalize the report and secure Mr. Zamacona's
13　signature finalizing this whole matter. And Mr.
14　Zamacona actually approved this action by signing on
15　the bottom of that letter?
16　　A. Yeah, his signature is there.
17　　Q.Okay. Now, on March 5th, 1996, approximately
18　two months later. Mr. Cuellar wrote you a letter,
19　correct?
20　　A. That's correct.
21　　Q.And he's talking about that previous letter of
22　yours, the January 25th, '96 letter?
23　　A. That's correct.
24　　Q.And he says he needs to get some information
25　from you, No. 1, the letter from your office indicating

**73**

1 the right way for the owners to take money out of the
2 company without paying taxes to IRS according to your
3 comments and conversations held with the owners during
4 the month of December '95?
5 A. That's correct.
6 Q And, again, that's talking about the stock
7 deal?
8 A. That's correct.
9 Q.And a letter from your office indicates the
10 date you are going to capitalize all -- he uses the
11 word "all" -- of the owners' loans?
12 A. That's correct.
13 Q Okay. And then he goes on to talk about how
14 the stock percentage is going to increase?
15 A. That's correct.
16 Q.Okay. Now, let's go into April of '96. I'm
17 going to ask you to pay close attention to the dates as
18 the rest of this stuff comes together. On Page 103 --
19 A. Which, by the way -- let me just interject
20 this --
21 Q.Sure.
22 A. -- before you -- although there are letters
23 going back and forth, at this time my recollection is
24 we had personal face-to-face communication.
25 Q.Okay.

**74**

1 A. We talked about the issues. I went back with
2 some letters, but we had personal communication with
3 Mr. Zamacona, Mr. Lozano and Mr. Cuellar.
4 Q.Okay. And, Mr. Beneke, by the way, feel free
5 to interrupt me at any time including -- I know that I
6 have been -- you know, some of my questions have been
7 rather complex. If there's anything that you need to
8 explain at any time, please interrupt me. If you feel
9 that I may misconstrue any evidence, please feel free
10 to interrupt me, or if you just plain think anything
11 needs explaining further.
12 A. Okay.
13 Q.Now let's go to April 23rd, 1996, Page 103,
14 which is the IRS form 433-A. That's the one for
15 individuals. I believe I have -- I don't remember if I
16 put all of them in or just Mr. Zamacona's and Mr.
17 Lozano's.
18 A. My information is Pages 102 through 105 is Mr.
19 Zamacona's. Pages 106 through 109 is Mr. Lozano's.
20 Q.Okay. Again, this -- and both of them signed
21 under the penalties of perjury on April 23rd, 1996?
22 A. That's correct.
23 Q.Okay. On either one of those two forms --
24 okay. What are those forms for, first of all?
25 A. They are -- this is a form 43 -- 433-A, it's

**75**

1 collection information statements from individuals --
2 or for individuals. It identifies, you know, some
3 relevant information with regard to an individual's
4 assets and liabilities in terms of U.S. holdings.
5 Q Okay. And you have already testified about
6 these forms at the previous bankruptcy hearing. And
7 basically if Mr. Lozano and Zamacona owned any notes,
8 they should have been reported on these things?
9 MR. HALL. Objection: form. Objection:
10 repetitive.
11 A. They probably should have been.
12 Q.Okay. April 25th, 1996. Now, there's a letter
13 from Mr. Cuellar to the Internal Revenue Service?
14 A. That's correct. That's Page 110 for my
15 information.
16 Q.Yes, sir, and this is two days subsequent to
17 the signing of the forms 433s?
18 A. That's correct.
19 Q.Okay. By the way, on the form 433-As there are
20 no fax marks or other indications that these documents
21 were signed in Mexico and subsequently faxed back to
22 Treasure Hills?
23 A. These appear to be originals.
24 Q.Okay. So there's no indication that Mr.
25 Zamacona or Lozano were out of town, at least according

**76**

1 to that limited information?
2 A. That's correct.
3 Q.Okay. Now, in this letter beginning Page 110,
4 it discusses a meeting that took place between Treasure
5 Hills and the IRS on April 23rd, 1996, the same day
6 that the form 433-As are executed?
7 A. That's correct.
8 Q.And do you remember attending that meeting?
9 A. No.
10 Q.Okay. Do you know who attended that meeting?
11 A. No.
12 Q.Okay. Anyway, it includes the two forms and --
13 plus some other materials and sends it off to the IRS,
14 correct?
15 A. Correct.
16 Q.And copies of that letter were sent both to
17 Long & Chilton and Manny Vela, their attorney?
18 MR. DUARTE: That calls for speculation as
19 to whether they were, in fact, sent or not.
20 Q.Is there an indication on that letter that
21 indicates that they were sent copies?
22 A. Yes, this indicates copies were provided.
23 Q.Now let's go to Page 111. First of all, what
24 is the run date of this document?
25 A. April 25th, 1996.

## 77

1 　Q.Okay. So that's the date that that computer
2 　printout was --
3 　∴ Generated.
4 　Q.-- generated? And, again, that's a computer
5 　printout generated by Long & Chilton?
6 　∴ That's correct
7 　Q.Okay. Now, what -- now, this is a title to
8 　reclassify shareholders' loans, correct?
9 　∴ That's correct.
10 　Q.And it's part of the general journal of
11 　Treasure Hills?
12 　∴ That's correct.
13 　Q.And then it has for -- apparently all of this
14 　was for the year ending 12-31-95?
15 　∴ These entries were posted as of December 31st,
16 　1995, that's correct.
17 　Q.Okay. And then each of the loans are
18 　identified by account numbers?
19 　∴ That's correct.
20 　Q.And then you have the description or comment,
21 　in other words, describing the thing?
22 　∴ That's correct.
23 　Q.And the debit to -- and that debit would be to
24 　actually reclassify the loans, right?
25 　∴ That's right. It will be to -- if you will, to

## 78

1 　zero the note balance.
2 　Q.Okay. Basically this is the internal
3 　documentation of Treasure Hills. the general journal
4 　that certain loans were reclassified from note payables
5 　to paid in capital?
6 　∴ That's correct.
7 　　　　MR. DUARTE: I'm going to object to the
8 　mischaracterization of that particular document.
9 　Q.Does the bottom line, account No. 3850-00-000,
10 　state paid in capital?
11 　∴ That's correct, it does.
12 　Q.And the top is to reclassify shareholder loans?
13 　∴ That's correct.
14 　Q.And the purpose -- in your capacity as an
15 　accountant for Treasure Hills, the purpose of these
16 　entries were to reclassify these loans to paid in
17 　capital?
18 　∴ That's correct.
19 　Q.Okay. The first note, account No. 2510-00-000
20 　-- and from now on I'm going to omit the last five
21 　digits -- note payable, stockholder - R. Lozano,
22 　$1,863,687. We have previously identified this debt as
23 　being the McBride note, correct?
24 　∴ That's correct.
25 　Q And this note was specifically reclassified

## 79

1 　into paid in capital?
2 　∴ That's correct.
3 　Q Account No. 2530. note payable. stockholder
4 　loan - Roberto R. Lozano. $57,200?
5 　∴ That's correct.
6 　Q Do you know. is that the Rio Grande Savings &
7 　Loan note increased by $5,000?
8 　∴ That's correct, it is
9 　Q Okay. And that was specifically reclassified
10 　into paid in capital?
11 　∴ That's correct.
12 　Q Account 2630, note payable, stockholder - R.
13 　Lozano, $640,913. That's an NCNB note?
14 　∴ That's correct.
15 　Q.And that was specifically reclassified into
16 　paid in capital?
17 　∴ That's correct.
18 　Q.Account 2792, stockholder - H. Zamacona,
19 　$2,210,606. That's the Due to Shareholder account and
20 　amount for Mr. Zamacona?
21 　∴ That's correct.
22 　Q.And that amount would match the 5472s on the
23 　tax returns?
24 　∴ That's correct.
25 　Q.And that was specifically reclassified into

## 80

1 　paid in capital?
2 　∴ That's correct.
3 　Q.Account No. 2794, note payable. stockholder -
4 　R. Lozano, $2,514,099. That, again, is Mr. Lozano's
5 　Due to Stockholder number?
6 　∴ That's correct.
7 　Q.And that would match the form 5472s for Mr.
8 　Lozano?
9 　∴ That's correct.
10 　Q.And that was specifically reclassified into
11 　paid in capital?
12 　∴ That's correct.
13 　Q.And the journal entry 0791 as of 12-31-95 is
14 　the journal entry utilized to reclassify these loans;
15 　is that correct? It's about the last highlighted item.
16 　∴ That's correct.
17 　Q.Now, April 25th was the same day -- exact same
18 　day that Mr. Cuellar sends the 4033s over to the
19 　Internal Revenue Service, correct, according to his
20 　letter?
21 　∴ That's correct.
22 　Q.Okay. Four days later, April 29th, 1996, Page
23 　113, can you identify that document?
24 　∴ Yeah. This is obviously a situation in which
25 　the client had come by the office with certain

## 81

1   instructions for us. I was not present, okay?
2       MR. DUARTE: I'm going to allow him to
3   answer, but I'm going to object to this as speculation.
4       A. And the staff person who we had in the office
5   dealing with certain elements of the Treasure Hills
6   account had talked to Carlos Cuellar and had received
7   instructions from Carlos Cuellar with regard to
8   reclassifying or -- and with regard to making certain
9   changes to the shareholder loans as they had been
10  reflected on the books of the company
11      MR. DUARTE: I'm going to object as
12  nonresponsive. It's hearsay and it calls for
13  speculation.
14      Q. Okay. Basically it's a memo to you? You are
15  Wayne?
16      A. Yes.
17      Q. Okay. And it starts off "Carlos" -- that would
18  be Mr. Cuellar?
19      A. Yes.
20      Q. Okay. -- "dropped this off Friday and wants us
21  to make the changes," and then goes over to certain
22  changes to apparently the schedule of note payables,
23  being Exhibit X to financial statements?
24      A. That's correct.
25      Q. And there's a little post-it that was attached

## 82

1   to it and it's dated 4-29-96?
2       A. Right.
3       Q. Again, the post-it is addressed to Wayne --
4   that being you?
5       A. Right.
6       Q. And it states that "Carlos" -- that would be
7   Mr. Cuellar?
8       A. Right.
9       Q. -- "called and would like the changes to the
10  new financial right away." And who is Valerie?
11      A. Valerie is our staff person.
12      Q. Okay. Apparently Mr. Cuellar dropped off a
13  thing that's behind this letter, which, again, is a
14  copy of a draft of a schedule of notes payable for the
15  year ending December 31, 1995?
16      MR. DUARTE: I'm going to object. That
17  calls for speculation as to whether or not that was
18  attached or whether Carlos made those changes. All of
19  that is speculation. I object to the form of the
20  question.
21      A. It would appear.
22      Q. Okay. And that is Exhibit X, which is
23  basically the same exhibit always to all of the
24  financial statements?
25      A. Right.

## 83

1       Q. Exhibit X always refers to the notes payable?
2       A. That's correct.
3       Q. Now, under the notes payable, was Mr. Lozano or
4   -- was Mr. Lozano listed under any -- as being owed
5   anything for that year originally?
6       A. Originally -- well, what do you mean by
7   "originally."
8       Q. Okay. When this draft of the financial
9   statement, Exhibit X to the financial statement, was
10  drafted, Mr. Lozano was not listed under any of the
11  notes payables to shareholders?
12      A. That's correct.
13      Q. Okay. And according to this memo and the
14  notations on the schedule of the notes payable, Mr
15  Cuellar wanted to add Mr Lozano and Mr. Zamacona to it
16  in the same amount, being $65,000, as was Mr.
17  Diaz-Rivera, Alberto Diaz-Rivera listed at?
18      MR. HALL: Objection; calls for
19  speculation. Objection; form.
20      A. That's what the note would indicate.
21      Q. Okay. And let's go to Page 115. Now, is that
22  the final Exhibit X to the financial statements for
23  Treasure Hills for the year ending 12-31-95?
24      A. Page 115 would be reflective of the
25  instructions that we talked about previously as being

## 84

1   incorporated into the notes payable shareholder
2   supporting schedule.
3       Q. The bottom run of the financial statement
4   listed both Mr. Lozano and Mr. Zamacona down at 65,000,
5   the same as Mr. Diaz-Rivera?
6       A. That's correct.
7       Q. Okay. Now, let's go to Page 116. That would
8   be the form 5472 for Mr. Lozano. Does he go down from
9   $2,183.106 to $65,000?
10      A. That's correct.
11      Q. And that would match with the adjustments we
12  have just discussed?
13      A. That's correct.
14      Q. And Page 118, being the form for Mr. Lozano,
15  same thing, went down from $2,506,599 to 65,000?
16      A. That's correct.
17      Q. And, again, that's matches what we just
18  discussed?
19      A. That's correct.
20      Q. Okay. Do you remember in February of 1997
21  sitting down with Mr. Lozano and Mr. Zamacona at your
22  office and discussing the reclassification issue?
23      A. I do.
24      Q. Okay.
25      A. Okay. And let me just interject this: With

85

1 regard to this whole shareholder indebtedness matter
2 and the issues related to shareholder debt and equity.
3 the -- and we looked at some of the memos that occurred
4 early on at the time the IRS initially wrote their
5 report. went all the way back to, like, January or
6 February of 1996. But in the course of that -- those
7 initial discussions, we met face to face with -- or I
8 met face to face with Mr Zamacona. Mr. Lozano and Mr.
9 Cuellar. and we talked about the issues -- we talked
10 about these matters and what the reclassification of
11 shareholder debt to equity would mean and what the
12 consequences of all of that would be.
13        Those individuals basically concurred with
14 my recommendation to accept that and agree to do that
15 for purposes of resolving the IRS audit. But my
16 instructions to them at that time was to provide me
17 with information in terms of which of these
18 shareholders we were going to reclassify and how much
19 of this shareholder debt we were going to reclassify to
20 paid in capital.
21        In April when these reclassifications
22 actually occurred. we had -- I had no face-to-face
23 communication with any of these individuals. This was
24 -- this was a matter of, you know, them providing
25 instructions to our staff and. you know, these journal

86

1 entries made to the books of the company.
2        You know, I still had not had any real
3 communication with those parties in terms of. you know,
4 these are the -- these are the parties we are going to
5 reclassify and these are the parties we are not going
6 to reclassify. The meetings in February of '97. at
7 least in my mind, and this is like a year later. but
8 were really a continuation of the meetings that were
9 held -- the face-to-face meetings that were held in
10 like January of '96, okay?
11    Q.Okay. We have discussed that. And although we
12 don't know what was going on in their heads. you know,
13 what they knew or didn't know, you know, you don't
14 remember even discussing the effects that a bankruptcy
15 might have on the reclassification? Everybody was just
16 basically discussing what the effects would have if
17 someone wanted to sell --
18    A. Right.
19    Q.-- income taxes and stuff like that?
20    A. Right.
21    Q.And the stock, taking care of that problem and
22 so forth and so on?
23    A. That's right.
24    Q.Now, let's go into February of '97. Now.
25 the --

87

1        MR. DUARTE: I think I need to object to
2 that last sidebar as a conclusion on your part. I
3 don't think the witness testified to any of that.
4        MR. WALSH. Fine
5    Q Okay. We will fill in the gap before we get to
6 '97 Apparently in April of '96 all of this
7 reclassification was finalized. I filed suit on the
8 American Express note on May 21 '96  On May 23rd. 1996
9 you signed the 1995 tax return  Again. that would be
10 for the year of the reclassifications. On April 30th,
11 1996 Treasure Hills. Mr. Lozano and Mr. Zamacona and I
12 had had some depositions. and on April -- excuse me
13        Then on August -- excuse me. September
14 21st. 1996 Treasure Hills filed for bankruptcy. So the
15 meetings and the memo that took place in February of
16 1997 would be subsequent to the filing of the
17 bankruptcy proceedings. Now. going to Page 120
18    A. Okay.
19        MR. HALL: Objection: form of the
20 question. if that was a question. And object to the
21 answer as being nonresponsive.
22    Q This memo is dated February 19th. 1997?
23    A. That's correct.
24    Q.And it discusses the meeting that you had with
25 Mr. Cuellar and Mr Lozano and Zamacona on February

88

1 13th, 1997?
2    A. That's correct.
3    Q.And, again, all three of those individuals were
4 present at your office for this meeting?
5    A. That's correct.
6    Q.And then you go through this memo discussing
7 the impact, as you put it, associated with two
8 shareholders, namely Mr. Lozano and Mr. Zamacona?
9    A. That's correct.
10    Q.You go on to point out, and still on that first
11 page, that during 1995 an accounting entry was made for
12 the records of the company, which is summarized below
13 in terms of the effect such entry had on the
14 liabilities and equity in Treasure Hills Country Club?
15    A. That's correct.
16    Q.And that's basically talking about the
17 reclassification?
18    A. The reclassification made in April of '96.
19    Q.Okay. Now, let's go to the second page of the
20 first paragraph that states, "In the course of
21 generating the above-referenced accounting entry,
22 shareholder loans associated with the indebtedness of
23 Roberto Lozano, Hector Zamacona and Gaston Derbez was
24 reclassified making the total reclassification
25 $7,659,774. Based upon our office discussion of

AUGUST 17, 1999                                    WAYNE BENEKE, C.P.A.

89

1   February 13th, 1997, it is our understanding that the
2   indebtedness of Gaston Derbez included in our original
3   accounting entry is to remain" quote, "'shareholders'
4   loans" end quote, "and not," bold and underlined, "be
5   reclassified to equity  The effect of," quote.
6   "'reversing,'" end quote, "the G. Derbez loan from our
7   original account entry is summarized below," and then
8   you proceed to summarize it?
9       A. Right
10      Q Basically what you are talking about in that
11  thing is that the three notes, the McBride note, Rio
12  Grande Savings & Loan note and the NCNB notes, had been
13  reclassified into paid in capital, they don't want it
14  that way anymore, and they want to attempt to reverse
15  the reclassifications, correct?
16      A. Correct. We essentially did that in error.
17          MR. LIMON: I'm sorry. I didn't hear that
18  answer.
19          THE WITNESS: We did that in error  That
20  was done in error.
21      Q. That's what they're telling you?
22      A. Right.
23      Q. "In light" -- and then in the next paragraph
24  midway you have, "In light of Mr. Lozano and Mr.
25  Zamacona having reclassified their indebtedness from

90

1   shareholder loans to equity, it would appear -- it
2   would appear, quote, "'fair,'" end quote, "that their
3   ownership in the company be increased from its present
4   62 percent.  So basically now you are going to go in to
5   look -- you know, the more that they contribute, the
6   more stock that's issued out?
7       A. Yeah.
8       Q. Okay.  Now, some -- okay. I want to
9   specifically introduce -- I hand you what's been marked
10  as Plaintiff's Exhibit No. 6 and ask you to identify
11  this file.
12      A. Okay.  This is our work paper file the way we
13  bind up certain work papers in our file of Treasure
14  Hills Investments.
15      Q. Now, the file starts off with a bunch of
16  bankruptcy pleadings, correct?
17      A. That's correct.
18      Q. And inserted among those bankruptcy pleadings
19  are a lot of documentations that pertain to that memo
20  in the subsequent events that took place after that
21  memo we have just discussed, correct?
22      A. That's correct.
23      Q. Okay.  And those are to include the original
24  documents that would have handwritten notations and so
25  forth pertaining to the way of reversing the

91

1   reclassification?
2       A. That's correct.
3       Q Okay.  Now, the questions that I had asked you
4   earlier about Long & Chilton's records would also apply
5   to this file also just as it pertained to the three
6   files marked as Plaintiff's Exhibits 1 through 3?
7       A. That's correct.
8       Q Okay
9           MR. HALL  Object to the form of that
10  question, and the answer is nonresponsive
11      A. Wait.  I wasn't listening.  Ask me that
12  question again.
13      Q. The stuff that I had asked you about the
14  records pertaining to Plaintiff's Exhibits 1 through 3
15  concerning the personal knowledge of Long & Chilton's
16  filing system, that you remove the records from these
17  files that would be part of the records -- this
18  specific exhibit would be part of the records that you
19  removed -- that the correct files be removed, like this
20  file pertains to Treasure Hills and not another client
21  of yours, the fact that this particular exhibit is
22  actually a file that you removed from your office
23  pertaining to Treasure Hills and that you recognize
24  this file, all of that and the stuff on the computer
25  printouts also pertains to other documents --

92

1           MR. HALL:  Object to the form of the
2   question.
3       A. Yeah, it is certainly our file.  All that stuff
4   is ours.
5       Q. Okay.  Now, let's go back to the excerpts that
6   I have, Page 123 of Exhibit No. 5.
7       A. Okay.
8       Q. Now, there is some writing on this memo.
9   Apparently they took your -- now, you received this
10  from Treasure Hills, someone in Treasure Hills?
11      A. That's correct.
12      Q. Okay.  They basically took your memo and marked
13  it up.  That's a way of replying to your memo?
14      A. That's right.  That's correct.
15      Q. And it has a fax mark -- Long & Chilton fax
16  mark of February 19th, 1997 on it, correct?
17      A. That's correct.
18      Q. Okay.  First of all, this handwriting is in
19  Spanish.  Do you recognize the handwriting?
20      A. No.
21      Q. You don't know whether it belongs to Mr.
22  Cuellar or Mr. Lozano or Mr. Zamacona?
23      A. I have no idea.
24      Q. Okay.  Apparently they scratched out the date
25  and put in "sin fecha," which I believe translates into

---

### 93

1  "without date." Do you know who did that?
2  A. No.
3  Q.And then at the top they have some writing
4  about something about a "Enero de mil nuevecientos
5  noventaseis" being. you know, January of '96  Do you
6  know who inserted that there?
7  A. No.
8  Q But basically someone wanted you to change the
9  dates on the documents to reflect that they were
10  generated in 1996 and that the meeting took place in
11  1996 -- January of 1996 instead of February 1997?
12       MR. DUARTE. I'm going to object to that
13  because. No. 1. the witness does not speak Spanish; No
14  2. that's a mischaracterization; and, No. 3. that is
15  speculation on both your parts, and if the witness
16  desires to answer, it would be speculation on his part.
17  Q.Your answer being?
18       MR. HALL: Object to the form of the
19  question.
20  A. Well, my answer being that, you know. I don't
21  know. I don't know. I mean, "sin fecha," I know what
22  that means.
23  Q.Okay. Let me repose the question. Subsequent
24  to this memo and your future -- and your subsequent
25  correspondence going back between you and Treasure

---

### 94

1  Hills. the dates were actually changed to reflect that
2  the memo was generated in January of 1996 and discussed
3  a meeting that was being held in January of 1996?
4  A. Well, and, in fact. it was, okay? I mean. we
5  -- you know. this whole -- and that's what I was
6  talking about earlier. I mean, this whole -- with
7  regard to the reclassification, the recharacterization
8  of the shareholder loans began in January or February
9  of 1996. I never saw nor spoke to these parties again
10  until February. And in my mind, you know. this was
11  nothing more than a continuation of that original
12  conversation that was held in January or February of
13  1996.
14  Q.Okay.
15       MS. GRAFF: Can I clarify?  You are saying
16  you didn't speak to them for a whole year and didn't
17  see them for a whole year, an entire year?
18       THE WITNESS: That's correct. Now, I'm
19  talking of Mr. Lozano and Mr. Zamacona. Mr. Cuellar.
20  you know, I might have saw him, talked to him, okay,
21  off and on during that period. But Mr. Lozano and Mr.
22  Zamacona, I never had any personal contact. to my
23  recollection, at all.
24       MS. GRAFF: Between January and February
25  of '96 and then February of '97?

---

### 95

1       THE WITNESS: That's correct.
2  Q Okay. And my understanding is that. again, you
3  don't know what Mr Lozano. Mr. Zamacona or Mr. Cuellar
4  actually knew or didn't know about the
5  reclassifications prior to --
6  A. That's correct.
7  Q But in February of '97 you-all specifically
8  discussed the fact that these three notes had been
9  specifically reclassified?
10  A. That's correct.
11  Q And you discussed it specifically with both Mr
12  Cuellar -- with Mr. Cuellar. Mr Lozano and Mr
13  Zamacona?
14  A. That's correct.
15  Q.And according to the Plaintiff's Exhibit No. 6.
16  I believe you-all even went through financial
17  statements. the general journals. everything, all of
18  the documentation pertaining to the actual
19  reclassification?
20  A. That's correct.
21  Q.And then your -- again. I pointed out, Page 126
22  is another draft or maybe the final draft. Yes, this
23  is the final draft of the memo that goes -- you know.
24  after all of the changes reflected in Exhibit No. 6?
25  A. That is correct.

---

### 96

1  Q.Okay. And in that memo the date has been
2  changed to January of '96 and it discusses the meeting
3  taking place in January of '96?
4  A. Right.
5  Q.Which matches whoever's handwriting is striking
6  out the dates of the original memo?
7  A. That's correct.
8       MR. HALL: I'm going to object to that.
9  It mischaracterizes it.  The handwriting says "sin
10  fecha."
11       MR. DUARTE: I join in the objection.
12  Q.Okay.  Now, also in the final draft of this
13  memo -- okay, the final draft was placed in the 1996
14  tax return at the very front, correct? I hand you
15  what's been previously marked and introduced in a
16  deposition as another Exhibit 6 -- what does it say,
17  Treasure Hills?
18  A. Exhibit No. 9, Treasure Hills.
19  Q.-- Treasure Hills Exhibit No. 9.  And it
20  contains the original of that memo?
21  A. That's correct.
22  Q.Now, in that memo, that whole paragraph that
23  talks about the loans having been specifically
24  reclassified and that the shareholders did not want
25  them that way and they wanted them reversed, that was

---

97

1  removed, correct?
2      A. That's correct.
3      Q. And so was the statement in the other
4  paragraph, "In light of Mr. Lozano and Mr. Zamacona
5  having reclassified their indebtedness from the
6  shareholder loan to equity, it would only appear fair
7  that the ownership in the company be increased." that
8  was removed also?
9      A. That's correct.
10     Q. And then on that final memo there are some
11  exhibits to it that list certain loans as these were
12  going to be note payables to the shareholders  I guess
13  these were note payables to shareholders?
14     A. Yes, that's correct.
15     Q. Okay.  And these -- these amounts never
16  appeared in any of the previous financial statements
17  and so forth, for example, Lozano/Zamacona, 100,000.
18  Do you know where that came from?  And then there's
19  another Lozano/Zamacona for $364,757.41.
20     A. No, I'm not sure where those --
21     Q. Basically Mr. Lozano is on the phone and
22  Cuellar and were furnishing you this information?
23     A. This information, that's correct.
24     Q. Okay.  Now let's go into the financial records
25  for the year ending 1996, Page 134.

98

1      A. Okay.
2      Q. Okay.  The run date of this document is October
3  28th, 1997?
4      A. Okay.
5      Q. Okay.
6      A. That's correct.
7      Q. Now, the internal records for the account 2530
8  for Mr. Lozano, it shows that the beginning balance was
9  65,000, which would match the '95 internal records,
10  correct?
11     A. That's correct.
12     Q. And then apparently he made a $15,000 deposit
13  entry?
14     A. That's correct.
15     Q. Okay.
16     A. Advanced to the company an additional $15,000.
17     Q. That would be the stuff normally kept under the
18  Due to Shareholder loans?
19     A. That's correct.
20     Q. And then there was another adjusting entry to
21  the tune of $2,436.800?
22     A. That's correct.
23     Q. Okay.  And the way that you came up with that
24  two million-some-odd thousand was to be reclassified
25  other stockholder loans?  For example, beginning Page

99

1  135, account 2550, 331,500 note payable to stockholder
2  J Rangel/Claudia A ?
3      A. Well, okay.  That is the form of -- that is --
4  that's a debit entry.  That is a debit entry.  We
5  zeroed out that shareholder loan, that's correct.
6      Q. Okay   Then the same thing for account 27 --
7  no, 2570, note payable, stockholder - M  Juarez for
8  100,000?
9      A. That's correct
10     Q. Then account 2590 --
11     A. That's correct.
12     Q. -- note payable, stockholder - F  Medrano,
13  100,000?
14     A. That's correct.
15     Q. 2610, note payable, F. Cantu 90,000?
16     A. That's correct
17     Q. 2650, note payable, stockholder - F. de la
18  Garza, 255,000?
19     A. That's correct.
20     Q. 2660, note payable, stockholder - Tijerina,
21  90,000?
22     A. Correct.
23     Q. 2670, stockholder, note payable, P  de Anda,
24  $270,000?
25     A. That's correct.

100

1      Q. Account 2680, note payable, stockholder - J.
2  Guajardo, 75,000?
3      A. That's correct.
4      Q. My hole punched the account number out, but,
5  anyway, note payable, Jose Maiz, $100,000?
6      A. That's correct.
7      Q. Okay.  And then go to Page 137.  You continued
8  and did the same thing with Mr. Zamacona, the RGC
9  Group, J. Guajardo and Alberto Diaz-Rivera?
10     A. Correct.
11     Q. That came to 2.2-some-odd million dollars.  You
12  are still $324,800 short, so you took that out of the
13  paid in capital making an adjusting entry?
14     A. That's correct.  And that's right.  That's
15  exactly what the entry reflects.  However, what the
16  essence of the entry is, and for purposes of
17  expediency, that is clearly as you have represented,
18  the entry -- the accounting entry.  And it is -- it's
19  all one accounting entry.  In fact, what we have here
20  are two components, okay, the first component being
21  a -- if you will, a reclassification out of paid in
22  capital into shareholder loans, the Roberto Lozano
23  notes, okay?
24        So, if you will, you can picture this in
25  your mind's eye, there's two entries.  The first entry

---

101

1  is now a debit to paid in capital, because that's where
2  the Lozano note went in the first place, and a credit
3  to notes payable. Robert Lozano, okay? That's step
4  one. All right. Step two, then, is -- you know, and
5  this is based on the -- our instructions from the
6  client is --
7  Q The client being?
8  A. The client being, you know, Treasure Hills,
9  either Mr. Lozano or Mr. Zamacona or Mr Cuellar, one
10  of those three, -- instructions to us saying all of
11  the other shareholder loans, whatever they are on the
12  books of Treasure Hills are now paid in capital, okay?
13  And so entry No. 2 is, you know, debit, notes payable,
14  Claudia Rangel, Mr. Juarez, Mr. Medrano, Mr Cantu and
15  so on and so forth except paid in capital. Okay.
16  Instead we've made, you know, one big -- one big entry
17  which essentially gets everything to the same place but
18  in one entry as opposed to two.
19  Q.Okay. Now, to your personal knowledge, do you
20  know whether or not anyone, Mr. Cuellar, Mr. Zamacona,
21  Mr. Lozano or any other representative of Treasure
22  Hills, obtained any of these stockholders'
23  permission --
24  A. No.
25  Q.-- to wipe out --

---

102

1  A. I have no knowledge of that.
2  Q.Okay. Now, let's talk about the bottom line of
3  this stuff. Now, apparently you came up with a figure
4  of $2,516,800. And that is all being carried under one
5  account, correct?
6  A. That's correct.
7  Q.In fact, if you go to Page 139, that's a run
8  date of 10-28-97, the trial balance for period ending
9  12-31-96, account 2530. stockholder - R. Lozano,
10  2,516,800?
11  A. That's correct.
12  Q.Okay. Now, apparently there's some -- and even
13  on the internal records, the only thing that was
14  brought back was the Due to Stockholders loans to Mr.
15  Lozano and not the three debts, not the three specific
16  loans.
17  A. Well, okay. Now, I can tell you that it was
18  the intent of them to bring back the three loans, okay?
19  Q.Reverse the three loans?
20  A. That's right. That's right. Now -- and I know
21  that because of the discussions we had and the fact
22  that it was the secured loans that they were bringing
23  back. Now, it happened to have gone into the account
24  number for the regular shareholder loans.
25  Q.Not only that, the three -- okay. If you had

---

103

1  three notes, they would have been required under your
2  accounting principles and policies of Long & Chilton to
3  be carried under three account numbers, correct, just
4  the way they had been previously?
5  A. Well, I don't know that you could say that. I
6  don't know that that's a true statement.
7  Q.But they were carried under three different
8  account numbers?
9  A. Previously. And from my knowledge and
10  experience, okay, you know, I didn't even realize
11  really until I've become involved with it now what the
12  nature of those three loan balances were in the
13  beginning and this, you know, fourth loan balance. You
14  know, those didn't really mean anything special to me.
15  and not until now -- and I have gone back through all
16  this, looked at all the documents, done all the tracing
17  so I could do this testimony -- that I can now say
18  that. But I can tell you unequivocally that it was
19  their intent to put back on the books those three
20  loans.
21  Q.Okay. Let's see if I can summarize it. For
22  the year ending 1995 there's no question as to the
23  three loans, McBride. NCNB. Rio Grande Savings, were
24  specifically reclassified in the paid in capital?
25  A. (Moving head up and down).

---

104

1  Q.Okay. And regardless of --
2  MR. DUARTE: I'm sorry. I would like for
3  him to answer that verbally before you continue
4  recharacterizing any testimony.
5  A. Yes, they were -- for December 31st, 1995 they
6  were, in fact, reclassified.
7  Q.Okay. And on the books as of today they are
8  still reclassified into paid in capital on the internal
9  records regardless -- I understand your explanation
10  they weren't supposed to be. but on the books as of
11  today they are still reclassified?
12  A. Well, I don't know. That's subject to some
13  element of interpretation. You know, if -- whether you
14  put those back on the books in one account or in three
15  accounts, does that -- you know, does that change
16  anything? In my mind it doesn't. It's a note.
17  Q.Okay. Well --
18  MR. DUARTE: He's not finished yet, Larry.
19  Please let him finish.
20  A. It's a note. Whether it's in three accounts or
21  one account, it doesn't matter.
22  Q.Okay. The total of the three notes was
23  2,561,800, the recouped amounts 2,516,800, a difference
24  of a little less than $50,000?
25  A. $54,000.

---

105

1  Q.Okay. And the paid in capital to Mr. Lozano.
2  that was also reclassified -- excuse me. the Due to
3  Stockholders section was $2,514,099  The amount that
4  was reversed doesn't match exactly either one of them.
5  correct?
6  A. That's correct.
7  Q Okay. Lastly. when you were discussing this
8  reversal with Mr Zamacona. Mr. Lozano and Mr Cuellar.
9  did anyone at anytime ask you to come to the bankruptcy
10  court and explain the situation to the judge and say.
11  "Judge, a mistake was made. This was reclassified. I
12  don't have any reason to doubt these people when they
13  tell me it shouldn't have been reclassified." or did
14  they just tell you to change it on the books?
15  A. We never had any discussions about any of that
16  It was all. "This is what we want to do." and so we did
17  that.
18      MR. DUARTE:  I'm going to object:
19  nonresponsive. The question was, did you go to the
20  bankruptcy court and mention any of those things?
21      THE WITNESS:  No.
22      MR. WALSH:  No, that was not my question.
23  Okay. I believe I have no further questions  I will
24  pass the witness.
25      MR. DUARTE:  Who's up?  Do we need a

106

1  break?
2      MS. GRAFF:  I just have one question.
3          EXAMINATION
4  BY MS. GRAFF:
5  Q.It's my understanding that you encouraged
6  Treasure Hills Investments to get along with the IRS
7  audit and agree to those changes, and I guess my
8  question is, what has changed between that agreement
9  with the IRS to have them reclassified to now to where
10  you are saying that whether or not it's reflected on
11  the books, it was their intent to re-reclassify it
12  back?  What changed?
13  A. No. That's a very good question. My
14  discussions with them really never -- it was never my
15  intent in terms of the discussions with the client
16  about reclassifying these loans to mean necessarily all
17  of the loans, okay? My -- it was -- it was necessary
18  that we reclassify some of them. And that was the
19  whole purpose of, you know, kind of where our original
20  conversation fell apart. I mean, it never fell apart.
21  but we couldn't get to the end there because we needed
22  to get back with each other as to whose loans would be
23  reclassified and how much of those loans would be
24  reclassified.
25      So it was never really our intent to

107

1  reclassify them all. It was going to be necessary to
2  reclassify some of them unequivocally. But whose loans
3  and how much of those loans would be reclassified was
4  where we needed to talk and figure out what we were
5  going to do and. you know. so on and so forth
6  Q Essentially are you saying that you originally
7  reclassified the three notes and then you went back and
8  switched it and reclassified those back and then
9  changed every other shareholder's loan into paid in
10  capital? Am I oversimplifying it?
11  A No. you are exactly right.  You are exactly
12  right. What we ended up -- what we ended up doing.
13  okay, was reclassifying 100 percent of all of the
14  shareholder debt except for the -- and I'm going to
15  call it the secured debt. okay?  The secured debt. I
16  mean. that was the Lozano debt. okay?
17  Q.I don't think you answered my question. though.
18  What happened? I mean why the switch? Why go back
19  and --
20  A. Reclassify?
21  Q -- reclassify these notes?
22  A. Well, you know. the -- because that was a
23  secured loan. That was a secured loan. and so. you
24  know, it was important from the standpoint of the
25  client that, you know, that loan was different than all

108

1  of the other ones because it was secured.
2  Q.Wasn't it secured in '96 when it was originally
3  reclassified? I mean. did that change? That's what
4  I'm trying to find out.
5  A. Right.
6  Q.What caused -- what was the change? I mean, is
7  there something that was different? If it was secured
8  back then, I'm assuming it was secured back here at
9  this stage. And if I'm not being clear, I can --
10  A. No, no. I don't know. From my standpoint what
11  happened was Mr. Cuellar -- now, why Mr. Cuellar did
12  what he did, I don't know, but without really talking
13  to me or without really exploring all of this, okay, he
14  sends a note to one of our staff people in April of
15  1996 saying, "Reclassify this stuff," okay? All right?
16  That's what we do. "Boom." It goes into the -- make
17  that accounting entry, "bam." done, okay? You know, to
18  what extent people review it at that time, I don't
19  know, okay? But it's done, okay?
20  Q.It's not done by you?
21  A. Huh?
22  Q.It's not done by you?
23  A. Well, I mean, it's done by our office. I mean,
24  I don't do this personally. Even if I had, okay --
25  even if Carlos comes in to me and says, "Reclassify

109

1  this baby," if I knew how to run these computers, which
2  I don't, but if I did, that's probably what I would
3  have done, "boom," done. And the reason for that, even
4  me in my mind at that point in time the fact that this
5  land was secured and, you know, all of that sort of
6  thing, I never realized it, didn't know it, you know,
7  and to me it was just a loan, a shareholder loan. The
8  fact that it was secured by real estate wasn't
9  something I was intimately knowledgeable of.
10      Now -- I mean, that happens. Later on
11  what happens on the part of the client, you know,
12  whether they really have seen this and understood it, I
13  don't know. But later on -- and later on is after
14  bankruptcy -- we put it back on the books.
15      Q. Did you have any concerns about doing that?
16      A. I mean, maybe that's stupid. It obviously is
17  stupid now in hindsight, but it never -- honest to God,
18  never even entered my mind.
19      Q. Is that a usual practice to go back and
20  reclassify certain loans and then change the character
21  of other loans? I mean, all it seems to be is running
22  an accounting entry in the books. I mean, is that a
23  usual function for a CPA to go in and do this without
24  questioning the causes behind it?
25      A. Oh, yeah. I mean -- oh, yeah. I mean, from

110

1  our standpoint if the client -- in this kind of
2  engagement -- now, if we were auditing financial
3  statements, you know, that -- but in this situation
4  we're doing nothing more than serving as this client's
5  accounting department.
6      Q. Okay.
7      A. We are -- I mean, that's what we are for them.
8  We have the computers. We have the personnel to put
9  this data into a financial statement format and spit
10  out financial statements.
11      Q. So your --
12      A. So when the client says, you know, "Do this,"
13  "bam," it happens.
14      Q. Okay. So you're saying you are acting in the
15  function of a bookkeeper for Treasure Hills Investments
16  as opposed to an accountant that's called in to perform
17  an audit for published financial statements or
18  something?
19      A. Exactly, and give -- and give assurances to
20  third parties in the way of an opinion on the financial
21  statements. In other words --
22      Q. That's not what your engagement was?
23      A. That's right. You know, we have audited these
24  financial statements and these financial statements
25  present fairly. That's an audit engagement. And we

111

1  are not engaged in that capacity at all. We were
2  merely an extension of their accounting department to
3  process data in a financial statement format for them
4      Q. Okay.
5      MS. GRAFF: That's all I have right now.
6      (Brief recess.)
7                 EXAMINATION
8  BY MR. DUARTE:
9      Q. Mr. Beneke, I have a few questions, and you
10  have been very patient having gone your third time at
11  this, so I will try to be brief. First of all, all of
12  your files have been tendered, correct?
13      A. Every single piece of paper that we have in the
14  office, to my knowledge, is in one of those three
15  boxes.
16      Q. Or on the table?
17      A. Or on the table.
18      Q. And in your -- well, in your preparation for
19  the deposition, I think one of your comments suggested
20  that you had the opportunity to review all of these
21  documents, familiarize yourself with the facts and
22  become comfortable to where you can testify about what
23  happened as far as Treasure Hills went, correct?
24      A. That's correct.
25      Q. Now, going back and looking at this situation,

112

1  who was your client?
2      A. Treasure Hills Country Club.
3      Q. All right. And in representing this particular
4  client, was it your responsibility to look out for the
5  reporting requirements of the individual shareholders?
6      A. Not necessarily. I think we had a
7  responsibility to -- you know, when asked to
8  appropriately respond to those inquiries on the part of
9  the company, and certainly if we had, you know, any
10  knowledge of violations of laws, rules, regulations or
11  anything of that nature, certainly a responsibility to
12  communicate that to the client.
13      Q. At no point did you communicate any such
14  concern to the client, though?
15      A. No.
16      Q. And in terms of questions that were posed to
17  you by the client through one, two or three of its
18  representatives, you answered those questions?
19      A. That's correct.
20      Q. And in answering those questions did you
21  attempt to follow the rules and regulations associated
22  with preparing tax returns and filing different federal
23  and state and local returns for the client?
24      A. That's correct.
25      Q. Now, we have seen through the course of your

113

1   deposition that some documents take a while to prepare,
2   correct?
3   A. That's correct.
4   Q. And they may go through several drafts, is that
5   right?
6   A. That's correct.
7   Q. Ultimately when you come up with a final draft
8   and those drafts are distributed to third persons, do
9   you stand by those final drafts?
10  A. As a draft --
11  Q. No, as the final copy.
12  A. Yes. Yes, we would.
13  Q. When you sign off on that document do you
14  stand by that?
15  A. We would.
16  Q. Now, we have, for example, had an exhibit that,
17  for example, I think starts in February, goes back, and
18  there's a notation that is made by someone unknown and
19  there's some corrections made, and ultimately you end
20  up with a final copy, correct?
21  A. That's correct.
22  Q. Now, in looking back at that situation, for
23  example, with the memorandum associated with the
24  recharacterization of a certain debt, was there any
25  fraud on the government in that process to your

115

1   five years, you decide to convert it. Now, if there's
2   a promissory note for that $10,000 but it has not been
3   paid on other than interest, for example, and you
4   change it over to a capital contribution, from the
5   accounting standards, is there a way or is it proper
6   for the representation to be made to the government
7   that this is a capital contribution but still have a
8   double entry or some other accounting entry that will
9   reflect what we have on the one hand reported to the
10  government as capital contribution is, in fact, a note
11  payable? Is that something that is possible or
12  appropriate?
13  A. Well, I'm not sure I understand your question,
14  but from the standpoint -- from the standpoint of the
15  company's books, it's either one or the other and it
16  can't be both.
17  Q. All right. Now, in this particular situation,
18  over the course of time you put on the books that the
19  Roberto Lozano notes, the three notes that Mr. Walsh
20  was discussing with you, that those were reclassified
21  as contributions to capital at one point?
22  A. At one point, that's correct.
23  Q. And can you tell us specifically what
24  individual advised you to do that?
25  A. No. Well, I mean, first of all, the -- no one

114

1   knowledge?
2   A. To my knowledge, none.
3   Q. Okay. And in that process as you were going
4   through this year-long situation with
5   recharacterization, are there any material
6   misrepresentations of facts that are intentionally
7   placed in that memorandum?
8   A. None to my knowledge.
9   Q. So the starting in February on the first draft,
10  somebody suggesting that maybe this shouldn't have a
11  date and ultimately ending up with your final product,
12  you don't see a problem with that?
13  A. None whatsoever. And I had -- I had earlier
14  mentioned the fact that in my mind this was -- even
15  though the period of time was somewhat long, it was
16  nonetheless a continuation of a meeting that had
17  started a year earlier.
18  Q. So your final product is the result of your
19  consideration of all the facts that had occurred during
20  this entire period?
21  A. That's correct.
22  Q. Now, this issue of recharacterization
23  shareholder equity versus loans, if on your books you
24  characterize something as, let's just say shareholder
25  equity, a $10,000 loan that has been on the books for

116

1   told -- no one represented to me personally to do this.
2   The materials that we looked at earlier would indicate
3   that Mr. Cuellar communicated with our office staff to
4   accomplish this accounting entry, and indeed that's
5   exactly what happened.
6   Q. Okay. Now, in accomplishing this accounting
7   entry as you've described that, you can't tell us, can
8   you, that specifically the three notes were designated
9   by Mr. Cuellar at anyone's direction to be
10  reclassified, can you?
11  A. I don't understand your question.
12  Q. Did he specifically say -- Carlos Cuellar, did
13  you hear him say in any way, shape or form, "I want you
14  to reclassify these three notes"?
15  A. No.
16  Q. And certainly Roberto Lozano didn't communicate
17  that to you?
18  A. That's correct.
19  Q. And to your knowledge, Hector de Zamacona did
20  not either?
21  A. That's correct.
22  Q. Now, in recategorizing this for accounting
23  purposes and perhaps with the Internal Revenue Service,
24  are you in this accounting stating to the Internal
25  Revenue Service or any third party that may look at

### 117

1 these books this loan -- the three loans that you have
2 now put into one accounting entry -- this has been paid
3 in full? Have you at any point said that?
4 A. No.
5 Q. On December 31st of 1996 I believe you carried
6 a note balance of 2,500,000 plus, was it your opinion
7 on the run date that Mr Walsh talked about that that
8 was, in fact, the correct balance on the real estate
9 lien notes?
10 A. Yes.
11 Q. And at this point in time do you have any
12 information that those notes have been paid?
13 A. No.
14 Q. Okay And do you have any information at this
15 point in time that after December 31st, 1996 anyone
16 paid the interest?
17 A. No.
18 Q. Have you seen releases of liens for the three
19 notes in question?
20 A. No.
21 Q. Now, with the Internal Revenue Service itself,
22 when you recategorize the three Lozano notes to
23 contributions to capital, did you advise the Internal
24 Revenue Service, "This is the particular debt we are
25 recategorizing"?

### 118

1 A. No, although you maybe could get there by a
2 review of the 5472s.
3 Q. Okay. Now, the 5472s were completed after
4 looking at the books that at this point now needed to
5 go and be corrected, if you will, right?
6 A. That's correct.
7 Q. So that federal document was based on erroneous
8 information?
9 A. That's correct.
10 Q. In effect, that document was completed in
11 error?
12 A. That's correct.
13 Q. Now, as far as the Internal Revenue Service was
14 concerned, they just wanted to see reclassification
15 that was more in line with the reality of this
16 corporation?
17 A. That's correct.
18 Q. And in doing that, did the Internal Revenue
19 Service through any of its officers or agents tell you,
20 "We want the secured notes reclassified"?
21 A. No.
22 Q. Did they tell you, "We want the unsecured notes
23 reclassified"?
24 A. You know, technically not. What they -- in my
25 opinion, what they were saying is that we needed some

### 119

1 reasonable relationship between the shareholder debt
2 and paid in capital. They didn't tell us, "Reclassify
3 them all," although they were certainly saying to us.
4 "Reclassify some."
5 Q. Now, I appreciate the answers you gave Ms.
6 Graff about your responsibilities and the role that you
7 had, but back when you were doing the recategorization,
8 if you had in your possession the information that
9 suggested to you the Roberto Lozano loans were, in
10 fact, secured notes. would you have recategorized those
11 on your own?
12 A. No. And I think -- and that is -- and that's a
13 very important point. and I don't mean to be making
14 excuses, but, you know. my knowledge of all of the
15 eminent details of the client and particularly these
16 relationships between the secured debt and the other
17 loans, at the time of these -- well, certainly at the
18 time of the first communication in January or February
19 of '96 and really not until the February meetings of
20 '97 did I really fully comprehend the significance of
21 the secured debt.
22 Q. All right.
23 A. And, you know, had we known about that, even in
24 April of '96, or had our people known about that, I
25 think we would have certainly gone to the client and

### 120

1 said, "Look, we can -- we can reclassify these, but
2 you've got a whole array of legal things to accomplish
3 in the course of that, including, you know, getting a
4 release of lien." I don't know that we would have done
5 all of that with having had that sort of knowledge.
6 Q. Okay. In follow-up to that question and the
7 answer you gave then, you are not here as a legal
8 expert indicating that reclassifying this for tax
9 purposes in any way released that lien, are you?
10 A. I certainly am not.
11 Q. And you are not indicating by your testimony
12 that by reclassifying those notes to contributions to
13 capital that that, in effect, paid those notes off, are
14 you?
15 A. That's correct.
16 Q. Now, you have discovered that the three notes
17 were secured, they were recategorized and you want to
18 reverse the process?
19 A. That's correct.
20 Q. Is there anything as far as your training goes
21 that tells you that reversing that process is illegal
22 in any way?
23 A. No.
24 Q. All right. From your training there was
25 nothing inappropriate in that process?

121

```
 1    A. No.
 2      Q. Now, Mr. Walsh talked to you a little bit about
 3    secured and unsecured debt as that was carried on the
 4    books  And I think at one point he was talking to you
 5    about the fact that there was a $1.5 million debt that
 6    was classified as secured with one of the notes and
 7    there was $900,000 approximately that was unsecured.
 8      A. That's correct.
 9      Q. That accounting entry does not necessarily in
10    your mind, does it. represent the reality of that note?
11    Is that a fair statement?  In other words --
12      A. That's a fair statement.
13      Q. Okay.  So the fact that you have these book
14    entries that you've got $900,000 unsecured, in fact,
15    the property might be worth $5,000,000 and it might all
16    be secured?
17      A. That's correct.
18      Q. Okay.  That's just a book entry that is made?
19      A. That's correct.
20      Q. At any point in time were you called upon to
21    review the stock certificates to verify who owned
22    different shares of stock?
23      A. To my knowledge we never -- we were never -- we
24    never requested that information, never had a reason to
25    really request that information, never really saw that
```

122

```
 1    information.
 2      Q. Okay.  Now, did you ever have a conversation
 3    with Roberto Lozano, Carlos Cuellar or Hector de
 4    Zamacona about the difference in the U.S. between a
 5    shareholder and an investor?
 6      A. No.
 7      Q. Okay.  Did they ever talk to you about how the
 8    mechanics would work of a corporation having a joint
 9    venture concerning profits?
10      A. No.
11      Q. Did they ever talk to you about having -- about
12    the corporation, Treasure Hills, having limited partner
13    on the golf course?
14      A. No.
15      Q. Did they talk to you about receiving investment
16    funds in order to allow individuals to participate in
17    profits from the golf course?
18      A. No.
19      Q. I read very briefly last night your trial
20    testimony, and there's a question about what the
21    reporting requirements are for foreign nationals who
22    have not lived in this country for six months back in
23    this time frame.  Do you recall now what those
24    requirements were?
25      A. No.
```

123

```
 1      Q. At this point in time can you from your
 2    personal knowledge say that Gaston Derbez violated any
 3    federal reporting requirements?
 4      A. No.
 5      Q. Can you say that about Mr. Zamacona?
 6      A. No.
 7      Q. Can you say that about Mr. Lozano?
 8      A. No.
 9      Q. Mr. Walsh asked you about the possibility of
10    cooking the books.  Did anybody ever ask you to cook
11    the books in this case?
12      A. No.
13      Q. And is it your understanding that that
14    terminology basically means to make fraudulent or false
15    entries?
16      A. Yes, I understand that's what it means.
17      Q. Okay.  With regards to Form 433-A, first of
18    all, you told us that is a federal reporting form
19    concerning U.S. holdings; is that fair?
20      A. That's correct.
21      Q. And the completion of Form 433-A by Hector
22    Zamacona, were you present when that occurred?
23      A. No.
24      Q. In connection with the 433-A form completed by
25    Roberto Lozano, were you present when that form was
```

124

```
 1    completed?
 2      A. No.
 3      Q. Did you receive any written instructions or
 4    copies of any information that was delivered by the
 5    Internal Revenue Service to either of those individuals
 6    in completion of that form?
 7      A. No, not to -- not to my knowledge or
 8    recollection.
 9      Q. Did you go with Roberto Lozano, Carlos Cuellar
10    or Hector de Zamacona to meet with the revenue agent?
11      A. No.
12      Q. So sitting here today you can't tell us what
13    information was specifically requested by the agent,
14    can you?
15      A. No.
16      Q. Mr. Walsh asked you a question -- and we have
17    gone pretty quick on some of these things.  I think the
18    question was posed to you with regards to the final
19    draft of the memorandum concerning the reversal,
20    reclassification that you received that information
21    from Mr. Lozano, Zamacona and Mr. Cuellar.  And you
22    said, "Yes, I did."  Can you tell us specifically who
23    gave you that information?
24      A. Well, no, I can't tell you specifically where
25    any of that information came from.  And the fact of the
```

Case 1:00-cv-00068   Document 11   Filed in TXSD on 10/02/2000   Page 115 of 143

125

1   matter is I believe that that information came to us
2   via the fax machine.
3       Q. Okay. Let me go into the American Express bank
4   note, the -- I guess it was $1.5 million approximately.
5   Was that note reclassified?
6       A It was, in fact, reclassified.
7       Q. As what?
8       A. As paid in capital.
9       Q Okay. Now, with regard to the American Express
10  bank note, you've looked at all these different
11  documents in preparing for this deposition. Is it fair
12  to say that none of the money from the American Express
13  bank note went to any of the unimproved real estate
14  that secured the Lozano notes? All of the money
15  essentially went to the golf course and different
16  bills, true?
17      A. I would have to say that that was true.
18      Q. And do you recall how much of the 1.5 million
19  was used to improve the golf course and the clubhouse?
20      A. Off the top of my head, I wouldn't be able to
21  tell you that without, you know, reviewing with some
22  element of detail those records again.
23      Q. Okay.
24          MR. DUARTE: Thank you very much. I'll
25  pass the witness.

126

1                    EXAMINATION
2   BY MR. LIMON:
3       Q. Mr. Beneke, my name is Abe Limon, and I
4   represent the corporation in the bankruptcy proceeding.
5   According to the accounting standards is that an
6   acceptable way -- or is that an acceptable reason
7   within which to make a decision about the
8   classification of debt? Whether it's debt or whether
9   it's paid in capital, the fact that a loan is secured
10  or unsecured, is that pretty normal?
11      A. Yeah, I think that would certainly be an
12  acceptable practice to view that loan certainly
13  differently than you would a loan -- an unsecured loan
14  -- an unsecured amount of money coming into the company
15  for purposes of sustaining operations or paying
16  overhead-type expenses. The fact that a loan is
17  secured with assets of the corporation certainly makes
18  it different than one which is not secured by assets of
19  the corporation and would certainly be a reason to
20  maintain that type of loan as a loan.
21      Q. And was this specific loan discussed during any
22  of your conversations with the IRS auditor?
23      A. I can't answer that. I'm not for certain
24  whether or not that specific issue was discussed. The
25  conversations that I recall with the agent had to do

127

1   with certainly just merely the magnitude of all of the
2   these shareholder loans as a -- in comparison with the
3   amount of equity or paid in capital that the
4   corporation reflected and the fact that that was just,
5   if you will, out of sync. And we essentially agreed
6   To my recollection there was never any specific
7   discussion about, for example, "This loan needs to be
8   reclassified. This loan doesn't." You know we didn't
9   have that sort of discussion.
10      Q And it's your testimony basically that you
11  didn't even have that discussion initially with any of
12  the principals of the corporation until sometime in
13  April of '96?
14      A. Exactly That is exactly right
15      Q. Okay. What is the usual or the acceptable debt
16  equity ratio in a company like this?
17      A. That -- and it would certainly vary depending
18  on the nature of a company's operation. And, for
19  example, what I'm talking about is -- and many
20  frequently see this, young upstart companies in the
21  service business, for example, you know, would tend to
22  have a higher element of debt to equity because, you
23  know, there is a hope in the case of a service industry
24  that, you know, future profits would allow the ability
25  of the company to immediately repay that loan, you

128

1   know, at some fairly short term, whereas if you have a
2   young company which is very heavily invested in
3   long-term fixed assets, the debt-to-equity relationship
4   would probably require something closer to a 50/50
5   relationship as compared to maybe a service industry
6   where you might see 75 percent debt to 25 percent
7   equity.
8       Q. And at the time of your conversations with the
9   IRS auditors, did you at all discuss with her what --
10  or did she discuss with you what ratio you wanted to
11  get it down to?
12      A. No, there was never any specific discussion of
13  that that I recall. And although we may have had -- we
14  may have had some general discussions about that very
15  thing, an inquiry on the part of ourselves as to what
16  do you think is fair, and we may very well have, you
17  know, if you will, kind of kicked around this 50/50, do
18  you think that's fair sort of thing. And I don't
19  really recall whether or not we had any sort of
20  resolution to that, but my recollection is that had we
21  gotten to a 50/50, I think the service would have been
22  plenty well satisfied.
23      Q. And when you took the action in April of '96,
24  which you testified that's when you got word to just
25  reclassify the whole thing, after you reclassified what

AUGUST 17, 1999                                                    WAYNE BENEKE C.P.A

129

1  was the debt-to-equity ratio?
2  ∴ Well, there was no debt. 100 percent equity.
3  Q So that's out of sync in your opinion, correct?
4  ∴ Yes.
5  Q And, in fact, according to normal accounting
6  practice, that's out of sync?
7  ∴ Yes.
8  Q So it would have been advisable to get it back
9  into sync; is that correct?
10  ∴ Yeah. Yes.
11  Q So when the principals of Treasure Hills asked
12  you to recapture the McBride, Derbez, Lozano note, do
13  you know what that got the ratio back into?
14  ∴ You know, including the -- you know, if you
15  include the debt from -- with the institution in
16  Mexico, you know, we may have been slightly under -- we
17  may have been somewhere in the range of like 45 percent
18  debt, you know, 55 percent equity. I mean, that's just
19  kind of off the top of my head. But I think that we
20  would have been -- if you consider the debt from the
21  institution in Mexico, consider that a part of debt,
22  which you obviously should, recharacterizing the
23  secured portion of this debt -- or this amount back up
24  to debt would have probably -- I mean, I think the
25  relationship would have worked out probably 40 or 45

130

1  percent debt to 55 to 60 percent equity, a little
2  higher than what you would even think it needed to be.
3  Q And in your professional opinion, do you think
4  that would have been acceptable to the IRS --
5  ∴ Yes, very much.
6  Q -- 40/60 or 45/55?
7  ∴ Very much so.
8  Q To your knowledge did the IRS ever notify you
9  after the recapture of the McBride/Derbez/Lozano note,
10  did they ever notify you that that was unacceptable?
11  ∴ No.
12  Q Have you ever been notified of any other audit?
13  ∴ No.
14  Q Have you ever been notified of any
15  dissatisfaction or disagreement by the IRS -- well, let
16  me take that question back. Do you know if forms 5472
17  for Mr. Lozano or Mr. Zamacona were filed in '96 or
18  '97?
19  ∴ I don't know. I would certainly -- I would
20  certainly believe at least for 1996 that those would
21  have been filed.
22  Q And would those have shown the recapture?
23  ∴ They certainly should have. Whether or not
24  they did or not, I don't think they did. I don't think
25  they did.

131

1  Q And do you know if they were filed for 1997 or
2  '98?
3  ∴ I don't -- I don't believe that the corporation
4  has filed a '97 return nor a '98 return.
5  Q And why is that? Is that due to the bankruptcy
6  proceeding?
7  ∴ That's correct.
8  Q Basically the audit by the IRS was really
9  forcing the company to do these things, wasn't it?
10  ∴ It certainly was.
11  Q And was that the reason you were recommending
12  it to the principals of the corporation?
13  ∴ It certainly was.
14  Q What would have happened if -- because you
15  earlier testified that you need the permission of the
16  note holder or debt holder, creditor to be able to do
17  that reclassification. Was that your testimony?
18  ∴ That's correct.
19  Q Okay. Would the IRS have forced the
20  recapitalization had the shareholders or loan holders
21  not have allowed that?
22  ∴ Well, I think that's the issue that the company
23  would have ultimately faced was a -- as opposed to the
24  company taking its own action and having some
25  concurrence as to what they wanted to do, be faced with

132

1  the service deciding that for them and the service's
2  decision being, if you will, less favorable than their
3  own decision to do so.
4  Q And do you know upon which parameters would the
5  service have made that decision? Had they been forced
6  to make the decision, what criteria would they have
7  used; do you know?
8  ∴ Well, they would have obviously taken a
9  position where it was all paid in capital. Now, you
10  know, I -- and having -- but I also believe that the
11  Lozano note by virtue of its legal position, and that
12  having been a secured debt, you know, I think the
13  service would have left that alone as a shareholder
14  loan.
15  Q Why do you say that?
16  ∴ Because --
17       MS. GRAFF: I'm going to object to that.
18  I don't think you can speculate on the IRS.
19  ∴ Although I believe -- I think it would have
20  taken on a different character because of its legal
21  situation.
22  Q Now, you earlier testified that in April of '96
23  was the time about when you got the order to reclassify
24  everything. At that time did any of the principals or
25  any agent or representative of Treasure Hills tell you

133

1   that they had -- they were considering filing a
2   bankruptcy?
3       A. No.
4       Q. Did any of them ever tell you that they were in
5   legal trouble with its creditors?
6       A. No.
7       Q. Did any of them ever tell you that they had
8   sought the advice of bankruptcy counsel about a
9   possible bankruptcy?
10      A. No.
11      Q. Let me call your attention to the audit papers.
12  Do you recall the factors that the auditor stated in
13  her report about -- I think it's Page 92 of Exhibit --
14  probably Exhibit 5. I think it's Page 92 --
15      A. Yes.
16      Q. -- and then especially down to 93 where the
17  auditor begins to look at and analyze each factor about
18  whether a debt is really a debt or whether it's paid in
19  capital.
20      A. Yes.
21      Q. Are you familiar with those characteristics?
22      A. Yes.
23      Q. Other than because of this case?
24      A. Yeah. I mean. I would -- you know, I have some
25  not necessarily specific recollection of all of these

134

1   issues, but certainly some general knowledge of the
2   things that the service looks at in terms of these
3   matters having to do with debt and equity.
4       Q. Okay. And taking just the Lozano note and upon
5   a review of these factors, in your opinion, would you
6   consider the Lozano note to be debt instead of
7   contribution to capital --
8       A. Yeah.
9       Q. -- based on these factors?
10      A. Yeah, I think you would. Now, the only -- you
11  probably have to interject this comment that in the
12  service's view, the nonpayment of interest can, if you
13  will, jeopardize the characteristics of a debt. Even
14  in the case of the Lozano note, I don't have any
15  specific recollection of the company servicing the
16  interest portion of that debt.
17          MS. GRAFF: Can we go off the record for a
18  second?
19          (Discussion off record).
20      A. So certainly the fact that there was no
21  nonpayment of interest might jeopardize. But all of
22  the other characteristics there that, you know, are
23  touched on in this particular agent's report, you know,
24  talks about collateral and things of that nature, an
25  actual signed document which would certainly leave

135

1   credibility to the fact that this note was a note and
2   not an equity component.
3       Q. I think you recaptured the Lozano note at the
4   end of '96: is that correct? You were told to do it in
5   April of '96 but I think your report really says ending
6   December '96.
7       A. That's correct.
8       Q. Did you reflect that in your report, the one
9   ending December '96 because of instructions you had
10  received in April of '96 or because of instructions --
11  or any instructions you may have received after October
12  of '96?
13          MS. GRAFF: May I clarify that question?
14  I'm sorry. I'm getting lost on the dates. I'm trying
15  to follow the dates, and I'm trying to understand if
16  you mean '97 which relates something back to January of
17  '96. That's what I'm trying to understand.
18          MR. LIMON: I think he had testified
19  earlier that the date of the recapture is as to the end
20  of '96, correct?
21          MS. GRAFF: Okay. I'm sorry. What I
22  understand is that in February of '97 was the
23  discussion that it should be recaptured and that it was
24  dated back to '96. I'm just trying to find out if
25  those are the dates you're talking about and the

136

1   conversations you're talking about.
2           MR. LIMON: He testified earlier that it
3   was in April of '96.
4       Q. Correct?
5       A. That's correct, that we reclassified all of the
6   shareholder debt.
7       Q. But it didn't actually show up in any report
8   until the end of '96?
9       A. Well, that's correct. That is correct. Well.
10  wait a minute. No. we may have -- we may have issued
11  an interim -- we may have issued a financial statement
12  for 1995. Wait a minute.
13          MR. WALSH: Can we get off the record for
14  a minute?
15          (Discussion off record).
16      Q. Again. for the record, when did you -- when was
17  the recapture of the Lozano note made?
18      A. We essentially put it, if you will, back on the
19  books in February of '97 effective for December 31st,
20  1996.
21      Q. When were you instructed to recapture it or to
22  put it back as a debt?
23      A. In February of 1997.
24      Q. Okay.
25          MR. LIMON: I have no further questions.

---

137

EXAMINATION

BY MR. HALL:

Q. Just very few, Mr. Beneke. I'm Brendan Hall
I have just a couple of questions. I believe your
testimony was that you did not take over the Treasure
Hills account until December 31st of 1995?

A. That's correct.

Q. So anything that happened prior to that date
you wouldn't have any personal knowledge of?

A. I wouldn't have any personal knowledge of.

Q. If you would turn to Page 76 of Exhibit 4 or 5
It's the tax memorandum.

A. Okay

Q. It's dated July 20, 1994, correct?

A. That's correct.

Q. That would have been prior to your working with
this client?

A. That's correct.

Q. So you wouldn't have any personal knowledge if
the client received that document?

A. I would not. I would not have any personal
knowledge.

Q. Now, at the very beginning of your deposition
you were shown these three -- I guess three-feet long
boxes over here which have been marked Exhibits 1, 2

---

138

and 3, and you said that those appeared to be the
documents you had provided to Mr. Walsh?

A. That's correct.

Q. And you probably reviewed them for ten or 15
seconds, correct?

A. Possibly.

Q. Okay. You did not make a thorough review of
these three boxes' worth of documents and checked even
any of the pages inside, did you?

A. No.

MR. HALL: No further questions.

MR. LIMON: I'm sorry. Could I have just
one final question?

MR. WEYAND: Go ahead.

EXAMINATION

BY MR. LIMON:

Q. Turn your attention to Page 83, Mr. Beneke.

A. Okay. That's.

Q. Your memo of December 29th, '95, correct?

A. That's correct.

Q. The last paragraph of that first page states
that you're already recommending to the corporation
that not all loans be reclassified; is that correct?

A. That's correct.

Q. Was that because of the attempt to reach some

---

139

50/50 debt-equity ratio?

A. Well, yeah, that -- there was some
considerations of that as well as the possibility that
we could experience some adverse tax situations from a
state franchise tax from the state franchise tax
matter. And the issue there has to do with a Texas
corporation owing a franchise tax based on its capital
structure. And in this particular case had we
reclassified all of the shareholder debt, we would have
-- we would have ended up having to pay some element of
state franchise tax probably unnecessarily because -- I
mean, we didn't need to reclassify all of the
indebtedness.

MR. LIMON. No further questions.

EXAMINATION

BY MR. WEYAND:

Q. Mr. Beneke, my name Dale Weyand, and I
represent Tres Deseos in these proceedings. And you
have to bear with me because I do not know the
documents as well as anyone else sitting at this table.
I have not looked at -- I've looked at very few of the
documents that are on this table, and I want to try to
get a little bit of understanding about some of the
documents on the table. On Plaintiff's Exhibit No. 4,
the front of that, those summaries, were those prepared

---

140

by you and/or Wayne Chilton -- or Chilton & Long?

A. Long & Chilton.

Q. Long & Chilton?

A. No.

Q. Who were those prepared by?

A. I would suspect that these are probably
prepared by Larry Walsh.

Q. Have you gone through line by line and verified
all the information in there?

A. Well, I can say this: I would not necessarily
say that I have looked at every single number on all of
these pages, but I have reviewed in probably some
pretty close detail the portions of these schedules
that have to do with the shareholder loans and the
changes that occurred with regard to those specific
loans over the course of the years that are set out
here.

Q. Okay. And those were not prepared by you,
though?

A. No.

Q. And those were not prepared by your office or
anyone in your office?

A. No.

Q. Is all the information reflected on those
summaries or those recaps accurately taken from the

---

141

1  financial records of the corporation?
2      A. Again, I think I could certainly say that with
3  regard to all of the information here as it has to do
4  with the shareholder loans, that that information is
5  accurate. I have, again, not spent an inordinate
6  amount of time looking at the rest of these numbers,
7  although I certainly would have no reason to believe
8  that they not be accurate. At first glance they would
9  certainly appear to be accurate.
10     Q. We talked about -- we talked quite a bit -- or
11 you talked quite a bit about the McBride note or what
12 Mr. Walsh referred to as the McBride note and some
13 portion of that note being secured and some portion of
14 that note being unsecured as reflected on the books of
15 the corporation.
16     A. That's correct.
17     Q. Do you know why it was broken out that way?
18     A. I can only answer that this way: Based on my
19 -- based on the information and some of the discussions
20 that I have had with Larry as of late, my -- I'm
21 talking about the last month or so -- my understanding
22 of that is that the secured and the unsecured portions
23 were the result of the agreements that were established
24 as a result of Treasure Hills' first bankruptcy.
25     Q. Okay. Do you know when Treasure Hills' first

142

1  bankruptcy was terminated, dismissed or whatever
2  happened in those proceedings?
3      A. Like April of 1991.
4      Q. Okay. So after that point in time there would
5  be no reason to classify or to distinguish or make a
6  distinguishment -- or distinction on the books of the
7  corporation as to part of the note being secured and
8  part of the note being unsecured; would that be a fair
9  statement?
10     A. That would be a fair statement.
11     Q. And at that point in time if that note was
12 secured by real property, in fact, the entire note
13 balance would be secured by that real property?
14     A. You know, I'm not an attorney. You know, I
15 probably couldn't tell you what that really means from
16 a legal standpoint. But from an accounting standpoint,
17 that would certainly be true, that there is no reason
18 to distinguish those.
19     Q. There was a number of questions and a whole
20 series of questions about the amount of consideration
21 that may have been paid for those secured notes and the
22 corporation's need to know the amounts paid by the
23 purchaser of those notes presumably, or the questions
24 were hinting at the possibility of having to claim a
25 capital gain. I'm just trying to refresh your memory.

143

1  Do you recall that series of questions?
2      A. I recall that
3      Q. In fact, it doesn't make any difference to the
4  corporation how much it acquiring you may have paid for
5  an asset it's still an obligation of the corporation?
6      A. That's correct
7      Q. And any gain that may be realized would be the
8  responsibility of the acquiring party to report?
9      A. That's right. In this particular case, the
10 individual.
11     Q. Now, if you have a contingent liability or a
12 questionable liability that is viewed or may be viewed
13 by some as an asset and you acquire or have that asset
14 or that liability assigned to you for no consideration
15 being paid and subsequently realize a lot of money off
16 that asset, would that also be categorized as capital
17 gain?
18     A. It would -- I think it would fair to say that
19 that would be categorized as some element of gain.
20 Whether it be capital or ordinary --
21     Q. It depends?
22     A. -- it depends.
23     Q. Okay. If you are the holder of a contingent
24 liability that you paid nothing for, is there any duty
25 to report that holding to the IRS?

144

1      A. No.
2      Q. If you realize anything on that asset, is there
3  a duty to report the realization to the IRS?
4      A. There certainly is.
5      Q. At any time did the McBride, NCNB, Rio Grande
6  bank notes stop being anything other than accounts
7  payable or obligations of Treasure Hills?
8      A. Never.
9      Q. Can I see Plaintiff's Exhibit 5 for a moment?
10 In looking at the exhibits that you have, I believe --
11 and I probably just missed it -- but based upon the
12 records of the corporation, when did Mr. Lozano
13 purchase the McBride, the NCNB-Texas and the Rio Grande
14 notes from Mr. Derbez?
15     MR. WEYAND: I'm asking the witness.
16     A. I don't know. 1993?
17     Q. Okay.
18     A. Well, no, 1994.
19     Q. Sometime in '94?
20     A. Sometime in 1994.
21     Q. And is that the type of information that you
22 rely upon your client to inform you about?
23     A. That is correct.
24     Q. Presumably Treasure Hills was given notice in
25 some form or fashion that Mr. Lozano was now the holder

145

1  of those notes?
2  ＝. That would be correct.
3  Q. I need to see Exhibit 5 again. We talked a
4  little bit about the release of the collateral transfer
5  of note in 1993. Did that release executed by Mr
6  McBride in any way change the obligations of the
7  corporation with respect to any of the three notes in
8  question?
9  ＝. No.
10  Q. If I understand -- if I had understood your
11  testimony so far today, one of the reasons the IRS made
12  a recommendation about reclassifying some of these
13  notes was that the corporation was taking a deduction
14  on its tax return for interest paid to the
15  shareholders?
16  ＝. Not -- and the important word that you just
17  said was "paid." In most cases this interest wasn't
18  paid but merely accrued.
19  Q. Okay.
20  ＝. And it essentially remained unpaid. But you
21  are correct from the standpoint that this interest was
22  deducted by the company as an operating expense.
23  Q. And a lot of those loans would be characterized
24  as unsecured loans?
25  ＝. As unsecured loans, that's correct.

146

1  Q. The typical types of loans that individuals who
2  are shareholders in corporations from time to time make
3  to the corporation to help it stay afloat?
4  ＝. That's correct.
5  Q. Based upon your analysis and review of the
6  books and records of the corporation, were any of those
7  loans made by the shareholders used to acquire any real
8  property?
9  ＝. Not to my knowledge.
10  Q. There never was a specific directive from the
11  IRS to reclassify these loans, was there?
12  ＝. Well, let's see. That might be a matter of
13  interpretation. Let me just read verbatim the agent's
14  conclusions in her report. She goes through a quite
15  extensive explanation.
16       MS. GRAFF: With respect to the interest
17  payment.
18  ＝. But with respect to the interest payment. And
19  that's what's important here, okay? And her final
20  statement is "Therefore, the corporation is not
21  entitled to a deduction for the interest expense or the
22  accrual of interest payable in relation to these
23  advances," and her advances -- the term "advances"
24  there meaning these monies from the shareholders.
25       So with regard to that, the agent is, you

147

1  know, not necessarily saying -- or again, my opinion of
2  what the agent is saying there is that in the case of
3  Treasure Hills, it is not necessarily required to
4  recharacterize any of these loans as paid in capital,
5  but from the standpoint of treating them as a debt of
6  the corporation you're going to cease doing that, okay?
7  And essentially they become de facto a capital
8  contribution
9  Q. Now, in that memorandum notice that you are
10  reading from, the IRS agent referred to advances made;
11  is that correct?
12  ＝. That's correct.
13  Q. And does this memo letter, directive, whatever
14  you want to call it, does that specify what advances
15  she is referring to?
16  ＝. Yes, it does.
17  Q. Okay.
18  ＝. And it talks about these monies advanced to the
19  company on the part of the shareholder. And, again,
20  this is certainly monies that are not the same as the
21  Lozano note but instead monies that were advanced on
22  the part of the shareholders to facilitate the
23  company's operating activities.
24  Q. You would agree with me, would you not, that at
25  no time did any shareholder in the corporation advance

148

1  funds to the corporation for the purpose of retiring
2  what you referred to as the Lozano notes?
3  ＝. That's correct.
4  Q. And as of December of 1996 approximately $2.5
5  million was owed on those notes --
6  ＝. That's correct.
7  Q. -- total? In your -- as an accountant dealing
8  with presumably a number of business clients, you had
9  an occasion -- or have you had any occasion to see
10  notes that have been executed by the corporations?
11  ＝. Numerous.
12  Q. Have you seen notes that have been paid off by
13  your clients and then surrendered or given to them?
14  ＝. That's correct.
15  Q. What do they look like? Let say that ABC
16  Industrial goes down to International Bank of Commerce
17  and borrows half a million dollars. They pay it off.
18  Once they pay it off -- have you had occasion to see a
19  note in that situation?
20  ＝. Right.
21  Q. What does it look like?
22  ＝. Typically it's -- there's a stamp across the
23  face of the note marking it paid. In today's
24  environment I'm wondering whether or not -- in the
25  electronic age whether or not that even occurs anymore,

**149**

1 but at least it used to.
2 Q. Okay. So sometimes the electronic age it may
3 just be reflected on some sort of an amortization
4 schedule that the note's been paid?
5 A. Paid.
6 Q. And you never see the note again?
7 A. That's exactly right.
8 Q. The person doesn't get back the original note,
9 their account is marked paid and that's the end of it?
10 A. That's correct.
11 Q. And if the bank -- let's say the bank -- one of
12 your clients or whatever, they have signed a note, they
13 never get the original note back, but on the bank it
14 shows it as being paid in full, your client doesn't
15 make any more payments, do they?
16 A. That's correct.
17 Q. And the bank can't come after your client to
18 get more money, can they?
19 A. No.
20 Q. That's the electronic age. What about notes
21 perhaps that have been transferred or assigned from one
22 entity to another, from one financial institution to
23 another, have you ever had an occasion to see a note
24 that was originally executed payable to one bank and
25 then that bank sold it to another bank? Have you had

**150**

1 an occasion to see a note like that?
2 A. I have seen a number of those.
3 Q. Okay. And what do those look like?
4 A. Very similar to, you know, any other note that
5 you would see made in the institution itself.
6 Q. And when the bank -- when the original payee of
7 the note assigns it, do they make the endorsement and
8 assignment on the note itself?
9 A. That's correct.
10 Q. For the assignment on the note, send that over
11 to whoever they are selling it to?
12 A. That's correct.
13 Q. Would you say that what we just talked about as
14 far as the notes you have seen that that is more or
15 less a universal practice?
16 A. I would say that that's a fairly standard
17 practice in the industry, that's correct.
18     MR. WEYAND: I have no further questions.
19         EXAMINATION
20 BY MR. WALSH:
21 Q. Mr. Beneke, we have talked about -- I believe,
22 again, Mr. Duarte -- a lot of Mr. Lozano's intent,
23 whether he intended to have these things reclassified
24 in April of '96 or not. The only information that you
25 can rely on as to what he was thinking is what he told

**151**

1 you in February of 1997.
2 A. That's correct.
3 Q. You don't know what he was actually thinking or
4 what he actually knew or anything? And, again, going
5 to the memo from Mr. Cuellar on April 29th, 1996 where
6 he was making the adjustments to Schedule X of the
7 financial statement, being the section dealing with
8 note payable, at least Mr. Cuellar knew that everything
9 had been reclassified?
10     MR. DUARTE: I'm going to object. That
11 calls for some speculation as to what Mr. Cuellar
12 actually knew or didn't know.
13 A. The information that -- the memo from the staff
14 person to me seemed to be very clear in that regard.
15 Q. Mr. Lozano is listed as not being owed anything
16 and Mr. -- whoever Mr. Cuellar indicates should get
17 $65,000? Everybody can draw their own conclusions?
18 A. That's correct.
19 Q. Okay. You testified that it was not your
20 responsibility, in relation to some of Mr. Duarte's
21 questions, to look at the individual reporting
22 responsibilities of the shareholders. During this
23 audit, the IRS requested that each of the individual
24 shareholders, including Mr. Zamacona, Mr. Lozano, Mr.
25 Diaz-Rivera, all of them supply them with their

**152**

1 personal tax returns that they may have filed.
2 Treasure Hills -- Mr. Cuellar in Treasure Hills faxed
3 all the individuals, and all of the individuals
4 responded that they did not -- had never filed tax
5 returns. Do you remember those transactions taking
6 place during the audit?
7     MR. HALL: Object on relevance grounds.
8 A. I remember it.
9 Q. So therefore the IRS was looking into the
10 individuals' reporting and the individual returns
11 during the audit at Treasure Hills?
12 A. Appeared to be so, right.
13 Q. Okay. You also stated that you did not have
14 any information whether or not the three notes,
15 McBride, NCNB and Rio Grande Savings, had been paid.
16 You're not -- you do not know whether or not those
17 notes had actually been paid off and that information
18 was being kept from you from the individual
19 shareholders?
20 A. That could be.
21 Q. Okay. For example, if Mr. Derbez or Mr. Lozano
22 was receiving payments from the sales of lots and
23 pocketing those monies and not reporting them to the
24 IRS and trying to conceal the fact that they were
25 receiving those monies from the IRS, none of that type

1  of information was presented to you?
2      A. None of that -- we had no knowledge of any of
3  that sort of thing happening.
4      Q. You had also testified that you had not seen
5  any releases of liens pertaining to these properties
6  Did you know that actually Mr Derbez filed several
7  releases of liens, that Mr. Lozano filed several
8  releases of liens also? Have you seen any of those?
9      A. No.
10     Q. Okay.
11     A. With regard to the mortgage note?
12     Q Yes.
13         MR. DUARTE: I'm going to object. That's
14  going to call for speculation on the part of this
15  witness, and it assumes facts not in evidence, also
16  mischaracterization.
17     Q. If there were releases of liens filed -- for
18  example, I showed you one, didn't I, for 74 lots?
19  Didn't I? Maybe it wasn't 74. Okay. Page 42, partial
20  release of lien. Okay. That pertains to -- let me get
21  that -- to the -- what I call the NCNB note which
22  originated with InterFirst over the $1.3 million note.
23     A. Yeah, there were releases. Yeah, that's a
24  release of the InterFirst debt.
25     Q. Okay.

1         MR. WEYAND: Partial.
2      Q. 74 lots?
3      A. Right.
4      Q. And then there is -- go to Page -- but for all
5  you know, there could be other releases on file that
6  you are not aware of?
7      A. Yeah.
8      Q. Okay. The forms 433-A Mr. Duarte was asking
9  you questions as to that you were not present when they
10  were completed and what information was or was not
11  given to Mr. Zamacona and Lozano as to what should be
12  reported. Now, those were dated the same date as the
13  meeting with the IRS. So for all you know, Mr. Lozano
14  and Zamacona could have been discussing the situation
15  with the Internal Revenue agent and gotten their
16  information there?
17     A. That's correct.
18     Q. Okay. Then you discussed on your final draft
19  of a memo if you could remember whether or not anyone
20  gave you -- any specific individual, whether it be Mr.
21  Cuellar, Mr. Lozano or Mr. Zamacona, gave you the
22  specific information to put in, for example, on the
23  notes or anything, and you did not remember any
24  specific individual?
25     A. Right. And I think what I said was that I

1  don't remember having any specific conversations. I
2  certainly remember not having any conversations with
3  Mr. Lozano or Mr. Zamacona. We may have had -- I may
4  have had some telephone conversations with Mr. Cuellar
5  with regard to it, but I think the information with
6  regard to the final stages of this memorandum were
7  provided to us via the fax machine.
8      Q Okay Now, how many meetings did you have at
9  your office with all three individuals discussing this
10  reversing of the classification, more or less?
11     A. I think it was one meeting one morning where
12  all of the details -- all of the details of this were
13  pretty much hammered out. Now, let me think about
14  this. There may have been two meetings where the first
15  one was in the morning, we hammered out all of the
16  matters. I spent the afternoon redrafting, refiguring
17  all this stuff, and I think then the next morning met
18  with them for a short time to review the final final.
19     Q. Okay.
20     A. No, that's not right either. I think -- I'm
21  sorry. I don't recall exactly, but I think it was one
22  meeting, and then I think the rest of it was fax
23  machines and that sort of thing.
24     Q. Mr. Duarte also asked you if any of the
25  American Express money went towards the three notes.

1  You testified no. Now, that's not exactly correct
2  insofar as $205,000 of it went to the three notes.
3      A. You are exactly right. You are exactly right.
4      Q. And you do not know what portion of the 84,000
5  that Mr. Derbez got, where it went?
6      A. Exactly. You are right. That is correct.
7      Q. In fact, you don't know -- all you know is what
8  they told you and what's reflected on your books?
9          MR. DUARTE: Objection; form.
10     Q. For example, they apparently, according to this
11  thing, on August 6th, 1992 paid a Virginia Botello
12  $12,000 to get a liquor license. Do you know what a
13  liquor license cost?
14     A. I have no idea.
15     Q. Okay. Does that sound a little steep to you?
16     A. Yeah, somewhat expensive.
17     Q. Okay. Mr. Limon was asking you some questions.
18  He asked you whether or not these three loans, McBride,
19  NCNB and Rio Grande Savings, were specifically
20  discussed with the IRS. You said that you didn't think
21  so. Let's go to the request of information. Okay.
22  That's Page 79. Okay.
23         Now, she starts off with requesting a
24  complete spread sheet analysis of all outstanding notes
25  due from the corporation, "show any and all activity

157

1   with respect to these notes. information should be
2   organized per loan and please ensure the following
3   described, amount owed, amount borrowed, purpose of the
4   note. date, payments made against note. balance.
5   accrued interest. interest paid: if note was
6   transferred. provide date of original note, amount of
7   original note. purpose of original note, date of
8   transfer and all information required in Items A
9   through F above." Now, the only three notes that
10  Treasure Hills had that were transferred among
11  individuals were these three notes. correct?
12      A. That's correct.
13      Q Now, go to the next page. Item C. with respect
14  to the following. "Gaston Derbez owing $1,795,000. Who
15  is Gaston Derbez, Trustee? What individuals does he
16  represent? 2. who is Gaston Derbez-Cantu? Same as
17  Gaston Derbez? If so, what is the meaning of the lien
18  transfer? I'm going to get back to that in a second.
19  where she specifically mentioned the lien transfer of
20  the Rio Grande Savings & Loan note on the 52,200. So
21  apparently the three notes were discussed specifically
22  with the IRS.
23          MR. HALL: I'm going to object to that
24  question as mischaracterizing the document. I think
25  the document that Mr. Walsh was questioning from is

158

1   dated 1994, and he's testified that he had no personal
2   knowledge or dealings before December 31 of '95.
3       Q. But this document would indicate that someone
4   discussed these particular items. the three specific
5   notes with the IRS?
6       A. Right. And I think what I was trying to
7   respond to was in the course of winding up this
8   examination with the service did I have any
9   recollection of these notes being discussed with the
10  agent at that time, and I didn't.
11      Q. In fact, Mr. -- also Mr. Limon asked you if the
12  IRS would take a different position if they knew that
13  the three notes were secured. Obviously the IRS did
14  know that they were secured. They talked about the
15  transfer of the lien.
16          MR. DUARTE: I'm going to object to that.
17  It calls for speculation on the part of this witness.
18      Q. Okay. You also testified that you -- after the
19  reclassification that took place there was no debt.
20  Please go to Page 115 of Exhibit 5. Now, after the
21  reclassification took place for the year ending
22  December 31, 1995 you had approximately $2,818,836.72
23  of notes payable and debt of the shareholders, and
24  notes payable to shareholders you had $1,987,000 for a
25  total of a little over $4.8 million.

159

1       A. Right.
2       Q. So you didn't have a zero debt ratio?
3       A. Right.
4       Q. There was plenty of debt there.
5       A. You are absolutely correct
6       Q. Okay. After the reclassification. including
7   for the year 1996, did you ever attempt to deduct any
8   interest from the McBride note or any of the other
9   three notes -- two notes?
10      A. Not to my knowledge, no
11      Q. Okay. You also testified that the -- you-all
12  began discussing the reversing of the classifications
13  and put them back on the books in February of 1997.
14  Wasn't it October of 1997 or late 1997 before the books
15  were actually changed? And that can be reflected by
16  the run dates.
17      A. Run date on --
18      Q. Which I believe is October 27th or --
19      A. Yeah. This got cut off. But, yeah, you are
20  correct.
21      Q. Okay. You said the balances of notes do not
22  have anything to do with the books. In other words, I
23  can purchase it for 1,000,000 and they can be owing me
24  $10,000,000 or whatever. I mean, the purchase price of
25  the note does not have to do anything with the amount

160

1   owing. Do you remember that?
2       A. Yes, that's correct.
3       Q. Okay. Now, however -- now, one thing that
4   would affect it, of course. would be how that first
5   bankruptcy plan treated the notes and what the
6   bankruptcy of the confirmed bankruptcy plan dictated,
7   what was the amount of the notes owing and the terms of
8   repayments. Now, that would be binding on everybody
9   including Treasure Hills?
10      A. That's correct.
11          MR. DUARTE: I'm going to object. That's
12  going to call for speculation and a legal conclusion.
13  He's not authorized or competent to testify about legal
14  issues.
15      Q. According to the accounting practices, would
16  the amounts that the bankruptcy plan dictated, amounts
17  owing and the term of repayment, be binding?
18      A. Yes.
19      Q. Okay. And also on the repayment terms
20  including, for example, certain of the debts were set
21  forth under the first bankruptcy plan as not being
22  entitled to accrue interest.
23      A. Yes.
24      Q. Okay. And I believe that you've testified at
25  one time or other that you understood what the statute

Case 1:00-cv-00068   Document 11   Filed in TXSD on 10/02/2000   Page 124 of 143

### 161

1  of limitations were even though you are not an attorney
2  or qualified to make the legal determinations as to
3  which portions --
4  A. Yes
5  Q. Okay. Do you understand what usury is?
6  A. Yes.
7  Q. Okay.
8  A. In a general sort of way.
9  Q. Okay. And if a bankruptcy plan would set an
10  amount of certain debt under the terms for payment,
11  what type of interest, and, you know, if all of a
12  sudden you took 2,000,000 and tried to make it into
13  4,000,000, that might implicate the usury statutes.
14  but, again, you are not an attorney qualified to
15  testify as to those matters?
16  A. Correct.
17  Q. You also testified that and according to the
18  books no shareholders advanced money to retire the
19  debt. Again, that's just on the books, and whether or
20  not shareholders were receiving money to retire the
21  debt but heighten it. you are not aware of it?
22  MR. HALL: Object to the form of the
23  question.
24  A. I have no knowledge of any of that sort of
25  activity occurring.

### 162

1  Q. Okay. We came across -- do you remember
2  reviewing some notes as to the possibility that the
3  Treasure Hills records were being -- that portions of
4  the sales of certain lots were being changed on the
5  book to reflect that a portion would be part of the
6  cost of the development instead of income to the
7  corporation?
8  A. Yes, I remember looking at --
9  Q. Okay. Some notes to that effect? But you have
10  not traced it and you do not know whether or not that
11  was actually done or anything?
12  A. That's correct.
13  Q. Okay. Do you know whether or not any of the
14  shareholders, including Mr. Lozano or Zamacona have
15  engaged in any scheme to keep the notes on the books
16  just for protection, in other words, trying to keep an
17  interest in the property regardless of whether or not
18  the debt had actually been paid or not?
19  A. Right. No, I have no knowledge of any of that
20  sort of thing.
21  MR. WALSH: I have no further questions.
22  MR. DUARTE: I have a couple.
23  EXAMINATION
24  BY MR. DUARTE:
25  Q. Just to follow up to what Mr. Walsh has just

### 163

1  asked you. the IRS agent Ms. Maxwell, requested tax
2  returns and certain information from certain
3  principals, and Mr. Walsh asked you. "Isn't it
4  reasonable then to conclude that the IRS was
5  investigating the propriety of their action?" And you
6  said. "Yes, that's fair to conclude." Am I
7  understanding what you --
8  MR. WALSH: If I indicated that, I
9  apologize I did not mean to indicate that
10  A. If I responded affirmatively to that
11  certainly didn't mean -- I had understood the question
12  to be merely that the -- as part of the IRS audit
13  process, the agent had requested copies of tax returns
14  -- U.S. tax returns for specific individuals. And what
15  I responded affirmatively to was that those individuals
16  did not supply the IRS with any tax returns. In other
17  words. they had not filed any tax returns
18  Q. All right. And just so that I'm clear -- I
19  mean, the impression I was left with was that the IRS
20  is now investigating these people for some kind of
21  conduct. You don't intend to indicate that?
22  A. No. And the fact of the matter is. that is a
23  very standard routine everyday occurrence in the
24  process of the IRS looking at what I would refer to as
25  a closely-held corporation. You know, they will

### 164

1  immediately request copies of all the principal
2  shareholders. officers. directors. things of that
3  nature.
4  Q. All right.
5  A. And I might add this. that -- wait a minute.
6  Forget it.
7  Q. Okay.
8  A. It's old age. I forget.
9  Q. With regard -- I asked you a question about
10  whether or not you had seen releases executed in
11  connection with the three Lozano notes, and Mr. Walsh
12  followed up with "It's possible other releases could be
13  out there?" Your answer was, "Yes. there could be."
14  You don't know of any. do you?
15  A. I don't.
16  Q. With regard to all of the relevant information
17  that has been provided to you on December 31st of 1996,
18  was the balance in your mind on this note still
19  2,500,000 plus?
20  A. That's correct.
21  Q. You are aware of no additional credits?
22  A. That's correct.
23  Q. You had the opportunity to be deposed once,
24  testified once and apparently you've had several
25  opportunities to discuss your testimony with Mr. Walsh,

Case 1:00-cv-00068   Document 11   Filed in TXSD on 10/02/2000   Page 125 of 143

165

1   correct?
2   A. That's correct.
3   Q. Even after all of your discussions with Mr.
4   Walsh, he has not provided you any additional
5   information that warrants your going back and crediting
6   that $2.5 million balance?
7   A. None whatsoever
8   Q. All right. It's still due?
9   A. Absolutely.
10  Q. The $205,000 that went to Gaston Derbez --
11  A. Out of the American Express proceeds?
12  Q. Yes, sir
13  A. That's correct
14  Q. Did that reduce the -- any of the three real
15  estate lien notes?
16  A. It was applied to the NCNB principal
17  Q. Okay.
18  A. Is that correct? Wait a minute  Wait a
19  minute.
20  Q. And that's my question.
21  MR. WALSH: McBride.
22  A. I'm sorry. Yeah, the McBride note, not NCNB.
23  It was applied to the McBride note.
24  Q. Okay. And the McBride --
25  A. And reduced the principal of the McBride -- the

166

1   old McBride note.
2   Q. Okay. Next --
3   A. Well -- yeah, that's correct.
4   Q. I keep having questions posed to you about your
5   knowledge of the conduct of the principals, and your
6   response was "I had no knowledge of any criminal
7   activity on the part of the principals," correct?
8   A. That's correct.
9   Q. All right. You're not suggesting that you have
10  now learned there was criminal conduct but at the time
11  you had no knowledge?
12  A. I have no knowledge, no -- I mean, I -- how do
13  you answer that question?
14  MR. HALL: I don't know.
15  Q. Did you ever obtain any information that led
16  you to believe there was criminal conduct on the part
17  of the principals?
18  A. Never.
19          EXAMINATION
20  BY MR. WEYAND:
21  Q. As you sit here today have you heard anything
22  that leads you to believe there was any criminal
23  conduct on the part of any of the principals of the
24  corporation?
25  A. None. None whatsoever.

167

1   MR. DUARTE  I obviously passed because
2   Dale took my question.
3   MR. WEYAND  He stole one from me.
4   MR. LIMON: My turn?
5          EXAMINATION
6   BY MS. GRAFF:
7   Q. On what basis are you saying that you know of
8   no criminal activity? What foundation do you have to
9   render that opinion that there was no criminal
10  activity?
11  A. I mean --
12  MS. GRAFF: Well, he's not a law
13  enforcement officer. I mean, how does he know what's
14  criminal and not?
15  Q. How are you answering that?
16  A. I mean, I think I have a -- the prudent man's
17  -- it's not the prudent man, but I have -- even if it's
18  an -- even if it's in my own mind of what criminal
19  activity ought to be, I have -- what I'm saying is, I
20  am not aware of anything morally -- what are the other
21  words — morally, knowingly -- I just don't know of
22  anything at all that would represent some violation of
23  law, rule, regulation that I'm aware of. Again, I'm
24  not an attorney and I'm not a criminal attorney, but I
25  just -- I just don't see anything out there that to me

168

1   is wrong.
2   Q. Okay.
3   MR. LIMON: I have a question.
4          EXAMINATION
5   BY MR. LIMON:
6   Q. You testified that the American Express debt
7   had been reclassified as equity; is that correct?
8   A. That's correct.
9   Q. If somebody is holding the paper on that note,
10  does that make them a shareholder, equity holder?
11  A. Yeah. I mean, it would certainly have some
12  characteristics of that. It certainly would.
13  Q. All right.
14  MS. GRAFF: The party is over.
15  (Proceedings concluded at 6:40 p.m.)

AUGUST 17, 1999                                                                        WAYNE BENEKE, C P

169

## CHANGES AND SIGNATURE

1

2   PAGE LINE CHANGE                    REASON

3   _____

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  I WAYNE BENEKE. C P A , have read the foregoing
    deposition and hereby affix my signature that same is
15  true and correct, except as noted above

16  _____
          WAYNE BENEKE C P A
    THE STATE OF TEXAS
17
    COUNTY OF CAMERON
18
    BEFORE ME, _____, on this day
19  personally appeared WAYNE BENEKE, known to me or proved
    to me to be the person whose name is subscribed to the
20  foregoing instrument and acknowledged to me that said
    witness executed the same for the purposes and
21  consideration therein expressed

22  Given under my hand and seal of office this _____
    day of _____, 1999
23

24  _____
25  Notary Public in and for the State of Texas

170

## REPORTER'S CERTIFICATE

I, LOU ZUNIGA, Certified Court Reporter,
certify that the above and foregoing proceeding was
reported by me on AUGUST 17, 1999; that the proceeding
was reported by me in stenograph and was subsequently
transcribed under my supervision.
I FURTHER CERTIFY that I am not a
relative, employee, attorney or counsel of any of the
parties, nor a relative or employee of such attorney or
counsel, nor am I financially interested in the action

WITNESS MY HAND on this the _____ day of
_____, 2000

LOU ZUNIGA, CSR NO. 2198
Expiration Date: 12/31/01
Bryant & Stingley, Inc
2010 East Harrison
Harlingen, Texas 78550
(956)428-0755

BRYANT & STINGLEY, INC.

INDEX

WAYNE BENEKE, C P .

| $ |
| --- |
| **$1,000,000** |
| [1] 52 2 |
| **$1,305** |
| [1] 24 23 |
| **$1,500,000** |
| [1] 43 2 |
| **$1,590,000** |
| [1] 33 2 40 2 |
| **$1,795,000** |
| [5] 22 22 22 23 24 2  24 8 |
| 157 14 |
| **$1,863,687** |
| [1] 78 22 |
| **$1,864,505.63** |
| [1] 23 21 |
| **$1,864,506** |
| [1] 43 2 |
| **$1,987,000** |
| [1] 158 24 |
| **$1.3** |
| [1] 153 21 |
| **$1.5** |
| [3] 33 4 22 22 5 125 4 |
| **$1.7** |
| [1] 43 13 |
| **$10,000** |
| [3] 34 12 54 25 25 25 3 |
| **$10,000,000** |
| [1] 159 24 |
| **$100,000** |
| [1] 100 5 |
| **$12,000** |
| [1] 15s 12 |
| **$15** |
| [1] 38 10 |
| **$15,000** |
| [3] 37 24 98 12,16 |
| **$164,000** |
| [1] 37 2 |
| **$164,410** |
| [2] 33 11 35 4 |
| **$174,410** |
| [1] 34 10 |
| **$179,500** |
| [1] 23 14 |
| **$2,041,496** |
| [1] 42 12 |
| **$2,041,496** |
| [1] 42 14 |
| **$2,183,106** |
| [1] 84 9 |
| **$2,210,606** |
| [1] 79 19 |
| **$2,264,099** |
| [1] 67 7 |
| **$2,436.800** |
| [1] 98 21 |
| **$2,506,599** |
| [2] 67 7 84 15 |
| **$2,514,099** |
| [2] 80 4 105 3 |
| **$2,516,800** |
| [1] 102 4 |
| **$2,586,687** |
| [1] 61 5 |
| **$2,818,836.72** |
| [1] 158 22 |
| **$2.5** |
| [3] 27 24 148 4 165 4 |
| **$205,000** |
| [8] 36 10 40 13,15 44 13 48 |
| 9 49 20 156 2 165 10 |
| **$270,000** |
| [1] 99 24 |
| **$3,000** |
| [1] 71 20 |
| **$324,800** |
| [1] 100 12 |
| **$364,757.41** |
| [1] 97 19 |
| **$4.8** |
| [1] 158 23 |
| **$5,000** |
| [1] 79 7 |
| **$5,000,000** |
| [1] 121 15 |

| $50,000 |
| --- |
| [5] 43 23 43 43 22 59 25 |
| 104 24 |
| **$500,000** |
| [2] 52 2 2 4 |
| **$506** |
| [1] 43 17 |
| **$52,200** |
| [4] 22 15 23 23 25 5 40 24 |
| **$54,000** |
| [1] 104 25 |
| **$57,200** |
| [1] 79 4 |
| **$58,000** |
| [1] 22 13 |
| **$6,115.57** |
| [1] 23 24 |
| **$64,583.33** |
| [1] 24 7 |
| **$640,913** |
| [2] 33 9 79 3 |
| **$65,000** |
| [3] 43 23 13 4 9 151 17 |
| **$7,659,774** |
| [1] 88 25 |
| **$736,000** |
| [5] 41 15 44 6 45 3 48 5 61 |
| 9 |
| **$736,205** |
| [1] 43 21 |
| **$815,000** |
| [2] 28 4 34 7 |
| **$815,313** |
| [3] 22 7 24 3 33 20 |
| **$84,000** |
| [1] 38 9 |
| **$900,000** |
| [2] 121 7,14 |
| **$904,000** |
| [1] 50 25 |
| **$913** |
| [1] 60 15 |
| **$941,000** |
| [1] 55 6 |
| **$996,687** |
| [3] 23 1,22 61 22 |

| ' |
| --- |
| **'89** |
| [1] 45 25 |
| **'91** |
| [6] 24 9,14 35 25 42 11,18 |
| 59 6 |
| **'92** |
| [1] 25 1 |
| **'93** |
| 2] 44 8 59 6 |
| **'94** |
| [6] 54 11 60 5 66 12 67 5 70 |
| 14 144 19 |
| **'95** |
| [5] 15 25 73 4 98 9 138 19 |
| 158 2 |
| **'96** |
| [31] 15 25 66 12 72 22 73 |
| 16 84 10 87 6,8 88 18 93 5 |
| 94 25 95 2 3 108 2 119 19, |
| 24 127 13 128 23 130 17 132 |
| 22 135 4 6,9 10,12,17,20,24 |
| 136 3,8 150 24 |
| **'97** |
| [11] 84 6,24 87 6 94 25 95 |
| 7 119 20 130 18 131 4 135 |
| 14,22 136 24 |
| **'98** |
| [2] 131 2,4 |
| **'encourage'** |
| [1] 70 1 |
| **'fair** |
| [1] 90 2 |
| **'loans'** |
| [1] 70 1 |
| **'reclassify'** |
| [1] 70 3 |
| **'reversing** |
| [1] 69 6 |
| **'shareholders'** |
| [1] 89 3 |

| 0 |
| --- |
| **0791** |
| [1] 90 13 |

| 1 |
| --- |
| **1** |
| [17] 4 14 14 4 15 5 18 15 |
| 9 9,19 20 18 24 14 25 10, |
| 14 23,25 72 25 91 5,14 93 |
| 13 137 25 |
| **1,000,000** |
| [1] 153 23 |
| **1,500,000** |
| [1] 24 20 |
| **1,590,000** |
| [1] 40 17 |
| **1,795,000** |
| [2] 40 13 50 19 |
| **1,863,687** |
| [2] 40 20 41 10 |
| **1,864,000** |
| [2] 42 15 14 |
| **1.3** |
| [1] 22 4 |
| **1.5** |
| [2] 27 18 129 18 |
| **1.7** |
| [1] 45 1 |
| **10** |
| [1] 50 4 |
| **10-28-97** |
| [1] 102 8 |
| **100** |
| [5] 70 19 71 2-3 107 13 129 |
| 2 |
| **100,000** |
| [3] 97 17 99 8,13 |
| **102** |
| [1] 74 21 |
| **103** |
| [2] 73 18 74 13 |
| **1042** |
| [1] 54 25 |
| **1042S** |
| [1] 54 25 |
| **105** |
| [1] 74 18 |
| **106** |
| [2] 4 14 74 19 |
| **109** |
| [1] 74 19 |
| **10th** |
| [1] 74 19 |
| **11** |
| [1] 1 4 |
| **11.83** |
| [1] 30 17 |
| **110** |
| [2] 75 14 76 3 |
| **1101** |
| [1] 3 8 |
| **111** |
| [2] 4 5 74 23 |
| **113** |
| [1] 80 23 |
| **115** |
| [3] 83 21,24 158 20 |
| **116** |
| [1] 84 7 |
| **118** |
| [1] 84 14 |
| **11th** |
| [1] 70 16 |
| **12** |
| [8] 24 6 29 3,13 31 12,15- |
| 16,19 32 11 |
| **12-31-91** |
| [1] 40 18 |
| **12-31-92** |
| [1] 40 18 |
| **12-31-95** |
| [3] 77 14 80 13 83 23 |
| **12-31-96** |
| [1] 102 9 |
| **12/31/01** |
| [1] 170 17 |
| **120** |

| WAYNE BENEKE (continued) |
| --- |
| [1] 83 2 |
| **1221** |
| 711 2 2 |
| **123** |
| [1] 72 2 |
| **126** |
| [2] 4 5 22 23 |
| **13** |
| [3] 4 2 23 23 |
| **134** |
| [1] 57 23 |
| **135** |
| [1] 39 2 |
| **137** |
| [2] 2 2 23 |
| **138** |
| [1] 22 2 |
| **139** |
| [2] 2 2 2 2 |
| **13th** |
| [2] 98 2 2 2 |
| **14** |
| [3] 4 4,23 |
| **14th** |
| [1] 52 3 |
| **15** |
| [1] 122 2 |
| **15,000** |
| [1] 39 23 |
| **150** |
| [1] 4 7 |
| **162** |
| [1] 4 8 |
| **166** |
| [1] 4 8 |
| **167** |
| [1] 4 9 |
| **168** |
| [1] 4 9 |
| **169** |
| [1] 4 10 |
| **16th** |
| [1] 33 10 |
| **17** |
| [5] 4 14,23 39 21 32 1 ,70 |
| **170** |
| [1] 4 11 |
| **18** |
| [1] 32 13 |
| **18-99** |
| [1] 25 10 |
| **19** |
| [3] 4 19 33 10 34 1 |
| **1989** |
| [3] 20 4 2 33 9 |
| **1990** |
| [4] 16 1 23 19 52 2 3 |
| **1991** |
| [11] 21 19 22 20 23 15 19 |
| 28 15 29 24 30 6 31 19,22 |
| 34 1 142 3 |
| **1992** |
| [8] 24 23 36 4 37 23 39 4, |
| 39 1 42 15 154 11 |
| **1993** |
| [3] 30 4 144 14 145 5 |
| **1994** |
| [8] 24 5 52 3 53 4,25 3 |
| 14 144 13,25 58 1 |
| **1995** |
| [12] 161 1 4 67 22 77 14 6 |
| 15 87 9 98 11 103 22 104 |
| 136 12 137 14 158 22 |
| **1996** |
| [36] 15 20 20 3,13 53 17 |
| 15,17,19 72 19 74 13,21 |
| 22 74 5,25 80 22 85 6 87 |
| 11,14 93 10 94 2-3,9,1 |
| 96 13 97 25 108 15 117 5, |
| 130 20 136 20 148 4 151 5 |
| 159 7 164 21 |
| **1997** |
| [14] 84 25 27 14,22 88 |
| 1 92 19 93 11 98 3 131 1 |
| 136 23 151 13 159 13-14 |
| **1998** |
| [1] 23 22 |
| **1999** |
| [4] 1 14,25 169 22 170 4 |
| **19th** |
| [2] 87 22 92 16 |

WAYNE BENEKE, C.P.

1:43

1st

**2**

2
2,000,000
2,500,000
2,516,800
2,561,800
2.2-some-odd
2.4
2.4-some-odd
2.5
2.5-some-odd
20
200,000
2000
2001
2010
205
205,000
20th
21
2198
21st
22
2200
22nd
23
23rd
24
25
2510-00-000
2530
255,000
2550
2570
2590
25th
2610
2630
2650
2660

2670
2680
27
2792
2794
27th
28th
29th

**3**

3
30
30th
31
31st
33
331,500
38
3850-00-000

**4**

4
4,000,000
4-29-96
40
40/60
400
4033s
42
43
433-A
433-As
433s
45
45/55
46
47
4th

**5**

5
50,000
50/50

500,0
52,200
5472
5472s
55
5th

**6**

6
6,000
50
62
640,913
65,000
6:40
6th

**7**

7
717
736,000
74
75
75,000
750
75201
76
78201
73209
78520-7199
78521
78550
79

**8**

8-17
8-17-88
8.83
800,000
83
84
84,000
85

**9**

9
90

90,000
900-some-odd
92
93
941,000
950
956,428-0755
96.2436D-B-11
99-2085-B
996,687
996-some-odd-thousand
9th

Paste
AEC
Abe
FEEDACO
Ability
Able
Above-referenced
Absent
Absolutely
Accept
Acceptable
Accepted
Accepting
Accepts
Accomplish
Accomplished
Accomplishing
Accordance
According
Account

WAYNE BENEKE, C.P.

**Accountant**
[5] ...

**Accountants**
[2] ...

**Accounting**
[24] ...

**Accounts**
...

**Accruable**
...

**Accrual**
...

**Accrue**
...

**Accrued**
[4] ...

**Accumulated**
[2] ...

**Accumulating**
[2] ...

**Accuracy**
[1] ...

**Accurate**
[3] ...

**Accurately**
[1] ...

**Acknowledged**
[2] ...

**Acquire**
[2] ...

**Acquired**
[3] ...

**Acquiring**
[2] ...

**Acquisitions**
[1] ...

**Acting**
[1] ...

**Action**
[5] ...

**Actions**
[1] ...

**Activities**
[1] ...

**Activity**
[4] ...

**Actual**
[5] ...

**Add**
[4] ...

**Added**
[1] ...

**Addition**
[1] ...

**Additional**
[4] ...

**Additionally**
[3] ...

**Addressed**
[3] ...

**Adjusting**
[2] ...

**Adjustments**
[2] ...

**Advance**
[1] ...

**Advanced**
[4] ...

**Advances**
[5] ...

**Adversary**
[2] ...

**Adverse**
[2] ...

**Advice**
[3] ...

**Advisable**
[1] ...

**Advise**
[2] ...

**Advised**
[3] ...

**Affect**
[2] ...

**Affirmatively**
[1] ...

**Affix**
[1] ...

**Afloat**
[1] ...

**Afternoon**
[1] ...

**Age**
...

**Agencies**
...

**Agency**
...

**Agent**
...

**Agent's**
...

**Agents**
[1] ...

**Ago**
[4] ...

**Agree**
[3] ...

**Agreed**
[4] ...

**Agreement**
[7] ...

**Agreements**
[1] ...

**Ahead**
[5] ...

**Ain't**
[1] ...

**Alberto**
[3] ...

**Aliens**
[2] ...

**Alleged**
[2] ...

**Allegedly**
[2] ...

**Allow**
[3] ...

**Allowed**
[1] ...

**Alone**
[1] ...

**Alter**
[1] ...

**Alterable**
[1] ...

**American**
[12] ...

**Amortization**
[1] ...

**Amount**
[37] ...

**Amounts**
[11] ...

**Analysis**
[4] ...

**Analyze**
[1] ...

**Anda**
[1] ...

**Annual**
[2] ...

**Answer**
[20] ...

**Answered**
[3] ...

**Answering**
[2] ...

**Answers**
[2] ...

**Antonio**
[2] ...

**Anyplace**
[1] ...

**Anytime**
[1] ...

**Anyway**
[2] ...

**Apart**
[2] ...

**Apologize**
[2] ...

**Appear**
[7] ...

**Appearances**
[1] ...

**Appeared**
[4] ...

**Applicable**
[1] ...

**Applied**
[4] ...

**Apply**
[5] ...

**Appreciate**
[1] ...

**Appropriate**
[4] ...

**Appropriately**
[1] ...

**Approved**
[1] ...

**April**
[12] ...

**Archives**
[1] ...

**Argue**
[1] ...

**Array**
[1] ...

**Aspects**
[2] ...

**Asset**
[6] ...

**Assets**
[4] ...

**Assigned**
[5] ...

**Assignment**
[5] ...

**Assigns**
[1] ...

**Assist**
[1] ...

**Assistant**
[1] ...

**Associated**
[3] ...

**ASSOCIATES**
[1] ...

**Assume**
...

**Assumed**
[1] ...

**Assumes**
[5] ...

**Assuming**
[4] ...

**Assumptions**
[1] ...

**Assurances**

**Answered**
[3] ...

**Answering**
[2] ...

**Answers**
[2] ...

**Attached**
...

**Attachment**
[1] ...

**Attempt**
[4] ...

**Attempted**
[1] ...

**Attempting**
[1] ...

**Attempts**
[1] ...

**Attended**
[1] ...

**Attending**
[1] ...

**Attention**
[7] ...

**Attorney**
[13] ...

**Attorney's**
[8] ...

**Attorney/client**
[1] ...

**Attorneys**
[1] ...

**Attributed**
[1] ...

**Audit**
[15] ...

**Audited**
[1] ...

**Auditing**
[1] ...

**Auditor**
[2] ...

**Auditors**
[1] ...

**Audits**
[1] ...

**August**
[5] ...

**Authorities**
[2] ...

**Authority**
[2] ...

**Authorized**
[1] ...

**Automatically**
[1] ...

**Available**
[1] ...

**Avoid**
[2] ...

**Aware**
[10] ...

**B**

**Baby**
[1] ...

**Backwards**
[1] ...

**Balance**
[17] ...

**Balanced**
[1] ...

**Balances**
[4] ...

**Balloon**
[3] ...

**Ballooning**
[1] ...

**Bam**
[2] ...

**Banamex**

**Banco**
: 24 24 25 5

**Bank**
[5] 22 3 21 17 :23 :. :23
:41 6 148 14 149 :.: :7 :7.
4:15 150 6

**Bankruptcy**
:2] 1 5 74 22 :3 22 :. : 23
: 39 22 28 15 34 9 5 :. 43
: 5 6 34 14 87 :14.:. :7 :6.
:1 105 9,20 109 :41 :1 4
:15.5 133 2.8:9 141 :5 .42
:.60 5:5,16.21 :9.: 5

**Banks**
· 66 9,13,17,23

**Based**
:.3, 45 :[·s] :.:·: · :3
: :1 101 5 118 7 :34 :· · ·
:1. 18:19 114 :. :··

**Basis**
:.] 13 5:6,14 :4 :.: :17:
:1. 27 2.9,21 28 :1.4 :: 2 55
:7 197 7

**Bates**
:1. 29 12:13

**Bear**
· 139 19

**Bearer**
: 31 9

**Became**
:1 67 25

**Become**
·3] 103 11 111.22 1:· ·

**Beforehand**
:21 44:13

**Began**
4] 23:18 29 14 9: 1 :·3 12

**Beginning**
:11 24 7,14 24 4 :2 :. 98:
:.1 76 3 98 8,25 :22:: 3
:7 23

**Begins**
:1. 133 17

**Behalf**
:11 49:10

**Behind**
:2] 82:13 109 24

**Belongs**
:11 92 21

**Below**
:2] 88:12 89:7

**Beneke**
:24] 1 13,17 4.3 10 22 11:4,
5 12:12 13.2,7,11,:7:4 :41
4 53:8 74:4 111:9 12e:? 137.
1 138:17 139.17 150 :1 :49:
:4,16,19

**Beneke's**
:1 12:24

**Better**
:1 66:9

**Between**
:14] 9:4 26.5 32:12 33:9 44:
25 46:11 68 21 76:4 93:15
94 24 106:8 119:1,16 122.4

**Beyond**
:11 46:2

**Big**
:1] 72.5 101 16

**Bills**
:11 125:16

**Bind**
:11 90:13

**Binder**
:2] 4:19-20

**Binding**
:2] 160:8,17

**Bit**
[5] 121:2 139.23 141:10-11
145:4

**Block**
:11 44:16

**Blocking**
:1] 30:24 31.21

**Board**
:2] 36:5 44 5

**Bold**
:11 89:4

**Book**
:3] 121.13,18 162:5

**Bookkeeper**

**Books**

**Boom**
:11 :14 16 109 3

**Borrowed**
:1. :3·7

**Borrows**

**Botello**

**Bottom**
:1 : .3 72 :5 78 9 ·:. 3

**Bought**
·. ·:. 20

**Box**
·. · ·:.8

**Boxes**
:. · :3 :. :9 : . :.3

**Boxes'**
:. :18 7

**Brand**
:11 25.25

**Brand-new**
:1: 25.25

**Breach**
:1 :4 15

**Break**
:· ::7:1

**Breakdown**
:1 ::7 12

**Brendan**
[4 : :. 7 15 :27 3

**Brief**
[3] 5: 17 111 4,11

**Briefly**
:11 :12 19

**Bring**
:11 :12 19

**Bringing**
:11 :22 22

**Broad**
:7 25.25

**Broken**
:1 :4 19 141 17

**Brought**
:7 5 : 6 2.6,:1 11.12 :.4
34 3 :12:14

**Brownsville**
:17 :12 2 8,12 5 9 e:15

**Brush**
:1 :3.8

**Bryant**
:1 :23 170:17

**Bucks**
:1 :9 25

**Built**
:2: :4 17 61:19

**Built-in**
:11 :4:17

**Bunch**
:2] 3:1:19 90:15

**Buren**
:11 2::1

**Business**
:3] :7.5 127.21 148:9

## C

**C.P.A.**
:3] 1:1.3 4:3 169:16

**Cameron**
:2] 33:22 169:17

**Candid**
:1: :3:6

**Cantu**
:3] 53:15 101 14 157 16

**Capacity**
:3] 29:23 78:14 111 1

**Capital**

**Capitalize**
:11 73 10

**Capitalized**
:2] 59 13 71 :6,18

**Care**
:21 20 4 84 21

**Carlos**
[:11 34 19 5. 15 81 4-7,17
8: 6.13 20 149 :. :2.6 :15.2
:4:9

**Carried**
:.3] 23 4 25:7 27 23 28 5
25 7 39 17 :2 9 63 20 132 4
133 3,7 117 5 121 3

**Carry**
:1: 64 15

**Cart**
:11 38 14

**Carts**
:11 n° 4

**Case**
[24] 1 3:4 5 3,8,11,21 6 22
:2 21 16 20 27 6:8 39 21 43
16 44 22 45 :6 71 17 123.11
127 23 133 23 134:14 139 8
143:9 147:2

**Cases**
:3] 44:17 71.16 145:17

**Cash**
:11 48 5

**Categorized**
:2] 143 16,19

**Caused**
:1] 108.6

**Causes**
:1] 109:24

**Cease**
:11 147:6

**Celebrated**
:11 36 8

**Certain**
[22] 15:9 17:10 19:20,22,24
20:2,8,10,20 21:13 33:1 37:
19 46:21 58:10 67:3 68:16
78:4 80:25 21:5,8,21 90:13
97:11 109:20 113:24 126:23
160:20 141:10 162:4 163:2

**Certainly**
[46] 30:10 35:13,18 37.7,11
39:20,23 42:7 44:1 46.8 47.
13 55:10 64:18 71.17 92.3
112.9,11 114:16 119:3,17,25
120:10 126:11-12,17,19 127
1,17 130:19-20,23 131 10,13
134:1,20,25 141 2,7,9 142
11 144:4 147 20 155.2 163.

**Certificate**
[4] 4 11 30:24 31.21 170:1

**Certificates**
:2] 31 7 121:21

**Certified**
:2] 1 21 170:2

**Certify**
:2] 170:3,7

**Cetera**
:3] 18 2 25:14 54.23

**Challenge**
:1] 56:20

**Challenged**
:1] 64:1

**Challenging**
:1] 68:16

**Change**
[13] 19:13 47:6 58:8 61:23
93:8 104:15 105:14 108:3,6
109:20 115:4 145 6 169:2

**Changed**
[8] 58:12 94:: 96.2 106.8,
12 :17.9 159:15 162:4

**Changes**
[9] 81:9,21-22 82.9,18 95:
24 106 7 140:15 169:L

**CHAPTER**
:1] 1 6

**Character**

**Characteristics**
:. :33 21 :.: :.32 20

**Characterization**
:. :·2 :·:

**Characterize**
:1 20 4 114 :.

**Characterized**
:15 :2

**Charge**
:. :5 20

**Charges**
:. 5 :2

**Charging**
:. :9 25

**Check**
:35 8

**Checked**
:35 8

**Chilton**
:5] :3 20 :· :3 14 :.9,10
· 5,17 16 :.: :29 19 30:
· 4 :. 50 :15 13:4 6 :7
:7 15 92 :4 :· :33 :15:9

**Chilton's**
:4, 14 15 :: :· :4:.23 :3 4
:· :5

**Circumstances**
: 5: 21

**Civil**
:21 : 24 6 22

**Claim**
:11 142 24

**Claimant's**
:11 57:2

**Clarification**
:21 11 15 35 :

**Clarify**
:21 84 15 135 :3

**Clarifying**
:1 56 4

**Clarity**
:21 11 8 25.1:

**Classification**
:3] 71:24 126 9 155 10

**Classifications**
:11 159 12

**Classified**
:2] 69:13,19 121 6

**Classify**
:11 142 5

**Claudia**
:2] 51:16 101 14

**Clean**
:11 46:7

**Clear**
[4] 11 3 108.9 151 14 163.

**Clearly**
:3] 36:21 71 21 100 17

**Client**
[37] 9.8,18 11 22 14:12 15
13,20 37:21 38 18 54:9,12
63:16 67:25 68:3 80:25 91:
20 101:6-8 104.15 107:25
109:11 110:1,1: 112.1,4,14
14,17,23 119 16,25 137 17,
20 144:22 149 14,17

**Client's**
:21 14 25 110 4

**Clients**
:3] 148:8,13 149 12

**Close**
:2] 14:15 73:17 140:13

**Closed**
:11 52:5

**Closely**
:3] 30:3 59:23 163:25

**Closely-held**
:2] 30:3 163:25

**Closer**
:11 128:4

**Club**
:3] 36.5 88:14 112 2

**Clubhouse**
:11 125:19

**Co**
:1] 9 9

**Co-counsel**
:1] 9:9

**Code**

Collateral
Collection
Column
Combined
Comfortable
Coming
Commencing
Comment
Comments
Commerce
Communicate
Communicated
Communicating
Communication
Companies
Company
Company's
Compare
Compared
Comparison
Competent
Compiled
Complete
Completed
Completion
Complex
Component
Components
Comprehend
Computation
Computer
Computers
Conceal
Concept
Concern
Concerned
Concerning
Concerns

Conclude
Concluded
Conclusion
Conclusions
Concurred
Concurrence
Conduct
Confidential
Confidentiality
Confirmed
Conflict
Connection
Consequences
Consequently
Consider
Consideration
Considerations
Considering
Constitute
Consummated
Contact
Contain
Contained
Contains
Context
Contingent
Continuation
Continue
Continued
Contribute
Contribution
Contributions
Control
Controls
Conversation
Conversations
Conversion
Convert
Converted
Cook
Cooking

Copied
Copies
Copy
Corner
Corporate
Corporation
Corporation's
Corporation-owned
Corporations
Correct
Corrected
Corrections
Correctly
Correspondence
Corroborate
Cost
Counsel
Country
County
Couple
Course

Court
Court's
Cover
Covered
CPA
Credibility
Credit
Crediting
Creditor
Creditors
Credits
Criminal
Criteria
CSR
Cuellar
Cuellar's
Cut

D

Dale
Dallas
Data
Date
Dated
Dates
Days
De
Deal
Dealing
Dealings
Debit
Debt

WAYNE BENEKE, C.P.

[9:2 18 :>4 5]
**Debt's**
[. >2 :2]
**Debt-equity**
[[: :39 1]
**Debt-to-equity**
[2] 128 3 129 1
**Debtor**
[1: .5 37 2]
**Debts**
[4] 23 17 41 2 102 15 160 20
**December**
[17] 15 20 :6 1-2 33 9 n7
:: :5 4 37 15:9 82 15 104 5
.:. 5.15 :35 n 9 136 19 137
:.:.138 19 148 4 158 2.22 144.
**Decide**
.. 115 1:
**Decided**
[: n5 4.n
**Deciding**
[... 132 1
**Decision**
[n 7.2 :25 7 132 2-3,5-n
**Deduct**
[1: n1 9 n9 5 159 7
**Deducted**
'). 41 16,20 145 22
**Deducting**
[1: 69 :0
**Deduction**
[3] 69 15 145 13 146 21
**Deductions**
[1: 69 12
**Deed**
[2, 53 23,25
**Deeds**
[.1 51 10
**DEFENDANT**
[[: 124.4
**Defendants**
[2: 1·10 2:13
**Define**
[1: 11 23
**Delays**
[1, 5:22
**Deliberating**
[[] 41.20
**Delivered**
[[: 124.4
**DEMETRIO**
[., 2 15
**Department**
[5] 3.1-2 11:24 110:5 111:2
**Depo**
[[: 25:24
**Deposed**
[2] 12.1 164-23
**Deposit**
[1: 98:12
**Deposition**
[25] : 13,17 12:2 13:21 14:
14 :9:n5,11-12 21.6 25,10,
13,15,23 26:8 52 24 53.9,12
70:14 96.16 111:19 113:1
121:11 137:23 149:14
**Depositions**
[3; 25:17 43 19 87 12
**Derbez**
[49] 3,6 21:21 22:5 26:6 27:
7,13 28:9,22,24-25 29:1 30:
16 31:5 32:2,18 33:11 34:22
35:2,7,9 36:3,10,12 37:3,23
38:7 41:6 42:3 43:19 44:6,8,
20 45:12,19 46:2 48:7-8 49:
2 50:14 51.7,10 52:1,13,16
53:24 55:25 57:20 58:3,11
59:14,19 60:8,11 88:23 89:2,
6 123:2 129:12 144·14 152:
21 153:6 156:5 157·14-17
165:10
**Derbez'**
[3] 26:16 58:4,9
**Derbez-Cantu**
[1] 137 16
**Derbez/Lozano**
[1: 57:18
**Derive**
[1: 53:10
**Deriving**
[1: 48·4

**Described**
[2] 1:4 3 :57 3
**Describes**
[1] 3t:1:7
**Describing**
[1] 77 2:
**Description**
[2] 4 15 37 20
**Deseos**
[3] 1 .2 2 18 :33 .*
**Designated**
[[: 4:> 2
**Desires**
[2] 49 · 9] :5
**Detail**
[4] 10 :3 23 :0 .: :: :40
13
**Detailed**
[1] 53 :
**Details**
[3] :3:5 :55 1:
**Determinable**
[3] 54 .3 54 4,10
**Determination**
[2] 57 9:.3
**Determinations**
[1] 1n1 :
**Determine**
[1] 28 :
**Determined**
[1] 6 :1
**Detrimental**
[1] 5:23
**Development**
[1] 1n2 9
**Diaz**
[4] 30:15 83 17 151: :5
**Diaz-Rivera**
[9] 30 :5 31:5 32 : : 83 17
84 5 1n0 9 151:25
**Dictated**
[2] 160:6,16
**Difference**
[9] 27.3-4,14 34·10,12 68:
24 104:23 122·4 143·3
**Different**
[12] 4:14 29 21 103·7 107:
25 108:7 112:22 121 :125
10,15 126 18 132,20 158 12
**Differently**
[1] 126 13
**Difficult**
[1] 9 1
**Digits**
[1] 79::::
**Direction**
[1] 114:9
**Directive**
[2] 14n:10 147:13
**Director**
[1] 44:5
**Directors**
[7] 9:3 32:3 36:5,8 63:11,
25 144·2
**Disagree**
[1] 8:6
**Disagreement**
[1] 130:15
**Disbursement**
[1] 39:24
**Disclosure**
[1] 41:3
**Discount**
[1] 54:22
**Discovered**
[1] 120:16
**Discuss**
[6] 8:24 9·17 10:16 128.9-
10 164:25
**Discussed**
[22] 6:9 8:1 9:21 10:15 11-
4 42:18 43:22 58:14 84:12,
18 86:11 90:21 94:2 95:8,11
126.21,24 134.18 156 20 157:
21 158:4,9
**Discusses**
[1] 54:n 87:24 96.:
**Discussing**
[10] 19:14 84:22 86:14,16
88:6 105:7 115:20 154.14

155.9 13
**Discussion**
[12] 9 13 :3 9 54 7,21 68
25 127 7,9,:: 128 12 134 19
135:23 13-.:5
**Discussions**
[8] 85 7 10:: 11 105 15 104
14·15 12E :2 141 19 145 3
**Disguise**
[2] 46 10 47 .5
**Dismissed**
[1] 142 1
**Disposed**
[1] 55 18
**Disposition**
[1] 55 20
**Dissatisfaction**
[1] 142 n
**Distinction**
[1] 142 9
**Distinguish**
[2] 142 5,15
**Distinguishment**
[1] 142 6
**Distributed**
[1] 113 5
**DISTRICT**
[1] 1.1
**Dividend**
[1] 54,4
**Dividends**
[1] 54 22
**DIVISION**
[2] 1:2 3 3
**Document**
[41] 19:15 20:17 24·5 29:18
30,13 31:3,11-12 32,5,9,16-
17 33:8-9,11 36·2,4 37 13,
18,21-22 38 4 50:6 53 15 58
25 59:2-3,10 47 20 76 24 78·
8 80:23 96.: 113:13 118 7,
10 134,25 137 20 157 24-25
159·3
**Documentary**
[1] 10:2
**Documentation**
[3] 62:1 78:3 95:18
**Documentations**
[1] 90·19
**Documents**
[25] 4:16-21 25:20 27,25 28:
3 38:16 49:14 69:14 75,20
90:24 91·25 93:9 103:16 111:
21 113:1 125:11 128·2,8 139:
20,22,24
**Dollars**
[8] 24:24-25 27:18 45.9,12
71:21 100:11 148.17
**Done**
[13] 8:25 41:18 89:20 103.
16 108:1:,17-20,22-23 109:3
120:4 162.11:
**Double**
[1] 115 8
**Doubt**
[1] 105:12
**Down**
[18] 7:15 8:1,3 24.21 26·23
34:8 45:9 40:20,23 48.5 84:
4,8,15,21 133·25 128:11 133:
14 144.14
**Draft**
[12] 62:14 83:9 95.22-23 96:
12-13 113:7,10 114:9 124:19
154:18
**Drafted**
[1] 83:10
**Drafts**
[3] 113:4,8-9
**Draw**
[1] 151:17
**Dropped**
[2] 81:20 92:12
**Duarte**
[58] 21:16 4:5,8 11,8,19 12:
10,17 22:8,14 25:12,22 26·2
32·22 33:12,22 34.3 35:1 42:
5 44:14,16 48:15 57·14 58:
23 60:2 61:17 63:17 64:16,20
65 2 66:21 71:1,7 74 18 78
7 81:2,11 82:20 87:1 93:12
96:11 104:2,18 105:18,25
111:8 125:24 150:22 151:10
152:13 154:3 155:24 156.9
158:16 160:11 162:22,24 167.

**Duarte's**
[.: :4 t 45: 2:
**Duces**
[1, 1n .1:
**Due**
[2n] 21 2 :.. n,:: 4:.6,22
2. 5, 3,:: 63 7 10 1:9,11,17
:: 43 3,4 .:.,9 72 :0 19 .
9t 45 5 38 :2 i:.:4 103 9
9.5 154 25 ,>5 >.
**Duly**
[2] 7 .8 .3 :.
**During**
[11] 30 5 3- :1 :: : 49 ,,
4 :4 33 :5 43 :3 : 44 n:5
.: :: :7 2 :2 3 19 :1 34 2:
.: 42 i5 4>:5 2:.:: :22 12 152 6
**Duty**
[3: 57 .: ... 2 :n 24 ]

**E**

**Early**
[1: n5 4 ]
**East**
[4] 1 23 2 ... .70 18
**Effect**
[7] n5 14,: 85 3 33 5 11
10 120 13 :5-2 :9
**Effective**
[1: 136 13
**Effects**
[2] 84.14,:n
**Ego**
[2] 57·3,1:
**Eighth**
[1] 13 15
**Either**
[10] 12 13 2: n 56 3 74 23
101.9 105:2 115·15 114 20
:24.5 155 22
**Electronic**
[3] 148:15 :49·1,20
**Element**
[7] 27.9,17 104:13 125 22
127 22 139·19 143:19
**Elements**
[1] 81:5
**Eminent**
[1] 119:15
**Employed**
[1] 13:18
**Employee**
[3] 51:12 177·8-9
**Enclosed**
[1] 51 9
**Encouraged**
[1] 106:5
**Encouraging**
[2] 70.5,23
**End**
[10] 4.12 83:4,6 90:2 106:
21 113 19 135:4,19 136·8
149·9
**Ended**
[3] 107·12 139·10
**Ending**
[19] 21 3,15-16 22:20 30.·
39 1 40 15 93 19 n0:5 77 1.:
n2 15 83 20 37 25 102 8 11:
22 114 11 135.5,9 158·21
**Endorsement**
[1] 150.7
**Ends**
[1] 47.3
**Energy**
[1] 3:3
**Enero**
[1] 93:4
**Enforce**
[1] 64:11
**Enforcement**
[1] 167.13
**Engaged**
[2] 111.1 162·15
**Engagement**
[4] 15:22 110.3,22,25
**Enrique**
[1] 38.14
**Ensure**
[2] 16:17 157 2

**Entered**
[1] 109:19

**Entire**
[5] 20:21 31:7 54:17 114:20
.1: 12

**Entitled**
[4] 30:24 34:21 .44:21 :40
:21

**Entity**
[1] 149:22

**Entries**
[6] 77:15 78:19 85:1 ,22:25
121:14 123:15

**Entry**
[34] 16:13 17:9 ,3:9 62:9
82:13-14 88 :1 .,3;21 89:3,7
98:13,23 99:- .9 13,15-8,6,
18-15,25 101:19 ,4,18 ,05
:7 109:22 113:1 ..9 4:7 ,17
:7 121:9,12

**Environment**
[1] 148:26

**Equipment**
[1] 67:3

**Equitable**
[2] 54:24 57:..

**Equitably**
[1] 56:22

**Equity**
[30] 41:22 42:,,1,24 48:23
49:1,20 70:4:7:,,9 83:,,11
93:14 99:5,90 ,,97:4 1:14:23,
25 127:3,16,2:,28 3,7 129
1-2,18 130:1 .2:3 135:2
148,7,10

**Erroneous**
[1] 118:7

**Error**
[4] 99:16,19-22 118:11

**Errors**
[2] 16:18 17:3

**Especially**
[4] 27:11 35:18 45:21 ,13:16

**Essence**
[2] 69:5 100:16

**Essentially**
[11] 17:23 62:9 65:21 85:16
101:17 107:6 123:15 127:3
136:18 145:20 147:7

**Established**
[1] 141:23

**Estate**
[4] 109:8 117:8 125:13 165:
15

**Et**
[3] 18:1 25:14 54:23

**Ethical**
[8] 8:4,8 9 21:23 10:5,:7,
21 12:20

**Events**
[1] 90:20

**Everyday**
[1] 163:23

**Evidence**
[9] 34:15 47:1 48:16,18 52:9
62:23 63:8 74:9 153:15

**Exact**
[1] 80:17

**Exactly**
[29] 8:22 14:11 16:15 :5 5
23:10 27:16 28:14 34:13,40:
11,13 41:18 62:15 66:14 67:
14 70:12 100:15 105:4 ,17
11 110:19 114:5 127:14 149:
7 155:21 156:1,3,6

**Examination**
[25] 4:4-9 13:13 106:3 111:
7 126:15 137:11 138:15 129:15
150:19 158:18 162:23 164:19
167:5 168 4

**Example**
[22] 14:20 20:19 25:4 26:21
35:14 37:4 41:15 46:19 97:
17 98:25 113:16-17,23 115:9
127:7,19,21 152:21 153:18
154:22 156:10 160 20

**Except**
[4] 20:23 67 2 107:14 149:15

**Exceptions**
[1] 67:2

**Excerpts**
[5] 19:15,18 20:5 41.1 32:5

**Excess**
[1] 27:18

**Exchange**

**Excuse**
[2] 43:20 4:.5

**Excuses**
[1] 119:14

**Executed**
[4] 7:6 145:5 148 10: 1;
21:154 10 149:25

**Exhibit**
[53] :9 6:7,,2:14,14 21 10-
11,,:,23,25 24:4 29:2,,:7
34:5 36:1 39 25:43 45:11 5
50:5 53:14:17 55 20 2:1 47
62:14 79 20 81:13 82 17-23
83:..,8 22 90:10 91 11,,92
9:4:15,24 97 ,8-:,,3
,24:5:25 3 51:22

**Exhibits**
[16] 4:14,24 ,:5 ,,:5:21 ,3
,3:,3 20 ,:25 ,6:,3 ,6:20
91:5,14 93:11 ,,3:11 25 ,4:15

**Exists**
[1] 48:20

**Expediency**
[1] ,20:17

**Expense**
[2] 145:22 144:2

**Expenses**
[2] 94:1 124:14

**Expensive**
[1] 156:16

**Experience**
[2] 103:10 139:4

**Expert**
[1] 120:8

**Expiration**
[1] 170:17

**Explain**
[6] 10:17 24:2,:7 48:13 74
8 139:10

**Explained**
[1] 9:5

**Explaining**
[2] 19:1 74:11

**Explanation**
[3] 68:12 104:9 146:15

**Exploring**
[1] 156:19

**Express**
[13] 5:3 24:17 37:14 41:24
64:1 87:8 125:3,9,12 155:25
165:11 166:9

**Expressed**
[1] 149:21

**Extension**
[1] 111:2

**Extensive**
[2] 39:22 144:,5

**Extent**
[3] 7:8 47:8 108:18

**Extinguishment**
[1] 48:22

**Extra**
[2] 37:24 72:3

**Eye**
[1] 100:25

**F**

**Face**
[11] 73:24 85:7-8,22 86:9
148,23

**Face-to-face**
[3] 73:24 85:22 86:9

**Faced**
[3] 28:11 131:23,25

**Facilitate**
[1] 147:22

**Facsimile**
[1] 50:7

**Fact**
[43] :10:18 12:23 23:17 33;7
42:13,21 61:11,25 62:13,23
67:21 68:11 79:19 91:21 94:
4 95:8 100:19 102:7,21 104:
6 109:4,8 114:114 115:10 117:
8 119:10 121:13,13-14 124:25
123:16 126:9,16 127:4 129:5
134 20 133:11 142:12 143:3
152 24 156:7 158:11 163 22

**Facto**
[1] 147:7

**Facto.**
[1] 133:17

**Factors**
[1] 133:22 ,3-5,7

**Facts**
[10] 34:4 41:,4 44:4 47:1
38:16 52:9 1:1:21 11:4,19
153:15

**Fair**
[17] 10:21 11:1 12:4 37:13
52:19 54:..9 37:1 11,12:12
122:19 125:,1 128:,,:18 142
8:10:143:18 ;:3:+

**Fairly**
[3] 39:22 7:; ,21 v :25:29
[:150:+

**Fairness**
[1] 1..25

**False**
[2] 38:23 .... 14

**Familiar**
[3] 16:20 52:10 133:21

**Familiarize**
[1] 1.1:2.

**Far**
[7] 9:15,:7 3 12:2,,2:8
11:,23 ,,3 :1 ,20:22 ,,5:11
153:14

**Fashion**
[1] 143:21

**Favorable**
[1] 137:2

**Fax**
[7] 51:3 75 20 92:15 125.2
155.7,21

**Faxed**
[3] 50:8 75:11 152:2

**FBI**
[5] 57:5,9,11 11:22,2,

**FDAP**
[2] 54:18,21

**February**
[25] 94:20 85:6 84 4,24 87
15:22,25 89:1 92::16 93:11
94:8,10,12;24-25 95:7 113:
17 114:9 11;3:18-19 135.22
135:19,23 151:1 159:13

**Fecha**
[3] 92:25 93:21 96 10

**Federal**
[6] 20:8 29:21 112:22 118:7
123:3,19

**Fee**
[2] 77:25 28:10

**Feet**
[1] 137:24

**Fell**
[2] 106:20

**Felt**
[1] 10:24

**Fernando**
[1] 25:4

**Few**
[3] 111:9 137 3 139:21

**Fiduciary**
[1] 56:25

**Figure**
[4] 7:19 33.5 102 3 107 4

**File**
[14] 4:21 15:9 20:25 49:16
90:11-13,15 90 91 5,20,22,24
92:3 164:5

**Filed**
[14] 52:5 53:25 87:7,14 130:
17,21 131:1,4 132:1,4 153:6-
7,17 163:17

**Files**
[14] 14:21,24 15:2,5,8,14,
18 18:22,15 20:19 91.6,17,
19 111:12

**Filing**
[6] 14:18 35:21 87:16 91 16
112:22 133:1

**Fill**
[1] 87:5

**Final**
[19] 82.22 95:22-23 96:12-
13 97 10 113:7,9,11,20 114:
11,18 124:18 138:13 146:19
154:18 155:9,18

**Finalize**
[1] 72:12

**Finalized**

**Finalizing**
:72 2

**Financial**
[..] 4:.. .14:21 ,2:13
.,: ,3 .,5:..  1,24 :23 2:
... .: ...  ,5:, :4 :54 ,8 21
4:4 83 2:,:2,3 2:..5 3:..
,, 4:4 81 .2-17 1,:2, ,5:2
..: 6.. 13 ,21 ,7:,2,,5
,.2 ..,7,,..

**Financially**
:, :70:2

**Financing**
,. 3,3 ,,47 :

**Fine**
.,:.7 .

**Finish**
, ,.2,:. ,

**Finished**
, 9:1 .2,:1

**Firm**
. : 4:7: ,,3 15 :2:3

**First**
,:1:2 :2 : 29 3,4 :2,,
,: ..5:..  ,4:9 :5 , 7 :,
,: 3 :,.. :7 :8 ,:20
,2 41:8 ,,3 ,20:25 ,21 3
,8:2: 24:2,,21 8::2-25
:7 :5 ,2:3 :,41 8,2:-25
,22:14 167:,,

**Fit**
. 10 4

**Five**
,.41 7:4: 24 25 34:9 27 3,
,,:24 31::1,,:16 32:5 41:20
..:,3 78 20 ,,5:1

**Fixed**
,. 54:1 54:5 ,10 128 3

**Folder**
, 6:21

**Folders**
,: 15:9,11-:2

**Follow**
74: 17:19 122 21 135:15 142
25

**Follow-up**
[2] 120:6

**Followed**
[1] 144:11

**Following**
[2] 45:15 157 2,14

**Follows**
[2] 13:12 22:,

**Footnote**
[2] 41:8 42:7

**Forced**
[2] 131:19 122:5

**Forcing**
[1] 111:9

**Foregoing**
[9] 169:14,25 170:3

**Foreign**
[3] 35:16 54:19,24 55:19 56
8-9 122:21

**Forgave**
[2] 45:12,14

**Forget**
[2] 164:6,8

**Forgiven**
[1] 65:19

**Forgiveness**
[4] 43:22 45:11 48:6 65:15

**Form**
[47] 10:2 22:9,16 29:22 32:
23 33:23 34:14 42:5,13,19
14,24 47:9 48:1,14-15 52:17
57:5 60:2 61:21 62:20 65:1,
74:14,25 75:9,19 76:6 80:7
82:19 83:19 84:8,14 87:19
91:9 92:1 93:18 99:1 121:3:7
123:17-18,21 124:25 124:6
144:25 156:9 251 22

**Format**
[3] 18:22 113:9 111.3

**Formed**
[1] 45:14

**Forms**
[11] 43:1 52:2 54:25 55:3
74:23-24 75:4,17 76:12 130
16 154:8

**Forth**
[17] 24:3,12 25:4 41:16 53

WAYNE BENEKE, C.P.

**Foundation**

**Four**

**Fourth**

**Frame**

**Franchise**

**Fraud**

**Fraudulent**

**Free**

**Freely**

**Frequently**

**Friday**

**Front**

**Full**

**Fully**

**Function**

**Funds**

**Furnishing**

**Furthermore**

**Future**

## G

**Gain**

**Gains**

**Gap**

**Garcia**

**Garza**

**Gaston**

**Gathered**

**Gears**

**General**

**Generally**

**Generated**

**Generating**

**Generically**

**Given**

**Glance**

**God**

**Golf**

**Government**

**Governmental**

**Graff**

**Graff's**

**Grande**

**Grounds**

**Group**

**Guajardo**

**Guess**

## H

**Half**

**Hall**

**Hammered**

**Hand**

**Handwriting**

**Handwritten**

**Hard**

**Hard-pressed**

**Hardin**

**Harlingen**

**Harming**

**Harrison**

**Harwood**

**Head**

**Heads**

**Hear**

**Heard**

**Hearing**

**Hearings**

**Hearsay**

**Heavily**

**Hector**

**Heighten**

**Held**

**Help**

**Hereby**

**HERIBERTO**

**Higher**

**Highlighted**

**Hills**

**Hills'**

**Hindsight**

**Hinting**

**Hit**

**Holder**

**Holders**

**Holding**

**Holdings**

**Hole**

**Honest**

**Hope**

**Hours**

**Hypothetical**

## I

**ID**

**Idea**

**IDEN**

**Identification**

**Identified**

**Identifies**

**Identify**

**Identifying**

**Illegal**

**Illegality**

**Immediately**

**Impact**

**Implicate**

**Important**

**Impossible**

**Impression**

**Improper**

**Improve**

**Inappropriate**

**Inc**

**Include**

**Included**

**Includes**

**Including**

**Income**

**Incorporated**

**Increase**

**Increased**

**Indebtedness**

**Indebtednesses**

**Indeed**

**Independent**

**INDEX**

**Indicate**

**Indicated**

**Indicates**

**Indicating**

**Indication**

**Indications**

**Individual**

**Individual's**

**Individually**

**Individuals**

**Individuals'**

**Industrial**

**Industry**

**Inform**

**Information**

**Informed**

**Initial**

Initialed
(2) 3:4 21 44 9

Initials
(1) 36 14

Inordinate
(1) 141 5

Input
(3) 16 11,21,24

Inquiries
(1) 112 8

Inquiry
(1) 128 15

Insert
(1) 53 11

Inserted
(2) 90 18 93 4

Inserting
(1) 14 10

Inside
(1) 136 9

Insignificant
(1) 71 20

Insofar
(10) 7 25 .0 15 23 ..
2:10 45 21 57 10 58 13 19 :

Instance
(1) 1 18

Instead
(6) 42 24 93 11 101 14 17
9 147 21 142 9

Institution
(4) 129 15,21 149 22 150 5

Instruct
(2) 17 23 38.18

Instructed
(1) 136 21

Instruction
(1) 43 14

Instructions
(13) 17 20 63.14 81 1,7 23
25 85 14,25 101 5,13 124 :
135.9-11

Instructs
(1) 54 13

Instrument
(2) 52.2 169:20

Instrumentality
(1) 57.3

Intend
(1) 163:21

Intended
(1) 130:23

Intent
(6) 102:19 103:19 104 11,15,
25 150 22

Intentionally
(1) 114:6

Interest
(40) 5:23-24 22:6,14 23.14,
24 24:7,14 28:6 30:8 38:15
39:15 40:3,6 54:22 55:23 56:
7 69:5,10,14,19 115:3 117:
16 134:12,16,21 145:14,17,
21 146:16,18,21-22 157:5
159:8 160:22 161 11 162:1"

Interested
(1) 170:10

InterFirst
(3) 22 3 153 22,24

Interim
(1) 136:11

Interject
(3) 73·19 84:25 134:11

Internal
(35) 17:24 23:5 24:18 25:1a,
18 26:21 28:8 35:17 37:20
38:17,19,24 39:16 43:7 49-
11 55:3 57:19 59:8 64:7 68:
4 75:13 78:2 80:19 98:7,9
102:13 104:8 116:23-24 117:
21,23 118:13,18 124:5 154.15

Internally
(1) 17:15

International
(2) 24:18 148:16

Interpretation
(2) 104:13 146.13

Interrupt
(4) 33:3 42:9 74·5,8,10

Intimately
(1) 19:9

Introduce

(1) 90 2

Introduced
(2) 29 · 36 15

Invested
(1) 129 1

Investigate
(1) 7 3 1; 22,25

Investigated
(2) 7 13 11

Investigating
(2) 16,25

Investigation
(4) 5 7:10-11,18 12,22

Investigations
(2) 6 .....

Investment
(4) 34 7 ·9 2,13 ... 13

Investments
(4) 28 5 4 4 15,20 22 2
93 14 ... 1 4 110 .1

Investor
(1) 11 :

Involve
(1) 2

Involved
(3) 4 12 · 4 22 ' 9 · 23 102
41

Involvement
(1) 29 .:

Irrelevant
(2) 12 23

IRS
(66) 5 .25 4:21,23-21 27 12
30 5++ 31:21 37:14 38 13 54
25 59 12 .69:3 63:22 65 22
48:7,12,15 69.7,17 7 3,9-
10,23 7 . 3,11 72 1, 72 7 4
14 74 5,23 85 4,15 106 4,9
126.22 13 9 130·4,.,15 13,
8,19 1,1,.19 143 25 144 3
145 11 147 11 147-1 151 2,
152 9,14-25 154 13 ..16,20
157 22 13 5,12-13 163 1,4,
12,16,18,24

IRS's
(1) 68.3

Issue
(13) 28:14 31:7 54.1,16,22
55:14,24 48:24 84 22 124 20
126.24 131 22 139·4

Issued
(5) 32·4 54 2 90 6 136 10-1

Issues
(9) 54·5,' 48.8 74 1 55 2,3
134 1 15:24

Item
(2) 89 18 157.13

Items
(4) 58.12 70·9 157.5 158 4

Itself
(6) 17 4,25 33:14 17 21
150 5,3

**Column 3 (J)**

Jackets
(1) 15:9

Jane
(2) 59:1,"

January
(18) 57:3 70:15-14,19 72.21
35:5 34:20 93·5,11 54 2-3,21
12,24 54:2-3 119:18 135 16

JENNIFER
(1) 3:2

Jeopardize
(2) 134:23,21

JOHN
(1) 2:7

Join
(1) 94:21

Joint
(1) 122:8

Jose
(1) 106 5

Journal
(7) 41:3 62.9 77:16 78·3 93
13-14 14:25

Journals
(3) 40:5 43.8 95:17

JR
(1) 2:15

Juanita

(1) 51

Juarez
(2) 3:7 7,14

Judge
(2) .55 27:.

Judgment
(1) 70 .

July
(7) 53 14,25 137 14

June

Justice

Justify
(1) 71 23

**K**

Keep
(6) 3 " . " 5 40 9 142 15-16

Kept
(3) 42:4 92 7 152 18

Kicked
(1) 128 1"

Kind
'3 30 .2 53 8 104 19 110 1
..:5 .1 29 19 163 20

Kinds
(1) 56 .0

Knowingly
(1) 147 21

Knowledge
(33) 14 17 16:8 18:13 19 2
42.3 66 24-25 91:15 101 19
92 1 103·9 111 14 112 10
114 1-2,3 116·19 119·14 120.
5 121 22 123 2 124.7 130.8
134.1 137 9-10,19,22 146.9
153 2 158.2 159·10 161 24
162 19 164:5-4,11-12

Knowledgeable
(1) 109 9

Known
(3) 119 23-24 169:19

**L**

Land
(1) 109.5

Language
(1) 44 11

Lara
(2) 5 5 4.17

Larry
(4) 62 25 134 18 140:7 141.
20

Last
(10) 32 11 54.11 60·22 70-
14 78.20 80:15 87.2 122 19
138:21 141:21

Lastly
(2) 18·24 105:7

Late
(2) 141:20 159:14

Latitude
(1) 71:16

Law
(7) 2·3,7,20 3:7 50·9 167.
12,23

Lawnmowers
(1) 67 4

LAWRENCE
(2) 1 6 2:10

Laws
(1) 112.10

Lawsuit
(4) 7:7,11,21 8.13

Lawyer
(1) 12.6

Lawyers
(1) 122:4

Leads
(1) 166:22

Learned
(1) 166:10

Least
(7) 19:23 28:12 75 25 86.7
130:20 149:1 151:18

Leave
(1) 44:1 134·25

Led
(2) 7.12 166:15

Ledger
20 14

Ledgers
. 13 9

Lee
. 53 9-4

Left
·2 .32 13 1·r 1·

Legal
. 10 2,49 1a 129 2,"
. 11.20 133 5 .42 14 1·3
2:.3 141 2

Legality
'> 25

Less
·4 2: 12 ·2 .32 1 · 9
. 3 10

Letter
. 4 · 11 27 14 3 .90 .2 25
. 1 · 12 13 9 7 5 17 9,23
. .. .25 9 73 73 12 7· 14
. . 10 82 13 13 7 ... :

Letters
1" 73 22 74 2

Liabilities
. 75 + 82 4

Liability
. 43 14.2,12,14 2

Liable
. 35.22-23

License
.2· 34·22-23

Lien
,. 1 36 1 51 25 117 9 12) 4
9 .33 20 157:17,19 158 15
.25 19

Liens
(e 28 4 117 18 153 5,"-9,1

Lifetime
·1· 49 3

Light
2· 49 23-24 97 ·

Limit
(1· 43 5

Limitations
(1· 161 1

Limited
(3. 44:1 76.1 122·12

Limon
(1·1 2:6 4:5-6,9 89:17 126
2-3 135,18 136:2,25 138:12,
10 139:14 154:17 158.11 1e
. +83.3,5

Line
.# 10:13 55.13 61.8 73·9
.2 2 118:15 140:9 149 2

Liquor
(2 156 12-13

List
(5· 29-15 31·18 32:10 44.1
9"·11

Listed
(8' 25·13,15 31.16 93:4,10
17 84:4 151:15

Listening
(1· 91-11

Lists
(2· 31 12 33 4

Lived
(· 122:22

Loan
(38) 22.12 24.11 34,20 37-
14 39:14 40:23 41:13 79·4,
9·5,12 97·6 99:5 103:12-1
10"·9,23,25 109:7 114:25
11 1· 126.9,12-13,16,20-21
1:? 7-8,15 123:10 132·14
157:2,20

Loans
(+3) 21:13 23:4 42:10,23 4
6 53:4 56:11 59:23 66:17 6
11 48:8,22,24 69:6,11,18 '
4 71:21 73:12 77:8,13,24 2
4:12,16 80:14 81·9 88:22
1 94 8 96:23 97:11 98.18,2
100 22 101:11 103·14,16,18
19,22,24 103.20,23 104:16-
1"·22-23 107·2-3 109.20-21
14.2:23 117 1 119:9,17 127:
134:22 140:14,16 141:4 143
23-25 146 1,7,11 147 4 156
"?

Loans'
(1) 89:4

Local
(1) 109:9

Locate
[1] 27 : :

Long-term
'[1] 128

Look
[13] 11 : .' 2 .: 22 4e 4
13 5 1.: .. : 20 1 : .33
27 148 :: .: : : 151 21 :

Looked
[4] 7 5: . :': .: 22 4e. :
: 125 1: .: .:7 .: :

Looking
[3] 11 :' : .: .:3 23:4: 59
: 111 1.. : .: .: 21 ' 8 141 :

Looks
3; 19 :' : : :

Losses
[5] 65 .: ' .: .: 5

Lost
[1] 135 :

LOU
[3] 1: : .:1 2: :

Lozano
[10] 8 .: .: ': .: 17 3: 4
15 15, 15 ' .: 4 : .1: .: .:7
20, 24 .: : .: .: 2: : .:
20 45 6: .: .: :: .:1,13:.:9,
22 24 :' .: : : :: 3: 15 3:
:: 53 : .: :: 56 :: 57.
:: 58 3 :: ': .: 97 5:u.11
99:24 9: .: : 94 : .79 4.:3
13 97. 4, :: 38 6 :00:22 101
2-3:,9,21 :': .:27:9,.:2 103:1,8
107 16 1.:3 19 1.:4 116 117 22
113 9 1.:2 : 123 ' :: 124 9.:
21 125 14 .: .:5 : :30 17 1:32.
11 134 4,:.: :.: .:5 3 146 7
144 12,25 :.:7 1. 148 2 151
15, 24 15: .: 18:7 3 154 1
13 21 155 : 162 .: 164 11:

Lozano's
[10] 41 .: .:3 .:: :: 9, 12,14
60 : 14 74 . 7.: 19 8: 4 155:22

Lozano-Lozano
[3] 1:9 : : : 8 :

Lozano/Zamacona
[2] 97 17,19

## M

Machine
[4] 17 15,25 12: : 155:7

Machines
[1] 155:2:

Magnitude
[3] 65 18,23 1:7 :

Maintain
[1] 126:20

Maiz
[1] 100 5

Man
[1] 167::7

Man's
[1] 167 :5

Manager
[2] 51:17 :3.19

Managing
[1] 32:3

Manner
[1] 23:6

Manny
[1] 74:17

March
[9] 29:1: 3:,19,:2 32:12-13
33:10 36 7 38:7 72:17

Maria
[1] 51:11

Mark
[2] 92:15-16

Marked
[13] 14:6 18:15 19:4, 12 20:
18 25 9,17 90 9 91:6 92.12
96:15 137 25 149 9

Marking
[1] 148.23

Marks
[1] 75:20

Masso
[2] 6:10, 13

Match

:6 42 19 79 22 90 7 94 11
:9 9 15

Matches
[3] :4 12 84 .:

Material
[1] 114

Materials
[2] 76 13 116

Matter
[15] 5 6 10 10 14 11 4 25
59 4 73 1: 72 13 85 1 24
104 21 125 : 139 4 146 12
:43 2:

Matters
[2] 5 2 : 10 22 5 10 29 14
39 :, 42 9 7 85 10 124 3 155
: 4:.: :

Maxus
[1] 9

Maxwell
[3, 59 1 7 163

McBride
[77] :1 20 22 12 19 13 11
:6 :.12 77 22 34 18 29 94 13
:0 12 :7 44 25 50 13 52 14
:7 45 :0 23 91 12 78 23 89
:1 ,:03 33 129 12 141 11 12
:44 5 .3 145 8 152 15 156
.8 153 9 165 21 15 164

McBride/Derbez/Lozano
[1] 153

McBrides
[1] 3: 1

Mean
[47] 17 22 30 1 31 13 34 24
39 20 :7 12 63 7 71 14 34 24
103 14 106 16 20 107 16 18
106 3 4 23 109 10 116 22
75 10 7 115 23 119 13 129
18 26 123 24 135 16 139 12
159 24 163 9 19 166 12
167 11 13 16 168 1

Meaning
[2] 14:4 157 1

Means
[4] 97 22 123 14 16 142 1

Mechanics
[1] 122

Mechanism
[1] 47 1

Medrano
[4] 3 7 99 12 101 1

Meet
[1] 124 1

Meeting
[13] 56 8 74 4 9 10 87 24
58 4 73 10 94 2 114 16
154 13 155 11 2

Meetings
[7] 56 6 8 9 87 15 119 19
155 3 1

Memo
[29] 43 17 44 12 15 51 3 55
8 81 14 83 13 87 15 22 88 6
90 19 21 92 8 12 13 93 24
94 7 95 23 96 1 6 13 20 22
97 10 138 19 12 13 151 5
13 154 1

Memorandum
[8] 54 3 6 113 23 114 7 124
19 127 12 147 9 155

Memorandums
[2] 54 12 1

Memory
[2] 53 11 142 2

Memos
[2] 44 5 85

Mention
[1] 105 2

Mentioned
[1] 14:4 157 1

Mentions
[1] 37 2

Mera
[1] 57

Merely
[5] 50 2 58 8 12 62 8 112 2
127 1 145 18 163 1

Merits
[1] 41 2

Met
[4] 28 25 85 7 8 155 1

Mexico
[6] 24 24 25 5 45 13 75 21

Midway
[1] 89 2

Might
[10] 47 2 6- 15 94 20 121
15 128 6 1:24 21 146 12 141
13 164

Mil
[1] 93

Million
[25] 24 24 25 24 9 25 27
3 :3 18 24 37 14 45 11 43
19 25 41 29 42 13 71 21 100
14 5 145 1 125 4 155 8 5
153 22 :57 25 15

Million-some-odd
[1] 98 2

Mind
[12] 13 4 .: 7 33 25 86 7
94 10 164 14 .:7 4 19 114
14 121 19 144 .8 147 :

Mind's
[1] 100 2

Minus
[3] 50 21 22 2

Minute
[8] 25 8 44 5 136 10 12 .4
144 5 145 14 2

Minutes
[3] 10 23 32 1 97 1

Mischaracterization
[3] 78 8 93 :4 153 1

Mischaracterizes
[2] 47 8 9s

Mischaracterizing
[1] 157 2

Miscommunicates
[1] 47

Misconstrue
[1] 74

Misconstrues
[1] 47

Misrepresentations
[1] 114

Missed
[1] 144 1

Mistake
[1] 105 1

Mistaken
[1] 29 2

Moment
[2] 13 5 144

Money
[15] 26 20 35 8 11 14 37 2
58 4 73 1: 122 14 126 14
143 15 149 12 155 25 141 18
2

Monies
[11] 34 23 35 3 20 37 13 53
1 146 24 147 138 20 21 152
23 2

Month
[3] 31 24 73 4 141 2

Monthly
[2] 23 23 36

Months
[4] 54 1, 55 7 72 18 122 2

Morally
[2] 167 20 2

Morning
[3] 155 11 15 1

Mortgage
[1] 153 1

Most
[2] 56 11 145 1

Moving
[1] 103 2

Multitude
[1] 16

Must
[3] 54 17 20 2

N.V.
[1] 1

Name
[9] 13 16 15 13 35 7 36 15
58 8 12 125 3 139 17 169 1

Namely
[1] 88

Names

129 16 2

Nancy
[1] 19 23

Nationals
[2] 25 14 122 21

Nature
[4] 14 24 44 13 43 4 .:63 12
117 11 127 .2 :33 24 .:44.3

NCNB
[16] 22 2 24:2 28 1 33 18
29 21 33 24 35 13 39 12 99
12 103 23 144 5 152 15 155
21 156 19 141 14,22

NCNB-Texas
[1] 144 13

Necessarily
[5] 4, 9 :7 :: .:2 : :01 2
.33 25 .43 .:: .:7 1 :

Necessary
[3] 51 22 :: .7 .7 :.

Need
[13] 17 22 .1 25 2: :. 74 :
27 :,05 25 .3 .: 15 .: 12:
.42 22 .:5 15

Needed
[5] 104 21 :7 4 1 3 .:5
:10 2 :

Needs
[3] 72 24 74 .: .:7 "

Never
[27] 22 25 11 :5 45 19 59 1:
:: 97 15 115 :5 104 .:,.29.
25 109 4,:7-: :21 2:,5:.
:27 4 128 12 .:4 8 :4:5 7 :
149 6,13 152 :4 144 .:5

New
[3] 25 25 52 : 82 10

Next
[5] 36,15 44 :, 54 10 34 :4
89:23 155 17 :57 13 ,:4 2

Night
[1] 122:19

Nobody
[1] 11,23

None
[11] 12:18 15 :7 114:1,2,1
125:12 152:25 153 2 :43:7
166.23

Nonetheless
[1] 114:16

Nonpayment
[2] 134:12,21

Nonresident
[1] 54:15,23

Nonresponsive
[6] 53:6 43.22 81:12 37 21
91.10 105:19

Normal
[2] 125:19 123 5

Normally
[1] 98:17

North
[2] 2:7 3:4

Notarized
[1] 31:21

Notary
[1] 169:24

Notation
[1] 113:19

Notations
[2] 83 14 97 24

Note
[141] 13:24 21 20-21 22:1-
12,18,21,23 23:11 24:17,19
21,25 26:11,21 27:13, 22 28
1-2 33:13-13,25 34:7 35:4,
39:4,9,15 40:17 41:3 43:23
44,24-25 45:4 49:22 50:13
52:12-13 53:4 59:17 61:24
62 10,12 64:11,14 78:1,4,1
21,23,25 79:3, 7,12-13 80:3
81:22 83:20 87:8 89:11-12
97:12-13 99:1,7,12,15,17,2
23 100:1,5 101:2 104:16,20
108:14 113:2,10 117:6 121:
10 125:4-5,10,13 129:12 1:
9 135:16 122:11 134:4,-5,14
135:1,3 136:17 141:11-14
142:7-8,11,-12 145:5 147.21
148:19,23 149:6,8,12-13,22
150:1,4,7-10 151:8-13 153:1
21-22 154:2 157:4-7,29 159
8,25 164:18 165:22-23 166.
168:9

Note's
[1] 149:4

Noted

[2] 27 22 149 15

**Notes**
[7] 22 11 :. 20 23 17 24 3
24 9,22 31 :4 34 17 39 2:,3,
:7 41 6 42 3 43 20 45 8,:8
43 3 56 21 53 5 54 9,9 59 12,17
42 8,10 42 :2 75 7 82 ... 83
... 3,11,. 13 41 :. 89 11:-12 95
9 100 23 10, 3,13 103 : 104
22 107 7,21 119 5 119 116 8,14
117 9,:2,19 22 120,22
119 10 120 :2 123,16 122 4
125 14 142 2,.23 144 6,.4
145 12,7,13 149 2,5,13,12
149 20 150 11 152 14,17 154
22 155 25 .34 24 157 1,4 ,11,
21 158 5,9,:2,23-24 154 9,
31 160 5,7 :62 2,9,15 147
1 145 15

**Nothing**
[4] 94 1 1,: 4 123 25 143

**Notice**
[3] 14 :2 24 147 7

**Noticed**
[1] 28 21

**Notified**
[2] 130 12,..

**Notify**
[2] 133 8,1.

**Noventaseis**
[1] 93 5

**Nuevecientos**
[1] 93 4

**Number**
[16] 4:15 15 12-13 16:23 29:
12,20 39:2 43:9 44:16 30:5
40:4 102 24 140.11 142:19
148:8 150:2

**Numbered**
[1] 1-20

**Numbers**
[7] 19,7 42:,3 44 17 77,13
103:3,8 141:4

**Numerous**
[1] 148 11

**NV**
[2] 2:2 8 13

O

**Oath**
[2] 45:7 48-3

**Object**
[43] 22:8 32:22 33:12,22 34:
3 35 1 44,4,4,14-15,23 47:9,
20 48:15 53:5 55:12 61:21
62:19 63:21 65:2,7 66:21 78:
7 81.3,11 82:15,19 87:1,20
91:9 92:1 93:2,18 96:8 105:
18 132:17 151:10 152:7 153:
3 157:23 153:16 160:11 161
22

**Objection**
[26] 22:16 42:5-6 44:16 48:
1,14 52:8 54:2 57:5,14 60:2
61:7 63:17-18 64:16,20 65:1
75:9 83:18-19 87:19 96:11
156:9

**Obligate**
[1] 33:21

**Obligated**
[4] 12:21 64:2,14,24

**Obligation**
[3] 27:10 47:7 143:5

**Obligations**
[11] 8:5,8 9,22-23 10:9,18,
21 56:12 58:10 144:7 145:6

**Obtain**
[8] 17:20 18:6 34:23 63:2
66:9,13,19 166:15

**Obtained**
[3] 18:11 21:22 34:23 37:14
101:22

**Obtaining**
[3] 17:19 18:7 42:3

**Obviously**
[9] 39:22 63:12 69:11 80:24
109:16 129:22 132:8 138:13
167:1

**Occasion**
[5] 148:9,18 149:23 150:1

**Occurred**
[5] 85:3,22 114:19 123:22
140.15

**Occurrence**
[1] 163 23

**Occurring**

**Occurs**
[2] 35 5 148 25

**October**
[2] 128 15

**Office**
[30] 5 5,14-15,17,1- .. 7
13,20 9 13 11 10 14 .. ,5 4,
21 36 22 50 9 72 25 ,. ,90
29 81 4 84 22 88 4,... ,. 22
109 23 111 :4 114 3 .. 21-
22 153 9 149 22

**Officer**
[1] 147 13

**Officers**
[1] 147 13

**Offices**
[3] 1 33 1 7,20

**Offset**
[3] 9 26 65 19,22

**Often**
[4] 14 11

**OID**
[1] 54 23

**Old**
[2] 164,8 164 1

**Omit**
[1] 78 20

**Once**
[7] 9 14 .0,1 12,2 , 3
144 23-24

**One**
[64] 42 27 13 22 15 1 ,7
17 21 20 22,2,11 24 .. 33,1
32:14 33:6,18 44:5,:. 49:12
50:13 51,11,15 56:25 37 13
60,7 48 1 74:14,23 :7: ,9
101 4,9,14,18 102:4 .. ,4,
21 105 4 104-2 108:1,. ,:
123 3,14 117:2 121 1 1:,:.
18 135 8 138 13 145 , ,4-
11,22-23,24 151:5,19 ,.
15,21 160 25,147 .

**One-sheet**
[1] 37 13

**Ones**
[1] 109:1

**Opened**
[1] 5,18

**Operating**
[6] 65:18 66:1,3,5 1:5 22
147,23

**Operation**
[1] 127:18

**Operational**
[1] 18,2

**Operations**
[3] 17:2-4 126:15

**Operator**
[1] 18:3

**Opinion**
[10] 9:6 34:14 110 2 ..,7,6
13:25 129:3 130:3 2:-4 3
147:1 167:9

**Opportunities**
[1] 146:25

**Opportunity**
[3] 10:25 111:20 164 23

**Opposed**
[4] 69:1 101.18 110 :31:
23

**ORAL**
[2] 1:13,17

**Order**
[3] 18:10 122:16 132 23

**Ordinary**
[1] 143:20

**Organization**
[1] 30:3

**Organized**
[1] 157:2

**Original**
[19] 20:23 21.23 22::3 24:3
34:7 54:22 89:2,7 90 23 94:
11 96:6,20 106:19 141:9,13
150:6 157:6-7

**Originally**
[10] 22:4 25:9 33:19 32:15
83:5-7 107:6 108.2 1:4-24

**Originals**
[1] 75:23

**Originated**
[2] 22:3 153:22

**Otherwise**
[1] 67 19

**Ought**
[1] 19 19

**Ourselves**
[1] 128 15

**Outstanding**
[5] 31 6,8 60,1 59-12 154 24

**Overhead**
[1] 124 14

**Overhead-type**
[1] 124 14

**Oversimplifying**
[1] 107 19

**Owe**
[1] 49 24

**Owed**
[7] 45 1 :1 22 49 42 25

**Owes**
[1] 50 2

**Owing**
[9] 23 8 24 11 13 4 139 7
37 14 129 22 147 :,7,17

**Own**
[7] 10 25 5:1 22 137 13 101
21 122 3 :2: 7 147 18

**Owned**
[9] 49 :1-2 54 21 59-24 49
.2 75 7 .21 21

**Owner**
[1] 42 17

**Owners**
[2] 54 17,20 142:3-4 156.
22 157:13 158:23 159:2

**Owners'**
[1] 73 11

**Ownership**
[2] 90-3 97:7

P

**P.m**
[1] 1:20

**Page**
[41] 4:2,14 17.14 29:3,11
30:23 31:12,15-14,19 32:1,
11,15 36:1 37:12 33:2 43:14
44:4,19 50:4 51 51:4,9,23 52:
11 53:15,18 54:3 58:18 67:
14 68:11 70:19 73:10 74:13
75:14 76:3,23 90:22 83:21,
24 84 7,14 87:17 98:11,19
92:6 95 21 97:25 98:25 100:
7 102 7 133:13-14 137:11
:35:17,21 153:13 154:4 156,
22 157:13 158:23 :59:2

**Page/Corrections**
[1] 4 10

**Pages**
[7] 20 8 29:3 33:21 74:18-
19 138:9 140:12

**Paid**
[79] 26:20 27:9,19 33:11 35:
9,11-12,14 37:3 46:21 47:4,
6 48:7,13 49:20 54:18 55:5
57:20,23 58:3 41:25 62:3,6,
11,17 63:1 68:19 69:11 78:5,
10,16 79:1,10,14 80:1,11 85:
20 89:13 100:12,21 101:1,12,
15 103:24 104:28 105:1 107:9
115:3 117:2,22,:6 119:2 120-
13 125.8 126:9 127:3 130:9
133:18 142:21-22 143:4,15,
24 145:14,17-15 147:4 149:
12,23 149:4-5,9,4 152:15,
17 156:11 157:5 162:18

**Paper**
[3] 90:12 111:13 168 9

**Papers**
[2] 90:13 133:11

**Paragraph**
[5] 88:20 89:23 96:22 97:4
138:21

**Parameters**
[4] 11:23 56:24 45:3 132:4

**Park**
[1] 2.7

**Parsons**
[1] 5 9

**Part**
[39] 5:25 7:4 30:11 32:24
33:13 38:18 41:21 45 14 46:
25 48:19,22 54:8,10 56:8,9
24 59:24 65:7 77:10 87:2 91.
17-18 93:16 100:4 101:9 107:
128:15 129:21 142:3-4 147:
19,22 133:13 156 17 162:5

**Partial**
[3] 163.:2 :44 7,16,23

**Partial**
[2] :43 ,9 154 :

**Participate**
[1] 122 14

**Participating**
[1] 122 14

**Particular**
[15] :7 11,20 19 21-:22 29
11 ,. 47 19 72 91 21 1:2 2
125 13 147 9 153 22 139 .,
143 9 159 4

**Particularly**
[1] 19 15

**Parties**
[14] 5 25 7 9-11,13,21 2
170 2

**Partner**
[4] :1 4 .5 ,5,2, .. ,2

**Partners**
[1] 48 1

**Parts**
[1] 93 15

**Party**
[7] 35 10 37 3 47 4 : 1
115 23 ,43 9 145 14

**Pass**
[3] 38 .. 105 24 .25 15

**Passed**
[1] 147 1

**Patient**
[1] 11. 10

**Pay**
[9] 35 22 36-9 62:4 44 2,
73:17 139:10 148 17-23

**Payable**
[27] 78 21 79:3,12 81 2 9
14 83 1,3,14 84:1 99 5,7,
15,17,29,23 100:1,6 :15 3
13 115.11 144 7 144-22 14
24 151 9 158-23-24

**Payables**
[5] 75 4 81 22 83 11 97-1
13

**Payee**
[1] 150-6

**Paying**
[3] 46:12 73:2 126:15

**Payment**
[14] 23:8 32:18 35:17 36:
38:1 48 5,19,24 56.7-9 14
17-18 161:10

**Payments**
[14] 23:14,18 23 24-4,23
14 52:17 54:6,11 58::2 59
13 149:15 152:22 157:4

**Payout**
[1] 23:13

**Payroll**
[1] 38:14

**Pays**
[2] 34:23 55:20

**Payte**
[1] 13:20

**PEDRAZA**
[1] 2.15

**Penalties**
[3] 5 24 55:23 74 21

**Penny**
[1] 145:12

**People**
[7] 31:14 51:20 105:12 1:.
14,18 119-24 163:20

**Per**
[1] 157.2

**Percent**
[21] 29:23 30:15-19 32,20
33:2,5 34:17,21 55:14-17
4 107:13 128:6 129:2,17-1
130:1

**Percentage**
[3] 29:16 68:22 73:14

**Perform**
[1] 110:16

**Perhaps**
[8] 9 14,17 40.4 44 7 49-
116:23 149:21

**Period**
[10] 11.:19 37:16 33:3 44-
67:1 72:1 94 21 102.8 114
15,20

**Periodical**

Case 1:00-cv-00068  Document 11  Filed in TXSD on 10/02/2000  Page 138 of 143

**Periods**

**Perjury**

**Permanent**

**Permission**

**Person**

**Personal**

**Personally**

**Personnel**

**Persons**

**Pertain**

**Pertained**

**Pertaining**

**Pertains**
[3] 91:22,25 153:20

**Phone**
[1] 97:2

**Picture**
[2] 66:7 100:24

**Piece**

**Place**

**Placed**
[2] 96:12 114:7

**Places**
[1] 40:5

**Plain**
[1] 74:12

**Plaintiff**
[1] 1.7:19 2.9

**Plaintiff's**

**Plan**

**Plaza**
[1] 2:7

**Pleadings**
[1] 90:16,18

**Plenty**
[2] 128:22 159:4

**Plus**

**PM**
[2] 1:21 160:15

**Pocketing**
[1] 152.23

**Point**

**Pointed**
[1] 95:21

**Policies**
[1] 103.2

**Policy**
[1] 51:3

**Polk**
[1] 65:1

**Portion**

**Portions**

**Posed**
[3] 112:16 124:18 155:4

**Position**

**Possession**
[2] 31:6 119:8

**Possibility**

**Possible**

**Possibly**
[2] 42:1 138:4

**Post-it**
[1] 41:19 92:3

**Posted**
[1] 77:15

**Potential**
[2] 5:20 46:12

**Potentially**

**Power**
[1] 70:24

**Practice**

**Practices**
[1] 140:15

**Preparation**
[1] 111:18

**Prepare**
[1] 143:1

**Prepared**

**Preparing**
[2] 112:22 125:11

**Present**

**Presented**
[2] 11:17 153:1

**Pressed**
[1] 71:23

**Presumably**

**Presumed**
[1] 69:17

**Presuming**
[1] 91:2

**Pretty**

**Previous**

**Previously**

**Price**

**Primarily**
[1] 68:7

**Principal**

**Principals**

**Principles**
[2] 63:6 103:2

**Print**

**Printout**
[2] 77.2,5

**Printouts**

**Prints**
[1] 17.17

**Privilege**
[1] 9:3

**Probable**
[1] 5:8

**Problem**
[3] 25:11 84:2... 14:12

**Procedure**
[3] 1:25 ... :7 23

**Procedures**

**Proceed**
[2] 5:12 89:2

**Proceeding**

**Proceedings**

**Proceeds**

**Process**

**Produce**
[1] :9 9:21

**Produced**

**Produces**
[1] 17:12

**Product**

**Professional**
[2] 70:4 130:2

**Profits**

**Program**
[2' 16:22 17:22

**Project**
[1] 46:16

**Promissory**
[1] 115:2

**Proper**

**Properties**
[1] 153:5

**Property**

**Propriety**
[1] 163.5

**Prosecution**

**Protection**
[1] 162:16

**Proved**
[1] 169:19

**Provide**

**Provided**

**Providing**
[1] 85.24

**Prudent**
[2] 147:16-17

**Public**
[1] 169:24

**Published**
[1] 110:17

**Punched**
[1] 100:4

**Purchase**

**Purchaser**
[1] 142:23

**Purchasing**
[2] 44:25 45:7

**Purpose**

**Purposes**

**Pursuant**
[2] 1:24 14:14

**Put**

**Putting**

**Q**

**Qualified**
[3] 49:8 261:2:4

**Quarter**
[1] 24:13

**Quarterly**
[1] 24:4

**Questionable**
[1] 143:12

**Questioning**

**Questions**

**Quick**

**Quite**

**Quote**

**R**

**Raised**
[1] 68:7

**Range**
[1] 129:17

**Rangel**
[2] 25:4 101:14

**Rangel/Claudia**
[1] 99:2

**Rather**
[2] 39:9 74:7

**Ratio**

**Re**
[2] 1:3 106:11

**Re-marked**
[2] 19:14 25:11

**Re-reclassify**
[1] 106:11

**Reach**
[1] 138:25

**Read**

**Reading**
[1] 147:10

**Readout**
[1] 17:21

**Readouts**

**Reads**
[1] 36:7

**Real**

**Reality**
[2] 118:15 121:10

**Realization**
[1] 144:2

**Realize**

**Realized**
[1] 55:18 109:6 143:7

**Really**

**Reason**

**Reasonable**
[1] 143:1 163:4

**Reasons**
[3] 29:21 70.10 145:11

**Recap**
[1] 29:24

**Recapitalization**

**Recaps**

**Recapture**

**Recaptured**

**Recategorization**

**Recategorize**

**Recategorized**

**Recategorizing**

**Receive**

**Received**

**Receiving**

**Recess**

**Recharacterization**

**Recharacterize**

**Recharacterizing**

**Reclassification**

**Reclassifications**

**Reclassified**

**Reclassify**

**Reclassifying**

**Recognizable**

**Recognize**

**Recollection**

**Recommendation**

**Recommended**

**Recommending**

**Recommends**

**Record**

**Recording**

**Records**

**Recouped**

**Redates**

**Redrafting**

**Reduce**

**Reduced**

**Reducing**

**Reduction**

**Reductions**

**Refer**

**Referenced**

**Referral**

**Referrals**

**Referred**

**Referring**

**Refers**

**Refiguring**

**Reflect**

**Reflected**

**Reflective**

**Reflects**

**Refresh**

**Regard**

**Regarding**

**Regardless**

**Regards**

**Regular**

**Regulation**

**Regulations**

**Related**

**Relating**

**Relation**

**Relationship**

**Relationships**

**Relative**

**Relayed**

**Release**

**Released**

**Releases**

**Relevance**

**Relevancy**

**Relevant**

**Reliable**

**Rely**

**Remain**

**Remained**

**Remaining**

**Remember**

**Remind**

**Remit**

**Remove**

**Removed**

**Render**

**Rents**

**Repaid**

**Repair**

**Repay**

**Repayment**

**Repayments**

**Repetitive**

**Replying**

**Report**

**Reportable**

**Reported**

**Reporter**

**Reporter's**

**Reporting**

**Reports**

**Repose**

**Represent**

**Representation**

**Representative**

**Representatives**

**Represented**

**Representing**

**Represents**

**Reproductions**

**Request**

**Requested**

**Requesting**

**Requests**

**Require**

**Required**

**Requirements**

**Requires**

**Resolution**

**Resolving**

**Respect**

**Respective**

**Respond**

**Responded**

**Response**

**Responsibilities**

**Responsibility**

**Responsible**

**Responsiveness**

**Rest**

**Result**

**Resulted**

**Retained**

**Retire**

**Retired**

**Retirement**

**Retiring**

**Return**

**Returns**

**Revenue**

**Reversal**

**Reverse**

**Reversed**

**Reversing**

**Review**

**Reviewed**

**Reviewing**

**RGC**

**Rick**

**Right-hand**
[1 . 1 15]

**Rio**
[1 . 1 24 . 24 .. 0 28 2 34 . 4
35 . 1 . 2 13 5 19 79 6 8 .
13 . . 23 23 . 14 51 . 3 152 15
154 . 3 155 . 2]

**Rittman**
[1 . 1 12]

**Rivera**
[4 . 33 15 . 3 . 17 151 25]

**Road**
[1 . 1 . 10]

**Robert**
[1 1 . 1 . 2]

**Roberto**
[1 1 . 1 . 1 . 2 . 4 79 4 5 1
1 . 1 . 2 . 19 114 14 . 4
1 . 2 . 25 124 9]

**Role**
[1 . 14 4]

**Ron**
[2 . 2 . 23 32 10]

**Room**
[4 . 24 . 23 12 . 5 24 13 4]

**Rounded**
[1 1 . 6]

**Routine**
[2 1 . 13 11 . 13 23]

**Rule**
[1 1 14 22]

**Rules**
[4 1 . 24 12 . 19 112 10 . 21]

**Run**
[11 17 13 14 18 1 76 24 34
3 34 3 102 14 109 1 117 7
159 . 16 17]

**Running**
[11 173 2]

---

**S**

**Safeguards**
[3 14 17 . 24]

**Sake**
[11 13 2]

**Sale**
[2 45 10 50 13]

**Sales**
[5 22 20 33 1 3 152 22 142 1]

**San**
[2 2 14 21]

**Sat**
[3 7 15 8 1 3]

**Satisfied**
[1 123 22]

**Save**
[1 23 23]

**Savings**
[13 22 12 24 10 28 2 34 20
39 14 40 23 40 17 79 6 89 1
12 1 3 23 152 15 156 19 157 1
20]

**Saw**
[5 13 4 29 1 94 9 20 121 25]

**Schedule**
[9 23 20 21 4 42 14 81 22
82 14 93 11 84 2 149 4 151 6]

**Schedules**
[1 123 13]

**Scheme**
[1 142 13]

**Scratched**
[1 93 24]

**Seal**
[1 169 22]

**Second**
[3 22 1 34 16 88 19 134 18
157 18]

**Seconds**
[11 138 5]

**Section**
[5 44 16 61 25 70 9 105 3
151 7]

**Secure**
[2 66 25 72 12]

**Secured**
[4 5 21 25 22 21 34 19 39
9 14 40 24 41 14 102 22 107
15 23 108 14 2 7 8 109 5 8
114 20 119 10 16 21 120 17
121 3 6 16 125 14 126 9 17]

---

**See**
[20 14 7 44 21 49 16 7 25
94 17 103 21 114 12 118 14
127 20 128 6 144 9 145 3
144 12 148 9 18 149 6 23
150 1 1 167 25]

**Seeking**
[1 44 10]

**Seem**
[2 33 15 42 7]

**Sell**
[2 72 4 86 17]

**Selling**
[1 150 11]

**Send**
[1 150 10]

**Sends**
[3 76 13 83 19 103 14]

**Sent**
[4 34 22 74 14 19 21]

**Separate**
[1 9 2]

**Separated**
[1 22 24]

**September**
[3 52 2 3 37 13]

**Series**
[3 20 1 142 20 143 1]

**Served**
[1 15 19]

**Service**
[29 30 11 37 20 38 17 13
24 49 11 53 3 59 8 64 8 48
4 71 15 73 13 80 19 116 23
25 117 21 24 118 13 19 124
5 127 21 23 128 5 21 132 1
5 13 134 2 158 8]

**Service's**
[2 132 1 134 12]

**Servicing**
[1 134 15]

**Serving**
[1 110 4]

**Set**
[11 22 21 24 23 22 24 3 5
12 53 15 54 4 140 16 140 20
161 9]

**Sets**
[2 44 24 70 9]

**Seven**
[2 12 15 24]

**Several**
[8 7 17 25 6 54 5 71 20
113 4 153 4 7 164 24]

**Shape**
[2 17 6 116 13]

**Share**
[2 12 24]

**Shareholder**
[41 35 15 42 11 53 4 60 8
10 22 23 69 11 71 21 78 12
79 19 81 9 84 1 85 1 2 11
19 88 22 90 11 94 8 97 4 98
18 99 5 100 22 101 11 102
24 107 14 109 7 114 23 24
119 1 122 15 127 2 132 13
136 6 139 9 140 14 141 4
147 19 25 148 10]

**Shareholder's**
[1 107 9]

**Shareholders**
[44 19 25 20 11 12 21 14
29 15 23 25 30 3 31 13 15
18 32 10 39 25 46 9 59 25
63 11 25 67 6 10 23 69 18
70 11 83 11 85 18 88 8 94 24
97 12 13 112 5 121 20 145
13 146 2 7 24 147 22 151 22
24 152 19 158 23 24 161 18
20 162 14 164 2]

**Shareholders'**
[1 77 4]

**Shares**
[5 29 16 31 14 32 6 11 121
22]

**Sheet**
[5 19 20 25 21 12 50 7 156
24]

**Sheets**
[3 20 1 10 67 6]

**Shimotsu**
[2 36 23 50 10]

**Short**

---

**Shorthand**
[1 . 2]

**Show**
[4 . 21 3 42 7 134 7 14 43]

**Showed**
[2 22 23 152 18]

**Shown**
[3 2 16 24 8 130 22 2
24]

**Shows**
[2 31 4 9 14 13]

**Sidebar**
[3 37 16 87 2]

**Sign**
[4 13 2]

**Signature**
[3 76 13 83 19 103 14]

**Signed**
[12 3 3 4 3 47 22 1 25
14 4 20 75 21 87 9 22 25
149 22]

**Significance**
[1 139 2]

**Signing**
[1 22 24]

**Similar**
[3 4 12 133 6]

**Sin**
[3 32 25 5 11 96 9]

**Single**
[2 43 13 143 11]

**Sit**
[1 166 21]

**Sitting**
[4 14 5 84 2 124 12 13 20]

**Situation**
[5 10 17 21 12 69 8 17
22 12 24 105 10 110 3 13
25 13 22 11 4 115 17 132
25 18 19 134 14]

**Situations**
[1 139 4]

**Six**
[7 12 14 52 5 122 22]

**Slightly**
[1 129 16]

**Software**
[2 14 19 18 21]

**Sold**
[3 27 13 22 18 149 21]

**Sole**
[1 45 2]

**Soliciting**
[1 46 14]

**Someone**
[8 34 23 44 7 49 17 54 17
92 10 93 8 113 18 158 1]

**Sometime**
[4 14 10 127 12 144 19 20]

**Sometimes**
[1 149 2]

**Somewhat**
[4 71 15 114 15 156 16]

**Somewhere**
[2 39 12 129 17]

**Sorry**
[13 14 4 29 10 41 12 43 4
71 1 8 99 17 104 2 135 24
21 138 12 155 21 165 22]

**Sort**
[14 4 21 9 16 69 2 103 5
125 3 127 9 128 18 19 143 3
133 3 155 23 161 8 24 162 20]

**Sought**
[1 133 8]

**Sound**
[1 156 15]

**Source**
[1 54 21]

**SOUTHERN**
[1 1 1]

**Spanish**
[4 43 25 44 1 92 19 93 13]

**Speaking**
[1 43 11]

**Speaks**
[2 33 14 41 12]

**Special**

---

**Specific**
[2 . 1 . 15 . 22
17 . 12 . 124 . 3 . 1
11 . 1 124 . 12 . 23 158 4
35 . 58 1 2 21]

**Specifically**
[12 . 17 5 1 . 2 15 4
34 . 3 . 5 . 13 . 3 . 24
93 . 2 . 16 . 3 . 24 21 3
1 . 1 . 3 . 21 5 22 20
26 58 1 2 21]

**Specify**

**Specifying**

**Speculate**
[1 . 1 8]

**Speculation**
[1 . 1 . 1 . 2 . 2 1
1 . 13 . 3 . 19 . 24 3
1 . 15 . 21 . 19 5 25]

**Speculative**
[1 . 1 2]

**Spent**

**Spit**

**Spread**
[2 19 16 2 3 113 20]

**Staff**
[7 34 24 8 4 82 11 85 2
108 4 114 3 151 13]

**Stage**
[2 4 3 102 3]

**Stages**
[1 55 6]

**Stamp**
[1 48 22]

**Stand**
[2 113 9 14]

**Standard**
[2 50 14 143 23]

**Standards**
[4 42 21 43 9 115 5 124 5]

**Standpoint**
[13 28 12 56 4 62 22 49 7
107 24 108 10 110 1 115 14
142 14 143 21 147 5]

**Start**
[4 3 1 21 4 22 18 39 5]

**Started**
[1 114 17]

**Starting**
[1 114 9]

**Starts**
[4 31 17 90 15 113 17 15
23]

**State**
[11 1 22 13 15 17 6 22 20
2 14 23 23 139 5 11 169
14 21]

**Statement**
[24 20 14 34 23 41 2 9 14
25 47 13 57 3 66 8 71 12 8
9 84 3 97 3 103 4 110 9 11
3 121 11 13 134 11 142 9
146 20 151 7]

**Statements**
[16 23 5 34 16 40 8 40 9
75 1 91 23 82 24 83 22 95
17 47 16 110 3 17 21 24]

**States**
[3 51 2 31 14 32 5 82
5 98 20 138 21]

**Stating**
[2 10 13 114 24]

**Stationery**
[2 30 14 36 5]

**Statute**
[1 140 25]

**Statutes**
[2 18 22 141 13]

**Stay**
[1 146 3]

**Steep**
[1 156 15]

**Stenograph**
[1 170 5]

**Step**

Stick

Still

Stingley

Stipulations

Stock

Stockholder

Stockholders

Stockholders'

Stole

Stop

Strange

Street

Striking
[1] 99:5

Structure
[1] 42:1, 39:8

Stuff

Stupid
[2] 159:16-17

Styled
[1] 1:19

Subject
[4] 27:15,17 44:3 104:1

Subordinated
[1] 54:22

Subordination
[2] 56:24 57:19

Subpoena
[1] 14:14

Subpoenaed
[1] 14:10

Subscribed
[1] 169:19

Subsequent
[9] 15:20,23 29:7 29:12 54:
7 75:16 87:16 90:20 93:23-24

Subsequently
[5] 20:5 21:17 75:21 143:15
170:5

Substantiate
[1] 42:23

Substantiated
[1] 59:16

Sudden
[1] 141:11

Sued
[1] 44:11

Sufficient
[1] 45:19

Suggested
[2] 111:19 119:9

Suggesting
[2] 114:10 164:9

Suit
[1] 87:7

Suite
[1] 3:4

Sum
[2] 38:9 71:20

Summaries
[3] 42:17 139:25 140:25

Summarization
[1] 69:17

Summarize
[3] 71.25 99:8 103.21

Summarized
[2] 88:12 99:7

Summary
[1] 70:1

Sums

Supervision
[1] 137:1

Supply
[2] 151:25 152:1

Support
[1] 43:2

Supporting
[1] 84:2

Supposed

Surrendered

Surrounding

Suspect

Sustaining

Switch

Switched
[1] 107:2

Switching
[1] 72:2

Sworn
[3] 169:17,22

Symbols
[1] 13:24

Sync
[4] 127:5 129:3,7,9

System
[3] 14:24 27:12 71:25

T

Tab
[1] 19:19

Table
[5] 111:16-17 139:25,22,24

Talks
[5] 44:3 36:11 95:23 134:24
147:18

Tax
[15] 12:3 20:8,20-21 21:4 26:
19 27:17 29:22 34:1 54:2,6,
11,17,25 55:16,21,22 64:14
69:14 69:23 69:15 72:13,15
71:14 72:5-6 79:12 37:9 9:
14 112:22 120:9 127:12 139
4-5,7,11 145:14 152:1,4 163:
1,13-14,16-17

Taxable
[1] 64:25

Taxation
[2] 27:15 46:3

Taxes
[7] 35:22 46:12 44:2 65:22
72:10 73:2 86:19

Technically
[1] 118:24

Tecum
[1] 14:15

Telephone
[1] 155:4

Ten
[5] 23:13 55:16-17 57:15
138:4

Tend
[1] 127:21

Tendered
[1] 111:12

Term
[5] 26:18 68:20 129:1 146:
23 160:17

Terminated
[1] 142:1

Terminology
[1] 123:14

Terms
[17] 11:25 23:8,23 24:6,
13 68:15 75:4 85:17 96:3 98:
13 106:15 112:16 134:2 160:
7,19 161:10

Testified
[25] 12:1-2 13:12,21 21:5
45:6 48:3 65:24 75:5 87:3
128:24 131:15 132:22 135:18
136:2 151:19 153:4 156:1
158:1,18 159:11 160:24 161.

Testify
[5] 12:4 34:5,19 111 22:160
13 141:15

Testimony
[10] 12:3 103:17 104:4 120
13 122:23 127:10 131:17 137
5 145:11 145:24

Texas
[15] 1:1,22,24 2:4,8,12,14,
21:3 4:18 139:8 149 16,24
170:18

Therefore
[2] 146:20 152:9

Therein
[1] 149:21

Thinking
[2] 150:25 151:3

Thinly
[3] 68:17 73:1 8:18

Third
[7] 35:23 47:1 1:23 20
111:10 113:8 116:25

Thorough
[1] 138:7

Thousand
[2] 45:9 74:8

Three
[54] 1:1 21:19 28:22 39:13
41:6 42:3 43:20 45:8,18 56:
21 60:10 88:3 89:11 91:5 95
8:101:10 102:15,18-19,25
103:1,3,7,12,19,23 104:14,
20,22 137:7 111:14 112:17
115:19 116:4 117:1,18,22
120:16 137:24 138:8 145:7
152:14 155:9,25 156:18 157:
9,11,21 158:4,13 159:9 164:
14 165:14

Three-feet
[1] 137:24

Tijerina
[1] 99:20

Title
[4] 49:15 51:3,12 77:7

Titled
[1] 32:18

Today
[6] 14:2 104:7,11 124:12
145:11 166:21

Today's
[1] 148:23

Together
[2] 65:5 73:18

Took
[16] 22:5 28:22 53:24 70:10
76:4 87:15 90:20 92:9,12 93:
10 100:12 129:23 158:19,21
161:12 167:2

Top
[5] 17:14 78:12 93:3 125:20
129:19

Total
[8] 26:25 36:10 43:23 56:19
88:24 104:22 148 7 158.25

Touched
[1] 134:23

Towards
[1] 155:25

Tower
[1] 3:3

Town
[1] 75:25

Traced
[3] 33:17 60:9 162:10

Tracing
[2] 42:22 103:16

Track
[1] 40:6

Training
[2] 120:20,24

Transaction
[10] 20:10 38:13 46:1,21 47:
17 51:21 52:7 53:23 57:21
63:8

Transactions
[5] 47:3 49:16 55:15 56:17
152:5

Transcribed
[1] 170:6

Transcript
[1] 4:12

Transfer
[15] 28:4,7 37:25 38:10 43:

17 164 4

Transferee
[1] 43:21

Transferees
[2] 35:24,17

Transferred
[4] 48:9,21 49:4,5,23,55
24:22 38:19 25:17 5:30

Transfers
[3] 28:21 59:13 7

Translates
[1] 42:25

Treasure

Treat
[1] 94:23

Treated
[3] 23:1 41:13 152:3

Treating
[1] 4:1

Tres
[3] 1:22 2:18 139:13

Trial
[3] 25:23 102:5 133:19

Tried
[1] 161:12

Trigger
[1] 19:9

Triggered
[1] 69:4

Trouble
[1] 133:5

True
[10] 39:21 45:7-8,14 47:1
103:6 125:16-17 142:17 145
5

Trustee
[7] 1:7 21:22 28:23-24 52
14 157:15

Truthful
[1] 38:20

Try
[2] 111:11 139:22

Trying
[12] 7:18 46:10 66:4 108:
135:14-15,17,24 142:25 152
24 158:6 162:16

Tune
[1] 98:21

Turn
[5] 38:17 48:8 137 11 129
7 167:4

Twice
[1] 41:8

Two
[22] 12:14 28:9 34:17 51
19-20 34:1 55:7 61:4 72:14
74:23 75:16 76:12 88:7 92
24 100:20,25 101:4,18 11
17 155:14 159:9

Tyler
[1] 3:8

Type
[6] 44:7 126:16,20 144:2
152:25 161:11

Types
[1] 146:1

Typical
[1] 144:1

Typically
[1] 148:22

U

U.S.

Case 1:00-cv-00068  Document 11  Filed in TXSD on 10/02/2000  Page 143 of 143
t>

WAYNE BENEKE, C1

**UCC**

**Ultimately**

**Unacceptable**

**Under**

**Undercapitalization**

**Underlined**

**Understood**

**Undeveloped**

**Unequivocally**

**Unimproved**

**UNITED**

**Universal**

**Unknown**

**Unless**

**Unnecessarily**

**Unpaid**

**Unsecured**

**Up**

**Upper**

**Upstart**

**Uses**

**Usual**

**Usury**

**Utilization**

**Utilized**

**Valerie**

**Value**

**Valued**

**Van**

**Various**

**Vary**

**Vela**

**VENTURA**

**Venture**

**Verbally**

**Verbatim**

**Verified**

**Verify**

**Versus**

**Via**

**View**

**Viewed**

**Viewing**

**Villarreal**

**Violated**

**Violation**

**Violations**

**Virginia**

**Virtually**

**Virtue**

**Voluntarily**

**VS**

---

## W

**Wait**

**Wall**

**Walsh**

**Wants**

**Warner**

**Warrants**

**Wayne**

**Week**

**Weeks**

**West**

**Weyand**

**Whatsoever**

**Whereas**

**Whereby**

**Whoever's**

**Whole**

**Wide**

**Wife**

**Wiley's**

**William**

**Winding**

**Wins**

**Wipe**

**Wire**

**Withheld**

**Withhold**

**Withholding**

**Witness**

**Won**

**Wondering**

**Word**

**Words**

**Workers**

**Works**

**World**

**Worry**

**Worth**

**Write**

**Writing**

**Written**

**Wrote**

---

## Y

**Year**

**Year-long**

**Years**

**You-all**

**Young**

**Yourself**

---

## Z

**Zamacona**

**Zamacona's**

**Zero**

**Zeroed**

**ZUNIGA**

t>

BRYANT & STINGLEY, INC.
